UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

LEROY PEOPLES,

                    Plaintiff,

vs.                                                    9:23-CV-1114
                                                       (DNH/MJK)

KATHY HOCHUL, NYS DOCCS
COMMISSIONER, and
BOARD OF EXAMINERS OF
SEX OFFENDERS,

                    Defendants.

LEROY PEOPLES Plaintiff, pro se
DAVID C. WHITE, ESQ., Assistant Attorney General

MITCHELL J. KATZ, U.S. Magistrate Judge

TO THE HONORABLE DAVID N. HURD:

## REPORT-RECOMMENDATION and ORDER

## I.  INTRODUCTION

Plaintiff, appearing pro se, commenced this action on September 1, 2023 pursuant to

42 U.S.C. § 1983 alleging, among other things, that the address registration requirement

of New York State's Sex Offender Registration Act ("SORA") violates his

Constitutional rights under the First, Fourth, Eighth, and Fourteenth Amendments.

Presently before the court is defendants' motion to dismiss the complaint (Dkt. No. 1)

("Compl.") pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(5), and 12(b)(6).[1] This matter

---

[1] Defendant Board of Examiners of Sex Offenders ("Board of Examiners") moves only pursuant to Fed. R. Civ. P. 12(b)(5) and reserves its right to raise other grounds for dismissal if personal jurisdiction is obtained over it.

1

was referred to me for a Report-Recommendation by United States District Court Judge David N. Hurd, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). For the following reasons, it is recommended that defendants' motion be granted, and that the complaint be dismissed in its entirety.

## II.   **PROCEDURAL HISTORY**

In the present action, Judge Hurd initially reviewed the complaint together with plaintiff's application to proceed in forma pauperis ("IFP"). (Dkt. No. 4). By Decision and Order dated October 6, 2023, the court granted plaintiff's IFP application and, also held that plaintiff's reliance on *Doe v. Pataki,* 427 F.Supp. 2d 398 (S.D.N.Y. 2006) ("*Pataki IV*") as a basis for his perceived entitlement to a new classification hearing was time barred by the applicable statute of limitations. (Dkt. No. 4, at 13). The court similarly ruled that plaintiff's claim that the Risk Assessment Instrument ("RAI") utilized by the Board of Examiners in 2018/2019 was unconstitutionally vague and overbroad was also time barred. Plaintiff's RAI challenge was also dismissed on initial review because the "RAI need not be the optimal tool for predicting recidivism in order to pass constitutional muster." (Dkt. No. 4, at 15) (citing *People v. Bligen*, 33 A.D.3d 489, 489-90 (1st Dept. 2006) ("The [RAI] classification procedure satisfies all the requirements of due process.") (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)). Further, the court sua sponte dismissed plaintiff's RAI based claims because the

complaint lacked any allegations that plaintiff was deprived of the opportunity to challenge the Board of Examiners' RAI recommendation to the sentencing court. *Id*.

On initial review, the court noted that notwithstanding that the alleged threat to plaintiff's safety existed before he was initially released on parole in June 2019, "the complaint is devoid of allegations explaining why plaintiff failed to raise the claims asserted in this action in either *Peoples v. Leon,* or the proceedings that precipitated plaintiff's sex offender classification." (Dkt. No. 4, at 18).[2] Also, there are no allegations in the complaint that plaintiff sought a modification of his assigned sex offender level based on this alleged change in circumstance before commencing this action. *Id*.

Despite these potential procedural hurdles, the court was mindful of the Second Circuit's direction that a pro se plaintiff's pleadings be liberally construed. *See Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) ("when [a] plaintiff proceeds *pro se,* . . . a court is obliged to construe his pleadings liberally") (citations omitted). The court therefore ruled that plaintiff's constitutional challenge to SORA's address requirement survived sua sponte review and required a response. (Dkt. No. 4, at

---

[2] Relevant to this action is plaintiff's 2018 litigation in this District where he challenged the imposition of certain special conditions associated with his parole. *See Peoples v. Leon*, No. 9:18-CV-1349 (LEK/ML), 2021 WL 1582173, Dkt. No. 1 (N.D.N.Y. Jan. 4, 2021) ("*Peoples v. Leon*").

9). The court did not express an opinion as to whether plaintiff's claims would withstand a dispositive motion. *Id.*

In light of the court's October 6, 2023 Decision and Order, only plaintiff's First Amendment, Fourth Amendment, Eight Amendment and Fourteenth Amendment challenges to SORA's address registration requirement survived initial review.

By letter dated February 8, 2024 plaintiff opposed defendants' motion, claiming "that the Court has not issued a Mandatory Scheduling Order which would set deadlines for submissions of dispositive motions; and, the defendants have not yet filed an Answer to the Complaint." (Dkt. No. 27). Plaintiff's February 8, 2024 letter also voluntarily withdrew all claims against the Board of Examiners and the New York State DOCCS Commissioner.

## III. <u>FACTS</u>

On January 12, 2005, plaintiff was convicted of "sex crimes . . . as a member of the Bloods [gang.]" (Compl. at 6). In March 2019 and prior to plaintiff's release from prison on June 5, 2019, the Board of Examiners made a risk level and designation recommendation to plaintiff's sentencing court in accordance with SORA. *See Peoples*, 2021 WL 1582173, at *5.[3]  Pursuant to New York Correction Law § 168-d,

---

[3] Pursuant to Fed. R. Evid. 201, a court may at any stage of a proceeding take judicial notice of "a fact that is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." This includes public filings. *See In re Howard's Exp., Inc.*, 151 Fed. App'x. 46, 48 (2d Cir. 2005) (taking judicial notice of Bankruptcy Court docket); *Caro v. Fidelity*

the sentencing court designated plaintiff a level three "sexually violent offender." *Id.*
The address registration requirement that plaintiff now challenges was a condition of
his June 2019 parole. *See Peoples,* 2021 WL 1582173, at \*3-5; *see also* N.Y. Corr.
Law § 168-l(6)(c).

Plaintiff is currently incarcerated on a parole violation. (Compl. at 5). *See
Peoples,* 2021 WL 1582173, at \*5 (reciting the special conditions of plaintiff's parole
and facts surrounding the charged violation). Plaintiff alleges that he has been in
protective custody "on several occasions" throughout his incarceration "because he is a
target of gang-violence with a[n] active hit on [his] person." (Compl. at 5-6).

Plaintiff's five-year period of post-release supervision is scheduled to expire on
May 24, 2024. (Compl. at 5). Although plaintiff will be required to register his address
pursuant to SORA following his release from incarceration, he "intends to refuse to
register as a sex offender . . . because he is a target of gang-violence," and the
publication of his home address places him and his wife in danger. (Compl. at 5-6).[4]

Plaintiff's complaint in *Peoples v. Leon* did not challenge the constitutionality of
the address registration requirement on any basis, including the alleged risk of harm he
now claims in this action.  *Peoples,* 2021 WL 1582173, Dkt. Nos. 1, 1-1. Notably,
there were no allegations in *Peoples v. Leon*, and there are none in the present case,
that plaintiff failed to comply with address registration requirement during the time

---

*Brokerage Services, LLC*, No. 3:12-CV-1066, 2013 WL 3299708, at \*6 (D. Conn. July 26, 2013)
(taking judicial notice of record in prior litigation between the same parties).

[4] Plaintiff clarifies elsewhere in his complaint that he "will follow all other SORA requirements"
except for the home address registration requirement. (Compl. at 7).

that he was released on parole in June 2019 and rearrested in August 2019. *See Peoples,* Dkt. No. 71-27 at 2-3 (identifying the charged parole violations).

## IV.    BOARD OF EXAMINERS AND NYS DOCCS COMMISSIONER

Insofar as plaintiff's February 8, 2024 letter voluntarily withdrew his claims against defendants Board of Examiners and the New York State DOCCS Commissioner, the court recommends that the complaint be dismissed as against them. The clerk of the court should terminate these defendants from the instant action, and that branch of defendant's motion for relief under Fed. R. Civ. P. 12(b)(5) should otherwise be rendered moot.

## V.    LEGAL STANDARDS

### A.    Fed. R. Civ. P. 12(b)(1)

"Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction . . . when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005); *see also Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000) (holding that plaintiff failed to meet is burden of proving subject matter jurisdiction by a preponderance of the evidence). The court "must take all facts alleged in the complaint

6

as true and draw all reasonable inferences in favor of plaintiff." *NRDC v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006) (citation and internal quotation marks omitted). "In resolving a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), a district court . . . may refer to evidence outside the pleadings." *Makarova*, 201 F.3d at 113. "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

### B.    Fed. R. Civ. P. 12(b)(6)

To survive a motion pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp.*, 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (when ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint) (citations omitted); *see also Int'l Audiotext Network, Inc. v. Am. Tel.*

7

& *Tel. Co.,* 62 F.3d 69, 71 (2d Cir. 1995) (on a de novo review of the district court's 12(b)(6) dismissal of the complaint, all of the factual allegations will be accepted as true). The court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *See Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference . . . ") (citations omitted); *see also Int'l Audiotext Network, Inc.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment). Finally, the court may consider matters of which judicial notice may be taken, such as public filings and administrative decisions. *See Kavowras v. New York Times, Co.*, 328 F.3d 50, 57 (2d Cir. 2003) (citing *inter alia County Vanlines, Inc. v. Experian Info. Solutions, Inc.*, 205 F.R.D. 148, 154 (S.D.N.Y. 2002) (taking judicial notice of NLRB decisions)). The court must heed its obligation to treat pro se pleadings with liberality. *See Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir. 2005) ("*All* complaints must be read liberally; dismissal on the pleadings *never* is warranted unless the plaintiff's allegations are doomed to fail under any available legal theory.") (citations omitted) (emphasis in original).

## VI.  <u>ANALYSIS</u>

### A.    **Subject Matter Jurisdiction**

Defendants incorrectly rely on the *Rooker-Feldman* doctrine as a basis for challenging plaintiff's standing to maintain this action. Under the *Rooker-Feldman* doctrine – created by two Supreme Court cases, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415-16 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482-86 (1983) – federal district courts lack subject matter jurisdiction to review final state court orders and judgments where the federal court plaintiff seeks to effectively reject or overturn the state court judgment. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (holding that *Rooker–Feldman* bars "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments").

Application of the *Rooker-Feldman* doctrine mandates that the following four elements be satisfied: (1) the plaintiff lost in state court; (2) the plaintiff complains of injuries caused by a state court judgment; (3) the plaintiff invites district court review and rejection of the state court judgment; and (4) the state court judgment was rendered before the district court proceedings were commenced. *See Dorce v. City of New York*, 2 F.4th 82, 101 (2d Cir. 2021).

Here, plaintiff challenges the constitutionality of the statutory framework of SORA as applied to him and not his underlying designation as a sex offender. Such a challenge "attacks an alleged defect of state . . . legislation rather than adjudication,"

9

*Hachamovitch v. DeBuono*, 159 F.3d 687, 694 (2d Cir. 1998), and does not implicate the *Rooker-Feldman* doctrine. *See Yunus v. Robinson,* No. 17-CV-5839, 2018 WL 3455408 (S.D.N.Y. June 29, 2018). Therefore, defendants have not satisfied the third *Rooker-Feldman* factor and its reliance on the doctrine is misplaced.

Insofar the *Rooker-Feldman* doctrine is inapplicable to the facts of this case, the court's inquiry turns to whether plaintiff has standing pursuant to Article III of the United States Constitution. "To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likelihood' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-158 (2014) (alterations adopted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "An Article III-sufficient injury, however, must be 'concrete and particularized' and 'actual or imminent,' not 'conjectural' or 'hypothetical.'" *Id.* at 158 (quoting *Lujan*, 504 U.S. at 560).

Pre-enforcement challenges to criminal statutes are "cognizable under Article III." *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016). When a plaintiff "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (internal quotation marks omitted). "Put differently, . . . a plaintiff has standing to make a preenforcement challenge 'when fear of criminal

prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative.'" *Hedges v. Obama*, 724 F.3d 170, 196 (2d Cir. 2013) (quoting *Babbitt*, 442 U.S. at 302). As the Supreme Court in *Susan B. Anthony List* stated, a plaintiff has suffered an injury-in-fact and has standing to bring a case when he is facing the "threatened enforcement of a law" that is "sufficiently imminent." *Susan B. Anthony List*, 573 U.S. at 158-59. Specifically, a plaintiff "satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id.* at 159 (quoting *Babbitt*, 442 U.S. at 298); *see also Hedges*, 724 F.3d at (2d Cir. 2013) (stating that a plaintiff has "standing to make a pre[-]enforcement challenge when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative") (quotation marks and citation omitted).

A plaintiff need not first "'expose himself to liability before bringing suit to challenge . . . the constitutionality of a law threatened to be enforced.'" *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007); *see also Babbitt*, 442 U.S. at 298 (stating that a plaintiff "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief") (citation omitted). "The identification of a credible threat sufficient to satisfy the imminence requirement of injury in fact necessarily depends on the particular circumstances at issue, and will not be found where plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is

likely, or even that a prosecution is remotely possible." *Cayuga Nation*, 824 F.3d at 331 (quotation marks and citation omitted). Nevertheless, the "standard established in *Babbitt* 'sets a low threshold and is quite forgiving to plaintiffs seeking such pre[-]enforcement review,' as courts are generally 'willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund.'" *Id.* (quoting *Hedges*, 724 F.3d at 197).

Plaintiff has expressly alleged that his "plan is to refuse to register his home-address only." (Compl. at 6), thereby satisfying the injury-in-fact requirement since his failure to comply with SORA's registration requirement is a crime. *See* N.Y. Corr. Law § 168-t. The possibility of plaintiff being prosecuted for his failure to comply with the address registration requirement "is not imaginary or wholly speculative." *Babbitt,* 442 U.S. at 302. Plaintiff therefore has standing to challenge SORA's address registration requirement.

### B.    Statute of Limitations

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See* 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights, [but] . . . only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

"It is well settled that Section 1983 claims filed in federal court in New York are subject to New York's three-year statute of limitations for personal injury actions." *Dickson v. Schenectady Police Dept.*, No. 21-CV-0825 (LEK/DJS), 2022 WL 1091615, at *4 (N.D.N.Y. Apr. 12, 2022) (citing *Owens v. Okure*, 488 U.S. 235, 251 (1989) (holding that New York's three-year statute of limitations for general personal injury actions is applicable to Section 1983 actions filed in federal courts in New York). For statute of limitations purposes, section 1983 actions accrue "from the time a plaintiff knows or has reason to know of the injury giving rise to the claim[.]" *Milan v. Wertheimer*, 808 F.3d 961, 963 (2d Cir. 2015) (internal quotation marks and citations omitted). "[T]he proper focus is on the time of the [unlawful] act, not the point at which the consequences of the act become[ ] painful." *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994) (internal quotation marks, citation, and emphasis omitted)*; see also Webster v. Himmelbach,* 271 F. Supp. 3d 458, 467 (W.D.N.Y. 2017) (alterations in original) (quoting *Gordon v. Parole Officer Semrug*, No. 14-CV-324S(F), 2016 WL 259579, at *4 (W.D.N.Y. Jan. 21, 2016)) ("[W]here the alleged constitutional violation results in an improper restraint on a plaintiff's protected liberty interest, assuming [a p]laintiff has such an interest, . . . [the claim] accrues for purposes of the applicable three-year statute of limitations when the restraint is initially imposed . . . and not when a subsequent violation by a defendant, based on the same, initial unconstitutional conduct, occurs.").

13

As relevant to this action, "[c]laims relating to a plaintiff's designation as a sex offender accrue 'when [the p]laintiff was informed of [the] decision to impose his [sex offender designation.]'" *Austin v. Cuomo*, No. 1:20-CV-00893, 2020 WL 7352664, at *6 (W.D.N.Y. Dec. 15, 2020) (quoting *Gordon v. Parole Officer Semrug*, 2016 WL 259579, at *4); *see also Webster v. Himmelbach,* 271 F. Supp. 3d at 466-67; *Fowlkes v. Parker*, No. 9:08-CV-1198 (LEK/DEP), 2010 WL 5490739, at *9 (N.D.N.Y. Dec. 9, 2010) (finding that "any claim associated with [plaintiff's SORA] registration itself . . . would be untimely since plaintiff was plainly on notice" when he signed a sex offender registration form).  Plaintiff's remaining claims challenging his address registration requirement all emanate from his May 2019 sex offender classification. *See Peoples*, 2021 WL 1582173, at *5. Considering the applicable COVID-19 Executive Orders extending the statute of limitations,[5]  plaintiff had until approximately January 2023

---

[5] On March 20, 2020, Governor Cuomo issued Executive Order 202.8 which states in relevant part:

> [B]y virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency In accordance with the directive of the Chief Judge of the State to limit court operations to essential matters during the pendency of the COVID-19 health crisis, any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding, as prescribed by the procedural laws of the state, including but not limited to the civil practice law and rules or by any other statute, local law, ordinance, order, rule, or regulation, or part thereof, is hereby tolled from the date of this executive order until April 19, 2020 (emphasis added).

Subject to the provision of Executive Law § 29-a(2)(a), Governor Cuomo issued a series of subsequent Executive Orders which further extended statutes of limitation. On October 4, 2020, Governor Cuomo

within which to commence this action. Plaintiff commenced this action on September 1, 2023, approximately eight months after the expiration of the statute of limitations.

Under certain circumstances, a plaintiff's untimely claims may be subject to exception, namely under the continuing violation doctrine and/or equitable tolling. "The chief purpose of the [continuing violation] doctrine is to protect the rights of plaintiffs where 'the earlier discrimination may only be recognized as actionable in the light of events that occurred later.'" *Keddy v. Smith Barney, Inc.*, No. 96 Civ. 2177, 2000 WL 193625, at *3 (S.D.N.Y. Feb. 16, 2000) (quoting *Galloway v. Gen. Motors Serv. Parts*

---

issued Executive Order 202.67, his final extension of statutes of limitation. Executive Order 202.67 states in relevant part:

> [B]y virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, or to provide any directive necessary to respond to the disaster, do hereby continue the suspensions and modifications of law, and any directives not superseded by a subsequent directive contained in Executive Orders 202 up to and including 202.21, and 202.27, 202.28, 202.29, 202.30, 202.38, 202.39, 202.40, 202.48, 202.49, 202.50, 202.55 and 202.55.1, as extended, and Executive Order 202.60 for another thirty days through November 3, 2020 The suspension in Executive Order 202.8, as modified and extended in subsequent Executive Orders, that tolled any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding as prescribed by the procedural laws of the state, including but not limited to the civil practice law and rules or by any statute, local law, ordinance, order, rule, or regulation, or part thereof, is hereby continued, as modified by prior executive orders, provided however, for any civil case, such suspension is only effective until November 3, 2020, and after such date any such time limit will no longer be tolled (emphasis added).

*Operations*, 78 F.3d 1164, 1167 (7th Cir. 1996)).  Here, however, a continuing violation theory does not cure the untimeliness of plaintiff's claims because "[t]he fact that the detrimental effects of [the] discrete decision [to designate plaintiff as a sex offender] may be continuing does not extend the statute of limitations indefinitely." *Austin v. Cuomo*, 2020 WL 7352664, at *7 (quoting *Munsch v. Evans*, 2012 WL 528135, at *13 (E.D.N.Y. Feb. 17, 2012)); *see also Webster v. Himmelbach,* 271 F. Supp. 3d at 467-68 (plaintiff's action was untimely where "restraint" upon his purported liberty interest in being free from a sex offender classification was initially imposed "when it was first determined that plaintiff would be designated as a [sex offender] and subject to various sex offender supervision restrictions," notwithstanding plaintiff's subsequent violations of his parole conditions and rerelease to parole supervision).

Nor does the record before this court indicate that the doctrine of equitable tolling cures the untimeliness of plaintiff's remaining claims.  Equitable tolling is only available in "rare and exceptional" cases where "extraordinary circumstances prevented a party from timely performing a required act, and . . . the party acted with reasonable diligence throughout the period he sought to toll." *Velez v. Paredez*, No. 9:22-CV-0362(LEK/ML), 2022 WL 2904380, at *6 (N.D.N.Y. July 22, 2022) (quoting *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005)). As the Second Circuit recognized in *Abbas v. Dixon*, the equitable tolling doctrine applies where a plaintiff demonstrates that he was induced by fraud, misrepresentations, or deception to refrain from timely

commencing an action, and that he acted with due diligence throughout the period to be tolled. 480 F.3d 636, 642 (2d Cir. 2007); *see also Gonzalez v. Hasty*, 651 F.3d 318, 322 ("Equitable tolling is an extraordinary measure that applies only when plaintiff is *prevented from filing* despite exercising that level of diligence which could reasonably be expected in the circumstances." (emphasis in original)).

The Second Circuit has cautioned that a court should not dismiss a complaint with prejudice on the basis of an anticipated statute of limitations defense without granting a *pro se* plaintiff notice and an opportunity to be heard. *Id.* at 642. Here, Plaintiff does not invoke equitable tolling, nor does he "articulate any acts by defendants that prevented him from timely commencing suit." *Abbas*, 480 F.3d at 642 (cleaned up). Defendants would presumably argue that plaintiff had an opportunity to make any argument supporting equitable tolling by opposing the motion to dismiss, and that he forfeited that opportunity by failing to do so. *See, e.g., Trapani v. Coryer*, No. 14-CV-683 (GTS/CFH), 2016 WL 8732638, at *6 (N.D.N.Y. June 6, 2016), *report and recommendation adopted*, 2016 WL 8732640 (N.D.N.Y. July 15, 2016) (plaintiff had notice and an opportunity to be heard with respect to tolling arguments through his response to the defense motion to dismiss); *see also Muhammadali v. City of New York*, 795 F. App'x 70, 71 (2d Cir. 2020) (affirming district court's decision to dismiss an action as time barred where plaintiff was made aware of the statute of limitations issue by the district court ruling, and was "specifically questioned at oral argument [by the

Second Circuit] to any fact or legal theory that might warrant tolling of the limitations period . . . [and] [n]either in his brief on appeal nor at oral argument did [plaintiff] identify any legal basis for tolling.").  Here, however, it is notable that the defendants' motion papers made no reference to the possibility that plaintiff could overcome the state-of-limitations defense by asserting viable grounds for equitable tolling.  "A pro se litigant might well be confused as to what extrinsic information beyond the scope of his complaint he was allowed to offer in opposition to a motion to dismiss based on the statute of limitation." *Mobley v. Crane*, No. 9:21-CV-299 (BKS/ATB), 2021 WL 5813689, at *4 (N.D.N.Y. Nov. 3, 2021), *report and recommendation adopted*, 2021 WL 5810406 (N.D.N.Y. Dec. 7, 2021) (citing *Ellington Long Term Fund, Ltd. v. Goldman, Sachs & Co.*, No. 09 CIV. 9802, 2010 WL 1838730, at *4 (S.D.N.Y. May 4, 2010) ("Plaintiffs' obligation to produce evidence at the motion to dismiss stage is even further reduced in the context of a motion to dismiss premised on the statute of limitations--an affirmative defense on which the defendant bears the burden of proof.")).

Accordingly, on the record before it this court recommends that defendants' motion to dismiss be granted based on statute-of-limitations grounds.  As further set forth below, this court is alternatively recommending that plaintiff's claims be dismissed for failure to state a claim.  However, if the district court rejects the alternative recommendation for dismissal under Rule 12(b)(6), and because the defense

18

papers arguably provided plaintiff with insufficient notice regarding how he could or should respond to the motion to dismiss, I recommend that the District Court allow plaintiff a further opportunity to raise any arguments in support of equitable tolling in any objection he chooses to file to this Report and Recommendation. If plaintiff makes plausible grounds for equitable tolling, the District Court may consider denying the defense motion based on timeliness, or referring the matter back to me for further consideration. If plaintiff fails to object to this Report and Recommendation, he would be more clearly forfeiting his opportunity to argue for equitable tolling, and dismissal of his remaining claims based on untimeliness would be justified.

### C.    Failure to State a Claim

For the following reasons, the court alternatively recommends that plaintiff's remaining causes of action be dismissed for failure to state a claim.

#### 1.    First Amendment

On its face, the complaint fails to allege any specific conduct that could plausibly give rise to a First Amendment claim. However, to the extent plaintiff's complaint can be construed to allege a violation of privacy claim under the First Amendment, the court notes that in *Doe v. Cuomo*, 755 F.3d 105, 114 (2d Cir. 2014) ("*Doe II*"), the Second Circuit found that a plaintiff's claim[6] that the SORA registration and notification requirements violated any constitutional right to privacy was unsupported "[g]iven the

---

[6] In *Doe II*, the plaintiff argued that the SORA provisions violated his substantive due process rights to privacy and to travel.

combination of the nature of the information released (consisting in large part of matters of public record) and the State's strong interest in releasing it." The court in *Doe II* also recognized that SORA's requirements "are rationally related to the aim of protecting the public." *Id*.; *see also Medina v. Cuomo,* No. 7:15-CV-01283 (GTS/TWD), 2015 WL 13744627, at *10 (N.D.N.Y. Nov. 9, 2015), *report and recommendation adopted*, 2016 WL 756539 (N.D.N.Y. Feb. 25, 2016) (citing *Cutshall v. Sundquist*, 193 F.3d 466, 481 (6th Cir. 1999) ("the Constitution does not provide [plaintiff] with a right to keep his registry information [he was required to provide under the Tennessee Sex Offender Registration and Monitoring Act] private.")).

Accordingly, the court recommends that plaintiff's First Amendment claim be dismissed.

### 2. Fourth Amendment

The Fourth Amendment protects an individual's right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. However, "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred," which implicates a citizen's Fourth Amendment rights. *Terry v. Ohio*, 392 U.S. 1, n. 16 (1968). To determine whether the Fourth Amendment has been violated, the court "must engage in a two-part analysis: (1) considering all of the circumstances of the case, was there a seizure within the meaning of the Fourth

20

Amendment; and (2) if there was a seizure, was such seizure reasonable." *Jie Yin v. NFTA*, 188 F. Supp. 3d 259, 270 (W.D.N.Y. 2016) (internal quotation marks and citation omitted).

Here, the complaint is bereft of any allegations that there was a "seizure" of any kind within the meaning of *Terry.* Plaintiff has not alleged that his liberty has in any way been restrained by means of physical force or show of authority. Even if the address registration requirement of SORA did subject plaintiff to a search or seizure for Fourth Amendment purposes, the Second Circuit has indicated that the same would not be unreasonable. *See Doe,* 755 F.3d at 115 ("Even if we assume for argument that SORA's requirements subject Doe to a search or seizure for Fourth Amendment purposes, we cannot agree that any such search or seizure is unreasonable."). In *Doe II,* the Second Circuit held that any searches or seizures required by SORA "serve special needs – such as the protection of potential future victims and the solving of crimes in the future – and purport neither to facilitate the investigation of any specific crime nor primarily to serve a 'general interest in crime control.'" *Id.* (quoting *Nicholas v. Goord*, 430 F.3d 652, 663, 669 (2d Cir. 2005)). As such, the address registration requirement of SORA does not run afoul of the Fourth Amendment, and the court recommends that plaintiff's Fourth Amendment claim be dismissed.

21

### 3.    Eighth Amendment

Plaintiff's claim that the address registration requirement mandated by SORA constitutes a violation of his Eighth Amendment right to be free from cruel and unusual punishment is unavailing. Plaintiff complains of the potential physical harm that he and his wife may endure because of plaintiff's prior association with a gang. *See* Compl. generally.

The Second Circuit has concluded that SORA is regulatory in nature and not punitive. *See Doe v. Pataki*, 120 F.3d 1263 (2d Cir. 1997); *see also Maldonado v. Fischer,* No. 11-CV-109, 2012 WL 4461647, at * 3 (W.D.N.Y. Sept. 24, 2012) (recognizing Second Circuit's determination that SORA's registration and community notification provisions were not "punishments" within the meaning of the Ex Post Facto Clause and concluding that plaintiff's allegations of cruel and unusual punishment under SORA failed to state a claim); *Cain v. Michigan*, No. 14-12567, 2015 WL 249296, at * 7 (E.D. Mich. Jan. 20, 2015) (because the Michigan sex offender registration act was found to be regulatory rather than punitive, plaintiff failed to state a claim for cruel and unusual punishment under the Eighth Amendment).  Therefore, SORA does not violate the Eighth Amendment's prohibition against cruel and unusual punishment, and the court recommends that plaintiff's Eighth Amendment claim be dismissed.

###### 4.    Fourteenth Amendment

###### a.    Procedural Due Process Claim

Section five of the complaint indicates that plaintiff is seeking relief for alleged violations of his due process rights. (Compl. at 4). When a person's liberty interests are implicated, due process requires at a minimum notice and an opportunity to be heard. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (The "central meaning of procedural due process" is that parties "whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner.") (citations and internal quotation marks omitted).

Assuming, for the sake of this analysis, that plaintiff's claims implicate a cognizable liberty interest for Fourteenth Amendment purposes,[7] his procedural due process claim nonetheless lacks merit.  SORA provides an elaborate procedural scheme for making and challenging sex offender level designations. Once the Board of

---

[7] Although the issue of whether requiring an individual to register as a sex offender implicates a liberty interest does not appear to have been conclusively decided in this Circuit, there are district court decisions that have found that a stigma plus liberty interest is implicated when an individual is required to register under SORA, since the stigma attached may affect the registered person in other areas such as employment. *See Woe v. Spitzer*, 571 F.Supp.2d 382, 387 (E.D.N.Y. 2008) (holding that SORA implicates a protected liberty interest) (citing *Doe v. Pataki*, 3 F.Supp.2d 456 (S.D.N.Y. 1998)).

*Medina v. Cuomo*, No. 7:15-CV-01283 (GTS/TWD), 2015 WL 13744627, at *13 (N.D.N.Y. Nov. 9, 2015), *report and recommendation adopted*, 2016 WL 756539 (N.D.N.Y. Feb. 25, 2016).

Examiners makes a recommendation regarding the appropriate level to be assigned, the matter is remitted to the sentencing court to make the actual determination. *See* N.Y. Corr. Law § 168-n(2). Prior to that determination, the offender is provided notification of the recommendation and an opportunity to be heard, with counsel to be assigned in appropriate circumstances. *See* N.Y. Corr. Law § 168-n(3). Once the designation is made by the sentencing court, the offender can then appeal the determination. *Id.*

Here, SORA's procedural safeguards afforded plaintiff the opportunity to be heard regarding his classification both prior to and after he was classified as a level three "sexually violent offender," thereby satisfying the procedural due process clause of the Fourteenth Amendment. *See McQuilkin v. Central New York Psychiatric Center*, No. 9:08-CV-00975 (TJM/DEP), 2010 WL 3765847, at * 20 (N.D.N.Y. Aug. 27, 2010) (finding that since defendants followed the procedures outlined in N.Y. Correction Law 402 the prison inmate plaintiff was afforded adequate due process prior to his involuntary commitment to a mental health facility), *report and recommendation* adopted, 2010 WL 3765715 (N.D.N.Y. Sept. 20, 2010).

Absent from the complaint are any allegations that plaintiff was denied the procedural safeguards afforded by SORA during any portion of the classification proceedings. Plaintiff does not allege that he was denied the opportunity to be heard either prior to or after the sentencing court designated him a level three "sexually violent offender."  Even affording the complaint the most liberal reading, the court

24

recommends that plaintiff's Fourteenth Amendment procedural due process claim be dismissed.

### b.    Substantive Due Process

The Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Cont. amend. XIV § 1. "Substantive due process is an outer limit on the legitimacy of governmental action," *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999), which "protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995).

In determining whether a statute or regulation "infringes a substantive due process right," the Court first must determine "whether the right is fundamental." *Goe v. Zucker*, 43 F.4th 19, 30 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 1020 (2023). "Rights are fundamental when they are implicit in the concept of ordered liberty, or deeply rooted in this Nation's history and tradition." *Id*. When an infringed right is fundamental, courts "apply strict scrutiny, and the government regulation must be narrowly tailored to serve a compelling state interest." *Id*. However, "[w]hen a claimed right is not fundamental," the court applies "rational basis review, and the government regulation need only be reasonably related to a legitimate state objective." *Id*.

Insofar as the Second Circuit in *Doe v. Pataki,* 120 F.3d 1263 (2d Cir. 1997) held that SORA is regulatory and not punitive, the court concludes that plaintiff "has not plausibly alleged any fundamental right is infringed by SORA's notification and registration provisions." *Kelsey v. Sherman,* No. 22-CV-1934, 2023 WL 3739925, at *12 (S.D.N.Y. May 31, 2023). "Since freedom from sex offender registration is not a 'fundamental right,' as that term is used in constitutional analysis, this Court must apply the 'rational basis' test, which does not ask whether the statute is wise, nor even whether it is substantially related to an important governmental objective, but only whether it is 'rationally related to a legitimate government interest.'" *Yunus v. Robinson*, No. 17-CV-5839, 2018 WL 3455408, at *21 (quoting *Winston v. City of Syracuse*, 887 F.3d 553, 566 (2d Cir. 2018) (holding that city could not constitutionally terminate water service to tenants whose landlords failed to pay their water bills).

"New York courts have found that the legislature's intent in enacting SORA was to "'protect[] vulnerable populations[,] and in some instances the public, from potential harm' posed by sex offenders.'" *People v. Alemany*, 13 N.Y.3d 424, 430 (2009) (citations omitted); *see also North v. Bd. of Exam'rs of Sex Offenders of N.Y.*, 8 N.Y.3d 745, 752 (2007) ("SORA is a remedial statute intended to prevent future crime; its aim is to 'protect communities by notifying them of the presence of individuals who may present a danger and enhancing law enforcement authorities' ability to fight sex crimes'" (citing *Pataki*, 120 F.3d at 1276)).

26

The court finds that plaintiff's challenge to the constitutionality of SORA's address registration requirement is without merit, as it is rationally related to New York State's interest in, among other things, protecting its vulnerable population, being able to monitor the whereabouts of sex offenders and aiding law enforcement. As such, the court recommends that plaintiff's Fourteenth Amendment substantive due process claim be dismissed.

**WHEREFORE, IT IS**

**RECOMMENDED** that the complaint be dismissed as against defendants NYS DOCCS Commissioner and Board of Examiners of Sex Offenders and that the clerk enter judgment pursuant to Fed. R. Civ. P. 41(a)(2) dismissing the action against them with prejudice;

**RECOMMENDED**, that defendants' motion to dismiss plaintiff's complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) be **GRANTED,** and plaintiff's complaint be **DISMISSED** in its entirety; and it is further

**RECOMMENDED** that defendants' motion to dismiss plaintiff's complaint as time-barred by the statute of limitations be **GRANTED** unless, in objections to this Report and Recommendation, plaintiff asserts plausible grounds supporting equitable tolling of the applicable statute of limitations for a sufficient time period to render the filing date of his complaint timely; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Report-Recommendation and Order, along with copies of the **unpublished** decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Hum. Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

April 22, 2024

Mitchell J. Katz
U.S. Magistrate Judge

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 29 of 236

Peoples v. Leon, Not Reported in Fed. Supp. (2021)

2021 WL 1582173

2021 WL 1582173
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Leroy PEOPLES, Plaintiff,
v.
Gina R. LEON, Ellen E. Alexander, Jane Doe,
John Doe, and Tina M. Stanford, Defendants.

9:18-CV-1349 (LEK/ML)
|
Signed 01/04/2021

**Attorneys and Law Firms**

LEROY PEOPLES, Plaintiff, pro se, 05-A-2620, Great Meadow Correctional Facility, Box 51, Comstock, NY 12821.

HON. LETITIA JAMES, Attorney General for the State of New York, KEITH J. STARLIN, ESQ., Assistant Attorney General, Attorney for Defendants, Gina R. Leon, Ellen E. Alexander and Tina M. Stanford, The Capitol, Albany, New York 12224-0341.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]  This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

MIROSLAV LOVRIC, United States Magistrate Judge

**\*1**  Plaintiff *pro se* Leroy Peoples ("Peoples" or "Plaintiff"), an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") at Great Meadow Correctional Facility ("Great Meadow C.F."), brings this action pursuant to 42 U.S.C. § 1983 against Defendants, in their official capacity, for violations of his First and Fourteenth Amendment rights. Dkt. No. 1 ("Compl."). Presently before the Court is Defendants' motion for summary judgment and dismissal of Peoples' Complaint pursuant to Rule 56(b) of the Federal Rules of Civil Procedure. Dkt. No. 71. For the following reasons, it is recommended that Defendants' motion for summary judgment be granted in part and denied in part.

**I. BACKGROUND** [2]

[2]

Local Rule 7.1(a)(3) states:
Summary Judgment Motions
Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorneys' affidavits. The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.
Local Rule 7.1(a)(3).
Defendants filed a Statement of Material Facts. Dkt. No. 71-1. Plaintiff responded and admits the facts contained in certain paragraphs of Defendants' Statement of Material Facts. Dkt. No. 82.

**A. Facts** [3]

[3]

The parties annexed exhibits to their submissions. without objection or challenge to the authenticity of the documents. Dkt. Nos. 71-3 through 71-22; 71-26 through 71-28; 82-2 and 82-3. Therefore,

Case 9:23-cv-01114-DNH-MJK Document 31 Filed 04/22/24 Page 30 of 236

Peoples v. Leon, Not Reported in Fed. Supp. (2021)

2021 WL 1582173

the Court will consider the exhibits in the context of the within motion. *See* *U.S. v. Painting known as Hannibal*, No. 07-CV-1511, 2010 WL 2102484, at *1, n.2 (S.D.N.Y. May 18, 2010) (citing *Daniel v. Unum Provident Corp.*, 261 F. App'x 316, 319 (2d Cir. 2008) ("[A] party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party)). In light of the procedural posture of the case, the following recitation is derived from the record now before the Court, with all inferences drawn and ambiguities resolved in non-moving party's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

### 1. Plaintiff's Criminal History

**\*2** On May 22, 2000, Peoples was convicted of attempted Criminal Possession of a Controlled Substance in the 3rd Degree with Intent to Sell. Dkt. No. 71-6 at 6-7. When Peoples failed to return to court for his sentencing, a warrant was issued. Dkt. No. 71-4 at 3. On September 17, 2001, Peoples was sentenced to a prison term of eighteen to fifty-four months. *Id.*; Dkt. No. 71-6 at 7.

On July 1, 2002, Peoples was released on parole. Dkt. No. 71-4 at 3; Dkt. No. 71-6 at 3, 7. Peoples returned to prison in January 2003, after violating his conditions of parole. *Id.* On March 19, 2003, Peoples was re-released on parole. *Id.*

In June 2003, Peoples was arrested for two gunpoint abductions, rapes, and robberies. Dkt. No. 71-1 at ¶35; Dkt. No. 82 at p. 2, ¶14. Pursuant to Indictment No. 2103/03, Peoples was charged with two counts of rape, sodomy, kidnapping, robbery, and sexual abuse stemming from two different incidents on March 7, 1998 and April 7, 2003. Dkt. No. 71-4; Dkt. No. 82-2 at 11-18. The second incident occurred nineteen days after Peoples was released on parole. Dkt. Nos. 71-3, 71-4, 71-5, 71-26 at 40. In January 2005, Peoples pled guilty to two counts of rape in the first degree. *Id.* Peoples' guilty plea was precipitated by DNA evidence obtained by authorities. Dkt. No. 71-1 at ¶38; Dkt. No. 82-1 at ¶17. Peoples' conviction has not been overturned. Dkt. No. 71-26 at 47.

At the sentencing hearing, the victim of the March 1998 rape provided a statement to the court. Dkt. No. 71-5 at 3-6. In her statement, the woman described being attacked from behind by Peoples, who was masked and armed with a gun, while she was walking to a laundromat. *Id.* at 3-5. The woman claimed that Peoples put his gun to her head and walked her back to her home at gunpoint. *Id.* The woman stated that Peoples forced her into a stairway, pulled a hat over her face, told her to pull down her pants and "raped [her] from the back" while he held the gun to her head. *Id.* The woman told the court that Peoples told her to turn around and face him, stole her wallet, and fled. Dkt. No. 71-5 at 3-6.

On January 27, 2005, Peoples was sentenced to a term of 3 1/3 to 10 years for the first rape and to 16 years for the second rape, to run concurrently, and a five year period of post-release supervision ("PRS"). Dkt. No. 71-3. Because Peoples was fifteen at the time he committed the first rape, he was sentenced as a juvenile. Dkt. No. 71-1 at ¶41; Dkt. No. 82 at p. 2, ¶20, p. 6, ¶13. The sentencing court certified Peoples as a "Sex Offender" pursuant to New York Correction Law § 168-d. Dkt. No. 71-3. The court advised Peoples that he would be obligated to register as a sex offender in New York. Dkt. No. 71-5 at 9.

### 2. Parole Proceedings

In August 2018, defendant Offender Rehabilitation Counselor ("ORC") Gina R. Leon ("Leon") interviewed Peoples in preparation for an October 2018 hearing before the New York State Board of Parole (the "Board"). Compl. at 2; Dkt. No. 71-6 at 1. Peoples did not submit a parole packet for his October 2018 interview and asked Leon to forward his 2016 packet to the Board for consideration. Dkt. No. 71-2 at ¶ 15. Following the interview, Leon prepared a Parole Board Report and Confidential Report with thirty-six recommended special conditions of release, the Offender Case Plan, and assisted in the preparation of the COMPAS instrument [4]. Dkt. No. 71-6; Dkt. No. 71-10; Dkt. No. 71-23 at ¶ 5; Dkt. No. 71-11.

[4]  COMPAS is a risk-assessment instrument used to "inform decision-making throughout the various phases of incarceration and community supervision." *See* www.doccs.ny.gov (last visited Nov. 13, 2020).

**\*3** On October 16, 2018, defendants Board of Parole Commissioner Ellen Alexander ("Alexander"), John Doe, and Jane Doe conducted a parole release interview with Peoples to determine if he would be granted discretionary

2021 WL 1582173

early release to parole or held until his maximum expiration ("ME") date and released to PRS. Dkt. No. 71-2 at ¶¶ 12, 18. During the hearing, Peoples "accepted responsibility" for the "gunpoint rapes" and admitted to selling and possessing crack and/or cocaine. Dkt. No. 71-16 at 4, 5. Peoples stated that he was "unable to complete" the recommended Sex Offender Counseling and Treatment Program ("SOCTP") while in DOCCS' custody. *Id.* at 6.

On October 17, 2018, the Board denied Peoples discretionary release to parole, concluding that he should be held until June 7, 2019, his maximum expiration date. Dkt. No. 71-16 at 13. The Board explained:

> Based on your interview and overall record, after weighing the statutory factors, discretionary release is denied. Your instant offense involved your actions committing two gunpoint rape related offenses. This is a continuation of your criminal history and record on community supervision, which includes a previous prison term for a drug related offense.
>
> The panel notes your rehabilitation efforts, including your achievement of your G.E.D., the tailor shop and completion of ART and ASAT. You have not been able to complete the sex offender program. Your disciplinary record includes multiple disciplinary offenses, including infractions since your last interview. Also considered were your 2016 parole packet, a letter from the Appellate Advocates as well as official letters of opposition and support and your sentencing minutes.
>
> We have reviewed your case plan, your release plans and your risk and needs assessment which indicates your elevated risk of felony violence and need for reentry substance abuse services and treatment.

Dkt. No. 71-16 at 13.

The Board issued a Form 9026 Parol Board Decision Notice with thirty-six special conditions ("Special Conditions") of release. [5] Dkt. No. 1-2 at 3-11; Dkt. No. 71-2 at ¶ 19. Of these thirty-six conditions, Peoples objects to the following:

> 3. I will participate in a substance abuse treatment program as directed by the P.O.
>
> 4. I will participate in an alcohol abuse treatment program as directed by the P.O.

> 8. I will participate in anti-aggression/anti-violence counseling as directed by the P.O.
>
> 10. I will have no contact with any person under the age of eighteen without written permission of the P.O.
>
> 11. I will comply with all case specific sex offender conditions to be imposed by the P.O.
>
> 14. I will comply with geographical restrictions as directed by P.O.
>
> 15. I will abide by the mandatory condition imposed by the Sexual Assault Reform Act ("SARA").
>
> 16. I will not use or possess any medications or supplements designed or intended for the purpose of enhancing sexual performance or treating erectile dysfunction without the written permission of my parole officer and the approval of his or her area supervisor.
>
> 18. I will not use the internet to access pornographic material, access a commercial social networking website, communicate with other individuals or groups for the purpose of promoting sexual relations with persons under eighteen, and communicate with a person under the age of eighteen unless I receive written permission from the Board of Parole to use the internet to communicate with a minor child under eighteen years of age who I am the parent of and who I am not otherwise prohibited from communicating with.
>
> 20. I will not own, use, possess, purchase or have control of any computer, computer related material, electronic storage devices, communication devices and/or the internet unless I obtain prior written permission from my parole officer.
>
> **\*4** 21. If I am permitted by my parole officer to possess a computer at my residence, permission will be granted for only one computer.
>
> 22. I will provide all personal, business, phone, internet service provider, and/or cable records to my parole officer upon request.
>
> 23. I will provide copies of financial documents to my parole officer upon request. These documents may include, but are not limited to, all credit card bills, bank statements, and income tax returns.

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 32 of 236

**Peoples v. Leon, Not Reported in Fed. Supp. (2021)**

2021 WL 1582173

24. I will provide all user IDs and passwords required to access the computer, my C.M.O.S., and Bios, internet service provider, and/all email accounts, instant messaging accounts, any removable electronic media, including but not limited to media such as smart cards, cell phones, thumb drives and web virtual storage.

25. I will provide my parole officer with my password and user ID for any approved device.

26. I acknowledge that individuals who have access to my computer system and/or other communication or electronic storage devices will also be subject to monitoring and/or search and seizure. I agree to be fully responsible for all material, data, images and information found on my computer and/or other communication or electronic storage devices at all times.

27. I will not create or assist directly or indirectly in the creation of any electronic bulletin board system, services that provide access to the internet, or any public or private computer network without prior written approval from my parole officer.

28. I will not use any form of encryption, cryptography, steganography, compression and/or other method that might limit access to, or change the appearance of, data and/or images without prior written approval from my parole officer.

29. I will not attempt to circumvent, alter, inhibit, or prevent the functioning of any monitoring or limiting equipment, device or software that has been installed by or at the behest of, or is being utilized by, the Department of Corrections and Community Supervision for the purposes of recording, monitoring or limiting my computer or internet use and access, nor will I tamper with such equipment, device or software in any way.

30. I will cooperate with unannounced examinations directed by my parole officer of any and all computer(s) and/or other electronic device(s) to which I have access. This includes access to all data and/or images stored on hard disk drives, floppy diskettes, CD roms, optical disks, magnetic tape, cell phones, and/or any other storage media whether installed within a device or removable.

31. I will install or allow to be installed, at my own expense, equipment and/or software to monitor or limit computer use.

32. I will submit to photo imaging every 90 days, or whenever directed by my parole officer or other representative of the N.Y.S. Department of Corrections and Community Supervision.

33. I understand that I shall not download, access, or otherwise engage in any internet enabled gaming activities to include Pokemon Go, I further understand that I shall not be in the company of any person who is engaged in any internet enabled gaming activities nor will I have any gaming software on any internet enabled device that I am permitted to access or otherwise possess.

**\*5** 34. I will propose a residence to be investigated by the Department of Corrections and Community Supervision and will assist the Department in any efforts it may make on my behalf to develop a residence.

35. If I am deemed a Level 3 risk pursuant to Article 6-c of the Correction Law - or - I am serving one or more sentences for committing or attempting to commit one or more offense(s) under Articles 130, 135 or 263 of the Penal Law or Sections 255.25, 255.26 or 255.27 of the Penal Law and the victim of such offense(s) was under 18 years of age at the time of the offense(s), and as such I must comply with section 259-c(14) of the Executive Law, I will not be released until a residence is developed and it is verified that such address is located outside the Penal Law definition of school grounds and is approved by the Department.

36. In pertinent part, Executive Law 259-c(14) provides: "The Board shall require, as a mandatory condition of such release, that such sentenced offender shall refrain from knowingly entering into or upon any school grounds, as that term is defined in subdivision fourteen of section 220.00 of the Penal Law, or any other facility or institution primarily used for the care or treatment of persons under the age of eighteen while one or more of such persons under the age of eighteen are present, ..." Penal Law 220.00(14)

"School grounds" means (A) in or within any building, structure, athletic playing field, playground or land contained within the real property boundary line of a public or private elementary, parochial, intermediate,

Case 9:23-cv-01114-DNH-MJK Document 31 Filed 04/22/24 Page 33 of 236

Peoples v. Leon, Not Reported in Fed. Supp. (2021)
2021 WL 1582173

junior high, vocational, or high school, or (B) any area accessible to the public located within one thousand feet of the real property boundary line comprising any such school or any parked automobile or other parked vehicles located within one thousand feet of the real property boundary line comprising any such school. For the purposes of this section an "area accessible to the public" shall mean sidewalks, streets, parking lots, parks, playgrounds, stores and restaurants.

Dkt. No. 1-2 at 5-11; Dkt. No. 71-1 at ¶ 20.

5    The conditions imposed by the Board are the same conditions previously recommended by Leon. *Compare* Dkt. No 71-6 at 26-28 *with* Dkt. No. 1-2 at 5-10.

In March 2019, pursuant to the Sex Offender Registration Act ("SORA") (Correction Law § 168), the Board of Examiners of Sex Offenders made a risk level and designation recommendation to Queens County Supreme Court, the sentencing court. Dkt. No. 82-3 at 7. In May 2019, the Honorable Ira H. Margulis determined that Peoples' risk level was 3 and designated him a "sexually violent offender" pursuant to Correction Law § 168-d.[6] *Id.*

6    On May 24, 2019, Peoples filed a Notice of Appeal of the order adjudicating him a Level 3 risk of re-offense and designating him a sexually violent offender. Dkt. No. 82-3 at 6. The record does not contain any evidence related to the outcome of the appeal.

On June 5, 2019, Peoples was released from DOCCS' custody and began serving his term of PRS subject to the Special Conditions. Dkt. No. 22; Dkt. No. 71-26 at 11. In August 2019, Plaintiff was arrested for violating the conditions of his parole and held at Broome County Jail ("Broome C.J."). Dkt. No 71-26 at 61. On May 20, 2020, a final revocation hearing was conducted. Dkt. No. 82-3 at 8-17. Peoples plead guilty to tampering with his GPS monitoring device and removing it from this ankle. Dkt. No. 82-3 at 16; Dkt. No. 71-26 at 65-66. The Administrative Law Judge ordered Peoples held for eighteen months, which began to run on August 6, 2019. *Id.* Peoples was transferred from Broome C.J. to Elmira Correctional Facility ("Elmira C.F."). Dkt. No. 74.

**\*6** In August 2020, Peoples was transferred from Elmira C.F. to Attica Correctional Facility ("Attica C.F.") and placed in protective custody due to his prior affiliation with the "Bloods-GKB" gang. Dkt. No. 76; Dkt. No. 71-4 at 3; Dkt. No. 82-2 at 40-42. Peoples is currently in DOCCS' custody. Dkt. No. 79.

### B. Procedural History

On November 16, 2018, the Court received the Complaint in the within action. Dkt. No. 1. Upon review of the Complaint, the Court directed defendants Leon, Alexander, Jane Doe, John Doe, and the Chairwoman of the New York State Board of Parole Tina Stanford ("Stanford") to respond to the § 1983 claims challenging the impositions of certain Special Conditions. *See generally,* Dkt. No. 8.

On May 3, 2019, Leon, Alexander, and Stanford filed an Answer to the Complaint. Dkt. No. 19. On February 27, 2020, Peoples was deposed. Dkt. No. 71-26. On July 17, 2020, Defendants filed the within motion pursuant to Fed. R. Civ. P. 56 seeking judgment as a matter of law with respect to Peoples' claims. Dkt. No. 71.

### II. LEGAL STANDARD

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of demonstrating the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 317, 248 (1986).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. Fed. R. Civ. P. 56; *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury,

Case 9:23-cv-01114-DNH-MJK   Document 31   Filed 04/22/24   Page 34 of 236
Peoples v. Leon, Not Reported in Fed. Supp. (2021)
2021 WL 1582173

and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

Peoples asks the Court to consider his Complaint as an affidavit in opposition to the motion for summary judgment. Dkt. No. 82-1 at 13. "Although 'a plaintiff's pro se status does not allow him to rely on conclusory allegations or unsubstantiated speculation to overcome a motion for summary judgment,' *Almonte v. Florio*, 02-CV-6722, 2004 WL 60306, at *3 n.10 (S.D.N.Y. Jan. 13, 2004) (citation and italics omitted), where a plaintiff 'verifie[s] his complaint by attesting under penalty of perjury that the statements in the complaint [are] true and to the best of his knowledge,' the 'verified complaint is to be treated as an affidavit for summary judgment purposes,' *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)." *King v. Puershner*, 17-CV-1373, 2019 WL 4519692, at *1 n.1 (S.D.N.Y. Sept. 19, 2019). Here, Plaintiff's complaint states, "I declare under penalty of perjury that the foregoing is true and correct." Compl. at 7. Therefore, the undersigned will accept Plaintiff's Complaint as an affidavit to the extent that the statements contained therein are based on Plaintiff's personal knowledge or are supported by the record. *See Berry v. Marchinkowski,* 137 F.Supp.3d 495, 530 (S.D.N.Y. 2005).

**\*7** All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli*, 113 F.3d 330, 334 (2d Cir. 1997). Furthermore, where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law.

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191–92 (2d Cir. 2008). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION [7]

[7] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to Plaintiff.

Defendants move for summary judgment arguing that: (1) the claims for monetary damages are barred by the Eleventh Amendment; (2) the First and Fourteenth Amendment claims related to the Special Conditions must be dismissed because the conditions were reasonably related to Plaintiff's crimes and tailored to serve legitimate state interests; (3) judicial immunity bars Plaintiff's claims against Alexander; and (4) Stanford was not personally involved in the October 2018 determination. Defendants also argue that they are entitled to qualified immunity on the First and Fourteenth Amendment claims. Dkt. No. 71-29.

### A. Eleventh Amendment

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). "New York State has not consented to suit in federal court." *Abrahams v. Appellate Div. of Supreme Court*, 473 F. Supp. 2d 550, 556 (S.D.N.Y. 2007) (citing *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38-40 (2d Cir. 1977)).

Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan*, 440 U.S. 332, 340-41 (1979). "[C]laims against a government employee in his official capacity are treated as a claim against

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 35 of 236

Peoples v. Leon, Not Reported in Fed. Supp. (2021)

2021 WL 1582173

the municipality," and, thus, cannot stand under the Eleventh Amendment. *Hines v. City of Albany*, 542 F. Supp. 2d 218, 227 (N.D.N.Y. 2008).

**\*8** However, "[u]nder the doctrine in *Ex Parte Young*, 'a plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officers ... in their official capacities, provided his complaint (a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective.' " *Clark v. DiNapoli*, 510 Fed. App'x 49, 51 (2d Cir. 2013) (quoting *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007)). "A plaintiff may not use this doctrine to adjudicate the legality of past conduct," meaning there must be some "plausible threat of future violations." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 277-78 (1986)); *see W. Mohegan Tribe and Nation*, 395 F.3d at 21 (noting that, "in determining whether the *Ex Parte Young* doctrine applies to avoid an Eleventh Amendment bar to suit, 'a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective' "); *see also New York State Corr. Officers & Police Benev. Ass'n, Inc. v. New York*, 911 F. Supp. 2d 111, 129 (N.D.N.Y. 2012) (D'Agostino, J.) ("[D]eclaratory relief is not permitted under *Ex Parte Young*, when it would serve to declare only past actions in violation of federal law: retroactive declaratory relief cannot be properly characterized as prospective.").

Here, Plaintiff seeks both monetary and non-monetary relief. Dkt. No. 1-1 at 19-20. Plaintiff's claims against Defendants in their official capacities for monetary damages are barred by the Eleventh Amendment. Accordingly, I recommend that Defendants' motion for summary judgment and dismissal of all claims for monetary damages against Defendants in their official capacities be granted.

## B. Constitutional Claims Related to Special Conditions

Defendants move for summary judgment and dismissal of the section 1983 claims challenging the Special Conditions arguing that the conditions are reasonably related to Peoples' criminal history, past conduct, tailored to deter recidivism, and serve legitimate state interests in protecting the public. *See* Dkt. No. 71-29 at 4-19. Peoples asserts both general and specific challenges to the imposition of twenty-six of the thirty-six Special Conditions.

"[U]nder New York law, the Board of Parole is entitled to impose conditions on the conditional release of an inmate." *Doe v. Simon*, 221 F.3d 137, 139 (2d Cir. 2000); N.Y. Exec. Law §§ 259-c, 259-g, 259-i(2); N.Y. Comp. Codes R. & Regs. tit. 9, § 8003.3 ("A special condition may be imposed upon a [parolee] either prior or subsequent to release ... each special condition may be imposed by a member of the Board of Parole, an authorized representative of the division of parole, or a parole officer," memorialized by "a written copy of each special condition imposed.").

In its determinations, "the Parole Board may consider all of the circumstances surrounding the conviction - including conduct for which petitioner has not been convicted." *Robles v. Williams*, No. 02 CIV 6102, 2007 WL 2403154, at \*4 (S.D.N.Y. Aug. 22, 2007) (internal quotation marks omitted). Further, it is not "arbitrary nor capricious" for the Board to consider remorse when deciding whether to deny parole. *Matter of Simon v. Travis*, 95 N.Y.2d 470, 477 (2000); *see also M.G. v. Travis*, 236 A.D.2d 163, 169 (1997).

Parolees are entitled to some form of due process in the imposition of special conditions of parole. *Pollard v. U.S. Parole Comm'n*, No. 15-CV-9131, 2016 WL 3167229, at \*4 (S.D.N.Y. June 6, 2016) (citing *U.S. v. Green*, 618 F.3d 120, 122 (2d Cir. 2010)). This "limited due process right" entitles a parolee to conditions of parole that are reasonably related to his prior conduct or to a legitimate government interest such as rehabilitation, the prevention of recidivism and future offenses, and protection of the public. *See Singleton v. Doe*, No. 14-CV-0303, 2014 WL 3110033 at \*3 (E.D.N.Y. July 7, 2014); *U.S. v. Myers*, 426 F.3d 117, 123-24 (2d Cir. 2005) (summary order); *Robinson v. Pagan*, No. 05-CV-1840, 2006 WL 3626930, at \*6 (S.D.N.Y. Dec. 12, 2006) (citation omitted); *Yunus v. Robinson*, No. 17-CV-5839, 2019 WL 168544, at \*20 (S.D.N.Y. Jan. 11, 2019) (internal citation omitted). "If a special condition implicates a fundamental liberty interest," the court "must carefully examine it to determine whether it is 'reasonably related' to the pertinent factors, and 'involves no greater deprivation of liberty than is reasonably necessary[.]' " *Myers*, 426 F.3d at 126. Courts "must use common sense to guide [their] interpretation of supervised release conditions." *U.S. v. Moritz*, 651 Fed. App'x 807, 810 (10th Cir. 2016) (citations omitted).

**\*9** In support of the motion, Leon provided a Declaration and swears that she reviewed the following documents in deciding what special conditions to recommend: sentence and commitment orders; pre-sentence investigation reports;

2021 WL 1582173

sentencing minutes; the parole board criminal history report; DOCCS program assignment history; disciplinary history; legal date computation; DOCCS' program refusal notification forms; letters from the District Attorney's office, the criminal defense attorney, and various individuals; release planning records; and the parole packet from Peoples' prior hearing in 2016. Dkt. No. 71-23 at ¶¶ 5, 7. Leon avers that her recommendations were reasonably related to Peoples' criminal history, his past conduct, and tailored to prevent recidivism, protect the public, and promote Peoples' rehabilitation. *Id.* at ¶ 9.

Alexander also provided a Declaration in support of the motion. Dkt. No. 71-2. Alexander stated that the Board's decision was guided by the factors set forth in N.Y. Executive Law § 259-1(2)(c)(A).[8] *Id.* at ¶ 13. Alexander avers that the Board reviewed the following records/documentation, in connection with the decision whether to grant Peoples early release to parole: sentence and commitment orders; pre-sentence investigation report; sentencing minutes (including a victim statement); criminal history; DOCCS institutional records; letters from the District Attorney and defense counsel; the COMPAS instrument; the Offender Case Plan; release planning records; letters from various individuals/ entities; and Peoples' parole packet from his October 2016 interview. *Id.* at ¶¶ 14, 15. After the October 2018 interview, Alexander and the other Board members determined that Peoples would not be granted discretionary release and that he would remain incarcerated until his maximum expiration date. Dkt. No. 71-2 at ¶ 19. The Board imposed thirty-six special conditions of parole, which Alexander asserts are reasonably related to Peoples' criminal history, his past conduct, tailored to prevent recidivism, protect the public, and prevent future offenses. *Id.* at ¶¶ 20, 48. Alexander also opined that Peoples attempted to make excuses for his crimes and did not express remorse for his victims. *Id.* at ¶ 46.

[8]    Discretionary release on parole shall not be granted merely as a reward for good conduct or efficient performance of duties while confined but after considering if there is a reasonable probability that, if such inmate is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society and will not so deprecate the seriousness of his crime as to undermine respect for law. In making the parole release decision, the procedures adopted pursuant to subdivision four of section two hundred fifty-nine-

c of this article shall require that the following be considered: (i) the institutional record including program goals and accomplishments, academic achievements, vocational education, training or work assignments, therapy and interactions with staff and inmates; (ii) performance, if any, as a participant in a temporary release program; (iii) release plans including community resources, employment, education and training and support services available to the inmate; (iv) any deportation order issued by the federal government against the inmate while in the custody of the department and any recommendation regarding deportation made by the commissioner of the department pursuant to section one hundred forty-seven of the correction law; (v) any current or prior statement made to the board by the crime victim or the victim's representative, where the crime victim is deceased or is mentally or physically incapacitated; (vi) the length of the determinate sentence to which the inmate would be subject had he or she received a sentence pursuant to section 70.70 or section 70.71 of the penal law for a felony defined in article two hundred twenty or article two hundred twenty-one of the penal law; (vii) the seriousness of the offense with due consideration to the type of sentence, length of sentence and recommendations of the sentencing court, the district attorney, the attorney for the inmate, the pre-sentence probation report as well as consideration of any mitigating and aggravating factors, and activities following arrest prior to confinement; and (viii) prior criminal record, including the nature and pattern of offenses, adjustment to any previous probation or parole supervision and institutional confinement. N.Y. Exec. Law § 259-i(2)(c)(A).

**\*10**  In the Parole Board Release Decision Notice, the Board explained that "[y]our instant offense involved your actions committing two gunpoint rape related offenses" was a reason for the decision to deny parole. Dkt. No. 1-2 at 4.

In opposition to the motion, Peoples presents three general challenges to the imposition of all twenty-six conditions.

### 1. General Objections

2021 WL 1582173

First, Peoples claims that the conditions were improperly imposed by the Board, rather than by the sentencing court. Dkt. No. 1-1 at 10; Dkt. No. 82-1 at 7. As discussed *supra*, the Board of Parole is charged with "the duty and discretion of setting conditions for an inmate on parole release." *Doe*, 221 F.3d at 139; *Robinson*, 2010 WL 11507493, at *3 (citing N.Y.C.R.R. §§ 8003.2 and 8003.3); N.Y. Penal Law § 70.40(1)(b). Accordingly, Peoples' objection, on this ground, lacks merit.

Peoples also challenges the special conditions claiming that Defendants improperly considered circumstances surrounding his convictions, including the use of a gun, and refused to consider certain "mitigating factors." Dkt. No. 82-1 at 3-6. In his opposition to the motion, Peoples presents those "mitigating factors", for the first time. To wit, Peoples asserts that he did not use a gun during the commission of the crimes and claims that an "inoperable b.b. gun was discovered in the second crime." Dkt. No. 82 at p.5-8, ¶¶ 2, 3, 7, 12, 14, 15. Additionally, Peoples claims that he knew one of the victims, that she was "not a stranger," and now contends that he did not "rob her, abduct her at gunpoint, or rape[ ] her by forcible compulsion[.]" Dkt. No. 82 at p. 6, ¶4; Dkt. No. 82-1 at 4-5. Peoples also insists that one of the assaults was a consensual sexual encounter in a pre-arranged meeting place as payment for drugs. *Id.* at p. 6, ¶¶ 4-6.

As discussed *supra*, "[t]he Board may consider all of the circumstances surrounding the conviction—including conduct for which petitioner has not been convicted—so long as some record evidence of such conduct exists in the record and it is not the sole basis for the Board's determination." *Williams v. Travis*, 783 N.Y.S.2d 413, 414 (2004). Here, the record contains extensive references to Peoples' use of a gun during the commission of the crimes and to the fact that the victims were strangers and that they were raped by forcible compulsion.

During the plea hearing, Peoples admitted to two counts of engaging in "sexual intercourse with a female to whom [he] [was] not married by means of forcible compulsion." Dkt. No. 82-2 at 28. Upon inquiry, Peoples admitted that the women were strangers and that he displayed "what appeared to be a handgun." *Id.* at 28-29. During the parole hearing, Peoples was asked the following question and gave the following answer:

> Q. Okay. So are you accepting responsibility for these gunpoint rapes?

> A. I have, I am and this is part of my past that I cannot take away.

Dkt. No. 71-16 at 4.

Peoples' new, self-serving statements, presented for the first time in his opposition to the motion for summary judgment, are unsupported by the record and do not create an issue of fact for a jury. Indeed, no reasonable jury could find the assertions credible and conclude, based upon the statements, that the Board's decision to consider all aspects of the seriousness of Peoples' offense was arbitrary or capricious. *See Stolow v. Greg Manning Auctions Inc.*, 80 Fed. App'x 722, 725 (2d Cir. 2003) (citing *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that ... contradicts the affiant's previous deposition testimony.")); *Fox v. Harris*, No. 6:15-CV-0616 (LEK/ATB), 2017 WL 1319835, at *2 (N.D.N.Y. Apr. 7, 2017) (holding that the plaintiff "cannot escape summary judgment via 'self-serving statements ... made in his opposition that contradict his sworn deposition testimony.' ") (citation omitted).

**\*11** Finally, Peoples contends that Defendants failed to consider his plea transcript. Dkt. No. 82-1 at 3-6. Leon and Alexander do not state whether they considered Peoples' plea transcript during their reviews. However, as noted *supra*, the statements in the plea transcript do not offer any support for Peoples' objection. As noted *supra*, Plaintiff admitted raping two strangers with "forcible compulsion" using "what appeared to be a handgun." Dkt. No. 82-2 at 28-29.

Having determined that Peoples' general objections to the imposition of the Special Conditions lack merit, the Court will address Peoples' specific challenges to the Special Conditions, in turn. [9]

[9]  Plaintiff does not present any constitutional challenge to the following Special Conditions: 1, 2, 5, 6, 7, 9, 12, 13, 17, 19. Dkt. No. 1-1 at 10-14 and Dkt. No. 82-1.

## 2. Specific Objections

### a. Requirement to Participate in Programs

2021 WL 1582173

   3. I will participate in a substance abuse treatment program as directed by the P.O.

   4. I will participate in an alcohol abuse treatment program as directed by the P.O.

   8. I will participate in anti-aggression/anti-violence counseling as directed by the P.O.

Peoples objects to these conditions as arbitrary and capricious because he satisfactorily completed Aggression Replacement Training ("ART") and Alcohol and Substance Abuse Treatment ("ASAT") while in DOCCS' custody and claims that he has "been clean and sober for quite some time." Dkt. No. 1-1 at 10; Dkt. No. 71-16 at 10. Alexander avers that the conditions were imposed due to Peoples' "lengthy, significant history of alcohol and substance abuse and history of selling controlled substances" and history of violent behavior and disciplinary violations while in custody, that continued even after Peoples completed ART. Dkt. No. 71-2 at ¶¶ 49(A) and (B). Alexander also explains that the conditions are reasonable because, although Peoples participated in ASAT ten years ago, he has not lived outside of prison at all since that time. *Id.*

According to the record before the Court, Peoples began using and abusing alcohol and marijuana at ages eleven and twelve. Dkt. No. 71-1 at ¶¶ 59-60; Dkt. No. 82 at p. 2, ¶ 25. Plaintiff also has a history of crack/cocaine and Ecstasy use. *Id.* Peoples was arrested, as a juvenile, in 1996 and 1998 and convicted of criminal possession of a controlled substance with intent to sell. Dkt. No. 71-6 at 7-8. Peoples admitted that he was smoking marijuana when he was arrested in March 2000 for possession of crack/cocaine with the intent to sell and stated that he was "on drugs" at the time he committed one of the rapes. Dkt. No. 71-1 at ¶¶ 60-61; Dkt. No. 82 at p. 2, ¶ 25.

During the parole hearing, Peoples admitted to selling drugs and stated that his "actions came about because [he] was growing up in an environment where [he] resorted to drugs and anger to address all of [his] problems." Dkt. No. 71-16 at 4, 5, 9. Peoples told the Board that he would participate in substance abuse services if it was a condition of parole. *Id.* at 10. Although Peoples claims that he has "been clean and sober for quite some time," during his deposition, he testified to testing positive for marijuana on June 13, 2020. Dkt. No. 71-26 at 86-87. The COMPAS instrument indicates that Peoples has a history of substance abuse including committing offenses while high/drunk, prior drug charges/

convictions, history of drug and alcohol problems, history of prior treatment, and history of failed drug tests. Dkt. No. 71-10 and 4, 10. As a result, Leon concluded that Peoples was at risk for substance abuse problems. *Id.* at 5, 10.

**\*12** The record is also replete with evidence suggesting that anti-aggression programming is reasonably related to Peoples' history. Due to the nature of Plaintiff's conviction, the sentencing court designated Peoples as a "sexually violent offender". Dkt. No. 82-3 at 7. During his pre-trial detainment and incarceration, Peoples incurred several disciplinary infractions and was found guilty of violating prison rules on twenty-three occasions and received violations for possessing unauthorized medications, smuggling, fighting, violent conduct, creating a disturbance, assaulting an inmate, harassment, and threats. Dkt. No. 71-1 at ¶¶ 69, 71; Dkt. No. 82 at p. 3, ¶30, at p. 8, ¶21. Peoples incurred thirty one months of recommended loss of good time as a result of disciplinary infractions. Dkt. No. 71-1 at ¶73; Dkt. No. 82 at p. 3, ¶30. Indeed, some of the infractions occurred after Peoples participated in ART. Dkt. No. 71-1 at ¶89; Dkt. No. 82 at p. 3, ¶41. Between his October 2016 parole interview and his October 2018 parole interview, Peoples was found guilty of three Tier II violations and two Tier III violations including one assault involving physical injuries to another inmate. Dkt. No. 71-1 at ¶73; Dkt. No. 82 at p. 3, ¶32. Peoples does not dispute his disciplinary history and admits that he refused to complete sex offender programming. Dkt. No. 71-1 at ¶¶68, 75-77; Dkt. No. 82 at p. 3 at ¶34, p. 8, ¶20; Dkt. No. 71-16 at 5, 9.

During the parole interview, when asked by Alexander, "what do you think about why you did [your crimes] and what impact you've had on your victims?" Dkt. No. 71-16 at 4. Peoples responded that he believed his "actions came about because I was growing up in an environment where I resorted to drugs and anger to address all of my problems." *Id.*

In light of Peoples' history of drug abuse, history of criminal conduct involving drugs, the forcible and violent circumstances surrounding his crimes, and disciplinary record in prison, the Special Conditions directing him to participate in alcohol, substance and anti-aggression programs are not arbitrary or capricious. *See Ahlers v. New York State Div. Of Parole,* 1 A.D.3d 849, 850 (2003). Indeed, Peoples' recent placement in DOCCS protective custody, due to his gang affiliations, further supports the need for Peoples to participate in anti-aggression programming. Dkt. No. 76. The Court finds the conditions to be "reasonably related to

2021 WL 1582173

legitimate penological objectives and rationally related to [plaintiff's] history and potential recidivism."

Accordingly, the Court recommends that Defendants' motion for summary judgment and dismissal of Plaintiff's constitutional challenge to these conditions be granted.

### b. Minors

10. I will have no contact with any person under the age of eighteen without written permission of the P.O.

Peoples challenges this condition because his victims were not under eighteen. Dkt. No. 1-1 at 11. Peoples also claims that the condition precludes him from having contact with his younger brother and extended family members. *Id.* at 10-11.

"[I]t is well established that a parent's interest in maintaining a relationship with his or her child is a fundamental liberty interest protected by substantive due process." *Maldonado v. Mattingly*, No. 11-CV-1091, 2019 WL 5784940, at *10 (W.D.N.Y. Nov. 6, 2019) (citations omitted). Courts however, have not extended the "same solicitude" to non-custodial parents who did not play an active role in a child's life, prior to incarceration. *Yunus*, 2009 WL 168544, at *34 (citing *Meyers*, 426 F.3d at 128) (holding that the parolee must demonstrate some "commitment to the responsibilities of parenthood").

Here, Peoples does not have any children and does not claim to have a custodial relationship with any member of his extended family or his younger brother. Dkt. No. 71-1 at ¶81; Dkt. No. 82 at p. 3, ¶38. Moreover, in 2001, Peoples' mother obtained an Order of Protection against Peoples on her behalf and on behalf of Peoples' minor brother. Dkt. No. 71-1 at ¶82; Dkt. No. 71-6 at 3-4 [10]. Peoples testified that he has four nieces/nephews under the age of eighteen, however, the record lacks facts establishing that Peoples had a close relationship with any of them. Dkt. No. 71-26 at 107. The condition does not act as a total bar preventing Peoples from maintaining familial relationships with his nieces and nephews or ban him from all contact with any person under 18 years of age. Rather, Peoples is required to seek permission from his parole officer. To this end, Peoples testified that when he was on parole from June 2019 until August 2019, he never

requested, or was denied, permission to have contact with anyone under the age of eighteen. Dkt. No. 71-26 at 82.

[10]      Peoples does not dispute the truth of this assertion but objects to the fact because "defendants have not produced the actual Order of Protection[.]" Dkt. No. 82 at p. 9, ¶26.

**\*13** Pursuant to the record before the Court, this condition is not arbitrary or capricious. *See Maldonado*, 2019 WL 5784940, at *3, 10 (finding same condition restricting contact with minors to be reasonable); *see also Yunus*, 2009 WL 168544, at *34 (reasoning that there is no authority for proposition that a parolee has a fundamental right to visit family members). Accordingly, the Court finds that this condition does not violate Peoples' due process rights and recommends that Defendants' motion for summary judgment and dismissal of Plaintiff's constitutional challenge to this condition be granted.

### c. Travel Restrictions

14. I will comply with geographical restrictions as directed by P.O.

Peoples contends that he should be permitted to travel within the state and argues that restricting his movement to his county of residence constitutes an "unconstitutional bill of attainder." Dkt. No. 1-1 at 11. Defendants argue that the condition is necessary as Peoples previously fled to Connecticut to avoid arrest. Dkt. No. 71-2 at ¶ 49(E).

Courts have held that limitations on the freedom of travel and association may be imposed without violating the parolee's constitutional rights. *See Bostic v. Jackson*, No. 9:04-CV-676 (NAM/GJD), 2008 WL 1882696, at *2 (N.D.N.Y. Apr. 24, 2008); *Cusamano v. Alexander*, 691 F.Supp.2d 312 (N.D.N.Y. 2009) (finding no due process violation where the parolee's special conditions included travel limitations). Moreover, travel restrictions may assist parole officers in monitoring a parolee's activities and thus, serve a valid penological interest. *Trivsan v. Annucci*, No. 14-CV-6016, 2019 WL 2304647, at *5 (E.D.N.Y. May 30, 2019).

Based upon the record and Peoples' prior conduct, the Court does not find the imposition of this condition to be arbitrary

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 40 of 236

Peoples v. Leon, Not Reported in Fed. Supp. (2021)

2021 WL 1582173

or capricious. In 2000, a warrant was issued when Peoples failed to return to court for sentencing on his drug conviction. Dkt. No. 71-4 at 3. During his deposition, Peoples testified that while he was on parole in 2003, one of the conditions was that he not leave the state without prior permission from his parole officer. Dkt. No. 71-26 at 43-43. Despite that condition, Peoples traveled from Queens to Connecticut without permission from his Parole Officer. *Id.* Additionally, at his parole revocation hearing, Peoples plead guilty to tampering with his GPS monitoring device and removing it from his ankle. Dkt. No. 82-3 at 16.

Accordingly, the Court recommends that Defendants' motion for summary judgment and dismissal of Plaintiff's constitutional challenge to this condition be granted.

### d. Sexual Assault Reform Act ("SARA") Conditions

15. I will abide by the mandatory condition imposed by the Sexual Assault Reform Act ("SARA").

34. I will propose a residence to be investigated by the Department of Corrections and Community Supervision and will assist the Department in any efforts it may make on my behalf to develop a residence.

35. If I am deemed a Level 3 risk pursuant to Article 6-c of the Correction Law - or - I am serving one or more sentences for committing or attempting to commit one or more offense(s) under Articles 130, 135 or 263 of the Penal Law or Sections 255.25, 255.26 or 255.27 of the Penal Law and the victim of such offense(s) was under 18 years of age at the time of the offense(s), and as such I must comply with section 259-c(14) of the Executive Law, I will not be released until a residence is developed and it is verified that such address is located outside the Penal Law definition of school grounds and is approved by the Department.

**\*14**  36. In pertinent part, Executive Law 259-c(14) provides: "The Board shall require, as a mandatory condition of such release, that such sentenced offender shall refrain from knowingly entering into or upon any school grounds, as that term is defined in subdivision fourteen of section 220.00 of the Penal Law, or any other facility or institution primarily used for the care or treatment of persons under the age of eighteen while one or more of such persons under the age of eighteen are present, ..." Penal Law 220.00(14)

"School grounds" means (A) in or within any building, structure, athletic playing field, playground or land contained within the real property boundary line of a public or private elementary, parochial, intermediate, junior high, vocational, or high school, or (B) any area accessible to the public located within one thousand feet of the real property boundary line comprising any such school or any parked automobile or other parked vehicles located within one thousand feet of the real property boundary line comprising any such school. For the purposes of this section an "area accessible to the public" shall mean sidewalks, streets, parking lots, parks, playgrounds, stores and restaurants.

Peoples does not dispute that he has been designated as a level three offender but objects to these conditions arguing his crimes did not involve minors, school grounds, or public parks. Dkt. No. 82-1 at 8; Dkt. No. 1-1 at 12.

In 2000, pursuant to SARA, the mandatory conditions set forth in N.Y. Executive Law § 259-c(14) applied only to sex offenders convicted of certain enumerated offenses and only if the victim had been under the age of eighteen. *Williams v. Dep't of Corr. & Cmty. Supervision*, 150, 24 N.Y.S.3d 18, 21 (2016). In 2005, SARA was amended to include level three sex offenders, regardless of the age of the victim. *Id.* Initially, courts in New York offered varying interpretations of the scope of the 2005 amendment. In November 2020, the New York Court of Appeals issued two decisions and addressed the scope of the 2005 amendments. *People ex rel. Negron v. Sup't Woodbourne Corr. Fac.*, 2020 WL 6828791, at \*1 (N.Y. Nov. 23, 2020) and *People ex rel. Johnson v. Sup't Adirondack Corr. Fac.*, 2020 WL 6828834 (N.Y. Nov. 23, 2020). In both cases, the Court held that the 2005 amendments to SARA apply "to any defendant who is serving a sentence for various enumerated sex offenses, when the victim of the offense was under the age of 18 at the time of the offense or, [...] the defendant has been designated a level three sex offender." *Id.* The Southern District similarly interpreted the 2005 amendments to SORA. *Yunus*, 2018 WL 3455408, at \*4. Peoples is a level three sex offender convicted of violating Penal Law § 130.35, one of the enumerated offenses. Dkt. No. 82-2 at 11. Therefore, pursuant to the controlling caselaw on this issue, Peoples is subject to the mandatory condition.

In a further attempt to invalidate the conditions, Peoples also argues that the 2005 amendments were enacted in August 2005 and September 2005, after his conviction and sentencing, and therefore, enforcing the conditions against him violates the Ex Post Facto Clause. Dkt. No. 82-1 at 8.

2021 WL 1582173

"Ex post facto" is a term of art applicable only to "punishment" - legislative action that retroactively "punishes as a crime an act previously committed, which was innocent when done," "makes more burdensome the punishment for a crime, after its commission," or "deprives one charged with crime of any defense available according to law at the time when the act was committed." *Beazell v. Ohio*, 269 U.S. 167, 169-70 (1925). The Ex Post Facto Clause prohibits laws which "retroactively alter the definition of crimes or increase the punishment for criminal acts." *Collins v. Youngblood*, 497 U.S. 37, 43 (1990). Courts in New York and in the Second Circuit have held that the 2005 SARA amendments are "non-punitive", do not violate the Ex Post Facto Clause and were enacted to protect the community, not punish offenders. *Smith v. Flynn*, No. 16-CV-9242, 2018 WL 3946453, at *7 (S.D.N.Y. Aug. 16, 2018) (citing *Wallace v. New York*, 40 F.Supp.3d 278, 314 (E.D.N.Y. 2014) and *Williams v. Dep't of Corr. and Cmty. Supervision*, 24 N.Y.S.3d 18, 23 (1st Dep't 2016)); *Devine v. Annucci*, 56 N.Y.S.3d 149 (2017) (holding that the retroactive application of SARA does not violate the Ex Post Facto Clause). Consequently, the Court is not persuaded by Peoples' arguments.

**\*15** Accordingly, the Court does not find the imposition of these conditions to be arbitrary or capricious and recommends that Defendants' motion for summary judgment and dismissal of Plaintiff's constitutional challenge to these conditions be granted.

### e. Medications

16. I will not us or possess any medications or supplements designed or intended for the purpose of enhancing sexual performance or treating erectile dysfunction without the written permission of my parole officer and the approval of his or her area supervisor.

Peoples argues that this condition violates his right to privacy. Dkt. No. 1-1 at 12. Defendants have not responded to Peoples' arguments.

Based upon the facts surrounding Peoples' convictions, the condition does not involve a greater deprivation of liberty than is necessary as the condition is not a complete ban on taking medication for sexual enhancement. Additionally, Peoples does not allege that, during his time on parole, that he requested, and was unreasonably denied, permission to possess any medications intended to enhance his sexual performance. Accordingly, because the evidence suggests that the condition is reasonably related to Peoples' criminal history and to the goals of protecting the public, the Court recommends that Defendants' motion for summary judgment and dismissal of Plaintiff's constitutional challenge to this condition be granted.

### f. Computer and Internet Restrictions

18. I will not use the internet to access pornographic material, access a commercial social networking website, communicate with other individuals or groups for the purpose of promoting sexual relations with persons under eighteen, and communicate with a person under the age of eighteen unless I receive written permission from the Board of Parole to use the internet to communicate with a minor child under eighteen years of age who I am the parent of and who I am not otherwise prohibited from communicating with.

20. I will not own, use, possess, purchase or have control of any computer, computer related material, electronic storage devices, communication devices and/or the internet unless I obtain prior written permission from my parole officer.

21. If I am permitted by my parole officer to possess a computer at my residence, permission will be granted for only one computer.

22. I will provide all personal, business, phone, internet service provider, and/or cable records to my parole officer upon request.

24. I will provide all user IDs and passwords required to access the computer, my C.M.O.S., and Bios, internet service provider, and/all email accounts, instant messaging accounts, any removable electronic media, including but not limited to media such as smart cards, cell phones, thumb drives and web virtual storage.

Case 9:23-cv-01114-DNH-MJK   Document 31   Filed 04/22/24   Page 42 of 236
Peoples v. Leon, Not Reported in Fed. Supp. (2021)
2021 WL 1582173

25. I will provide my parole officer with my password and user ID for any approved device.

26. I acknowledge that individuals who have access to my computer system and/or other communication or electronic storage devices will also be subject to monitoring and/or search and seizure. I agree to be fully responsible for all material, data, images and information found on my computer and/or other communication or electronic storage devices at all times.

27. I will not create or assist directly or indirectly in the creation of any electronic bulletin board system, services that provide access to the internet, or any public or private computer network without prior written approval from my parole officer.

**\*16** 28. I will not use any form of encryption, cryptography, steganography, compression and/or other method that might limit access to, or change the appearance of, data and/or images without prior written approval from my parole officer.

29. I will not attempt to circumvent, alter, inhibit, or prevent the functioning of any monitoring or limiting equipment, device or software that has been installed by or at the behest of, or is being utilized by, the Department of Corrections and Community Supervision for the purposes of recording, monitoring or limiting my computer or internet use and access, nor will I tamper with such equipment, device or software in any way.

30. I will cooperate with unannounced examinations directed by my parole officer of any and all computer(s) and/or other electronic device(s) to which I have access. This includes access to all data and/or images stored on hard disk drives, floppy diskettes, CD roms, optical disks, magnetic tape, cell phones, and/or any other storage media whether installed within a device or removable.

31. I will install or allow to be installed, at my own expense, equipment and/or software to monitor or limit computer use.

33. I understand that I shall not download, access, or otherwise engage in any internet enabled gaming activities to include Pokemon Go, I further understand that I shall not be in the company of any person who is engaged in any internet enabled gaming activities nor

will I have any gaming software on any internet enabled device that I am permitted to access or otherwise possess. Peoples' argument that these conditions were improperly imposed and unrelated to his criminal history because his crimes did not involve a minor or the internet, *see* Dkt. No. 82-1 at 8, lack merit.

Because Peoples is a level three sex offender, N.Y. Executive Law § 259-c(15) dictates that he is:

> ... prohibited from using the internet to access pornographic material, access a commercial social networking website, communicate with other individuals or groups for the purpose of promoting sexual relations with persons under the age of eighteen, and communicate with a person under the age of eighteen when such offender is over the age of eighteen, provided that the board may permit an offender to use the internet to communicate with a person under the age of eighteen when such offender is the parent of a minor child and is not otherwise prohibited from communicating with such child. [11]

N.Y. Exec. Law § 259-c(15) (the Electronic Security and Targeting of Online Predators Act ("e-STOP")); *M.F. v. New York Exec. Dep't Div. of Parole*, No. 08 CV 1504, 2010 WL 9461647, at *2 (S.D.N.Y. Mar. 24, 2010) (citing N.Y. Exec. § 259-c(15)). The aforementioned condition applies regardless of whether the internet played any role in the sex offender's crimes. *Yunus*, 2018 WL 3455408, at *4.

[11]    As used in this subdivision, a "commercial social networking website" shall mean any business, organization or other entity operating a website that permits persons under eighteen years of age to be registered users for the purpose of establishing personal relationships with other users, where such persons under eighteen years of age may: (i) create web pages or profiles that provide information about themselves where such web pages or profiles are available to the public or to other users;

Case 9:23-cv-01114-DNH-MJK   Document 31   Filed 04/22/24   Page 43 of 236
Peoples v. Leon, Not Reported in Fed. Supp. (2021)
2021 WL 1582173

(ii) engage in direct or real time communication with other users, such as a chat room or instant messenger; and (iii) communicate with persons over eighteen years of age; provided, however, that, for purposes of this subdivision, a commercial social networking website shall not include a website that permits users to engage in such other activities as are not enumerated herein.

N.Y. Exec. Law § 259-c.

**\*17** During Peoples' sentencing, he was "certified" as a sex offender and advised that he was obligated to register as a sex offender in New York. Dkt. No. 71-3. As a result of that designation and pursuant to DOCCS Directives 8304(III)(A) [12] and 9202 [13], Peoples is a mandatory sex offender subject to conditions of release referred to as "GES SC 40 A-F". Dkt. No. 71-22; Dkt. No. 71-2 at ¶ 49(J). Conditions GES SC 40 A-F were recommended by Leon and included in the Board's Decision and Notice as Special Conditions 20, 21, 22, 24, 25, 26, 27, 28, 29, 30, and 31. Dkt. No. 1-1 at 7-9; Dkt. No. 71-6 at 27; Dkt. No. 71-2 at ¶¶ 49(J), (L)-(N).

[12]    DOCCS Directive 8304(III)(A) defines mandatory sex offenders as "[a]ll offenders subject to registration with the New York State Offender Registry." Dkt. No. 71-21.

[13]    DOCCS Directive 9202, entitled Management of Sex Offender Use of Computer Related Materials and Electronic Devices, provides, in pertinent part:
B. Condition of Supervision: Condition(s) of release relating to use and access to computers, computer related material, electronic storage devices, communication devices, and the Internet on sex offenders will be imposed as follows:
1. ORCs and SORCS are to identify mandatory sex offender cases on an ongoing basis and include the special condition (GES SC 40 A-F) on the Parole Board Report or other report prepared for the Parole Board.

Dkt. No. 71-22.

Peoples also contends that the aforementioned "sweeping" conditions are overly-broad, prevent him from pursuing "entrepreneurial aspirations," and are not necessary or legitimate. Dkt. No. 82-1 at 10-14. Peoples seeks to invalidate these conditions relying upon the Supreme Court decision in *Packingham v. North Carolina*, 137 S.Ct. 1730

(2017). In *Packingham*, the Court held that a broad North Carolina criminal statute barring registered sex offenders from accessing commercial social networking websites was unconstitutional. *Id.*

Defendants argue that *Packingham* does not apply because the restrictions at issue were imposed as parole conditions. Dkt. No. 71-29 at 14-17. Upon review of recent caselaw, the Court does not agree with Defendants' restrictive interpretation of the holding in *Packingham*.

In *Yunus v. Robinson*, the Southern District considered, and rejected, a similar argument. The court noted "[e]ven before *Packingham*, courts in this Circuit looked with disfavor on broad cellphone, computer and internet restrictions for sex offenders on parole or supervised release, generally requiring an individualized showing that a particular restriction 'relates to [the offender's] prior conduct.' " *Yunus*, 2018 WL 3455408, at \*30 (citations omitted). The Court reasoned, "[t]here is no indication in *Packingham* that parolees are exempted from the Court's decision [...] "[i]n fact, the [Supreme] Court was clear that the distinction between those who were presently under the supervision of the criminal justice system and those who no longer were was not a basis for it's holding[.]" *Yunus*, 2019 WL 168544, at \*16.

This district court and others have rejected similar arguments. *See Lopez v. Stanford*, No. 18-CV-3493, 2020 WL 6900909, at \*8 (E.D.N.Y. Nov. 24, 2020) (rejecting the defendants' argument that *Packingham* is inapplicable to parole conditions); *Hartwick v. Annucci*, No. 5:20-CV-408 (DNH), 2020 WL 6781562, at \*9 (N.D.N.Y. Nov. 18, 2020) (citing to *Packingham* in context of the plaintiff's challenge to parole conditions); *Manning v. Powers*, 281 F.Supp.3d 953, 961 (C.D. Cal. 2017) (holding that the plaintiff's challenge to a social media parole condition "is controlled by the Supreme Court's recent decision in *Packingham*").

**\*18** In January 2019, the Second Circuit addressed a similar argument, in the context of a condition of supervised release imposed at sentencing. In *U.S. v. Eaglin*, 913 F.3d 88 (2d Cir. 2019), the Second Circuit was presented with a constitutional challenge to a condition that barred the plaintiff from "accessing the Internet from any computer or Internet-capable device in any location unless authorized by the [c]ourt or as directed by the U.S. Probation Office upon approval of the [c]ourt." *Id.* at 94. The condition was defined as a broad ban on social networking sites. *Id.* at 96. The court acknowledged the differences between the facts at hand and

Peoples v. Leon, Not Reported in Fed. Supp. (2021)

2021 WL 1582173

*Packingham.* To wit, a criminal statute was not at issue and Eaglin's challenged condition of supervised release applied only to him and for a limited duration. Nevertheless, the Circuit concluded that *Packingham's* holding applied stating, "[i]n our view, *Packingham* [ ] establishes that, in modern society, citizens have a First Amendment right to access the internet" and "to access certain social networking websites[.]" *Eaglin,* 913 F.3d at 96-97. The court held that the ban was substantially unreasonable holding that, "[i]n light of our precedent, and as emphasized in *Packingham's* recognition of a First Amendment right to access certain social networking websites, the imposition of a total internet ban as a condition of supervised release inflicts a severe deprivation of liberty." *Id.* at *97. The Circuit further noted that Eaglin was not convicted of a crime involving the internet, that the ban would restrict his access to banking and employment, and that the condition was not necessary to protect the public. *Id.* at 97-98.

Defendants also argue that *Packingham* does not apply because Peoples may possess or purchase a computer, with permission from his parole officer. Dkt. No. 71-29 at 11-14. Once again, *Yunus v. Robinson* is instructive. In *Yunus,* the plaintiff, a parolee convicted of two counts of kidnapping, claimed that the following conditions violated his First Amendment rights:

> No. 12: Plaintiff cannot engage or participate in any online computer service that involves the exchange of electronic messages;

> No. 35: Plaintiff may not "own or possess a beeper, scanner or cell phone without permission of his parole officer";

> No. 39: Plaintiff may not possess a computer or computer-related materials without approval by his parole officer; and

> No. 48: Plaintiff is prohibited from accessing a commercial social networking website.

*Yunus*, 2019 WL 168544, at *15.

The court rejected the defendants' argument that the conditions were "not absolute" and concluded:

> These limited exceptions do not satisfy the concerns about access to the 'vast democratic forums of the internet' for a multiplicity of purposes that was the basis for the Supreme Court's decision. *Packingham,* 137 S. Ct. at 1735-37 (internal quotation marks omitted). Furthermore, the possibility of certain case-by-case exceptions was insufficient to save other overly broad conditions of

supervised release limiting internet or technology access, even when analyzed under a less demanding standard. *See United States v. Sofsky,* 287 F.3d 122, 126 (2d Cir. 2002); *United States v. Peterson,* 248 F.3d 79, 81, 82-84 (2d Cir. 2001). Therefore, the possibility of case-by-case exceptions from some of these conditions does not exempt them from *Packingham,* a conclusion reinforced by the nearly blanket manner in which they have allegedly been applied.

*Yunus,* 2019 WL 168544, at *16.

Courts in this circuit and others have held a condition requiring prior written approval from a probation officer cannot salvage an otherwise overly broad restriction. *See U.S. v. Maxson,* 281 F.Supp.3d 594, 600 (D. Md. 2017) (citing *inter alia U.S. v. LaCoste,* 821 F.3d 1187, 1192 (9th Cir. 2016) ("If a total ban on Internet use is improper but a more narrowly tailored restriction would be justified, the solution is to have the district court itself fashion the terms of that narrower restriction. Imposing a total ban and transferring open-ended discretion to the probation officer to authorize needed exceptions is not a permissible alternative.")); *see also Scott v. Rosenberger,* No. 19-CV-1769, 2020 WL 4274226, at *9 (S.D.N.Y. July 24, 2020) ("... the possibility of case-by-case exceptions to a ban does not save an overly broad condition.").

In support of the contention that *Packingham* does not apply, Defendants cite to *U.S. v. Savastio,* 777 Fed. App'x 4 (2d Cir. 2019) and *U.S. v. Browder,* 866 F.3d 504 (2d Cir. 2017). Upon review, the Court finds Defendants' reliance upon the aforementioned cases to be misplaced.

**\*19** In *Savastio,* the plaintiff was on supervised release. The court "reject[ed] Savastio's attempt to rely on the principles articulated in *Packingham*" noting that, "[t]he Supreme Court explicitly linked its holding to 'the troubling fact that the law imposes severe restrictions on persons who already have served their sentence and are no longer subject to the supervision of the criminal justice system.' " *Savastio,* 777 Fed. App'x at 4.

For several reasons, the Court is not persuaded that the holding in *Savastio* is controlling herein. First, *Savastio* is a summary order and thus, lacks precedential effect. *See* Local Rule of the Second Circuit 32.1.1. Second, the facts of *Savastio* are readily distinguishable. Savastio pled guilty to possession of child pornography. *Savastio,* 777. Fed. App'x at 5. The condition of release that Savastio challenged read as follows:

Peoples v. Leon, Not Reported in Fed. Supp. (2021)

2021 WL 1582173

Your internet use will be limited and/or restricted under conditions to be set by the U.S. Probation Office in accordance with their Computer and Internet Monitoring Program. Such internet restriction may include a limitation of your daily internet use and/or the ban of certain websites, applications, chat rooms, or other internet activities as determined by the U.S. Probation Office. These determinations will be based upon an evaluation of your risk and needs, along with consideration of the factors outlined in 18 U.S.C. § 3553(a).

*Savastio*, 777 F. App'x at 5. The Circuit noted that given the plaintiff's history of accessing child pornography over the internet, the condition was reasonably related to his history. *Id.* Additionally, the court found *Packingham* "inapposite", because the condition allowed Savastio to receive permission from the probation office or district court and defined the condition as a monitoring requirement. *Id.* at 7-8. Here, Peoples has not been convicted of any crime involving pornography, minors, or the internet. Moreover, Peoples' condition is not a "monitoring condition" and does not contain similar qualifying language.

In *Browder*, the Circuit referred to *Packingham* only in dicta, noting the differences between *Packingham* and Browder's challenges. *Browder*, 866 F.3d 504, 511, n. 26. Notably, Browder's condition was a "computer monitoring" condition, not a complete internet ban. *Id.* Most "significantly" however, was the fact that Browder presented a Fourth Amendment challenge, while *Packingham* involved the First Amendment. *Id.* Here, Peoples' claims rest with the First Amendment and his condition cannot be described as a "monitoring" condition, but rather, a total internet ban. Therefore, for the same reasons, Peoples' challenge is distinguishable from *Browder*.

In opposition to Defendants' motion, Peoples references a case presently before the United States District Court for the Eastern District of New York, *Jones, et al. v. Stanford and Annucci*, No. 1:20-CV-1332 (E.D.N.Y. filed March 12, 2020), challenging the constitutionality of e-STOP. *See* Dkt. No. 82-1 at 8-9, 10. *Jones* presents a factual scenario strikingly similar to the facts presented herein. In *Jones*, the plaintiffs presented constitutional challenges to parole conditions imposed pursuant to e-Stop and DOCCS Directives 9201 and 9202. *Id.*, Dkt. No. 1. The plaintiffs were convicted of various sexual offenses including attempted rape, rape, sexual abuse, and sexual misconduct involving a minor. *Id.* at 11-18. The plaintiffs were designated at risk Levels One, Two, and Three, and as a condition of their release, an internet and social media ban was imposed. *Id.*

**\*20** In August 2020, the plaintiffs filed a motion for a preliminary injunction seeking to enjoin the defendants from enforcing e-Stop and the Directives. *Jones*, at Dkt. No. 28. In a Memorandum & Order issued on September 9, 2020, the court granted the plaintiff's application and preliminarily enjoined the defendants from applying e-Stop and Directive 9201 "wholesale to Registrants who have not used the internet to facilitate the commission of their underlying sex offense." *Id.*, Dkt. No. 37. The defendants argued that *Packingham* did not apply to "those on community supervision" and cited to *Savastio*. *Id.* at 9. Relying upon *Eaglin* and *Yunus*, the court rejected that argument. *Id.* The court distinguished the facts from those in the "non-precedential" case, noting that in *Savastio*, the condition was a "monitoring condition" that "did not amount to an outright ban on Savastio's access to all forms of social media." *Id.*

The court also noted that the ban was not narrowly tailored to the plaintiffs or in its application to social media. *Jones*, Dkt. No. 37 at 7-17. Addressing each plaintiff, the court noted that the underlying offenses did not involve improper internet use. *Id.* at 11-12. Under the circumstances, the court reasoned that, perhaps "less restrictive alternatives" to monitor the plaintiff's internet use was available and concluded that the imposition of a "blanket ban" was "incompatible with the First Amendment." *Id.* at 12-14. The *Jones* case is presently pending in the Eastern District.

The Court agrees with the reasoning set forth in *Eaglin, Yunus*, and *Jones* and finds that the Special Conditions related to social networking websites, the internet, and Peoples' ability to own or possess a computer are overlapping and may infringe upon Peoples' First Amendment rights. While the Court does not dispute that a legitimate penological interest exists in monitoring Peoples' activities, Defendants have not offered any evidence or explanation regarding why such restrictive conditions are necessary or whether any other less restrictive means of monitoring Peoples were considered. *See*

Peoples v. Leon, Not Reported in Fed. Supp. (2021)

2021 WL 1582173

*U.S. v. Bolin*, 976 F.3d 202, 213-14 (2d Cir. 2020) (citing to *Packingham, Eaglin*, and *Savastio* and concluding that "[i]nternet monitoring, as opposed to a blanket ban, [...], remained to all outward appearances a viable option as it would adequately protect the public from [the releasee's] potential misuse of the Internet while imposing a more reasonable burden on [his] First Amendment interest in accessing the Internet."); *see Eaglin*, 913. F.3d at 98 (holding that an earlier Internet restriction under which his Internet use was monitored by the Probation Office, appeared to be a "viable option").

Most importantly, an issue that was somewhat ignored by Defendants on the motion, the record is devoid of any evidence establishing that the internet, social media, pornography, and children factored into any of Peoples' crimes or criminal history. Defendants have not proven, with competent admissible evidence, that the conditions are "narrowly tailored" so as not to burden Peoples' First Amendment rights more than necessary. *See Scott*, 2020 WL 4274226, at *9 (holding that because the plaintiff's underlying crime did not involve computers or the internet, the restrictions on all computer or internet use without permission were not reasonably related to the plaintiff's conduct); *Yunus*, 2018 WL 3455408 at *32 (holding that parole conditions restricting access to computers and social media were not "narrowly tailored" as required by the Constitution because the plaintiff had never been charged with any internet-related criminal conduct). To be entitled to summary judgment on the issue of the constitutionality of the social media, internet, and computer restrictions, Defendants must prove that the conditions do not violate Peoples' constitutional rights and, on the record, the Court finds that Defendants have not met that burden. Accordingly, it is for the factfinder to conclude whether the special conditions involving technology infringe upon Peoples' First Amendment rights and the Court recommends that this portion of Defendants' motion for summary judgment be denied.

### g. Financial Documentation

**\*21**  23.  I will provide copies of financial documents to my parole officer upon request. These documents may include, but are not

limited to, all credit card bills, bank statements, and income tax returns.

Peoples argues that this condition is over-broad and unconstitutional. [14] Dkt. No. 1-1 at 13. Defendants argue that this condition is reasonably related to Peoples' criminal history, past conduct, and to deter recidivism and protect the public. Dkt. No. 71-2 at ¶ 49(K); Dkt. No. 71-29 at 15.

[14]  Plaintiff also argues that the condition violates the settlement agreement in *Peoples v. Annucci*, No. 11-CV-2694 (S.D.N.Y. Mar. 16, 2016). Dkt. No. 82-1 at 11. The Court is familiar with the settlement agreement in *Peoples v. Annucci* and finds that it is not relevant or binding upon the Court as it relates to the issues presented herein.

"[F]inancial conditions may make it easier for the Probation Department to track [a parolee] in order to ensure his compliance with his registration obligation and with the conditions of his supervised release." *U.S. v. Bradshaw*, 653 Fed. App'x 325, 328 (5th Cir. 2016). However, where the conditions are "vague and overbroad" or imposed without context, the condition may impact liberties. *U.S. v. Sterling*, 959 F.3d 855, 863 (8th Cir. 2020) (reasoning that "broad financial disclosure conditions" are needed in cases involving convictions related to child support, debt, money, or greed).

Here, Peoples' conviction did not involve any monetary crimes and he is not required to make restitution payments. *Cf. U.S. v. Jeremiah*, 493 F.3d 1042, 1046 (9th Cir. 2007) (upholding restrictions on bank accounts, credit cards, and taxes because the conditions were reasonably related to supervising the defendant's ability to make restitution payments). While Peoples has a history of failing to comply with travel and geographical restrictions, the condition, as presently written, is overreaching as it does not include any language related to the purpose of the condition or language that would prevent the parole officer from demanding information arbitrarily. *But cf. U.S. v. Scaife*, No. 12 CR 519, 2015 WL 3775352, at *10 (N.D. Ill. May 20, 2015) (upholding condition that required the defendant to "provide the Probation Officer with access to requested financial information 'necessary to monitor compliance with the conditions of supervised release.' ").

Accordingly, the Court recommends that Defendants' motion for summary judgment be denied with respect to this special condition.

Case 9:23-cv-01114-DNH-MJK   Document 31   Filed 04/22/24   Page 47 of 236

Peoples v. Leon, Not Reported in Fed. Supp. (2021)

2021 WL 1582173

### h. Photo Imaging

32. I will submit to photo imaging every 90 days, or whenever directed by my parole officer or other representative of the N.Y.S. Department of Corrections and Community Supervision.

Peoples argues that there is no evidence that he has ever altered his image or attempted to alter his image and therefore, the condition is over broad and arbitrary. Dkt. No. 82-1 at 12; Dkt. No. 1-1 at 13. Defendants contend that the condition is mandated by statute and reasonably related to Peoples' criminal history, needed to protect the public, and necessary to prevent future offenses. Dkt. No. 71-29 at 18.

Pursuant to SORA and N.Y. Corr. Law § 168-f(3):

... [a] sex offender designated as a sexual predator or having been given a level three designation must personally verify his or her address with the local law enforcement agency every ninety calendar days after the date of release or commencement of parole or post-release supervision, or probation, or release on payment of a fine, conditional discharge or unconditional discharge. At such time the law enforcement agency having jurisdiction may take a new photograph of such sex offender if it appears that the offender has had a change in appearance since the most recent photograph taken pursuant to paragraph (b-2) of subdivision two of this section. If such photograph is taken, the law enforcement agency shall promptly forward a copy of such photograph to the division. The duty to personally verify shall be temporarily suspended during any period in which the sex offender is confined to any state

or local correctional facility, hospital or institution and shall immediately recommence on the date of the sex offender's release.

**\*22** A Level Three sex offender must register in person with the local police department every ninety (90) days and their registration obligations continue annually for life. *Rodriguez v. Attorney Gen.*, No. 10 CIV. 3868, 2011 WL 519591, at *5 (S.D.N.Y. Feb. 15, 2011); *People v. Barber*, 27 Misc. 3d 1234(A), 911 N.Y.S.2d 694 (Sup. Ct. 2010) (citations omitted).

As discussed *supra*, Peoples was designated a Level Three sex offender. Peoples has not stated how this condition deprives him of a fundamental liberty interest in violation of the Constitution. Moreover, the government has a legitimate interest in SORA and protecting the community from sex offenders. *People v. Knox*, 12 N.Y.3d 60, 68 (2009).

Accordingly, the Court recommends that Defendants' motion for summary judgment, with respect to this condition, be granted.

### i. Requirement to Comply with Conditions Imposed by Parole Officer

11. I will comply with all case specific sex offender conditions to be imposed by the P.O.

Peoples argues that this condition is "overly-broad and unconstitutional" as it constitutes a "blanket-condition meant to whimsically abuse discretion by overreaching and infringing on constitutional rights." Dkt. No. 1-1 at 11.

"A special condition of parole that is so vague that a person of common knowledge must guess at its meaning will be struck down as void for vagueness." *Yunus*, 2018 WL 3455408, at *25 (quoting *LoFranco v. U.S. Parole Comm'n*, 986 F. Supp. 796, 808 (S.D.N.Y. 1997), *aff'd*, 175 F.3d 1008 (2d Cir. 1999)). While Alexander claims that the condition is "specifically tailored" and "enables the calibration of his conditions according to his particular risk factors and criminogenic needs," *see* Dkt. No. 71-2, Defendants did not

Case 9:23-cv-01114-DNH-MJK   Document 31   Filed 04/22/24   Page 48 of 236

Peoples v. Leon, Not Reported in Fed. Supp. (2021)

2021 WL 1582173

present any legal argument or caselaw in support of the motion for summary judgment with respect to this condition. As presently constituted, the condition does not "sufficiently inform" defendant of "what conduct will result in his being returned to prison. *See Yunus*, 2018 WL 3455408, at *25. As to this condition, there are genuine issues of material fact for a factfinder to resolve. Therefore, the Court recommends that Defendants' motion for summary judgment be denied with respect to this special condition.

### C. Personal Involvement

Defendants move for summary judgment and dismissal of all claims against Stanford, the Chairwoman of the Board, arguing that Stanford was not personally involved in the October 2018 determination imposing the Special Conditions at issue herein. *See* Dkt. No. 71-29 at 21-25. Peoples argues that Stanford personally involved in the constitutional violations because she permitted a policy or custom to continue to deny registered sex offenders access to the internet and social media in violation of *Packingham*. *Id.* at 14-15.

As discussed *supra*, Peoples sued Defendants for declaratory relief, injunctive relief, and compensatory damages. Although Peoples does not specifically state that he is suing Defendants in their individual capacity, *see* Compl. at 1; Dkt. No. 1-1 at 1, 9-20, courts in this district assume that pro se prisoners intend to sue pursuant to § 1983 in both capacities. *See Zaire v. Doe*, No. 9:03-CV-629 (FJS/RFT), 2006 WL 1994848, at *10 (N.D.N.Y. July 13, 2006). The arguments presented by Defendants in support of dismissal of the claims against Stanford, and Plaintiff's opposition, implies that the parties believe that the defendants have been sued in their individual capacities. *See Davis v. Cty. of Nassau*, 355 F.Supp.2d 668, 675–76 (E.D.N.Y. 2005) (citing *Shabazz v. Coughlin*, 852 F.2d 697, 700 (2d Cir. 1988)) (reasoning that the plaintiff's for damages, "coupled with the defendants' summary judgment motion [...], suggests that the parties believed that this action is a personal capacity suit.").

### 1. Claims Against Stanford in her Individual Capacity

**\*23** "Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a section

1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *See Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). Prior to *Iqbal*, the Second Circuit held that supervisory personnel may be considered "personally involved" only if they (1) directly participated in the alleged constitutional violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)).

In a recent case, *Tangreti v. Bachmann*, the Second Circuit addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing supervisory liability. *Id.*, 2020 WL 7687688 (2d Cir. 2020). In *Tangreti*, the plaintiff was sexually abused by correctional officers at York Correctional Institute in 2014 and argued that the defendant, a counselor supervisor, violated the Eighth Amendment by exhibiting deliberate indifference to the risk of sexual abuse by the officers. *Id.* at * 2, 3. Consistent with other circuits, the court concluded that "there is no special rule for supervisory liability" and held that a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.' " *Id.* at *6. Therefore, to avoid summary judgment, the plaintiff had to establish that the defendant violated the Eighth Amendment by her "own conduct, not by reason of [her] supervision of others who committed the violation" and could

Peoples v. Leon, Not Reported in Fed. Supp. (2021)

2021 WL 1582173

not "rely on a separate test of liability specific to supervisors." *Id.*

In support of the motion, Stanford provided a Declaration and avers that she does not have authority to unilaterally establish a process for administratively appealing the imposition of special conditions by a Parole Board panel. Dkt. No. 71-24 at ¶ 7. Stanford was not present at Peoples' parole interview, she did not review the Board's conclusions and, in fact, was not aware of the Board's decision until she was served with the summons and Complaint in this lawsuit. *Id.* at ¶ 13. Stanford had no contact with Peoples, prior to being served with the Complaint. *Id.* at ¶ 15.

**\*24** Based upon the holding in *Tangreti*, summary judgment should be entered in favor of Stanford. The record lacks any evidence that Stanford violated Plaintiff's First and/or Fourteenth Amendment rights through her own individual actions or conduct.

Even if the Court considers the *Colon* factors, summary judgment is still warranted. The third *Colon* category provides for personal involvement where "the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom." *Colon*, 58 F.3d at 873. "A policy or custom can be explicitly established in an adopted rule or regulation, or may exist if the 'violative practice is persistent and widespread,' and if the acts of subordinate employees 'imply the constructive acquiescence of senior policy-making officials.' " *Lipton v. Cty. of Orange*, 315 F.Supp.2d 434, 453 (S.D.N.Y. 2004). To establish personal involvement pursuant to the third *Colon* factor, a plaintiff must produce evidence that the defendant had policymaking responsibility and that, after notice of an unconstitutional practice, the defendant created the improper policy or allowed it to continue, causing the harm. *See Pusepa v. Annucci*, No. 17-CV-7954, 2019 WL 720699, at *4 (S.D.N.Y. Feb. 19, 2019) (citation omitted).

Even assuming that Stanford was responsible for creating policy, Peoples has not presented evidence establishing that Stanford was on notice that an unconstitutional policy existed and failed to take action. The record lacks facts related to other instances of similar unconstitutional practices involving registered sex offenders and their access to the internet and social media in violation of *Packingham*, or evidence of Stanford's knowledge of the instances to permit a jury to find that Stanford was personally involved pursuant to the third *Colon* factor. *See Pusepa*, 2019 WL 720699, at *7 (accepting

allegations of frequent sexual abuse at facility to suggest that the supervisory defendants were aware that their policies permitted the abuse to continue); *see also Casey v. Brockley*, No. 9:13-CV-01271 (DNH/TWD), 2018 WL 1399244, at *9 (N.D.N.Y. Feb. 16, 2018) (awarding summary judgment in favor of the superintendent because the plaintiff failed to provide evidence of similar events and "sheds no light on [the Superintendent's] actions or conduct in creating or permitting a policy or custom"). [15]

[15]       With respect to the remaining *Colon* factors, the record evidence does not suggest that Stanford was aware of Peoples' claims or that she acted, or failed to act, once placed on notice of the allegations.

Thus, the Court recommends granting Defendants' motion summary judgment and dismissing Peoples' claims against Stanford, in her individual capacity.

### 2. Claims Against Stanford in her Official Capacity

Although it is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983 for monetary damages, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation, *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013), "district courts in this Circuit have held 'that the personal involvement requirement does not apply to bar actions ... pursuant to § 1983 for injunctive relief against a state official.' " *Nassau & Suffolk Cty. Taxi Drivers Ass'n, Inc. v. State*, 336 F.Supp.3d 50, 68 (E.D.N.Y. 2018) (quoting *Marinaccio v. Boardman*, No. 1:02-CV-00831, 2005 WL 928631, at *9 (N.D.N.Y. Apr. 19, 2005)); *McLaurin v. Paterson*, No. 07 CIV 3482, 2008 WL 3402304, at *11 (S.D.N.Y. Aug. 11, 2008) (denying motion to dismiss the claims against the Governor and the Chairman of the Division of Parole in their official capacities based upon the lack of personal involvement in parole hearings). However, "[u]nder *Ex parte Young*, the state officer against whom a suit is brought 'must have some connection with the enforcement of the act' that is in continued violation of federal law." *Daily Mart Convenience Stores, Inc. v. Nickel (In re Dairy Mart Convenience Stores, Inc.)*, 411 F.3d 367, 372–73 (2d Cir. 2005) (quoting *Ex Parte Young*, 209 U.S. at 154, 157). "So long as there is such a connection, it is not necessary that the officer's enforcement duties be noted in the act." *Id.*; *Rother v. NYS Dep't of Corr. & Cmty. Supervision*, 970 F.Supp.2d 78, 102–03 (N.D.N.Y. 2013) (reasoning that "[a]ll that a Plaintiff

2021 WL 1582173

must show is that the official had: (1) 'a direct connection to, or responsibility for, the alleged illegal action[s]'; and (2) 'the authority to perform the required act.' ") (citation omitted).

**\*25** Defendants' arguments in support of summary judgment are limited to an analysis of the *Colon* factors and personal involvement as it relates to claims for damages against Stanford, in her individual capacity. Defendants offer no argument or evidence establishing that Stanford is not "connected" with the decisions to impose special conditions of parole.

The evidence before the Court does not demonstrate an absence of an issue of fact regarding whether Peoples is prevented from asserting a claim for injunctive relief against Stanford. Thus, the Court recommends denying Defendants' motion summary judgment and dismissal of Peoples' claims against Stanford, in her official capacity.

### D. Judicial Immunity

Defendants argue that Peoples' claims against Alexander are barred by absolute immunity. Dkt. No. 71-29 at 19-20. Peoples did not respond to this argument.

It is well established that "officials acting in a judicial capacity are entitled to absolute immunity against § 1983 actions, and this immunity acts as a complete shield to claims for money damages." *Montero v. Travis*, 171 F.3d 757, 760 (2d Cir. 1999) (citation omitted). This immunity extends to claims for injunctive relief unless a declaratory decree was violated or declaratory relief is unavailable. *Id.* at 761; *Davis v. Travis*, No. 07 CIV. 3047, 2008 WL 5191074, at *3 (S.D.N.Y. Dec. 3, 2008) (holding that absolute immunity barred claims for damages and injunctive relief against parole board officials). "[A]bsolute immunity protects officials in their adjudicative or prosecutorial functions[,]" but "does not extend to the performance of administrative or investigative functions." *Farrell v. Burke*, No. 97 Civ. 5708, 1998 WL 751695, at *4 (S.D.N.Y. Oct. 28, 1998) (citing *Scotto v. Almenas*, 143 F.3d 105, 110 (2d Cir. 1998)).

"[P]arole board officials, like judges, are entitled to absolute immunity from suit for damages when they serve a quasi-adjudicative function in deciding whether to grant, deny or revoke parole" because these tasks are "functionally comparable to that of a judge." *Montero,* 171 F.3d at 761; *Scotto,* 143 F.3d at 111. While some courts have held that the

imposition of special parole conditions can be an adjudicative act that merits absolute immunity, courts in this circuit have also recognized that the decision to impose special conditions may be administrative in nature and "void of any discretion on the parole official's part." *Hartwick*, 2020 WL 6781562, at *8 (citations omitted); *Doe v. Annucci*, No. 14 CIV. 2953, 2015 WL 4393012, at *8 (S.D.N.Y. July 15, 2015); *Farrell*, 1998 WL 751695, at *4 (citing *inter alia, Morrissey v. Brewer*, 408 U.S. 471, 478 (1972) (stating that parole officers perform largely administrative functions)). To resolve the issue of whether the imposition of special conditions of parole is an adjudicative or administrative act, a factual inquiry is necessary. *Farrell*, 1998 WL 751695, at *4.

Although Defendants move for summary judgment on this issue, the motion lacks any argument or analysis of Alexander's role or facts establishing that she performed solely adjudicative functions, rather than administrative or investigative. Conversely, the record before the Court indicates that some of the special conditions imposed were the "product of an adjudicative process" while others were administered pursuant to statutory authority; "as administrative." *See Hartwick*, 2020 WL 6781562, at *8 (declining to apply absolute immunity where the Board allegedly imposed statutory unconstitutional parole conditions related to the internet).

**\*26** Based upon the record, the Court finds issues of fact for a jury to resolve related to the issue of immunity. Accordingly, the undersigned recommends denying the Defendants' motion for summary judgment on this ground. *See Farrell*, 1998 WL 751695, at *4 (refusing to dismiss on the grounds of absolute immunity where the facts did not permit the Court to determine whether the parole officers acted adjudicatively or administratively in imposing special conditions). [16]

[16]     Defendants cite to *Stewart v. Smallwood*, No. 92 Civ. 4043, 1993 WL 77381 (S.D.N.Y. Mar. 15, 1993), in support of the argument that officials who imposed parole conditions are absolutely immune from civil damages. In *Hartwick,* Judge Hurd deviates from the decision in *Stewart* noting that the court found "parole board officials absolutely immune without further inquiry." *Hartwick*, 2020 WL 6781562, at *8.

Case 9:23-cv-01114-DNH-MJK   Document 31   Filed 04/22/24   Page 51 of 236

Peoples v. Leon, Not Reported in Fed. Supp. (2021)

2021 WL 1582173

**E. Qualified Immunity**

In the alternative, Defendants argue that they are shielded from liability based on the doctrine of qualified immunity because Peoples had no clearly established right to be free from the special conditions he challenges. [17] Dkt. No. 71-29 at 26-27.

[17]   To the extent that Defendants move for summary judgment and dismissal of all claims based on the doctrine of qualified immunity, I do not consider these arguments in the context of claims for which I have already recommend dismissal in this Report-Recommendation. *See Armand v. Simonson*, 12-CV-7709, 2016 WL 1257972, at *15 (S.D.N.Y. Mar. 30, 2016) ("[b]ecause the Court dismisses Plaintiff's claim against Peterson, there is no need to consider whether she may also be entitled to qualified immunity."); *see also Posr v. City of New York*, 10-CV-2551, 2013 WL 2419142, at *10, n.8 (S.D.N.Y. June 4, 2013) ("Because [the defendant] did not violate [the] [p]laintiff's [constitutional] rights, there is no need to consider if [the defendant] is entitled to qualified immunity."), *aff'd sub nom. Posr v. Ueberbacher*, 569 Fed. App'x 32 (2d Cir. 2014).

Qualified immunity shields federal and state officials from suit " 'unless [1] the official violated a statutory or constitutional right that [2] was clearly established at the time of the challenged conduct.' " *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "A right is 'clearly established' if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Beckles v. City of New York*, 492 Fed. App'x 181, 182 (2d Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: " '(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful.' " *Phillips v. Wright*, 553 Fed. App'x 16, 17 (2d Cir. 2014) (quoting *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013)). "Even

if the right at issue was clearly established in certain respects, however, an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Doe v. Lima*, 270 F.Supp.3d 684, 710 (S.D.N.Y. 2017) (citations omitted), *aff'd sub nom. Doe v. Cappiello*, 758 Fed. App'x 181 (2d Cir. 2019).

**\*27**   Qualified immunity only bars monetary damages - it does not bar declaratory and injunctive relief. *Robinson v. New York*, 486 Fed. App'x 905, 907 (2d Cir. 2012); *Singleton v. Doe*, 210 F.Supp.3d 359, 371 (E.D.N.Y. 2016) (citing *Allen v. Coughlin*, 64 F.3d 77, 81 (2d Cir. 1995)). Thus, Defendants' motion for summary judgment and dismissal of the claims for declaratory relief and injunctive relief prohibiting the enforcement of the special conditions of parole is denied.

With respect to Peoples' claim for monetary damages, the record contains genuine issues of material fact as to the constitutionality of certain Special Conditions of parole. As such, the first prong of the qualified immunity analysis has been met.

With respect to the second prong, in support of the motion for summary judgment, Defendants summarize the legal standards related to qualified immunity and state, in a cursory manner, that Peoples had no clearly established right to be free from any of the special conditions of confinement. Dkt. No. 71-29 at 27. While Defendants are correct, it is also well established that parole conditions may not be applied in an arbitrary and capricious manner and must be reasonably related to the parolee's underlying offense. *Yunus*, 2019 WL 168544, at *19 (S.D.N.Y. Jan. 11, 2019) (citation omitted); *Scott*, 2020 WL 4274226, at *13. As discussed *supra*, there are genuine issues of material fact as to whether Defendants acted arbitrarily and capriciously in imposing Special Conditions 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, and 33. Further, as previously noted, cases in this Circuit have held that special conditions on internet and computer access may infringe upon a parolee's First Amendment rights if the restrictions are overly-broad and not reasonably related to a parolee's past conduct. Defendants' brief lacks any argument suggesting that Peoples' right to be free from some or all of these conditions was not clearly established. On the basis of the record before it, the Court cannot find that Defendants are entitled to the protections of qualified immunity.

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 52 of 236

**Peoples v. Leon, Not Reported in Fed. Supp. (2021)**

2021 WL 1582173

Therefore, the Court recommends denying Defendants' motion for summary judgment and dismissal based upon qualified immunity.

### F. Declaratory and Injunctive Relief Against Leon

Leon avers, and Peoples does not dispute, that she retired from DOCCS in January 2020 and is no longer employed by DOCCS. Dkt. No. 71-23 at ¶1. Therefore, because Leon does not have the authority to remedy any ongoing constitutional violations, Peoples cannot seek injunctive or declaratory relief against her. *Marshall v. Annucci*, No. 16-CV-8622, 2018 WL 1449522, at *8 (S.D.N.Y. Mar. 22, 2018). Accordingly, Peoples' claims for injunctive and declaratory relief against Leon are dismissed, sua sponte, as moot. *McKethan v. New York State Dep't of Corr. Servs.*, No. 10 CIV. 3826, 2012 WL 2367033, at *2 (S.D.N.Y. June 21, 2012) (finding that retiree has no ability to provide injunctive relief) (citing *Corr. Officers Benevolent Assoc. v. Kralik*, No. 04–CV–2199, 2009 WL 856395, at *8 (S.D.N.Y. Mar. 26, 2009)) ("[B]ecause a defendant no longer occupied the position which he occupied at the time of the underlying events, and therefore did 'not have the official capacity necessary to enable him to comply with the injunctive relief sought,' he had to be dismissed from the case").

### G. Doe Defendants

**\*28**  As discussed *supra*, Peoples asserted claims against two unnamed defendants identified as Commissioner Jane Doe and Commissioner John Doe. Compl. at 1, 2. In a Memorandum-Decision and Order issued on February 19, 2019 (the "February Order"), the Court directed Plaintiff to "take reasonable steps to ascertain their identities through discovery[.]" Dkt. No. 8 at 10. Peoples was advised to amend the operative pleading to properly name the individuals as parties and was advised that if he failed to ascertain the identify of the Doe defendants to permit timely service of process, all claims against the individuals were subject to dismissal. *Id.*

Peoples did not comply with the February Order and, further, his opposition to Defendants' motion is devoid of any reference to the Doe Defendants. Therefore, as to the still unidentified John Doe and Jane Doe Defendants, I recommend these Defendants be dismissed based upon: (1) Fed. R. Civ. P. 16(f) for failure to comply with a court

order pursuant to; (2) Fed. R. Civ. P. 41(b) and N.D.N.Y.L.R. 41.2(a) for failure to prosecute under; and (3) Fed. R. Civ. P. 4(m) for failure to serve within 90 days.

### IV. CONCLUSION

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that Defendants' motion for summary judgment and dismissal (Dkt. No. 71) be **GRANTED** as to:

a. Plaintiff's claims for monetary damages against Defendants in their official capacities;

b. Plaintiff's First and Fourteenth Amendment claims related to Special Conditions 3, 4, 8, 10, 14, 15, 16, 32, 34, 35, and 36;

c. Plaintiff's claims for monetary damages against Stanford in her individual capacity; and it is further

**RECOMMENDED**, that Defendants' motion (Dkt. No. 71) be **DENIED** as to:

    a.  Plaintiff's First and Fourteenth Amendment claims related to Special Conditions 11, 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, and 33; and

    b.  Plaintiff's claims for injunctive relief against Stanford in her official capacity; and

    c.  the issue of judicial immunity; and

    d.  the issue of qualified immunity; and it is further

**RECOMMENDED**, that Plaintiff's claims against Jane Doe and John Doe be **DISMISSED**, *sua sponte;* and it is further

**RECOMMENDED**, that Plaintiff's claims for injunctive and declaratory relief against Leon be **DISMISSED**, sua sponte; and it is further

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules; and it is further

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [18] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk

2021 WL 1582173

of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

[18]   If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(c).

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1582173

---

**End of Document**   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 54 of 236
Yunus v. Robinson, Not Reported in Fed. Supp. (2018)
2018 WL 3455408

2018 WL 3455408
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Equan YUNUS, Sr., aka Damon Vincent, Plaintiff,

v.

J. Lewis ROBINSON, et al., Defendants

17-CV-5839 (AJN) (BCM)
|
Signed 06/29/2018

**Attorneys and Law Firms**

David Benjamin Berman, Emery Celli Brinckerhoff & Abady LLP, New York, NY, for Plaintiff.

Amanda Shoffel, Daniel A. Schulze, New York State Office of the Attorney, New York, NY, for Defendants.

**REPORT AND RECOMMENDATION
TO THE HON. ALISON J. NATHAN**

BARBARA MOSES, United States Magistrate Judge

**\*1** Plaintiff in this action is a registered sex offender who, insofar as the record reveals, has never committed any sexual misconduct. After pleading guilty in 2002 to two counts of kidnapping, plaintiff learned that he would be required to register as a sex offender for a minimum of 20 years, because one of his victims was under the age of 17 at the time of the crime, rendering it a "sex offense," and plaintiff a "sex offender," as those terms are defined in New York's Sex Offender Registration Act (SORA), N.Y. Correct. Law (CL) § 168-a, *et seq.* Prior to plaintiff's release on parole in 2016, a state court judge found that there was "virtually no likelihood that [he] will commit a sex crime ever," and classified him as a level one (low risk) offender. Since then, notwithstanding his low risk classification, plaintiff has been denied permission to move out of the men's shelter where he was placed by his parole officer and remains subject to a variety of other restrictive conditions, including some that are required by New York's sex offender laws and others that are not made mandatory by statute but are nonetheless —he alleges—applied indiscriminately to all registered sex offenders without regard for their individual circumstances.

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, claiming that his designation as a sex offender violates his procedural and substantive due process rights and that certain of his parole conditions are unconstitutionally vague, violate his free speech rights, interfere with his right to intimate family relations, or were imposed in an arbitrary and capricious manner not reasonably related to his past conduct.

Now before me for report and recommendation are (a) defendants' motion to dismiss all of plaintiff's claims with prejudice, made pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(1) (Dkt. No. 59), and (b) plaintiff's motion for a preliminary injunction, made pursuant to Fed. R. Civ. P. 65(a) (Dkt. No. 43). Defendants contend that the Second Amended Complaint (SAC) (Dkt. No. 54) fails to state any claim upon which relief may be granted and that certain of plaintiff's claims are barred by the *Rooker-Feldman* doctrine. Plaintiff contends that this Court should issue a mandatory injunction relieving him of his "sex offender designation" and freeing him from a number of the parole conditions to which he is currently subject.

For the reasons that follow I respectfully recommend that defendants' motion to dismiss be granted with respect to plaintiff's First Claim for Relief, as well as portions of the Third, Fourth, Fifth, and Sixth Claims for Relief, and otherwise denied. I further recommend that plaintiff's motion for a preliminary injunction be granted to the extent that defendants be enjoined from subjecting plaintiff to the registration and notification provisions applicable to "sex offenders" under SORA or the mandatory parole conditions prescribed for registered sex offenders, and that they rescind any discretionary parole conditions imposed on him solely by virtue of his designation as a "sex offender." In the alternative, I recommend that certain specific parole conditions be rescinded.

## I. OVERVIEW OF APPLICABLE LAWS AND REGULATIONS

### A. Sex Offender Registration Act

**\*2** SORA was enacted in 1995 to protect the public from "the danger of recidivism posed by sex offenders," 1995 N.Y. Sess. Laws ch. 192, § 1 (effective Jan. 21, 1996). The Legislature also noted that the statute would bring New York into conformity with the federal Jacob Wetterling Act, passed as part of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796, 2038 (Sept. 13, 1994), which "conditioned certain federal funding on states' enactment of legislation requiring the registration of

2018 WL 3455408

sexually violent offenders and people who committed crimes against children." *People v. Knox*, 12 N.Y.3d 60, 67, 875 N.Y.S.2d 828, 832 (2009). Under SORA, a "sex offender" is anyone convicted of a "sex offense" or "sexually violent offense" as those terms are defined in the statute. CL § 168-a(1). Kidnapping in the first or second degree, in violation of N.Y. Penal Law (PL) § 135.25 or § 135.20, is a "sex offense" whenever the victim of the kidnapping "is less than seventeen years old and the offender is not the parent of the victim." CL § 168-a(2)(a)(i).[1] In *Knox*, the New York Court of Appeals upheld the constitutionality of this provision against a substantive due process challenge brought by appellants who—like plaintiff Yunus—were convicted of kidnapping or related crimes with no proof of "any sexual act or sexual motive." 12 N.Y.3d at 64, 875 N.Y.S.2d at 830. Upon conviction of a "sex offense," the court "shall certify that the person is a sex offender." CL § 168-d(1)(a).

[1]    SORA has been amended many times over the past two decades, and the list of crimes defined as "sex offenses" has grown over that period. Since its original enactment, however, SORA has included both first-degree and second-degree kidnapping as "sex offenses" if the victim was less than 17 years old. *See* 1995 N.Y. Sess. Laws ch. 192, § 2.

Under SORA, all sex offenders must register with the New York State Division of Criminal Justice Services (Division). Among the consequences of sex offender registration are:

> [T]he registrant's name, address, photograph and fingerprints remain on file with the Division; the registrant must verify his address annually to the Division, and must appear periodically at a law enforcement agency to provide a current photograph; local law enforcement agencies are notified when a registrant moves into their jurisdiction; and any caller inquiring about a named individual will be told if that person is a registered sex offender.

*Knox*, 12 N.Y.3d at 65, 875 N.Y.S.2d at 831 (citations omitted).

Failure to register as required is a felony under state law and, under certain circumstances, a felony under federal law. *See* CL § 168-t; 18 U.S.C. § 2250(a).

Before a sex offender is released or paroled from prison, the Board of Examiners of Sex Offenders (Board) must assess "the risk of a repeat offense by such sex offender and the threat posed to the public safety," CL § 168-*l*(5), and make a recommendation to the sentencing court, based on "the degree of the risk of re-offense." *Id.* § 168-l(6).[2] The court must then hold a "SORA hearing" to classify the person as a level one, level two, or level three sex offender. *Id.* § 168-n(2); *Francis*, 30 N.Y.3d at 744, 71 N.Y.S. 3d at 399. Level one offenders, for whom "the risk of a repeat offense is low," must register annually for 20 years. CL §§ 168-*l*(6)(a),168-h(1). Level two (moderate risk) and level three (high risk) offenders must register for life. *Id.* §§ 168-*l*(6)(b), 168-*l*(6)(c), 168-h(2). Law enforcement officials may disseminate "relevant information" about a registered sex offender "to any entity with vulnerable populations related to the nature of the offense committed by such sex offender." *Id.* § 168-*l*(6)(a), (b), (c).[3] Only level two and level three offenders are pictured in the on-line Sex Offender Registry maintained by the Division. *Id.* §§ 168-*l*(6)(b), 168-*l*(6)(c), 168-q. However, information about level one offenders is available to members of the public by calling a toll-free number maintained by the Division. *Id.* § 168-p(1).

[2]    The Board makes its recommendations using an "assessment instrument" under which points are assessed for various factors believed to correlate with a higher risk of sexual recidivism. *See generally People v. Francis*, 30 N.Y.3d 737, 744, 71 N.Y.S. 3d 394, 399 (2018).

[3]    Disclosable information includes the registrant's name and photograph, "exact address, background information including the offender's crime of conviction, mode of operation, type of victim targeted, the name and address of any institution of higher education at which the sex offender is enrolled, attends, is employed or resides and the description of special conditions imposed on the offender." CL § 168-*l*(6)(a).

**\*3** The court is not required to accept the Board's recommendation as to the appropriate risk classification of a sex offender. *See* CL § 168-n(2); *Francis*, 30 N.Y.3d at 744, 71 N.Y.S. 3d at 744 (the SORA court has "the ultimate

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 56 of 236

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)
2018 WL 3455408

responsibility of designating the offender's risk level"). However, departures from the Board's recommendations are "the exception, not the rule." *People v. Johnson,* 11 N.Y.3d 416, 421, 872 N.Y.S.2d 379, 382 (2008) (affirming level two classification where appellant "never asked" the sentencing court "to use its discretion to depart from the Board's recommendation").

There is no provision in the statute for the SORA court to consider whether the "sex offender" coming before it is in fact a sex offender. In most cases—including this one—persons convicted of crimes defined as sex offenses by the New York Legislature become sex offenders automatically, by operation of law, upon conviction. CL § 168-d(1)(a). [4]

[4]    In some cases, the court in which the offender is convicted must hold an additional hearing to determine the age of the victim before concluding that the crime of conviction meets the definition of a sex offense. For example, patronizing a prostitute in the third degree, in violation of PL § 230.04, is a "sex offense" under SORA if "the person patronized is in fact less than seventeen years of age." CL § 168-a(2)(i). When a defendant is convicted under PL § 230.04, the court is required to hold a separate hearing, at which the state must prove the victim's age by clear and convincing evidence, before that defendant is certified as a sex offender. CL § 168-d(b). No such hearing is required in kidnapping cases.

After the initial SORA hearing, either the sex offender or the district attorney may petition the court for "an order modifying the level of notification." CL §§ 168-o(2), (3). However, there is no provision in the statute for a sex offender to challenge his designation as such. Nor, under current law, is there any statutory avenue for a level one sex offender to seek relief from the registration requirement at any time during the 20 years he is required to register. *See Doe v. Cuomo,* 755 F.3d 105, 112-13 (2d Cir. 2014). [5]

[5]    When SORA was first enacted in 1996, CL § 168-o permitted any registered sex offender to petition the sentencing court to "be relieved of any further duty to register." In 1999, that provision was revised by 1999 N.Y. Sess. Laws 1999 ch. 453, § 18 (effective January 1, 2000), which among other things specified, in what became CL § 168-o(1), that a sex offender must have been registered

"for a minimum period of ten years" before he may petition for relief. As a practical matter, this eliminated the petition right for level one and level two sex offenders, who at that time were only required to register for ten years, but preserved it for level three offenders, who—in the absence of judicial relief—were required to register for life. The statute was amended again by 2002 N.Y. Sess. Laws ch. 11, § 22 (effective March 11, 2002), which expressly limited the petition right to level three offenders, and only if they had been registered for a minimum of 13 years. Most recently, in 2006, in 2006 N.Y. Sess. Laws 2006, ch. 1, § 3 (effective January 18, 2006), the Legislature increased the registration period for level one sex offenders from 10 to 20 years, increased the registration period for level two offenders from ten years to life, and further revised CL § 168-o(1) to eliminate the de-registration (or "de-classification") petition right for all sex offenders other than level two offenders who had been registered for a minimum of 30 years.

### B. New York Executive Law
**\*4** Registration aside, sex offenders on parole are subject to a number of conditions not ordinarily imposed on other parolees. All level three sex offenders, and all sex offenders whose victims were under the age of 18 (regardless of risk level), *must* be prohibited from:

> using the internet to access pornographic material, access a commercial social networking website, communicate with other individuals or groups for the purpose of promoting sexual relations with persons under the age of eighteen, and communicate with a person under the age of eighteen when such offender is over the age of eighteen, provided that the board may permit an offender to use the internet to communicate with a person under the age of eighteen when such offender is the parent of a minor child and is not otherwise prohibited from communicating with such child.

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 57 of 236

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)
2018 WL 3455408

N.Y. Exec. Law (EL) § 259-c(15). This prohibition applies regardless of the nature of the underlying crime, and regardless of whether the internet played any role in that crime.

In addition, pursuant to New York's Sexual Assault Reform Act (SARA), 2000 N.Y. Sess. Laws ch. 1, § 8 (effective Feb. 1, 2001), parolees convicted of certain offenses (including kidnapping) who are level three sex offenders, or whose victims were under the age of 18 (regardless of risk level), *must* be prohibited from "knowingly entering into or upon any school grounds, as that term is defined in [PL § 220.00(14) ], or any other facility or institution primarily used for the care or treatment of persons under the age of eighteen while one or more of such persons under the age of eighteen are present," EL § 259-c(14), unless the parolee is a student, an employee, or family member of a student at the school and has the "written authorization of his or her parole officer and the superintendent or chief administrator of such facility, institution or grounds." *Id.* The term "school grounds," as defined in PL § 220.00(14), was expanded in 2005 to include "any area accessible to the public located within one thousand feet of the real property boundary line" of the school. *Id.* § 220.14(b). Thus, a parolee subject to EL § 259-c(14) "is unable to reside within 1,000 feet of a school." *People v. Diack*, 24 N.Y.3d 674, 682, 3 N.Y.S.3d 296, 302 (2015).

The 1,000-foot rule does not appear to be vigorously enforced outside of the housing context, *see Diack*, 24 N.Y.3d at 682, 24 N.Y.S.3d at 302 (noting trial court decisions that "have interpreted section 220.00(14) as creating a residency restriction"), and as a practical matter may be impossible to enforce as written, particularly in dense urban areas. *See State v. Floyd Y.*, 56 Misc. 3d 271, 273, 50 N.Y.S.3d 848, 849 (N.Y. Sup. Ct. N.Y. Co. 2017) ("since most 'publicly accessible areas' [in New York City] are within 1,000 feet of some kind of school or child care institution," law enforcement agencies have "focused on prohibiting residences which violate the 1,000 foot rule"). By its express terms, however, EL § 259-c(14) places a parolee at risk of being reincarcerated for knowingly "entering into or upon" any publicly-accessible area within 1,000 feet of the property line of a school. *See Williams v. Dep't of Corr. & Community Supervision*, 136 A.D.3d 147, 149, 24 N.Y.S.3d 18, 20 (1st Dep't 2016), *appeal dismissed*, 29 N.Y.3d 990, 53 N.Y.S.3d 257 (2017) ("In accordance with SARA, the granting of petitioner's parole was subject to mandatory conditions that restrict both the location of his residency and his knowing travel to no closer than 1000 feet of school grounds."); *see also Floyd Y.*, 56

Misc. 3d at 273, 50 N.Y.S.3d at 849 (interpreting EL § 259-c(14) as a residency restriction "is clearly not in conformity with the statute's language").

### C. Special Parole Conditions

**\*5** Beyond the conditions made mandatory by the Executive Law, a paroled sex offender, like every other parolee in New York, is required to comply with a set of standard release conditions, *see* 9 N.Y.C.R.R. § 8003.2, and must "fully comply with the instructions of his parole officer and obey such special additional written conditions as he, a member of the Board of Parole or an authorized representative of the Division of Parole, may impose." *Id.* § 8003.2(*l* ). The only regulatory limit upon the "special conditions" is that "[t]he releasee shall be provided with a written copy of each special condition imposed." *Id.* § 8003.3.

### II. PROCEDURAL HISTORY

Plaintiff commenced this action on August 1, 2017, by filing a hand-written *pro se* Complaint (Dkt. No. 2) naming as defendants Andrew Cuomo, the Governor of New York; Anthony J. Annucci, the Acting Commissioner of the New York Department of Corrections and Community Supervision (DOCCS); and Parole Officers (POs) Joan Lewis-Robinson, Derek Jones, Rodney Smith, Denise Grannum, and Yolanda Vasquez (collectively the Parole Officer Defendants).[6] On January 22, 2018, plaintiff filed a *pro se* preliminary injunction motion (Dkt. No. 25), and on February 13, 2018, in response to defendants' initial motion to dismiss (Dkt. No. 22), he filed an Amended Complaint. (Dkt. No. 33.)

[6]    All defendants have been served. (Dkt. Nos. 8-13, 34, 68.) However, plaintiff advises the Court that he is "no longer pursuing his claims" against Governor Cuomo because "the relevant injunctive relief he seeks can be obtained from Defendant Annucci." Def. MTD Opp. Mem. (Dkt. No 69), at 1. Upon submission of an appropriate notice or stipulation of dismissal, I respectfully recommend that Governor Cuomo be dismissed from this action and that the caption be amended accordingly.

Thereafter, *pro bono* counsel appeared on plaintiff's behalf. Through counsel, plaintiff filed his revised preliminary injunction motion, followed by his SAC, to which defendants responded with their revised motion to dismiss. These are the motions now before the Court.[7]

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 58 of 236

7      On April 18, 2018, I dismissed the parties' earlier motions as moot. (Dkt. No. 61.)

Your Honor referred this action to me for general pretrial management (Dkt. No. 15) and for report and recommendation on the pending motions. (Dkt. No. 62.) I heard oral argument on the motions on May 8, 2018, *see* Tr. of May 8, 2018 Hr'g (Oral Arg. Tr.) (Dkt. No. 77), and now submit my report and recommendation (Report).

## III. FACTS

The facts concerning plaintiff's crime, his plea, his SORA hearing, and his parole conditions are largely undisputed. On April 10, 2002, plaintiff (then known as Damon Vincent) pleaded guilty in New York State Supreme Court, New York County, to two counts of "kidnapping for ransom," for which he was sentenced to 18 years in prison. SAC ¶ 22; Yunus Decl. (Dkt. No. 45) ¶ 1. [8] One of the victims was a boy less than 17 years old who was not plaintiff's child. SAC ¶ 24. There was no "sexual component" to the crime, SAC ¶ 23; Yunus Decl. ¶ 3. Nor has plaintiff ever committed, or been accused of, any sexual misconduct. SAC ¶¶ 3, 29; Yunus Decl. ¶ 6. However, the district attorney later told the SORA judge (and plaintiff did not deny) that plaintiff abducted his 14-year-old kidnapping victim at gunpoint, drove him to Philadelphia in handcuffs, held him hostage in a closet, and "finally only returned him when he received money and drugs." Yunus Decl. Ex. A (SORA Tr.) (Dkt. No. 45-1), at 8:20-9:2.

8      According to defendant Lewis-Robinson, plaintiff's current PO, plaintiff was convicted of "kidnapping in the first degree." Lewis-Robinson Decl. (Dkt. No. 56), ¶ 4. According to the New York Appellate Division, however, he was convicted of kidnapping in the second degree in violation of PL § 135.20. *People v. Vincent*, 15 A.D.3d 311, 789 N.Y.S.2d 883 (1st Dep't 2005).

**\*6** After exhausting his options on direct appeal, making an unsuccessful motion to vacate the judgment under N.Y. C.P.L. § 440.10, and filing an unsuccessful *habeas corpus* petition in this Court, [9] plaintiff served fifteen and a half years in prison, during which time he completed substance abuse programs and took college courses. SAC ¶¶ 26-28; Yunus Decl. ¶ 4; SORA Tr. at 3:11-22. Insofar as the record discloses, none of the claims made in this § 1983 action were raised or litigated on appeal or in plaintiff's prior lawsuits.

9      *See Vincent v. Smith*, 2010 WL 23324, at *3-4 (S.D.N.Y. Jan. 5, 2010). In each of these proceedings plaintiff argued, unsuccessfully, that PL § 135.20 was unconstitutional as applied to him because Congress had occupied the field of interstate kidnapping with the passage of the Federal Kidnapping Act, 18 U.S.C. § 1201. *See Smith*, 2010 WL 23324, at *2-4 (describing the appeal and the § 440.10 motion in detail, and ultimately denying plaintiff's *habeas* petition).

## A. Plaintiff's SORA Hearing

On June 24, 2016, in anticipation of plaintiff's release to parole, he appeared before Justice Michael Obus—the same judge who sentenced him—for a "sex offender assessment proceeding" pursuant to CL § 168-n(2); Yunus Decl. ¶ 7; *see also* SAC ¶ 30; SORA Tr. at 2:15-16. The district attorney acknowledged that "there was not a sexual offense in this case," SORA Tr. 8:11, but asked the court to classify plaintiff as a level two offender—as recommended by the Board—in light of the violent nature of the underlying kidnapping, the use of a weapon, plaintiff's prior criminal record, and his substance abuse history. SORA Tr. at 8:9-16:7. Plaintiff, through counsel, argued for a downward departure to level one, arguing among other things that "a level one designation is really the only appropriate designation in a case like this, where [there] is no sexual misconduct." *Id.* at 18:17-19. Ruling from the bench, Justice Obus granted the downward departure, stating:

> Under the circumstances presented here, I am satisfied that there is virtually no likelihood that [plaintiff] will commit a sex crime ever.
>
> Recognizing that a level one assessment will still involve substantial oversight of [plaintiff] ... I believe that a level one assessment is more than sufficient for the purpose of these proceedings.
>
> So I will grant the downward departure, notwithstanding the seriousness of this case, to a level one assessment. And I will simply mark the papers accordingly, so that [plaintiff] would have an order. And the People will have an order if they wish to seek review.

*Id.* at 22:14-23:1. Neither party appealed Justice Obus's SORA assessment.

## B. Plaintiff's Parole Conditions

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 59 of 236

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

Plaintiff was released to parole on July 14, 2016. SAC ¶ 39; Yunus Decl. ¶ 9. His "supervision maximum," meaning the expiration of his parole supervision, is February 13, 2019. Yunus Decl. Ex. B (Dkt. No. 45-2), at ECF page 2. Upon his release, plaintiff was informed that he was subject to numerous restrictions, including those set forth in EL § 259-c(14), prohibiting him from knowingly entering into or upon any "school grounds," defined to include any publicly-accessible area within 1,000 feet of a school. *Id.* at ECF pages 2-3. Plaintiff was initially directed to reside at the Redemption Center in Brooklyn, *Id.* at ECF page 4, where he was given a 9:00 p.m. to 7:00 a.m. curfew. *Id.* He was further instructed that he could "not reside at any residence that has not been approved by [his] PO." *Id.* He cannot leave New York City, even temporarily, without the prior approval of his PO. *Id.*

 **\*7**  On July 19, 2016, PO Smith assigned plaintiff "forty-eight of the most restrictive special conditions of parole," printed on a six-page document entitled "Special Conditions of Release to Community Supervision for Sex Offenders." SAC ¶ 41; Yunus Decl. ¶ 9 &. Ex. B at ECF pages 5-11. [10] Smith told plaintiff that he gives "all sex offenders" the same restrictions. SAC ¶ 42; Yunus Decl. ¶ 9. As relevant here, the Sex Offender Conditions include Special Condition No. 4, which incorporates the "1,000-foot rule" required by EL § 259-c(14), and Special Condition No. 17, which separately prohibits plaintiff from being "within 300 yards of places where children congregate, such as toy stores, parks, pet stores, schools, playgrounds, video galleries, malls, bike trails, skating rinks, amusement parks, bowling parks, bowling alleys, pool halls, etc., without the prior approval of [his] parole officer."

[10]    For ease of reference, this Report will refer to the "Special Conditions of Release to Community Supervision for Sex Offenders" (collectively the Sex Offender Conditions) by number, as "Special Condition No. ___."

Special Condition No. 15 prohibits plaintiff from having any "contact with any children under the age of eighteen (18)," including family members, unless he has prior approval from his PO and "a responsible adult over the age of twenty-one (21) is present." Nos. 18, 19, and 20 bar him from possessing children's toys or clothes, keeping puppies or kittens, or having children's names, addresses, or photographs in his possession.

Other provisions of the Sex Offender Conditions restrict plaintiff's access to telephones, computers, and the internet. Special Condition No. 35 prohibits him from owning a cell phone without permission of his PO, and specifies that even with permission he may not "possess one that is video or photo-capable." No. 39 states that he may possess "only one computer and/or laptop," at his residence, and only if approved in advance by his PO. No. 39 requires plaintiff to obtain permission to use any "services that provide access to the internet, or any public or private computer network." No. 12 prohibits him from engaging in any computer service that "involves the exchange of electronic messages," which would seem to prohibit email communication. A separate provision, Special Condition No. 48, prohibits him from using the internet to "access a commercial social networking site." As written, Nos. 12 and 48 appear to be absolute.

Special Condition No. 24 requires plaintiff to notify his PO when he "establish[es] a relationship with a consenting adult." He must also "inform the party of [his] prior criminal history concerning sexual abuse, in the presence of [his] parole officer." Further, plaintiff must inform his PO "**HOW** and **WHEN** this person can be contacted" and must provide contact information for the "consenting adult." (All emphases in the original.)

Plaintiff's ability to travel within New York City is restricted as well. Special Condition No. 32 states that he may not own or operate a motor vehicle, may not possess or apply for a driver's license, and may not "rent operate, or be a passenger in any vehicle" without the prior approval of his PO.

In the fall of 2016, plaintiff's supervision was transferred to PO Vasquez, and then to PO Lewis-Robinson, his current supervisor. SAC ¶¶ 44-50; Yunus Decl. ¶ 10. Both of these POs "enforced the same restrictive conditions of parole originally enforced by PO Smith," telling him that all sex offenders were treated alike, regardless of their risk level. SAC ¶¶ 46, 52; Yunus Decl. ¶ 11. In October 2016, plaintiff was given an updated set of written parole conditions, including another copy of the six-page, 48-item Sex Offender Conditions. Yunus Decl. ¶ 11 & Ex. C (Dkt. No. 45-3), at ECF pages 4-10. At this point, some of plaintiff's parole conditions were made even more restrictive. For example, his curfew (Special Condition No. 30) was expanded, requiring him to be inside between 8:00 p.m. and 8:00 a.m. According to plaintiff, PO Lewis-Robinson told him that she changed the curfew "because I am a sex offender." SAC ¶¶ 106-07; Yunus Decl. ¶¶ 41-42. According to PO Lewis-Robinson, she changed

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 60 of 236

2018 WL 3455408

the curfew because plaintiff had been moved from the Redemption Center in Brooklyn to the Willow Avenue Men's Shelter in the Bronx, where "all shelter residents" have the same curfew. Lewis-Robinson Decl. ¶ 25. At the same time, Lewis-Robinson added a new special condition, prohibiting plaintiff from engaging in "Internet enabled gaming activities to include Pokemon Go." *Id.* Ex. F (Dkt. No. 56-6).

**\*8** Other conditions, however, were seemingly made less restrictive. For example, Special Conditions No. 6-10, concerning compliance with "sex offender treatment," were marked "N/A" in the document given to plaintiff in October 2016, presumably meaning that he is not required to attend such treatment. *See* Yunus Decl. Ex. C, at ECF page 5. No. 38, requiring the parolee to cooperate with GPS monitoring, was also marked "N/A." *Id.* at ECF page 8.

### C. Modification of Parole Conditions

Many of the Sex Offender Conditions, as noted above, are not absolute; they bar the conduct described therein only if the parolee has failed to obtain the advance permission of his PO. The parties dispute the extent to which PO Lewis-Robinson has been willing to provide the necessary permissions, particularly with regard to the conditions that most significantly impact plaintiff's life, which he identifies as the restrictions on where he may live, the limits on his phone, computer, and internet use, and the rules prohibiting him from seeing his minor nieces and cousins.

### 1. Residence Restrictions

Plaintiff has made several efforts to move out of the shelter system. In July and August of 2016, he sought permission to move to the residence of his fiancée or his uncle, but PO Vasquez "rejected both addresses, stating they were within 1,000 feet of a school." SAC ¶ 65; Yunus Decl. ¶ 18. She did not explain how she had measured the distance, or why plaintiff's own calculations, assisted by Google Maps, were incorrect. SAC ¶¶ 66-7; Yunus Decl. ¶ 18. In November 2016 plaintiff submitted the same addresses to PO Lewis-Robinson, who also rejected them as non-compliant with the 1,000-foot rule. SAC ¶ 70; Yunus Decl. ¶ 19.

PO Lewis-Robinson explains that DOCCS uses software called the Critical Infrastructure Response Information System (CIRIS) to determine whether a proposed address is within 1,000 feet of a school, and that the first two addresses

proposed by plaintiff were too close to multiple schools. Lewis-Robinson Decl. ¶¶ 8-13 & Exs. A-B.

Beginning in December 2016, plaintiff requested permission to move to the residence of his fiancée's sister-in-law, Lisa Blake. SAC ¶¶ 72-77; Yunus Decl. ¶¶ 20-25. Ms. Blake's address was "SARA-compliant," Lewis-Robinson Decl. ¶ 14, but plaintiff was not given permission to move. According to plaintiff, his PO ignored the request for months before finally contacting Ms. Blake in the fall of 2017, only to "reject[ ] my proposed move on the ground that Ms. Blake was being 'uncooperative,' " SAC ¶¶ 74-77; Yunus Decl. ¶¶ 20-25, simply because she was unavailable for an appointment on the date that Lewis-Robinson suggested. Yunus Decl. ¶¶ 24-25. According to PO Lewis-Robinson, however, Ms. Blake "refused to permit a site inspection of the property." Lewis-Robinson Decl. ¶ 18. [11]

[11]    In her declaration, PO Lewis-Robinson also notes that Ms. Blake's lease states that no unrelated persons are permitted to reside at the property. Lewis-Robinson Decl. ¶ 19. However, as defendants conceded at oral argument, this issue was not raised in 2017 and was not a basis for her denial of plaintiff's request to move. *See* Oral Arg. Tr. at 62:1-11.

Ms. Blake largely supports plaintiff's version of these events, attesting that she did not hear from PO Lewis-Robinson until September 2017 and that after an appointment was arranged for September 20, 2017, it was PO Lewis-Robinson who "cancelled" it "without any explanation." Declaration of Lisa Blake dated April 30, 2017 (Dkt. No. 72), ¶¶ 3-11. PO Lewis-Robinson then ignored Ms. Blake's efforts to reschedule the appointment. *Id.* ¶ 12.

**\*9** Plaintiff complains that his forced residence at the Willow Avenue Men's Shelter, together with his 8:00 p.m. to 8:00 a.m. curfew, interferes with his ability to find employment. SAC ¶¶ 106-118. In particular, he attests that he could not accept a full-time job at Access-A-Ride, which would have required him to leave the shelter residence at 7:00 a.m. Yunus Decl. ¶ 44. He has therefore been relegated to lower-paying part-time or seasonal jobs. *Id.* ¶ 46. PO Lewis-Robinson counters that she has approved numerous requests to adjust plaintiff's curfew, for example, permitting him return as late as 10:30 p.m. on days when he has evening classes at the Borough of Manhattan Community College (BMCC). Lewis-Robinson Decl. ¶ 26-27 & Exs. H-I. She also approved

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)
Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 61 of 236

2018 WL 3455408

requests from plaintiff to participate in an internship at the Fortune Society and to work at H&R Block. *Id.* ¶¶ 28-29 & Ex. J.

### 2. Cellphone, Computer, and Internet Restrictions.

As noted above, Special Condition No. 35 states that plaintiff may not own a cell phone without permission of his PO. Even if given permission, may not "possess one that is video or photo-capable." Similarly, No. 39 requires him to obtain the permission of his PO to possess or use a computer or to access the internet, while No. 48 prohibits him—even with PO permission—from accessing any "commercial social networking website."

On May 21, 2017, plaintiff was "found to be in possession of an unapproved smart phone and a personal laptop." Lewis-Robinson Reply Decl. (Dkt. No. 73-1) ¶ 12. As a result, plaintiff was incarcerated on a parole violation until July 26, 2017. *Id.* ¶ 14. Thereafter, Lewis-Robinson gave plaintiff permission to possess a smartphone, to use the computers at BMCC "for work and school related use," and to create a LinkedIn account. Lewis-Robinson Decl. ¶¶ 22-24. However, she never allowed him to possess a personal computer or to access social media generally (the LinkedIn account, he says, was part of a project for a marketing class), and he is "rarely able" to use the BMCC computers because his curfew requires him to leave campus as soon as his classes end. SAC ¶¶ 81-92; Yunus Decl. ¶ 31.

On April 11, 2018, plaintiff was once again charged with a parole violation, this time on the allegation that he refused to participate in a mental health evaluation. *See* Pl. Ltr. dated April 13, 2018 (Dkt. No. 57); Oral Arg. Tr. at 4:10-13. Plaintiff prevailed at his preliminary hearing and was released. Oral Arg. Tr. at 4:1-4, 42:1-3. Shortly thereafter, however, his PO rescinded his authorization to possess a smartphone. Yunus Reply Decl. (Dkt. No. 71), ¶¶ 14-15 & Ex. A. According to plaintiff, his PO told him that he would be locked up if she "sees me with any phone, not just a smart phone." *Id.* ¶ 16. According to PO Lewis-Robinson, plaintiff is still "allowed to possess a cellular phone as long as it does not possess video or picture capabilities." Lewis-Robinson Reply Decl. ¶ 29. [12] She adds that he has not yet submitted a request for a compliant phone. *Id.*

[12] According to the Merriam-Webster Online Dictionary, a "smartphone" is a cell phone equipped with "additional software functions" such as "e-mail or an internet browser." *See* https://www.merriam-webster.com/dictionary/smartphone (last visited June 29, 2018). However, defendants read plaintiff's most recent parole condition as permitting an internet-enabled phone but prohibiting one that can take photos or videos. *See also* Oral Arg. Tr. at 42:3-11 (agreeing that the "smartphone" restriction refers to whether the phone has "[a] camera or video"). According to counsel, the new restriction was imposed because, during the April 2018 parole violation hearing, non-sexual pictures of minors were found on plaintiff's prior phone. *Id.* at 44:8-23.

### 3. Restrictions on Contact with Minor Family Members

The parties agree that Special Condition No. 15 prohibits plaintiff from having any contact with children under eighteen, including his own "nieces, nephews, and cousins." Lewis-Robinson Decl. ¶ 21. Plaintiff has two nieces, but—due to his parole restrictions—has never met one of them, and has not seen the other since he has been on parole. SAC ¶¶ 94-98; Yunus Decl. ¶ 35. Because he cannot have contact with his nieces, it is also difficult for plaintiff to see their mothers, who are his sisters. SAC ¶ 99; Yunus Decl. ¶ 36.

**\*10** Plaintiff is close to his uncle, who is his closest living relative on his mother's side of the family, and in 2017 he requested permission to attend his uncle's Thanksgiving dinner. SAC ¶¶ 100-04; Yunus Decl. ¶¶ 37-39. His PO told him that he could go but "would be 'locked up' if there were any children there." SAC ¶ 104-05; Yunus Decl. ¶ 39. Plaintiff's uncle lives with his wife and minor grandchildren (plaintiff's cousins). SAC ¶ 101; Yunus Decl. ¶ 37. Since "there would obviously be children" present at Thanksgiving, Yunus was not able to celebrate the holiday with his family. Yunus Decl. ¶ 40. PO Lewis-Robinson does not deny these events.

### 4. Plaintiff's Pre-Litigation Efforts to Obtain Relief

Plaintiff alleges in general terms that he frequently protested his parole restrictions to his POs and their supervisors—defendants Jones, Young, and Grannum—without success.

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 62 of 236

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

*See, e.g.*, SAC ¶¶ 46-47 (Vasquez and her supervisor, Grannum, told plaintiff that they "did not care" if his parole conditions related to his prior conduct and refused to modify them); *Id.* ¶¶ 52-53 (Lewis-Robinson likewise told plaintiff that all sex offenders get the same special conditions, and that she "was not interested in his prior conduct"); *Id.* ¶ 54 (Lewis-Robinson's supervisors Jones and Young told plaintiff that he would remain subject to whatever conditions Lewis-Robinson imposed). *See also* Yunus Decl. ¶ 12 (all three supervisors told plaintiff that his parole conditions were "at the discretion of [his] parole officer"). At one point, after plaintiff submitted a "written complaint" to Senior PO Young, Young suggested that plaintiff "get relief in court" if he had a problem with his parole conditions. SAC ¶ 136; Yunus Decl. ¶ 12.

## IV. PLAINTIFF'S CLAIMS

In his First Claim for Relief, plaintiff alleges that his designation as a sex offender violates his Fourteenth Amendment right to procedural due process because he had no opportunity to challenge that designation in an adversarial hearing. SAC ¶¶ 139-45. In his Second Claim, plaintiff challenges the same designation on substantive due process grounds, asserting that requiring him to register as a sex offender bears no rational relationship to any legitimate legislative purpose. *Id.* ¶¶ 146-51. Both of these claims are asserted only against Acting Commissioner Annucci in his official capacity, and both seek only prospective injunctive relief.

Plaintiff's Third and Fourth Claims, brought against all defendants, challenge specific conditions of his parole and seek both damages and injunctive relief. The Third Claim alleges that Special Conditions No. 4 (prohibiting him from knowingly entering into or upon any "school grounds," defined to include any area accessible to the public and within 1,000 feet of the school's property line) and No. 17 (prohibiting him from entering or being within 300 yards of "places where children congregate") are void for vagueness, as is Special Condition No. 24, which mandates various disclosures when plaintiff enters into a "relationship" with a "consenting adult." SAC ¶¶ 152-58. The Fourth Claim contends that the ban on social media (Special Condition No. 48), along with related restrictions on plaintiff's cellphone and computer access, violate his rights under the First Amendment. *Id.* ¶¶ 159-63.

*11 The Fifth Claim, brought against defendants Lewis-Robinson, Young, and Jones, alleges that the refusal of these defendants to permit plaintiff to see his own nieces and minor cousins interferes with his private family relationships in violation of the Due Process Clause. SAC ¶¶ 164-69. This claim also seeks both damages and injunctive relief.

Finally, in his Sixth Claim for Relief, plaintiff alleges that the Parole Officer Defendants refused to "consider alternative proposed residences in good faith," thereby effectively creating an "arbitrary" requirement that he remain in a DOCCS-designated homeless shelter. SAC ¶¶ 171-172. In addition, the Sixth Claim alleges that nine of plaintiff's parole conditions (some of which he previously challenged on other grounds) violate the Due Process Clause because they are "arbitrary" and "unrelated" to his crime of conviction or any of his prior conduct. *Id.* ¶ 173. The challenged Special Conditions are Nos. 35 and 39 (limiting his access to cellphones and computers), No. 24 (governing his relationships with consenting adults), Nos. 31 and 32 (restricting his ability to own, drive, or ride in automobiles), No. 22 (preventing him from possessing photo or video equipment), No. 14 (prohibiting him from reading or viewing sexually explicit materials), No. 19 (barring him from pet ownership) and No. 37 (prohibiting him from renting a post office box). *Id.* ¶¶ 173-75. Once again, plaintiff seeks both damages and injunctive relief.

Plaintiff's preliminary injunction motion is only slightly narrower than his complaint. He principally seeks an order relieving him of his sex offender designation altogether. *See* Pl. Not. of Mot. for Prelim. Inj. at 1. In the alternative (or perhaps in an abundance of caution, fearing that some of the same Special Conditions would be re-imposed even if he is no longer considered a sex offender), plaintiff asks this Court to lift the "vague residency requirements" that prevent him from moving in with his fiancée; permit him to use cellphones and computers; allow him to visit minor family members; lift the obligation that he disclose his "relationships" to his PO (and disclose his nonexistent history of "sexual abuse" to his partners); and "tailor" the automobile ban. *Id.* at 1-2.

## V. ANALYSIS

### A. Subject-Matter Jurisdiction

Before considering the merits of plaintiff's due process claims, I must consider whether this Court is divested of jurisdiction to do so by the *Rooker-Feldman* doctrine, which bars "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 63 of 236

2018 WL 3455408

court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). [13] According to defendants, plaintiff's "challenges to his sex offender registration and associated parole conditions" are barred by *Rooker-Feldman* because the injuries of which he complains flow from the 2016 state court judgment classifying him a level one offender. Def. MTD Mem. at 5-6. Plaintiff's "avenue for review of that determination," they say, "was through an appeal or an Article 78 petition in state court, with federal review through an eventual petition for certiorari to the United States Supreme Court, not through this collateral challenge to the state court's determination." *Id.* at 6. [14]

[13]    See *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

[14]    I understand defendants to argue that the *Rooker-Feldman* doctrine bars plaintiff's First and Second Claims for Relief, which challenge his designation as a sex offender on procedural and substantive due process grounds, respectively. *Cf.* Def. Prelim. Inj. Opp. Mem. (Dkt. No. 55), at 13-14 (seemingly raising *Rooker-Feldman* as a bar to plaintiff's substantive due process claim only); Def. MTD Reply Mem. (Dkt. No. 73), at 3 (arguing that plaintiff's "substantive" due process claim fails under *Rooker-Feldman* ). I do not understand defendants to rely on *Rooker-Feldman* with respect to plaintiff's claims challenging the Parole Officer Defendants' post-designation decisions imposing (or refusing to lift) various parole conditions not made mandatory by statute. Nor could they colorably press such an argument. It is well-settled that the *Rooker-Feldman* doctrine does not bar "judicial review of executive action, including determinations made by a state administrative agency" such as DOCCS. *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 644 n.3 (2002); *see also Spiteri v. Russo*, 2013 WL 4806960, at *13 (E.D.N.Y. Sept. 7, 2013) (*Rooker-Feldman* does not apply to decisions of the Board of Examiners of Sex Offenders), *aff'd sub nom. Spiteri v. Camacho*, 622 F. App'x 9 (2d Cir. 2015).

**\*12**  Defendants misconceive the reach of the doctrine on which they rely. Following *Exxon-Mobil*—which reminded the lower federal courts that *Rooker-Feldman* occupies a "narrow ground," 544 U.S. at 284—the Second Circuit held

in *Hoblock v. Albany Cty. Bd. of Elections* that the doctrine deprives the federal courts of subject-matter jurisdiction only in "suits that are, in substance, appeals from state court judgments." 422 F.3d 77, 84 (2d Cir. 2005). *Hoblock* laid out four requirements that must be met before a federal court may dismiss an action under the *Rooker-Feldman* doctrine:

> First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must "complain[ ] of injuries caused by [a] state-court judgment[.]" Third, the plaintiff must "invit[e] district court review and rejection of [that] judgment[ ]." Fourth, the state-court judgment must have been "rendered before the district court proceedings commenced"—i.e., *Rooker–Feldman* has no application to federal-court suits proceeding in parallel with ongoing state-court litigation.

*Id.* at 85 (quoting *Exxon-Mobil*, 544 U.S. at 284) (alterations in the original); *accord McKithen v. Brown*, 481 F.3d 89, 97 (2d Cir. 2007); *Spiteri*, 2013 WL 4806960, at *12 (holding that *Rooker-Feldman* did not bar plaintiff's federal challenge to his designation as a sex offender in New York after being convicted in California of unlawful sex acts on a minor).

In my view, the present action is clearly not—in either form or substance—an appeal from the outcome of plaintiff's 2016 SORA hearing, which classified plaintiff as a level one sex offender. First, and perhaps most obviously, plaintiff did not lose at his SORA hearing. *See Hoblock*, 422 F.3d at 85 ("First, the federal-court plaintiff must have lost in state court."). Throughout that hearing plaintiff consistently sought a level one classification—the lowest available—which his counsel characterized as "the only appropriate designation here." SORA Tr. at 5:19-22. *See also id.* at 6:21-8:5 (arguing that since nothing in the record indicates a "likelihood of sexual recidivism," which is "the issue and purpose in this case," plaintiff "should, therefore, be designated a level one"); *Id.* at 18:17-19 (arguing that "a level one designation is really the only appropriate designation in a case like this, where there is no sexual misconduct"). The district attorney disagreed, urging the court to assess plaintiff as a level two offender in accordance with the recommendation of the Board, *Id.* 8:9-10:20, and arguing vigorously against any "downward departure in this case." *Id.* at 16:3-4. Justice Obus rejected that argument, held that "there is virtually no likelihood that [plaintiff] will commit a sex crime ever," and "grant[ed] the downward departure, notwithstanding the seriousness of this case, to a level one assessment." *Id.* at 22:14-24. Plaintiff therefore cannot be characterized as "state court loser." *Exxon Mobil*, 544 U.S. at 281. [15]

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 64 of 236

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

For this reason alone, the case at bar is distinguishable from *Zuneska v. Cuomo*, 2013 WL 431826 (E.D.N.Y. Feb. 1, 2013), in which a level one sex offender petitioned a New York County Court to "declassify" him, lost that case (because, as noted *supra* at n.5, SORA contains no avenue for a level one offender to file such a petition), and then filed a federal suit in which he argued that the state court erred in holding that "New York State does not allow for the de-classification of a registrant as a matter of law." 2013 WL 431826, at *2. Noting that the County Court decision "was a loss" for Zuneska, *Id.* at *4, the district went on to consider the remaining *Hoblock* factors and ultimately concluded that Zuneska was "attempting to ... re-construe a state court appeal as a federal cause of action." *Id.* at *5.

**\*13** Second, the injuries of which plaintiff complains were not "caused by" the decision at his SORA hearing. *See Exxon-Mobil*, 544 U.S. at 284; *Hoblock*, 422 F.3d at 87 (Plaintiffs "are not subject to the *Rooker–Feldman* bar unless they *complain of an injury* caused by a state judgment. Indeed, this is the core requirement from which the others derive.") (emphasis in original). As defendants implicitly acknowledge, plaintiff became a "sex offender," by operation of law, long before his classification hearing. *See* Def. MTD Mem. at 3 ("Because Plaintiff pled guilty to the crime of kidnapping a victim under the age of 17 who was not his child, he was *statutorily* classified as a sex offender.") (emphasis added); *see also* CL § 168-d(1)(a) (upon conviction, the court "shall certify that the person is a sex offender"). The purpose of the hearing was simply to determine "the level of notification" to be given to the public of that status. CL § 168-n(2); *see also Spiteri*, 2013 WL 4806960, at *13 (holding *Rooker-Feldman* inapplicable because "the issue" at Spiteri's SORA hearing "was Plaintiff's risk level classification, not whether he was required to register as a sex offender").[16] CL 168-*l*(8) makes this point crystal clear: even if the court fails to hold a SORA hearing or "render a determination" as to the offender's risk level, that failure "shall not affect the obligation of the sex offender to register."

Elsewhere in its analysis, the *Spiteri* court relied on *Rooker-Feldman* to dismiss a narrow subset of plaintiff's claims challenging various evidentiary and procedural rulings made during his SORA hearing, including defendants' failure to grant him

a continuance to seek exculpatory evidence. 2013 WL 4806960, at *19-20. Plaintiff here makes no comparable claims.

As the Second Circuit explained in *McKithen*, "a party is not complaining of an injury 'caused by' a state-court judgment when the exact injury of which the party complains in federal court existed *prior* in time to the state-court proceedings, and so could not have been 'caused by' those proceedings." 481 F.3d at 97-98 (emphasis in the original).Here, the injury of which plaintiff complains—his designation as a sex offender—occurred prior to, and independently of, his 2016 SORA hearing, such that this action cannot be barred by *Rooker-Feldman.*

For similar reasons, the present suit cannot fairly be characterized as seeking "review and rejection" of the judgment entered at plaintiff's SORA hearing. *Exxon-Mobil*, 544 U.S. at 284; *Hoblock*, 422 F.3d at 85. At that hearing, plaintiff neither requested nor obtained a ruling as to the constitutionality of the statute under which he was classified.[17] He requested exactly what he got—a level one classification—and he makes no argument here that he should be re-classified. Nor does he contend that the state court erred in any other way. *Cf. Zuneska*, 2013 WL 431826, at *4 (dismissing federal action where the state court "denied Plaintiff's request to be relieved from the registration requirements of SORA" and he then filed a federal complaint attacking the state court's "holding that that [SORA] does not provide for de-classification"). Rather, he challenges "the statutory premise Justice Obus was bound by—that Plaintiff must register as a sex offender." Pl. Prelim. Inj. Reply Mem. (Dkt. No. 70) at 3. Such a challenge "attacks an alleged defect of state ... legislation rather than adjudication," *Hachamovitch v. DeBuono*, 159 F.3d 687, 694 (2d Cir. 1998), and thus does not come within the bar of *Rooker-Feldman*.[18]

To the contrary: although plaintiff's counsel expressly referenced *People v. Knox* at the outset of his presentation, he did so not to challenge its holding but to acknowledge, candidly, that "the Court of Appeals did uphold this provision." SORA Tr. at 6:9-12. Counsel then argued, relying in part on *Knox* itself, that "a level one is all but required" where the offense was not itself sexual. *Id.*; *see also id.* at 17:18-22 (*Knox* "support[s] our position" as to classification); *Id.* at 18:15-19 (*Knox* "indicate[s] that ... a level one designation is really the only

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 65 of 236

2018 WL 3455408

appropriate designation in a case like this, where there is no sexual misconduct").

[18]  It may well be, as defendants urged at oral argument, *see* Oral Arg. Tr. at 55:1-13, that plaintiff *could have* used his SORA hearing to make (and lose) a due process challenge to his designation as a sex offender, which *would have* permitted him to appeal that issue (unsuccessfully) through the state courts. *See, e.g., People v. Citron*, 13 Misc. 3d 833, 834 n.2, 827 N.Y.S.2d 445, 447 n.2 (N.Y. Sup. Ct. Bronx Co. 2006) (holding in consolidated proceedings, some of which "arose in the context of an original SORA determination," that the statute was not unconstitutional as applied to convicted kidnappers who did not sexually assault their victims), *aff'd*, 46 A.D.3d 353, 848 N.Y.S.2d 616 (1st Dep't 2007), *aff'd sub nom. People v. Knox*, 12 N.Y.3d 60, 875 N.Y.S.2d 828 (2009). Had he done so, however, plaintiff would be barred from making the same challenge here as a matter of claim or issue preclusion—which must be asserted as an affirmative defense—not by the *Rooker-Feldman* doctrine. "*Exxon Mobil* teaches that the narrow *Rooker-Feldman* inquiry is distinct from the question whether claim preclusion (res judicata) or issue preclusion (collateral estoppel) will defeat a federal plaintiff's suit." *Hoblock*, 422 F.3d at 92. If a plaintiff seeks redress for a pre-existing injury in state court, and if that court "cho[oses] not to remedy the injury," *Id.* at 88, *res judicata* may bar plaintiff's subsequent effort to litigate the same or a similar claim in federal court, but *Rooker-Feldman* does not. *Id.*

*\*14*  Having failed to establish three of the four requirements for application of the *Rooker-Feldman* doctrine, defendants have not persuaded me that the Court lacks subject-matter jurisdiction. I therefore recommend, respectfully, that Your Honor proceed to the merits of plaintiffs' claims. [19]

[19]  In one of their briefs, defendants argue, in the alternative, that plaintiff's injuries flow "directly" from "his conviction of a crime designated a sex offense under state law," which this Court would need to "review and reject" in order to award any relief. Def. MTD Mem. at 6-7. I disagree. To be sure, plaintiff was the "loser" in his criminal case, and his conviction was a necessary predicate to his designation as a sex offender. But this action does not challenge that conviction. Plaintiff does not deny that he is guilty of kidnapping, and does not ask this Court to relieve him of his criminal conviction. The procedural due process question here is whether, having been convicted only of non-sexual conduct, plaintiff was entitled to a further hearing before being designated a sex offender. The substantive due process question is whether, having committed only non-sexual crimes, he may constitutionally be designated a sex offender. It is not clear whether or how either of those questions could have been raised on direct appeal from his criminal conviction. *See People v. Griffin*, 171 Misc. 2d 145, 151-52 & n.3, 652 N.Y.S.2d 922, 926 & n.3 (Sup. Ct. N.Y. Co. 1996) (rejecting incarcerated sex offender's challenge to various provisions of SORA as unripe because he had not yet completed his prison sentence, had his SORA hearing, or been required to register). In this case, they were not, and in any event are not barred by *Rooker-Feldman*.

### B. Legal Standards

A civil action may be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) if the well-pleaded factual allegations contained in the plaintiff's complaint, accepted as true, fail to "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ); *Irrera v. Humpherys*, 859 F.3d 196, 198 (2d Cir. 2017). A claim is facially plausible when its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The non-conclusory factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. If the plaintiff has not "nudged his claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

In this case, all of plaintiff's claims are brought pursuant to 42 U.S.C. § 1983, which requires a plaintiff to establish "(1) the violation of a right, privilege, or immunity secured by the Constitution or laws of the United States (2) by a person acting under the color of state law." *Doe v. Lima*, 270 F. Supp. 3d 684, 710 (S.D.N.Y. 2017) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988), and *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155-56 (1978) ), *appeal filed sub nom. ABC v. DEF*, 17-3155 (2d Cir. Oct. 2, 2017). All of the defendants named herein "are state officials employed by DOCCS," Def. MTD Mem. at 22, and there is no dispute but that they were all acting under

Case 9:23-cv-01114-DNH-MJK   Document 31   Filed 04/22/24   Page 66 of 236

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

color of state law. Before a state official may be held liable in damages, however, the plaintiff must show that she was acting in her individual capacity—that is, performing discretionary functions—and was "personally involved in the deprivation of the federal right." *Lima*, 270 F. Supp. 3d at 712; *accord Farrell v. Burke*, 2004 WL 2813175, at *6 (S.D.N.Y. Dec. 8, 2004) (collecting cases).

**\*15** "Even if an individual is personally involved in a constitutional violation, he may be protected by the doctrine of qualified immunity, which shields government officials from civil liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Christian v. Warden of O.B.C.C.*, 2018 WL 1441401, at *2 (S.D.N.Y. Mar. 22, 2018) (quoting *Hassell v. Fischer*, 879 F.3d 41, 46 n.7 (2d Cir. 2018) ). *See also Lima*, 270 F. Supp. 3d at 710 (a state official is entitled to qualified immunity "unless the facts show '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of challenged conduct' ") (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) ). When litigating qualified immunity under Rule 12(b)(6), however, a defendant "must accept the more stringent standard applicable to this procedural route," meaning that "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Doe v. Annucci*, 2015 WL 4393012, at *12 (S.D.N.Y. July 15, 2015) (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) ).

The Eleventh Amendment bars claims for monetary relief against the State of New York, and therefore—by extension—bars damages claims against state employees in their official capacities. *See Washpon v. Parr*, 2007 WL 541964, at *1 (S.D.N.Y. 2007) ("the Eleventh Amendment bar "extends to actions for damages brought against state officials in their official capacities"). A private plaintiff may, however, sue such officials for declaratory or injunctive relief where the underlying claim is based on an ongoing violation of federal law. *See Ex Parte Young*, 209 U.S. 123 (1908); *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007) (under *Young*, "a plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for prospective, injunctive relief from violations of federal law"). A parole condition may be challenged as "ongoing" not only when it is currently in effect but also when it is "plausible" that the condition will be re-imposed. *Doe v. Annucci*, 2015 WL 4393012, at *15-17

(holding that sex offender parolee who was wrongfully deprived of contact with his infant son could maintain a claim for injunctive relief even though the offending parole conditions were modified, permitting plaintiff to live with his family, before he filed suit).

"Qualified immunity does not bar declaratory and injunctive relief." *Singleton v. Doe*, 210 F. Supp. 3d 359, 371 (E.D.N.Y. 2016) (granting summary judgment against plaintiff's claims for damages arising out of his designation as a "discretionary sex offender" but denying summary judgment "as to Plaintiff's claim seeking injunctive relief from the same"); *accord Allen v. Coughlin*, 64 F.3d 77, 81 (2d Cir. 1995). However, a plaintiff seeking a preliminary injunction pursuant to Fed. R. Civ. P. 65(a) must do more than survive a motion to dismiss. He must present evidence showing "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (citing *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) ). In this case, plaintiff seeks a mandatory injunction; that is, an injunction which alters rather than preserves the status quo. *N. Am. Soccer League*, 883 F.3d at 37. "Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.' " *Id.* (quoting *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (internal quotation marks omitted) ).

**\*16** In the sections that follow, I first consider, as to each Claim for Relief, whether it plausibly alleges a violation of plaintiff's constitutional rights and, if so, whether plaintiff has adequately stated a claim for damages, injunctive relief, or both. If I conclude that plaintiff has pleaded a cognizable claim for injunctive relief, I next consider whether he has shown a "clear or substantial likelihood of success on the merits" as to that claim, as required for the mandatory injunctive relief he seeks. Once each Claim for Relief has been analyzed in this fashion, I address the remaining factors relevant to plaintiff's preliminary injunctive motion in Part V(I) of this Report, *infra.*

### C. First Claim—Procedural Due Process

In his First Claim for Relief, plaintiff contends that he was deprived of procedural due process because he had no

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 67 of 236

opportunity to challenge his designation as a "sex offender" in an adversarial proceeding. SAC ¶¶ 139-45. Procedural due process claims "are to be examined 'in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.' " *Doe v. Pataki*, 3 F. Supp. 2d 456, 466 (S.D.N.Y. 1998) (quoting *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted) ). Here, both elements are contested. For the reasons that follow I conclude that plaintiff possesses a cognizable liberty interest in not being required to register as a sex offender. However, clear Supreme Court and Second Circuit precedent compel me to conclude that, having been convicted of an offense requiring registration under state law, plaintiff is not entitled to any further process.

### 1. Plaintiff's Liberty Interest

Because "reputation alone" is not a liberty or property interest "by itself sufficient to invoke the procedural protections of the Due Process Clause," *Paul v. Davis*, 424 U.S. 693, 701 (1976), procedural due process claims involving sex offender registration are ordinarily analyzed under the "stigma plus" doctrine, which requires a showing of reputational injury "plus" some additional, "tangible burden." *Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994). *See, e.g., Doe v. Pataki*, 3 F. Supp. 2d at 457 (holding, in action challenging certain provisions of SORA on procedural due process grounds, that the test is "whether plaintiffs have established damage to reputation and impairment of some additional interest").

The reputational prong of the test requires a showing that the challenged government action "will result in stigma, that is, in 'public opprobrium' and damage to [plaintiff's] reputation." *Valmonte*, 18 F.3d at 999-1000 ("[t]here is no dispute" that Valmonte's inclusion on the New York State Central Register of Child Abuse and Maltreatment "potentially damages her reputation by branding her as a child abuser"); *see also Pisani v. Westchester Cty. Health Care Corp.*, 424 F. Supp. 2d 710, 718 (S.D.N.Y. 2006) (plaintiff must prove "the utterance of a statement about him that is injurious to his reputation, that is capable of being proved false, and that he or she claims is false") (internal quotations and citations omitted).

The "plus" prong requires a showing of some concrete, state-imposed burden beyond the "intangible deleterious effect that flows from a bad reputation." *Valmonte*, 18 F.3d at

1001 (holding that inclusion on the Central Register placed a "tangible burden" on plaintiff because child care providers were prohibited by law from hiring persons listed on the Central Register without providing a written explanation of the reason); *Pisani*, 424 F. Supp. 2d at 718 (plaintiff must demonstrate "some tangible and material state-imposed burden ... in addition to the stigmatizing statement") (quoting *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005) ).

**\*17** More than 20 years ago, in *Doe v. Pataki*, the Hon. Denny J. Chin had no difficulty in concluding that a class of probationers and parolees, challenging their prospective inclusion on New York's sex offender registry, had "a protected liberty interest that entitled them to procedural due process." 3 F. Supp. 2d at 468.[20] The reputational prong was met because inclusion in the sex offender registry "will likely result in their being branded as convicted sex offenders who may strike again and who therefore pose a danger to the community." *Id.* at 467. As Judge Chin observed, the public identification of an individual as a "sex offender" "is likely to carry with it shame, humiliation, ostracism, loss of employment and decreased opportunities for employment, perhaps even physical violence, and a multitude of other adverse consequences. Thus, there is no genuine dispute that the dissemination of the information contemplated by [SORA] to the community at large is potentially harmful to plaintiffs' personal reputations." *Id.* at 468. The "plus" factor prong was also met, Judge Chin held, because registration "place[s] a 'tangible burden' on plaintiffs, potentially for the rest of their lives." *Id.*

[20]    Judge Chin ultimately held that SORA (as originally enacted) provided inadequate procedures for determining sex offender risk levels. 3 F. Supp. 2d at 472-73. Consequently, the court entered an injunction preventing New York from classifying class members "at higher than risk level one" until the state provided each sex offender with (among other things) notice of the risk level recommended by the Board, followed by an adversary court hearing at which the offender could challenge the recommendation with the assistance of counsel. *Id.* at 478-79. Plaintiff Yunus had the benefit of these improved procedures at his SORA hearing.

Since *Doe v. Pataki* was decided in 1998, both the tangible burdens and the reputational damage that come with sex offender registration have, if anything, intensified. Over that period the Legislature has steadily increased the

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

legal restrictions applicable to registered sex offenders. For example, level one offenders were originally required to register for ten years, during which period they could petition for de-registration. *See* 1995 N.Y. Sess. Laws ch. 192, § 2. But under today's version of SORA, level one offenders must register for 20 years, with no opportunity for relief. CL §§ 168-h(1), 168-o. Similarly, when New York first created its sex offender registry there were no mandatory parole conditions prescribed for individuals required to register. But under today's version of SARA, certain sex offenders on parole or conditional release—including plaintiff Yunus—may not live or knowingly travel within 1,000 feet of a school or similar facility. EL 259-c(14); *Williams v. DOCCS*, 136 A.D.3d at 149, 24 N.Y.S.3d at 20. Thus, as the Appellate Division noted last year in *People v. Diaz*, even a convicted child murderer has a reputational interest in avoiding a "sex offender" designation, which "often results in the offender being subject to social ostracism and abuse, and impedes the person's ability to access schooling, employment, housing, and many other areas." 150 A.D.3d 60, 66, 50 N.Y.S.3d 388, 392 (1st Dep't), *leave to appeal granted*, 29 N.Y.3d 914, 63 N.Y.S.3d 4 (2017). [21]

[21]    In 1989, Diaz shot and killed his 13-year-old half-sister, in Virginia, during an argument over drugs. He was convicted of first-degree murder and sentenced to 40 years in prison. Decades later, he was released from prison, whereupon he was required to register under Virginia's Sex Offender and Crimes Against Minors Registry Act, Va. Code Ann. §§ 9.1-900, *et seq.* Diaz then moved to New York, where the Board of Examiners of Sex Offenders required him to register as a sex offender pursuant to CL § 168-a(2)(ii), which generally requires registration in New York if the offender was "required to register as a sex offender in the jurisdiction in which the conviction occurred." The Appellate Division ultimately held that because his underlying crime had "no sexual component," and because his Virginia registration was "under a broader statute that covers both sex crimes and crimes against minors," Diaz could not be required to register as a "sex offender" in New York. 150 A.D.3d at 62-66, 50 N.Y.S.3d at 389-93.

**\*18** Defendants do not dispute the "tangible burdens" that plaintiff bears under SORA and SARA. Instead, relying on *Vega v. Lantz*, 596 F.3d 77, 82 (2d Cir. 2010), they argue that registration as a sex offender cannot harm his reputation

because he *is* a sex offender, having been convicted of an offense defined as such by SORA. *See* Def. MTD Mem. at 7 ("there is no liberty interest implicated when a plaintiff has correctly been required to register as a sex offender under the pertinent state law"); Def. Prelim. Inj. Opp. Mem. at 11 ("the purportedly defamatory statement that plaintiff was convicted of an offense that is designated under SORA to require registration as a sex offender with attendant restrictions is true") (emphases in the original).

While it is of course true, in a tautological sense, that plaintiff was convicted of an offense that is defined as a sex offense under SORA, that syllogism, standing alone, cannot be a defense to the "liberty" element of his procedural due process claim. First, the argument is entirely circular. Using the same logic, the State of New York could define shoplifting as a sex offense, and then argue that requiring shoplifters to register as sex offenders does not implicate any protected liberty interest because they *are* sex offenders.

Second, the defamatory "statement" to which plaintiff objects is that he is a *sex* offender, and is therefore likely to be *sexually* dangerous, not the sanitized assertion that he "was convicted of an offense that is designated under SORA to require registration." Def. Prelim. Inj. Opp. Mem. at 11. *See Knox*, 12 N.Y.3d at 66-67, 875 N.Y.S.3d at 831-32 (defendants convicted of non-sexual kidnapping offenses "have a constitutionally-protected liberty interest ... in not being required to register under an incorrect label"). Our Circuit made an analogous point in *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 49 (2d Cir. 2001) (*Dep't of Pub. Safety*), *rev'd on other grounds sub nom. Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003) (*Conn. v. Doe*), which held—as relevant here—that a convicted sex offender challenging Connecticut's registration law had a cognizable liberty interest at stake, notwithstanding his conviction, because the registry "implies that each person listed is more likely than the average person to be currently dangerous," which "stigmatizes every person listed on the registry. And the plaintiff claims that, as to him, it is false." *See also Vega v. Lantz*, 596 F.3d at 81-82 (although the Supreme Court reversed *Dep't of Pub. Safety* on other grounds, "it continues to be the case that wrongly classifying an inmate as a sex offender may have a stigmatizing effect which implicates a constitutional liberty interest"). [22]

[22]    Since the Second Circuit has expressly reaffirmed this aspect of *Doe v. Dep't of Pub. Safety*, I am not persuaded by defendants' assertion that there

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

is a "split" among the district courts within our Circuit as to whether sex offender designations "implicate a liberty interest." Def. Prelim. Inj. Mem. at 11. If there is such a split, it results from a misapprehension of controlling law.

Outside of the Second Circuit, numerous courts have recognized that the "sex offender" label has such a powerful visceral impact that even an incarcerated felon has "a liberty interest in not being branded a sex offender." *Kirby v. Siegelman*, 195 F.3d 1285, 1291 (11th Cir. 1999) (holding that inmate convicted of attempted murder "has a right to due process before the state declares him to be a sex offender"); *see also Chambers v. Colorado Dep't of Corr.,* 205 F.3d 1237, 1242, 1243 (10th Cir. 2000) (holding that the sex offender label is "replete with inchoate stigmatization" and enjoining Colorado from categorizing inmate as sex offender without affording him "a hearing to challenge the label"); *Neal v. Shimoda*, 131 F.3d 818, 829 (9th Cir. 1997) ("We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender").

**\*19** *Vega v. Lantz* is not to the contrary. While serving a prison sentence for assault and kidnapping, Vega was given a "Sexual Offense Treatment Needs" (SOTN) score of "3," meant for individuals with a "current conviction, pending charge, or known history of sexual offenses involving physical contacts with the victim(s)." 596 F.3d at 80. Relying solely on the fact that he had been acquitted at trial of sexual assault in the first degree, Vega argued that his SOTN score barred him from certain prison jobs "without due process." *Id.* at 80, 81, The Second Circuit rejected the claim because Vega "did not allege falsity" of the reputation-tarnishing statement. *Id.* at 82. That is, Vega did not deny either the facts of the crime for which he was convicted or their sexual component: after an escalating pattern of violence against his teenaged girlfriend, he locked her a bedroom, "entered the bedroom, stabbed the victim, beat her and cut her nipple off of her right breast before forcing her to swallow it." *Id.* at 79. Not only was this undisputed conduct sufficient to meet the technical requirements for a SOTN score of "3" under the prison's classification manual (a "sexual offense" involving "physical conduct"); it was surely sufficient to earn Vega the label of "sex offender." *See id.* at 83 ("If Vega had not been convicted of amputating a part of a sixteen year old girl's body that is classified as a sexual organ under Connecticut law, this may well have presented a different case.").

The present action is "a different case." Plaintiff does not deny that he "was convicted of an offense that is designated under SORA to require registration," Def. Prelim. Inj. Opp. Mem. at 11, but he does deny that he is a "sex offender" as that term is commonly understood, *see* SAC ¶ 10 (plaintiff "has never committed sexual misconduct"). Thus, he squarely alleges that his designation as a sex offender is both false and injurious, *Pisani*, 424 F. Supp. 2d at 718. This case is more like *Dep't of Pub. Safety*, 271 F.3d at 49, in which the plaintiff admitted that he was convicted of a registrable offense but was stigmatized by the implication that that he was "currently dangerous," which he denied. *See also Valmonte*, 18 F.2d at 1000-04 (plaintiff met the technical requirements for inclusion on the Central Register of Child Abuse and Maltreatment, but was stigmatized because the listing "brand[ed] her as a child abuser," which she denied). [23]

[23]
> Valmonte met the technical requirements for listing on the Central Register because she slapped her eleven-year daughter on the face, which led to a "child abuse hotline" complaint and "child protective proceedings," which were ultimately dismissed on the condition that the Valmonte family receive counseling. 18 F.3d at 997.

The courts, like the prison officials sued in *Vega v. Lantz*, are "under no constitutional obligation to blind themselves to reality." 596 F.3d at 84. In this case, the reality—alleged by plaintiff and undisputed by the State of New York—is that plaintiff has never been convicted of, charged with, or engaged in any sexual misconduct, but has nonetheless been branded a sex offender. Under these facts, in my view, plaintiff has adequately alleged a constitutionally protected liberty interest.

### 2. Sufficiency of Process

The second step of the procedural due process analysis asks whether the procedures by which plaintiff was deprived of his liberty interest were "constitutionally sufficient.' " *Doe v. Pataki*, 3 F. Supp. 2d at 466. The parties agree that plaintiff has already had "two separate full-blown adversarial proceedings in court," Def. Prelim. Inj. Opp. Mem. at 12: his criminal prosecution, which ended in his 2002 kidnapping plea, and his 2016 SORA hearing, which ended in his level one classification. They disagree as to whether any further process is due.

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 70 of 236

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

Defendants rely on *Conn. v. Doe*, 538 U.S. at 7-9, and *Doe v. Cuomo*, 755 F.3d 105 (2d Cir. 2014), both of which held that a person who has been convicted of an offense requiring registration under SORA is not entitled to any additional hearing, either *ex ante* (in *Conn. v. Doe* ) or *ex post* (in *Doe v. Cuomo* ), to adjudicate his obligation to register. These cases, defendants contend, require me to conclude that once plaintiff was convicted of a registrable offense—here, kidnapping an unrelated minor—"[t]here is no inquiry left to be made and no reason to require elaborate procedures to make it." *Doe v. Cuomo*, 755 F.3d at 113. I agree.

**\*20** In *Conn. v. Doe*, the respondent was a "convicted sex offender" who challenged Connecticut's sex offender registration statute on procedural due process grounds, arguing that he was entitled to a pre-deprivation hearing to determine whether he was "currently dangerous." 538 U.S. at 5-6. The Court assumed, *arguendo*, that sex offender registration deprived respondent of a liberty interest, but rejected his claim because state law did not require that the offender be "dangerous" before he could be made to register, *Id.* at 7 ("the law's requirements turn on an offender's conviction alone"), and "due process does not entitle him to a hearing to establish a fact that is not material under the Connecticut statute." *Id.* The Court held, in essence, that respondent's *procedural* due process rights were circumscribed by the express terms of the statutory test for sex offender registration. "Unless respondent can show that a *substantive* rule of law is defective (by conflicting with a provision of the Constitution), any hearing on dangerousness is a bootless exercise." *Id.* at 7-8 (emphasis in the original). Since the respondent did not raise any substantive due process challenge, the Court did not consider whether a state could constitutionally require sex offenders to register without any individualized dangerousness determination. *Id.* at 8.

A decade later, our Circuit applied the same rule in *Doe v. Cuomo*, brought by a New York resident who pled guilty in 1999 to a single misdemeanor count of attempted possession of child pornography. 755 F.3d at 108. Appellant Doe was sentenced to a term of probation and classified as a level one offender. After nearly 12 years on the sex offender registry, Doe sought relief in federal court pursuant to § 1983, arguing (among other things) that he had a procedural due process right to a hearing "to show that he was not a danger to the community." *Id.* at 113. Relying on *Conn. v. Doe*, the Second Circuit rejected that claim, because in New York,

as in Connecticut, actual dangerousness is irrelevant to sex offender registration:

> Although Doe contends that the State did not afford constitutionally adequate procedures in applying SORA to him, there was no fact that would require a protective *procedure* to determine. New York State has concluded—as it was constitutionally entitled to do—that the mere fact of conviction of certain sex offenses justifies the imposition of SORA's registration, notification, and other restrictions.

*Id.* (emphasis in the original).

Plaintiff distinguishes both of these cases on the ground that the offenders who filed them were convicted of sex crimes—that is, crimes that were "inherently sexual," Pl. Prelim. Inj. Reply Mem. at 2—whereas he, having never been convicted of or even charged with sexual misconduct, should be afforded an opportunity to argue that he is "not a sex offender at all." *Id.* In the *procedural* due process context, however, this is a distinction without a difference. "Plaintiffs who assert a right to a hearing under the Due Process Clause must show that the facts they seek to establish in that hearing are relevant under the statutory scheme." *Conn. v. Doe*, 538 U.S. at 8. The fact that plaintiff Yunus seeks to establish —that there was no sexual component to his crimes—is not "relevant under the statutory scheme," *id.*, because New York has concluded that everyone convicted of kidnapping an unrelated minor must register as a sex offender. *See* CL §§ 168-a(1), 168-a(2)(a)(i). Plaintiff admittedly kidnapped an unrelated minor. Since "[a]ll of the facts necessary to conclude that SORA restrictions apply to [Yunus] are ... known and unchallenged, *Doe v. Cuomo*, 755 F.3d at 113, "[t]here is no inquiry left to be made." *Id.*

Moreover, no principle of *procedural* due process prevents New York from applying SORA to those who, like plaintiff, kidnapped unrelated minors but did not sexually assault them. *See Conn. v. Doe*, 538 U.S. at 8. "Unless [plaintiff] can show that a *substantive* rule of law is defective," any hearing on whether there was a sexual component to his crime would be "a bootless exercise." *Id.* at 7 (emphasis in the original).

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 71 of 236

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

In short, plaintiff's claim " 'must ultimately be analyzed' in terms of substantive, not procedural, due process." *Id.* (quoting *Michael H. v. Gerald D.*, 491 U.S. 110, 121 (1989) (plurality opinion) ).

**\*21** Since plaintiff's procedural due process claim cannot withstand the logic of *Conn. v. Doe* and *Doe v. Cuomo*, I respectfully recommend that his First Claim for Relief be dismissed.

### D. Second Claim—Substantive Due Process

Neither the Supreme Court nor the Second Circuit has addressed the substantive due process issue presented in this action, which is whether New York may constitutionally include, among those required to register as sex offenders, a person who was convicted of kidnapping an unrelated minor but has never engaged in any actual or attempted sexual misconduct. The parties agree that since freedom from sex offender registration is not a "fundamental right," as that term is used in constitutional analysis, this Court must apply the "rational basis" test, which does not ask whether the statute is wise, nor even whether it is substantially related to an important governmental objective, but only whether it is "rationally related to a legitimate government interest." *Winston v. City of Syracuse*, 887 F.3d 553, 566 (2d Cir. 2018) (holding that city could not constitutionally terminate water service to tenants whose landlords failed to pay their water bills).

Although "[t]his form of review is highly deferential," *Winston*, 887 F.3d at 560, "it is not meant to be toothless." *Id.* (quoting *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013) ). Even under the rational basis test, a state may not "rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985) (invalidating city zoning ordinance that required special use permit to operate group home for the mentally retarded); *see also Diaz*, 150 A.D.3d at 65-66, 50 N.Y.S.3d at 392 (applying rational basis review and concluding that a convicted child murderer whose crime had no sexual component could not be required to register as a sex offender under SORA because "the connection between defendant's crime and the legislative purpose behind SORA is too attenuated").

Defendants urge this Court to adopt the reasoning of *Knox*, which held that New York may constitutionally treat all child kidnappers as "sex offenders," whether or not there was

any sexual component to their crimes. *See* Def. MTD Mem. at 9-10; Def. Prelim. Inj. Opp. Mem. at 14-15; Def. MTD Reply Mem. at 3-4. The parties agree, however, that a federal district court is not bound by the decision of a state court on a matter of federal constitutional law. *See* Pl. Prelim. Inj. Mem. at 13 (Dkt. No. 44); Def. Prelim. Inj. Opp. Mem. at 14; *United States v. Diaz*, 854 F.3d 197, 208 (2d Cir. 2017). Outside of New York, the state courts are split on the precise question presented here, [24] and neither side cited any federal precedent. [25] After carefully considering the arguments on both sides in light of the standards set by the Second Circuit —most recently in *Winston*, 887 F.3d at 566—I conclude that plaintiff "plausibly alleges a violation of substantive due process," *id.*, and that no additional fact-finding is required to determine whether he is entitled to preliminary injunctive relief.

[24]    The Illinois and Wisconsin Supreme Courts have upheld the constitutionality of their states' sex offender registration statutes as applied to persons convicted of kidnapping unrelated minors, regardless of whether the criminal conduct was sexually motivated or included any sexual component. *People v. Johnson*, 225 Ill. 2d 573, 592, 870 N.E.2d 415, 426 (2007); *State v. Smith*, 323 Wis. 2d 377, 389-90, 780 N.W.2d 90, 96 (2010). The Florida and New Mexico Supreme Courts, applying the same rational relationship test, have held similar laws unconstitutional as applied to convicted kidnappers who did not commit any sexual misconduct. *State v. Robinson*, 873 So. 2d 1205, 1217 (Fla. 2004); *Am. Civ. Liberties Union of N.M. v City of Albuquerque*, 139 N.M. 761, 772, 137 P.3d 1215, 1226 (2006).

[25]    The Court has identified one federal case addressing the question presented here. In *Cox v. Commonwealth of Kentucky*, 2010 WL 3909236, at \*1, \*6 (W.D. Ky. Sept. 30, 2010), the district court dismissed a *pro se* complaint filed in 2010 by a woman who was convicted in 1986 of kidnapping a minor "for the purpose of having an infant child." The Commonwealth allegedly conceded at her trial that there was "no evidence that she committed a sexual offense." *Id.* at \*1. By the time the plaintiff completed her sentence, Kentucky law required lifetime registration for any person convicted of kidnapping a victim under the age of 18. *Id.* at \*2. The *Cox* court reasoned that the legislature's

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 72 of 236

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

"inclusion of kidnapping even where not sexually-motivated is rationally related to the Kentucky General Assembly's stated purpose of protecting minors from crime and potential sexual assaults," and consequently held that requiring plaintiff to register as a sex offender did not violate her substantive due process rights. *Id.* at *6.

**\*22** The purpose of SORA, as articulated in its enabling legislation, is to combat "the danger of recidivism posed by *sex offenders*, especially those *sexually violent* offenders who commit predatory acts characterized by repetitive and compulsive behavior," and to assist the criminal justice system "to identify, investigate, apprehend and prosecute *sex offenders*." 1995 N.Y. Sess. Laws ch. 192, § 1; *see also* 2006 N.Y. Sess. Laws ch. 1, § 1 (increasing length of registration periods to provide "better tracking and monitoring of *sex offenders*") (emphases added). [26] The question for this Court, therefore, is whether the statute is unconstitutional as applied to a person who—although convicted of a serious crime against a minor—did not engage or attempt to engage in the conduct that the statute was intended to combat.

[26]    Both state and federal courts routinely acknowledge these purposes. *See, e.g., People v. Mingo*, 12 N.Y.3d 563, 574, 883 N.Y.S.2d 154, 161 (2009) (the "purpose underlying SORA" is to protect the public from "sex offenders"); *Diaz*, 150 A.D.2d at 65, 50 N.Y.S.3d at 391 (the "legislative purpose" of SORA is "protecting the public from sex offenders"); *Doe v. Pataki*, 481 F.3d 69, 70 (2d Cir. 2007) (SORA aims to protect the public from "sex offenders" by notifying vulnerable populations of "the presence of sex offenders in their communities," and to enhance the ability to "investigate and prosecute sex offenses"). In *Knox*, the Court of Appeals described the "governmental interest advanced by SORA" somewhat differently—but without citation—as the protection of the community against "people who have *shown themselves capable of* committing sex crimes." 12 N.Y.3d at 67 (emphasis added). To the extent this formulation means something different from "people who have committed sex crimes," it appears to go beyond the purpose articulated by the Legislature or previously understood by the courts.

In *Knox*, the Court of Appeals held that there is a rational connection between the purpose of SORA and the inclusion of certain non-sexual kidnappings as "sex offenses" requiring registration, because "a great many cases of kidnapping or unlawful imprisonment of children are indeed sex offenses." 12 N.Y.3d at 68. *Knox* cited, *inter alia*, a 2002 study reporting that in "46% of the nonfamily abductions studied, the perpetrator had sexually assaulted the child," *id.*,[27] and reasoned that the Legislature "could rationally have found that the statistics understate the problem. It could have found that sexual assault occurs in many cases where there is no direct evidence of it—in cases where the victim is killed, or remains missing, or is unable or unwilling to recount his or her ordeal." *Id.* The court recognized that the blanket rule enacted by the Legislature would inevitably sweep in some for whom the term "sex offender" was "unmerited," *Id.* at 69, but concluded that the "administrative burden" of identifying those individuals, together with "the risk that some dangerous sex offenders would escape registration," justified "a hard and fast rule, with no exceptions," particularly since "defendants are suffering no worse injustice than being called 'sex offenders' instead of 'child predators,'" which would arguably be accurate. *Id.* The Illinois and Wisconsin courts articulated similar rationales for their own states' "hard and fast" registration rules. *See Johnson*, 225 Ill. 2d at 586 (citing the same 2002 study and reasoning that "[o]ur General Assembly, like New York's legislature, recognized that aggravated kidnapping can be a precursor to sex offenses"); *Smith*, 323 Wis. 2d at 402 (citing *Johnson* and reasoning that the legislature could have "rationally concluded that child abductions are often precursors to sexual offenses").

[27]    *See* David Finkelhor *et al., Nonfamily Abducted Children: National Estimates and Characteristics* at 10 (Crimes Against Children Research Center 2002), available at https://scholars.unh.edu/cgi/viewcontent.cgi?referer=https://scholar.google.com/&httpsredir=1&article=1016&context=ccrc. (last visited June 29, 2018).

**\*23** In *Robinson*, however, the Florida high court rejected a virtually identical argument,[28] explaining that the statistical linkage between child kidnapping and sex offending might satisfy the rational basis test in a facial challenge to the law but could not defeat an as-applied challenge brought by a plaintiff whose crime, though serious,[29] was concededly non-sexual:

[W]e assume, without deciding, that the Act's designation of child kidnappers as sexual predators is

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 73 of 236

rationally related to the legislative purpose of protecting children from sexual predators. Although the Legislature's concern for protecting our children from sexual predators may be reasonable, however, the application of this statute to a defendant whom the State concedes did not commit a sexual offense is not. Robinson's designation as a sexual predator can fulfill none of the statute's purposes. The State conceded he did not commit a sexual offense, and he left the infant child at a doctor's office a few blocks from where he and his companion appropriated the car. Thus, no question remains about whether Robinson possibly could have committed a sexual act on the child. No rational relationship exists between the statute's purpose of protecting the public from known sexual predators and Robinson's designation as one.

*Robinson*, 873 So. 2d at 1215. Yunus, like Robinson, does not claim that that SORA is unconstitutional on its face, nor even as applied to kidnappers whose convictions rest on ambiguous facts. Rather, he makes the "narrow" argument, *see id.* at 1217, that SORA is unconstitutional as applied to a person "who has received a judicial finding that he never has and near certainly never will commit a sexual offense." Pl. Prelim. Inj. Mem. at 12.

28    "The State argues that the Act meets rational-basis review because the Legislature rationally could have concluded that the inclusion of all defendants convicted of kidnapping or false imprisonment of a minor not their child is justified given that a high percentage of such crimes are committed for some sexual purpose. The State also argues that the Legislature rationally could have concluded that the difficulty in confirming whether an abducted child has been sexually exploited or whether the perpetrator had a sexual motive justifies the inclusion of all persons convicted of kidnapping or false imprisonment of a minor not their child. The State notes that because of a child victim's trauma, fear, or infancy, the child may be unwilling or unable to confirm whether sexual exploitation occurred. Further, the State urges that the very nature of the crimes of kidnapping and false imprisonment makes it difficult to prove sexual exploitation or motivation because the child is removed from public view." *Robinson*, 873 So. 2d at 1215.

29    Robinson was convicted of carjacking and kidnapping after he stole a car with a baby in the back seat. 873 So. 2d at 1208.

Plaintiff also argues, with some force, that the *Knox* court failed to appreciate the costs of sex offender registration, particularly when it dismissed as relatively trivial the "injustice" of being inaccurately called a "sex offender" as opposed to some other, more accurate label. *See* Pl. Prelim. Inj. Mem. at 14 ("this reasoning ignores the power of the term 'sex offender' "). The Supreme Court has recognized that even rational basis review must take into account the "countervailing costs" to the targets of the challenged statute. *Plyler v. Doe*, 457 U.S. 202, 223-24 (1982) (striking Texas statute that effectively barred undocumented alien children from public schools, even though no fundamental right or suspect class could be identified, in part due to the "lifetime hardship" and "stigma of illiteracy" that would "mark them for the rest of their lives"). The Court has also recognized that forced registration as a sex offender is a particularly harsh consequence of a criminal conviction, characterizing it as "state-sponsored condemnation" of selected criminal conduct, *Lawrence v. Texas*, 539 U.S. 558, 575-76 (2003), which in turn has a "consequential" impact on the designated offender's liberty interests. *Id.* at 576-77 (holding Texas sodomy statute unconstitutional after noting, among other things, that a person convicted under the statute would be required to register as a sex offender, and thus that the "stigma" of the conviction "is not trivial"). *See also Robinson*, 873 So. 2d at 1213 ("the Act imposes more than a stigma"); *ACLU of New Mexico*, 139 N.M. at 772, 137 P.3d at 1226 (invalidating "no exceptions" sex offender registration requirement because, among other things, "the hardship imposed on an offender convicted of kidnaping or false imprisonment to be labeled a sex offender, absent any evidence of a sexual motivation for the crime, is great"); *Diaz*, 150 A.D.3d at 66, 50 N.Y.S. 3d at 392 (implicitly critiquing *Knox* for downplaying "the harm caused to the individual who is forced to register," particularly where "he or she has committed a crime that has no sexual component").

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

**\*24** Not only do registered sex offenders face the profound stigma of the label itself, as discussed in Part V(C)(1) of this Report, *supra*; even if they are no longer on parole or supervised release, registration subjects them to a long list of filing requirements,[30] employment prohibitions, both *de jure* and *de facto*,[31] residency restrictions,[32] and other civil disabilities.[33] In addition, sex offender registration triggers a host of expanded criminal risks, including state and federal felony penalties for failure to register, *see* CL § 168-t (making failure to register a Class E felony for the first offense and a Class D felony for a second or subsequent offense); 18 U.S.C. § 2250(a) (mandating a federal prison term of up to ten years for a knowing failure to register as required under state law), and enhanced federal penalties for certain offenses committed while on a sex offender registry. *See, e.g.*, 18 U.S.C. § 2260A (prescribing a mandatory minimum of ten years in prison for defendants who commit certain crimes against minors while "being required by Federal or other law to register as a sex offender").

[30]    After their initial registration, level one sex offenders must verify by mail every year, CL §§ 168-f(1), 168-f(2)(a), and appear in person every three years to be photographed. CL § 168-f(2)(b-3). In addition, they must update their registration (and pay a fee) within ten days of any change in address, internet identifiers or accounts, or enrollment, attendance, employment or residence at any institution of higher education. CL § 168-f(4). If a registered sex offender leaves New York to reside, work, or attend school in another jurisdiction, he is required by federal law (and in all likelihood by state law as well) to register, and "keep his registration current" in each such jurisdiction. 34 U.S.C. § 20913(a). He is also required to keep his registration current in New York. *See Doe v. O'Donnell*, 86 A.D.3d 238, 924 N.Y.S.2d 684 (2011) (holding that petitioner, originally registered as a level two offender in New York, remained subject to its lifetime registration requirement after moving to Virginia, registering there, and successfully petitioning a Virginia court for deregistration); *see also* Samantha R. Millar, *Doe v. O'Donnell and New York's Sex Offender Registration Act: The Problem of Continued Registration Under SORA after Leaving the State*, 38 Cardozo L. Rev. 337 (2016).

[31]    *See, e.g.*, EL§ 168-v (registered sex offenders may not work on ice cream trucks); *Woe v. Spitzer*, 571 F. Supp. 2d 382, 388 (E.D.N.Y. 2008) ("it is not a great leap" to assume that certain employers "consult the SORA registry" before making hiring decisions and thereafter decline to hire registered sex offenders).

[32]    In *Diack*, 24 N.Y.3d at 686-87, the New York Court of Appeals invalidated Nassau County's Local Law 4, which prohibited all registered sex offenders (even if no longer on parole or post-release supervision) from residing within 1,000 feet of a school. The court based its decision on supremacy grounds, holding that "the State's comprehensive and detailed statutory and regulatory framework for the identification, regulation and monitoring of registered sex offenders prohibits the enactment of a residency restriction law such as Local Law 4." *Id.* at 677. Within New York, similar city, county and town laws (of which there were many, *see, e.g., Wallace v. State of New York*, 40 F. Supp. 3d 278 (E.D.N.Y. 2014) ) presumably may no longer be enforced. Outside of New York, however, comparable statutes and ordinances "remain on the books across the country," presenting a registered sex offender with a bewildering array of overlapping and sometimes inconsistent restrictions on where he may live, work, and travel. *See* Lori McPherson, *The Sex Offender Registration and Notification Act (SORNA) at 10 Years: History, Implementation, and the Future*, 64 Drake L. Rev. 741, 786 nn. 257, 262 (2016).

[33]    Although level one offenders are not included in New York's statewide online registry, certain counties and municipalities continue to place the names, photographs, and license plate numbers of level one offenders on the internet. *See, e.g.*, Orange County, New York, *Sex Offender Listing*, https://www.orangecountygov.com/977/Sex-Offender-Listing (last visited June 29, 2018). Other states put the names and photographs of all registered offenders online—which in turn makes them searchable nationwide through the federal National Sex Offender Public Website. *See* 34 U.S.C. § 20922; https://www.nsopw.gov/en-US/Home/About (last visited June 29, 2018). Thus,

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

once a level one offender leaves New York City to reside, work, or attend school, he may lose the relative anonymity of his level one status.

**\*25** Given the potentially devastating consequences of compelled sex offender registration, I cannot conclude that due process is satisfied by a statistical showing that 46% of the kidnappers placed on the sex offender registry—a group which does not include the plaintiff at bar—deserve to be there. *See City of Cleburne*, 473 U.S. at 446-47 (even under rational basis test, state may not "rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational"); *Diaz*, 150 A.D.3d at 65-66, 50 N.Y.S.3d at 392 (the relationship between murder and sex offending was "too attenuated" to require a child murderer whose crime concededly had no sexual component to register under SORA). Nor can I conclude that the "administrative burden" of determining which kidnappers are sex offenders, *Knox*, 12 N.Y.3d at 69, makes it rational for the State of New York to subject plaintiff Yunus to 20 years of public opprobrium, housing and employment barriers, exacting filing requirements, and heightened criminal risk after *conceding* that—for him—the term is "unmerited." *Id. See Winston*, 887 F.3d at 565 (city cannot "rationally" compel tenants to pay their landlords' water bills). I therefore conclude that plaintiff has plausibly alleged a violation of his substantive due process rights and recommend, respectfully, that defendants' motion to dismiss be denied as to the Second Claim for Relief. [34] Since there is no dispute as to the non-sexual nature of plaintiff's underlying crimes, I also conclude that plaintiff has demonstrated "a clear or substantial likelihood of success on the merits," *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d at 294, requiring me to consider (in Part V(I) of this Report, *infra* ) whether preliminary injunctive relief is warranted.

[34] Defendants' claim that plaintiff cannot prevail on his substantive due process claim without a determination "that both the New York State Legislature and the United States Congress acted irrationally," Def. MTD Mem. at 10, is considerably overstated. As the Court of Appeals noted in *Knox*, the federal Jacob Wetterling Act required states to include "kidnapping and unlawful imprisonment of children by nonparents as among the crimes requiring registration," on pain of losing federal funding, but "does not require attaching the label 'sex offender' to the perpetrators of

these crimes. That was the New York Legislature's choice." 12 N.Y.3d at 68.

**E. Third Claim—Vagueness**

In his Third Claim for Relief, asserted against all defendants, Plaintiff contends that three of his parole conditions are unconstitutionally vague. SAC ¶¶ 152-58; *see also* Pl. Prelim. Inj. Mem. at 15-19. Special Condition No. 4, which excludes plaintiff from "school grounds"—defined to include public areas within 1,000 feet of the school—is unenforceable, according to plaintiff, because EL § 259-c(14), which mandates this condition, "provides little explanation as to how 1,000 feet should be measured," making it "nearly impossible for even the most resourceful parolee to accurately assess his limitations without more guidance as to what falls within a restricted area." *Id.* at 17. Similarly, plaintiff argues that Special Condition No. 17, which prohibits him from being "within 300 yards of places where children congregate," is unconstitutionally vague as written and is not saved by the list of examples provided ("toy stores, parks, pet stores, schools, playgrounds, video galleries, malls, bike trails, skating rinks, amusement parks, bowling parks, bowling alleys, pool halls, etc."), because the list contains so many "dissimilar" establishments that "it is impossible to discern what threshold of child attendance constitutes a place where children 'congregate.' " Pl. Prelim. Inj. Mem. at 18-19. Finally, plaintiff objects to Special Condition No. 24, which directs him to notify his parole officer and make certain disclosures when he "establish[es] a relationship with a consenting adult," because "it is impossible to know what is meant" by the word "relationship." Pl. Prelim. Inj. Mem. at 24, 25. Plaintiff has persuaded me that the first two conditions are unconstitutionally vague. Defendants have persuaded me that the third condition is not.

"A special condition of parole that is so vague that a person of common knowledge must guess at its meaning will be struck down as void for vagueness." *LoFranco v. U.S. Parole Comm'n*, 986 F. Supp. 796, 808 (S.D.N.Y. 1997), *aff'd*, 175 F.3d 1008 (2d Cir. 1999). Parole conditions must be "sufficiently clear to inform [the defendant] of what conduct will result in his being returned to prison." *Id.* (internal quotation marks omitted). This is the same standard used to determine whether criminal statutes are unconstitutionally vague. *See Copeland v. Vance*, —— F.3d ——, 2018 WL 3076907, at \*3 (2d Cir. June 22, 2018) ("In any vagueness case ... the challenger can prevail by showing that the statute either 'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 76 of 236

2018 WL 3455408

prohibits' or 'authorizes or even encourages arbitrary and discriminatory enforcement.' ") (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000) ). "Simply stated, parolees must know what actions a special condition prohibits in order to avoid due process violations." *LoFranco*, 986 F. Supp. at 808, 811 (upholding a prohibition on associating with the Hell's Angels but striking, as unduly vague, a prohibition on associating with other "outlaw motorcycle gangs").

### 1. The 1,000-Foot Rule

**\*26** Plaintiff relies heavily on *Doe v. Snyder*, 101 F. Supp. 3d 672 (E.D. Mich. 2015), which invalidated a portion of Michigan's Sex Offender Registration Act making it a crime for registered sex offenders to work, "loiter," or reside within a "school safety zone," defined as "the area that lies 1,000 feet or less from school property." *Id.* at 682. The Michigan statute provided "no guidance as to whether the 1,000 feet distance should be measured 'point to point' or 'property-line to property line' nor whether it should be measured 'as the crow flies or as people actually travel.' " *Id.* at 683. Moreover, although the Michigan State Police were developing a software program "to precisely determine the geographic exclusion zones," it was not yet operational; consequently, "neither the registrants nor law enforcement have the necessary data to determine the zones even if there were a consensus about how they should be measured." *Id.* at 684. "Accordingly, due to SORA's vagueness, registrants are forced to choose between limiting where they reside, work, and loiter to a greater extent than is required by law or risk violating SORA." *Id.* at 684-85. *See also Doe v. Strange*, 2016 WL 1079153, at *2 (M.D. Ala. Mar. 18, 2016) (enjoining enforcement of an Alabama statute barring registered sex offenders from establishing or maintaining a residence "or other living accommodation" within 2,000 feet of a school, childcare facility, or resident camp).[35]

[35] The primary problem with the Alabama statute was the definition of "residence." *See Strange*, 2016 WL 1079153, at *9 ("ASORCNA defines 'residence' in a circular manner, failing to specifically identify the point at which a sex offender 'resides' within a zone of exclusion such that he is subject to prosecution."). Plaintiff here raises no comparable challenge.

New York's 1,000-foot rule does not suffer from the same infirmities as the Michigan statute at issue in *Doe v. Snyder*.

Special Condition No. 4 uses the term "school grounds" as defined in PL § 220.00(14), which in turn specifies that "school grounds" include a 1,000-foot buffer zone measured from "the real property boundary line comprising any such school." Just as clearly, the New York courts have held that the 1,000-foot distance is to be measured "by a straight-line or 'as the crow flies' method, and not as measured along the route a pedestrian would be required to travel, including detours around obstructions." *People v. Robbins*, 10 A.D.3d 570, 571, 782 N.Y.S.2d 80, 81 (1st Dep't 2004), *aff'd*, 5 N.Y.3d 556, 807 N.Y.S.2d 7 (2005). Moreover, unlike the Michigan State Police, New York parole officers not only agree on how to measure the distance but use the CIRIS software program, which allows them to "precisely determine" whether a proposed residence is SARA-compliant. *See* Lewis-Robinson Decl. ¶¶ 8-13 & Exs. A-B.

It is no doubt inconvenient for plaintiff—and for other parolees seeking SARA-compliant housing—that Google Maps and other publicly-available programs do not provide the same level of precision as CIRIS. The problem is compounded by the fact that "[i]n dense urban areas like New York City, a vast proportion of the housing stock is located within 1,000 feet of a school." *Floyd Y.*, 56 Misc. 3d 271 at 274, 50 N.Y.S.3d at 850; *see also Williams*, 136 A.D.3d at 150, 24 N.Y.S.3d at 21 ("most of Manhattan" is within 1,000 feet of a school); *Devine v. Annucci*, 45 Misc. 3d 1001, 1006 (Sup. Ct. Kings Co. 2014) ("large swaths of New York City," including a "very substantial portion of Brooklyn," are within 1,000 feet of a school), *rev'd*, 150 A.D.3d 1104, 56 N.Y.S.3d 149 (2d Dep't 2017). But this does not make Special Condition No. 4 unconstitutionally vague—at least not if it merely constitutes a "residency restriction," which is how defendants describe it. *See* Def. MTD Mem. at 11; Def. Prelim Inj. Opp. Mem. at 17.

Like many other parolees (whether or not designated sex offenders), plaintiff must "reside at the address [his] PO has on record for [him]" and "discuss any proposed changes in [his] residence ... with [his] Parole Officer" *before* he moves. *See* Yunus Decl. Ex. B, at ECF page 4, ¶ 2 & Ex. C, at ECF page 2, ¶ 3. Thus, unlike the plaintiffs in *Doe v. Snyder*—who were all "Tier III" offenders, no longer on parole but required to stay out of "school safety zones" for life, 101 F. Supp. 3d at 678—plaintiff is in no danger of inadvertently moving into a non-compliant residence. *Cf. LoFranco*, 986 F. Supp. at 808 ("The 'essential purpose of the "void for vagueness" doctrine is to warn individuals of the criminal consequences of their conduct.' ") (quoting *Jordan v. De*

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

*George,* 341 U.S. 223, 230 (1951) ). Moreover, he will be free from Special Condition No. 4 once he is no longer subject to parole supervision. For these reasons, if New York's 1,000-foot rule merely restricted where a parolee could reside, it would not be unconstitutionally vague. By the same token, the Parole Officer Defendants cannot be made liable in damages for their past conduct in relation to the 1,000-foot rule. Since the rule was mandated by statute for registered sex offenders whose victims were minors, they had no choice but to impose it upon plaintiff. Nor did they violate his due process rights by refusing to permit him to reside in an apartment that they objectively determined to be within the proscribed buffer zone.

 **\*27** But this does not end the inquiry, because Special Condition No. 4 is not simply a residency restriction, and plaintiff seeks prospective injunctive relief against its enforcement. "That a statute was lawfully applied to one set of facts does not necessarily prove that it may lawfully be applied to a different set of facts." *Copeland,* 2018 WL 3076907, at \*5 (explaining that a plaintiff bringing a "prospective, as-applied challenge" on vagueness grounds need not show that prior enforcement actions were invalid). As mandated by EL § 259-c(14), the challenged condition prohibits plaintiff from "knowingly enter[ing] into or upon school grounds," defined to include all publicly-accessible areas within 1,000 feet of the school's property line, at least "while one or more ... persons under the age of 18 are present." By its terms, this condition puts plaintiff at risk of parole revocation for working, shopping, or even walking down the sidewalk if he knows there is a preschool, elementary school, middle school, or high school in session within 1,000 feet of his route. *See Williams,* 136 A.D.3d at 149, 24 N.Y.S.3d at 20 (SARA "prohibits sex offender parolees from residing *or traveling* near schools") (emphasis added).[36] Moreover, "the fact that there are schools and childcare facilities throughout New York City is something everyone ... knows." *Floyd Y.,* 56 Misc. 3d at 273, 50 N.Y.S.3d at 849.[37] Thus, Special Condition No. 4 presents both of the risks that trigger the vagueness doctrine: making it difficult if not impossible for a parolee to know what conduct is prohibited, *see LoFranco,* 986 F. Supp. at 808,[38] and encouraging "arbitrary and discriminatory application," *Id.* at 810 (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 109 (1972) ), by "defin[ing] as a rule violator any respondent who happens to be present on most sidewalks, streets, restaurants, stores, parking lots, parked vehicles and parks in New York City during school hours." *Floyd Y.,* 56 Misc. 3d at 276, 50 N.Y.S.3d at 851.

36   *Williams* upheld the 1,000-foot rule against an *ex post facto* and substantive due process challenge. Neither *Williams* nor any other New York case cited by the parties considered whether the rule is unconstitutionally vague.

37   By way of example only, the public entrance of the Daniel Patrick Moynihan United States Courthouse, where plaintiff Yunus has been required to appear several times in connection with this action, is within 1,000 feet of at least two elementary schools.

38   While a parolee may be required to seek permission from his PO before moving his residence—thus giving the officer an opportunity to research the proposed location via CIRIS—it would be absurd to expect a parolee to submit his daily route to his PO for this purpose, and equally absurd to ask an officer with a caseload of 25 to 30 sex offenders, *see* Lewis-Robinson Decl. ¶ 6, to pre-authorize every step taken by every offender to ensure their compliance with the 1,000-foot rule.

It is tempting, in a case like this, to construe the restriction narrowly, in order to avoid constitutional doubt. That is what the Eighth Circuit did in *Weems v. Little Rock Police Dep't,* 453 F.3d 1010 (8th Cir. 2006), when faced with a challenge to an Arkansas law that made it a crime for certain sex offenders to "reside within two thousand feet (2,000′) of the property" on which any school or daycare facility is located. 453 F.3d at 1013. The court rejected the suggestion that the term "reside" also prohibited offenders from "working or studying within 2000 feet of a school or daycare center," and upheld the constitutionality of the 2,000-foot rule as so limited. *Id.* at 1016 ("[W]e see no good reason to create more difficult constitutional questions by adopting a broad construction that the State itself eschews.").

In New York, however, the statute does not even use the term "reside." Instead, employing unmistakably broad language, it instructs the Board of Parole to "require, as a mandatory condition of [the offender's release on parole], that such sentenced offender shall refrain from knowingly *entering into or upon* any school grounds." EL § 259-c(14) (emphasis added). The Supreme Court recently reminded the lower federal courts that the doctrine of constitutional avoidance, under which "a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 78 of 236

2018 WL 3455408

alternative that avoids those problems," has no application unless the statute "is found to be susceptible of more than one construction." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836, 842 (2018) (quoting *Clark v. Martinez*, 543 U.S. 371, 385 (2005) ). If an interpretation that would avoid constitutional doubt is "implausible," the court may not rely upon it to sidestep the difficulty. *Jennings*, 138 S. Ct. at 842-43 ("That is not how the canon of constitutional avoidance works. Spotting a constitutional issue does not give a court the authority to rewrite a statute as it pleases. Instead, the canon permits a court to 'choos[e] between competing *plausible* interpretations of a statutory text.' ") (quoting *Clark*, 543 U.S. at 381) (emphasis added). *See also Grayned*, 408 U.S. at 110 (noting, in the context of a vagueness challenge, that "it is not within our power to construe and narrow state laws"). Consequently, this Court cannot rewrite EL § 259-c(14), nor interpret Special Condition No. 4 as nothing more than a residency restriction.

**\*28** Having determined that Special Condition No. 4 is too vague to enforce as written, and is not susceptible of a plausible competing interpretation that would cure the deficiency, I also conclude that plaintiff has demonstrated a clear or substantial likelihood of success on the merits as to that claim. I therefore recommend, respectfully, that defendants' motion to dismiss the Third Claim for Relief be denied insofar as plaintiff seeks injunctive relief against the prohibition on "entering" any publically-accessible area within 1,000 feet of a school's property line. [39]

[39]    Plaintiff does not seek damages from the Parole Officer Defendants in connection with the 1,000-foot rule. *See* Pl. MTD Opp. Mem. (Dkt. No. 69) at 23-24 (acknowledging that "qualified immunity would apply to mandatory conditions tied to" his sex offender designation).

### 2. The 300-Yard Rule

Special Condition No. 17, which is not mandated by any statute, is even more problematic. First, it too goes well beyond regulating where plaintiff may reside, expressly prohibiting plaintiff from "enter[ing]" or "be[ing]" within 300 yards of "places where children congregate" unless he has the prior approval of his PO. Second, the rule provides no guidance as to how, or from what point, the distance should be measured. Nor does it reveal whether the no-go rule is in effect at all times, or only when children are in

fact "congregating" in a qualifying "place." Fourth, and most significantly, the 300-yard rule applies not only to schools and childcare facilities but also to other places "where children congregate," making it extraordinarily difficult for a parolee, a parole officer, or any other "person of ordinary intelligence," *Copeland*, 2018 WL 3076907, at \*3, to identify the "places" to which the parolee must give a 300-yard berth.

Significantly, Special Condition No. 17 is not limited to places where children are "likely" to congregate, *cf. United States v. MacMillen*, 544 F.3d 71, 74 (2d Cir. 2008), or even places "primarily" used by children, *cf. United States v. Dupes*, 513 F.3d 338, 342 (2d Cir. 2008). Any place where children might conceivably congregate could be deemed off-limits, along with a 300-yard buffer zone on all sides. The examples given exacerbate rather than alleviate this difficulty: they include places designed for children (such as "toy stores" and "playgrounds"), places that attract both adults and children (such as "parks" and "malls"), and places that the hypothetical "person of common knowledge," *LoFranco*, 986 F. Supp. at 808, might think of as decidedly adult-oriented (such as "pool halls"). Unsurprisingly, given these uncertainties, defendants do not claim to have any software that will tell them whether a given location is or is not compliant with Special Condition No. 17. *See* Lewis-Robinson Decl. ¶ 9 (CIRIS draws a straight line "from the proposed residence to the property line at the edge of the parcel of any schools within 1,000 feet").

The parole condition at issue here is therefore distinguishable from the restriction upheld in *MacMillen*, where the sentencing judge prohibited a defendant from entering places "where children are *likely* to congregate" 544 F.3d at 74 (emphasis added), and provided a set of relatively consistent examples ("schools, daycare facilities, playgrounds, theme parks, arcades, recreational facilities, and recreation parks"), all of which actually were places where children were likely to congregate. *Id.* It is also distinguishable from the condition at issue in *Dupes*, which required the defendant to stay more than one hundred feet from places "*primarily* used by children," such as "schoolyards, playgrounds and arcades." 513 F.3d at 342 (emphasis added).

**\*29** In *United States v. Peterson*, 248 F.3d 79, 86 (2d Cir. 2001), the Second Circuit rejected a condition prohibiting the defendant from "being on any school grounds, child care center, playground, park, recreational facility or in any area in which children are likely to congregate." This language, the court noted, left it unclear whether defendant would be barred from "visiting Yellowstone National Park or joining

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 79 of 236

an adult gym." *Id.* The 300-yard rule at issue here is, in my view, even less clear. Moreover, the depth of the buffer zone imposed by Special Condition No. 17 (900 feet, compared to 100 feet in *Dupes* and no buffer zone at all in *MacMillen* or *Peterson* ), combined with the wide range of public and private establishments that might trigger the rule and the inability of either a parolee or his PO to accurately measure the edge of the 300-yard no-go zone, make it virtually impossible for a parolee in New York City to go anywhere at all without risking re-incarceration for a parole violation. [40]

[40] By way of example only, the Daniel Patrick Moynihan United States Courthouse is within 300 yards of Columbus Park, where children frequently congregate to play. Plaintiff also notes that the Willow Avenue shelter, where he and other registered sex offenders are housed, is directly across the street from a family shelter at which young children congregate. *See* Yunus Decl. ¶ 28.

For these reasons, I conclude that plaintiff has plausibly alleged that Special Condition No. 17 is unconstitutionally vague and that he has demonstrated a clear or substantial likelihood of success on the merits as to that claim. I therefore recommend, respectfully, that defendants' motion to dismiss the Third Claim for Relief be denied insofar as plaintiff seeks prospective injunctive relief against the 300-yard rule. However, plaintiff does not allege that this rule has been enforced against him in the past. Nor, in light of *MacMillen* and *Dupes*, can he plausibly allege that this condition violated "clearly established" legal rights "of which a reasonable person" supervising his parole would have known. *Christian,* 2018 WL 1441401, at *2. The motion to dismiss should therefore be granted insofar as plaintiff seeks damages from any of the Parole Officer Defendants in connection with Special Condition No. 17.

### 3. The Relationship Rule

In *United States v. Reeves*, the Second Circuit considered a condition of supervised release that required the releasee to "notify the Probation Department when he establishes a significant romantic relationship and ... inform the other party of his prior criminal history concerning his sex offenses." 591 F.3d 77, 80 (2d Cir. 2010). The court concluded that the condition was too vague to be enforced because "people of common intelligence (or, for that matter, of high intelligence) would find it impossible to agree on the proper application

of a release condition triggered by entry into a 'significant romantic relationship.' " *Id.* at 81. The court criticized both limiting terms, noting that "[w]hat makes a relationship 'romantic,' let alone 'significant' in its romantic depth, can be the subject of endless debate that varies across generations, regions, and genders." *Id.* Therefore, the court explained, "the supervised release condition has no objective baseline." The court agreed that Reeves's "continued freedom during supervised release should not hinge on the accuracy of his prediction of whether a given probation officer, prosecutor, or judge would conclude that a relationship was significant or romantic." *Id.*; *accord United States v. Orozco,* 371 F. App'x 188, 189 (2d Cir. 2010).

Plaintiff argues that Special Condition No. 24 is even more amorphous in its description of what triggers the reporting requirement: "a relationship" with "a consenting adult." Since the word "relationship" is not limited in any way, plaintiff contends, no "objective baseline" is provided to assist him in determining what type of human interaction requires disclosure. Defendants counter that the required objectivity is found in the phrase "consenting adult," which makes it clear that a reportable relationship is a sexual relationship, and that since plaintiff has already disclosed his relationship with his fiancée, he "clearly understood the type of relationship the special condition targeted." *See* Def. MTD Mem. at 12-13 (noting that the dictionary definition of "consenting adult" is "[a]n adult who willing agrees to engage in a sexual act."). [41]

[41] *See also* Merriam-Webster Online Dictionary, *Consenting Adult*, https://www.merriam-webster.com/dictionary/consenting% 20adult (last visited June 29, 2018) (defining term as "an adult who has consented to have sex").

**\*30** I agree. A parolee of ordinary intelligence reading Special Condition No. 24 (particularly in context, among other conditions "for sex offenders") would no doubt conclude, as Yunus did, that the reporting requirement extended to his fiancée but not to the various non-sexual relationships in his life. *See State v. Maddox,* 2011 WL 4979925, at *2 (Vt. Jan. 27, 2011) (distinguishing *Reeves* and holding that a condition requiring a probationer to report "a dating or romantic relationship" was not unconstitutionally vague). I therefore recommend, respectfully, that defendants' motion to dismiss the Third Claim for Relief be granted as to the relationship rule.

### F. Fourth Claim—First Amendment

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 80 of 236

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

In his Fourth Claim for Relief, asserted against all defendants, plaintiff challenges the various special parole conditions that restrict his access to computers, cellphones, and social media. He principally contends that Special Condition No. 48, which is a "mandatory parole condition that he not access 'any commercial social networking site,' " violates the First Amendment. SAC ¶ 161. He also alleges that he is prohibited from possessing a smartphone or a computer, *Id.* ¶ 162, which exacerbates the deprivation of his constitutional rights because "a cell phone and computer are the only means by which [he] can access social media." *Id.* Plaintiff seeks preliminary and permanent injunctive relief lifting all of his cellphone, computer, and internet restrictions, arguing that they are "unconstitutional abridgements of Mr. Yunus's First Amendment rights and, in any event, are baseless in light of his prior conduct." Pl. Prelim. Inj. Mem. at 20.

Last year, in *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017), the Supreme Court held that registered sex offenders cannot be routinely or categorically barred from social media, even where—as in the North Carolina statute at issue there—the prohibition extends only to websites that could be used by minors. *Id.* at 1734. The Court began its analysis by acknowledging that online social networking is both a ubiquitous feature of modern civil society, *Id.* at 1735 ("[s]even in ten American adults use at least one internet social networking service") and the modern equivalent of the town square. *Id.* at 1737 (such services are, for many citizens, "the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge"). Because North Carolina's ban was "content neutral," the Court applied "intermediate scrutiny," under which a law that burdens speech must be 'narrowly tailored to serve a significant governmental interest' " and "must not 'burden substantially more speech than is necessary to further the government's legitimate interests.' " *Id.* at 1736 (quoting *McCullen v. Coakley,* 134 S. Ct. 2518, 2534 (2014) ). Under this test, a state may "enact specific, narrowly tailored laws that prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor." *Packingham,* 137 S. Ct. at 1737. The state may not, however, "suppress lawful speech as the means to suppress unlawful speech," which was "what North Carolina has done here." *Id.* at 1738 (quoting *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002) ).

Even before *Packingham*, courts in this Circuit looked with disfavor on broad cellphone, computer, and internet restrictions for sex offenders on parole or supervised release, generally requiring an individualized showing that a particular restriction "relates to [the offender's] prior conduct." *Singleton*, 210 F. Supp. 3d at 376.[42] Following *Packingham*, state and federal cases around the country have invalidated a variety of broad-based internet or social media restrictions imposed on sex offenders simply because they are sex offenders. To survive a constitutional challenge, any such restriction must be narrowly tailored to the history or known proclivities of the individual parolee, supervised releasee, or registered offender. *See, e.g., Doe v. Kentucky*, 283 F. Supp. 3d 608, 613 (E.D. Ky. 2017) (holding that statute prohibiting registered sex offender from accessing all social media websites that could be used by minors was not sufficiently "tailored" to pass constitutional muster, notwithstanding Doe's conviction for possessing child pornography, and enjoining defendants from enforcing the statute "not only against Mr. Doe, but altogether"); *Mutter v. Ross*, 240 W.Va. 336, 811 S.E.2d 866, 873 (2018) (noting that "*Packingham* made no exception for parolees" and invalidating special condition of parole preventing sex offender from accessing the internet where he had no "history of using the internet to engage in criminal behavior"). *Cf. United States v. Rock*, 863 F.3d 827, 830-32 (D.C. Cir. 2017) (upholding supervised release condition prohibiting sex offender from possessing a computer or going online without prior approval because Rock pleaded guilty to "distributing" child pornography "over the internet," such that as to him the restriction was "narrowly tailored" and not "arbitrary").

[42]     The plaintiff in *Singleton* was a "discretionary sex offender" who challenged, among other things, the same ban on camera-equipped cellphones that was imposed on plaintiff Yunus as Special Condition No. 35. 210 F. Supp. 3d at 376. The court denied defendants' motion to dismiss that challenge, noting that plaintiff's prior sexual misconduct did not involve cellphones or cameras and concluding that the condition improperly "functions as an overbroad ban on an item simply because Plaintiff *could* use its functions to commit a future lewd act." *Id.* (emphasis added). *See also United States v. Peterson*, 248 F.3d at 82-83 (rejecting government's argument that "a computer with Internet access offers the *possibility* of abusive use for illegitimate purposes" and striking "broad restrictions on Peterson's computer ownership and

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

internet access" that were not "reasonably related" to his actual criminal history) (emphasis added) (quoting 18 U.S.C. § 3563(b) ); *United States v. Sofsky,* 287 F.3d 122, 126 (2d Cir. 2002) (quoting *Peterson,* 248 F.3d at 83) ("We appreciate the Government's point that permitting Sofsky access to a computer and the Internet after serving his ten-year sentence can facilitate continuation of his electronic receipt of child pornography, but we are more persuaded by the observation in *Peterson* that '[a]lthough a defendant might use the telephone to commit fraud, this would not justify a condition of probation that includes an absolute bar on the use of telephones.' "); *Cf. United States v. Johnson,* 446 F.3d 272, 274-75 (2d Cir. 2006) (upholding broad ban on internet access as a condition of supervised release for a convicted sex offender who "used the Internet to conduct sexually-explicit conversations with minors, and to lure several of them to meetings").

 **\*31** Plaintiff Yunus has never been charged with any internet-related criminal conduct, sexual or otherwise. Yet Special Conditions No. 12 (no participation in "any online computer service that involves the exchange of electronic messages"), No. 35 (no beeper, scanner, or cellphone without PO permission, and no "video or photo-capable" phone), No. 39 (no computer, laptop, or "computer related materials," no "services that provide access to the internet," and no "public or private computer network" without PO permission), and No. 48 (no "commercial social networking"), which all appear to be standard in New York for "sex offenders," significantly restrict his ability to possess, use, or access a computer, a cellphone, any other device capable of connecting to the internet, and largely block him not only from social networking sites but from the internet itself. Moreover, the prohibition on accessing any "commercial social networking website" is made mandatory for all covered parolees by EL § 259-c(15). That is presumably why Special Condition No. 48, as written, is absolute, admitting no exceptions.

EL § 259-c(15) also defines the term "commercial social networking website" broadly,[43] to include not only child- or teen-oriented sites but also mainstream adult sites such as Facebook (2.2 billion active users), YouTube (1.8 billion), Instagram (800 million), Twitter (336 million), and LinkedIn (106 million).[44] As a result, plaintiff and other covered parolees are forbidden from logging in to the public Facebook page maintained by DOCCS (@NYSDOCCS) or from

following the official Twitter account maintained by the President of the United States (@realDonaldTrump). *See Knight First Amendment Inst. at Columbia Univ. v. Trump,* 2018 WL 2327290, at *1, * 15, *20 (S.D.N.Y. May 23, 2018) (holding, among other things, that "the President's tweets from @realDonaldTrump ... are official records," that Twitter "is a designated public forum," and that "the blocking of the plaintiffs [from the President's Twitter account] based on their political speech constitutes viewpoint discrimination that violates the First Amendment").

[43]     "As used in this subdivision, a 'commercial social networking website' shall mean any business, organization or other entity operating a website that permits persons under eighteen years of age to be registered users for the purpose of establishing personal relationships with other users, where such persons under eighteen years of age may: (i) create web pages or profiles that provide information about themselves where such web pages or profiles are available to the public or to other users; (ii) engage in direct or real time communication with other users, such as a chat room or instant messenger; and (iii) communicate with persons over eighteen years of age." EL § 259-c(15). A proviso explains that, "for purposes of this subdivision, a commercial social networking website shall not include a website that permits users to engage in such other activities as are not enumerated herein." *Id.* It is not clear whether this proviso exempts otherwise-qualifying websites from the categorical ban simply because they also permit their users to engage in non-enumerated activities, such as (for example) posting photos or videos.

[44]     *See* Priit Kallas, *Top 15 Most Popular Social Networking Sites and Apps [May 2018]*, Dreamgrow (May 22, 2018) https://www.dreamgrow.com/top-15-most-popular-social-networking-sites/ (last visited June 29, 2018). In percentage terms, 73% of all American adults now use YouTube, followed by Facebook (68%), Instagram (35%), LinkedIn (25%) and Twitter (24%). *See* Aaron Smith & Monica Anderson, *Social Media Use in 2018*, Pew Research Center, http://www.pewinternet.org/2018/03/01/social-media-use-in-2018/ (last visited June 29,

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)
2018 WL 3455408

Case 9:23-cv-01114-DNH-MJK   Document 31   Filed 04/22/24   Page 82 of 236

2018). "The typical (median) American reports that they use three of the eight major platforms that the Center measured in this survey." *Id.*

For the reasons explained in Part V(E)(1) of this Report, *supra*, I am not free to ignore the mandatory language of EL § 259-c(15) and Special Condition No. 48. Yet defendants do just that, arguing that "there is no such blanket prohibition," Def. Prelim. Inj. Opp. Mem. at 20, because plaintiff "has sought, and received permission to use the social media site LinkedIn" and "has not requested to use any other social media." Def. MTD Reply Mem. at 6. Defendants also note that plaintiff "has access to a computer and social media for academic purposes," and assert that he "is allowed to possess a cellular phone as long as it does not have video or picture capabilities." *Id.*

**\*32** Defendants overstate the facts. Plaintiff has never been permitted to possess a computer or laptop of his own for any purpose. He has been intermittently permitted to possess a cellphone, but at various times (including the present) he has been told that he may not have a "smart phone," that is, an ordinary modern phone capable of connecting to the internet. *See* Yunus Decl. ¶ 29; Yunus Reply Decl. ¶¶ 14-19 & Ex. A (Dkt. No. 71-1) (notice confirming that plaintiff's "previous authorization to possess a smart phone has been rescinded"). If plaintiff violates any of these conditions he can be returned to prison. This has already occurred once: as PO Lewis-Robinson attests, plaintiff was found guilty of a parole violation and re-incarcerated for several months in 2017 (prior to *Packingham* ) because he was "found to be in possession of an unapproved smart phone and personal laptop." Lewis-Robinson Reply Decl. ¶¶ 12-13.

To be sure, plaintiff is allowed to use the computers at BMCC (when he is on campus), but only "for academic purposes" and to communicate with his lawyers. Yunus Decl. ¶ 30; Lewis-Robinson Decl. ¶ 23. He was also permitted to access LinkedIn (notwithstanding the mandatory nature of the social networking prohibition), but only "as part of a project for a marketing class" at BMCC. Yunus Reply Decl. ¶ 18. Plaintiff remains barred from accessing any other social media site, *Id.* ¶¶ 17, 19, and now that he has no smart phone he is unable to connect to the internet at all, except during the limited time he spends on the BMCC campus (and then only for limited purposes). Yunus Decl. ¶ 31. The record thus reveals that while defendants have not barred plaintiff entirely from the internet, they have significantly restricted his online access through a variety of overlapping parole conditions, and but for a single exception—a LinkedIn account created for

a college course—have barred him completely from social media in accordance with the mandate of EL § 259-c(15). That mandate, in my view, cannot survive *Packingham.* [45]

[45]
Even if EC § 259-c(15) permitted individual parole officers to make case-by-case exceptions on request, that would not save an "otherwise overly broad restriction" on plaintiff's First Amendment rights. *United States v. Maxson*, 281 F. Supp. 3d 594, 600 (D. Md. 2017) ("the fact that Defendant may use the Internet if he obtains prior written approval from his probation officer cannot salvage this otherwise overly broad restriction"); *see also Mutter v. Ross*, 811 S.E.2d at 873 n.38 (rejecting defendants' argument that "the special condition of Mr. Ross's parole does not run afoul of *Packingham* because it allowed Mr. Ross to access the internet *after* obtaining permission from his parole officer") (emphasis in the original); *United States v. LaCoste*, 821 F.3d 1187, 1192 (9th Cir. 2016) ("When a total ban on Internet access cannot be justified ... a proviso for probation-officer approval does not cure the problem.").

Moreover, defendants make no effort to link *any* of the cellphone, computer, camera, social media, or other internet restrictions at issue here to plaintiff's criminal history, and consequently fail to demonstrate that they are "narrowly tailored," as the Constitution requires, to combat any identifiable danger that plaintiff would present if permitted to step into the modern equivalent of the town square. *Packingham*, 137 S. Ct. at 1737. That is because the record discloses no such danger. Plaintiff did not use the internet (or a camera) to commit his crimes. Nor has he engaged in any other internet-enabled misconduct. To the contrary: plaintiff asserts—and defendants do not contest—that he has never been accused of sexual misconduct of any sort, online or otherwise. He thus presents none of the risks that led the Legislature to prescribe the social media ban in 2008. *See* 2008 N.Y. Sess. Laws ch. 67, § 1 (effective April 28, 2008) (enacting mandatory social media ban for certain sex offenders on parole in order to protect children against "sexual predators" who stalk the internet anonymously "while attempting to engage children in illicit activity").

**\*33** Since defendants have offered nothing but plaintiff's status as a sex offender to justify the sweeping restrictions they have imposed on his access to cellphones, computers, social media, and the internet generally—and since nothing

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 83 of 236
Yunus v. Robinson, Not Reported in Fed. Supp. (2018)
2018 WL 3455408

in the record before me suggests that any better justification exists—I conclude not only that plaintiff has plausibly alleged a violation of his First Amendment rights but also that he has demonstrated a clear and substantial right to relief. I therefore recommend, respectfully, that defendants' motion to dismiss the Fourth Claim for Relief be denied insofar as it seeks prospective injunctive relief.

Insofar as the Fourth Claim seeks damages against the Parole Officer Defendants in their individual capacities, I must consider (a) whether plaintiff has plausibly alleged that they personally participated in the alleged deprivation of his constitutional rights, and (b) if so, whether they are nonetheless entitled to qualified immunity. *See Christian*, 2018 WL 1441401, at *2. Plaintiff alleges generally that all three of his POs—Smith, Vasquez and Lewis-Robinson—imposed the Sex Offender Conditions on him without regard to the specifics of his case. *See* SAC ¶¶ 41-42 (Smith), 45-46 (Vasquez), 51-53 (Lewis-Robinson). However, he does not allege that he ever discussed the social media ban or related restrictions with Smith or Vasquez (or their supervisors), much less that he asked any of them for a computer, a smart phone, internet access, or access to social media. Moreover, as noted above, Condition No. 48 is required by statute. Thus, plaintiff has failed to plausibly allege that these defendants are liable to him in their individual capacities for violating his First Amendment rights.

PO Lewis-Robinson was personally involved in the alleged deprivation. Plaintiff alleges that it is Lewis-Robinson who has permitted him to use a cellphone "only for his education and to communicate with counsel," *Id.* ¶¶ 85-86; who has not allowed him to use any computers other than those at BMCC—also for limited purposes, *Id.* ¶¶ 87-89; and who has forbidden any "non-academic use of the internet or social media." *Id.* ¶ 88. Moreover, it is undisputed that (after the SAC was filed) Lewis-Robinson rescinded her previous authorization for plaintiff to use a smart phone, Yunus Reply Decl. ¶¶ 14-16 & Ex. A; Lewis-Robinson Reply Decl. ¶ 29, and that she has never allowed plaintiff to access any social media other than LinkedIn, which she permitted during the spring 2016 and fall 2017 semesters as part of a class project. Yunus Reply Decl. ¶¶ 18-19.

Notwithstanding her hands-on involvement in the challenged parole restrictions, I conclude that Lewis-Robinson cannot be made personally liable for any First Amendment deprivations that plaintiff suffered at her hands prior to June 19, 2017, when *Packingham* was decided. "The doctrine of qualified immunity protects government officials from suit if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ). Prior to *Packingham*, it was not "clearly established" that a social media ban would violate the constitutional rights of parolees such as plaintiff—who implicitly concedes as much, arguing only that "[t]he Supreme Court's unmistakable holding [in *Packingham*] made it unreasonable for the Defendants to rely on this state's statutory requirement when prescribing conditions of parole." Pl. MTD Opp. Mem. at 24. I therefore recommend, respectfully, that insofar as the Fourth Claim seeks damages from the Parole Officer Defendants, it be dismissed except as to defendant Lewis-Robinson's conduct after June 19, 2017.

**G. Fifth Claim—Interference with Familial Relations**

**\*34** As noted above, Special Condition No. 15 prohibits plaintiff from having any contact with children under the age of 18 without the prior approval of his PO. Plaintiff does not challenge this condition on its face. Instead, he alleges that defendants Lewis-Robinson, Young, and Jones violated his "right to come together with members of his family" by refusing to make any exceptions to the no-contact-with-minors rule, even for holiday gatherings at which plaintiff's minor nieces and cousins were present along with multiple adults. SAC ¶¶ 166-67.[46] Plaintiff argues that he has a fundamental right to contact with extended family members; that parole conditions that "interfere with these protected family relationships must satisfy strict scrutiny," Pl. Prelim. Inj. Mem. at 22-23; and that a "blanket ban on contact with minors" cannot satisfy that test because it would have been "crystal clear to any fair-minded viewer that Mr. Yunus poses no threat to minors within his own family." *Id.* at 23. Defendants counter that plaintiff has no "fundamental" right to contact with extended family members who are not his own children and with whom he has never had a custodial relationship. *See* Def. Prelim. Inj. Opp. Mem. at 20.

[46]    In addition to his nieces and cousins, plaintiff has a son of his own who is an adult. Neither Special Condition No. 15 nor any of plaintiff's other parole conditions bar him from contact with his son. *See* Oral Arg. Tr. at 23:18-23.

Defendants are correct. "It is well established that a *parent's* interest in maintaining a relationship with *his or her child* is protected by the Due Process Clause of the Fourteenth

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 84 of 236

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

Amendment." *United States v. Myers*, 426 F.3d 117, 125 (2d Cir. 2005) (emphasis added) (citing *Wilkinson v. Russell*, 182 F.3d 89, 103-04 (2d Cir. 1999) ); *see also United States v. McGeoch*, 546 F. App'x 44, 48 (2d Cir. 2013) (summary order) ("A condition of supervised release that prevents a father from seeing his children outside the presence of an approved monitor is a severe one subject to careful scrutiny."). But even among biological parents, the degree of protection varies in accordance with the nature of the parent-child bond. As the Second Circuit explained in *Myers*, "[s]ome measure of due process protection" extends to a non-custodial parent who has demonstrated a "commitment to the responsibilities of parenthood." 426 F.3d at 128 (quoting *Lehr v. Robertson*, 463 U.S. 248, 261 (1983) (internal quotation marks omitted) ). However, the *Myers* court stopped short of extending the same solicitude to a supervised releasee who wished to see his son but had never been the boy's custodian and presented "no evidence" in support of his claim that he played "an active role in the life of his son" before he was incarcerated. *Myers*, 426 F.3d at 128 (remanding for additional fact-finding). *Cf. Lima*, 270 F. Supp. at 701-03 (applying strict scrutiny where state parole officers expelled sex offender parolee from his marital home after his wife gave birth to a son, without conducting any individualized inquiry into whether parolee was a danger to the infant).

Outside of the context of parole or supervised release, the courts have extended due process protection (both substantively and procedurally) to quasi-parental custodial relationships beyond the nuclear family. *See, e.g., Moore v. City of E. Cleveland*, 431 U.S. 494 (1977) (invalidating housing ordinance making it a crime for a grandmother to live in the same dwelling unit with two grandsons who were cousins rather than brothers); *Rivera v. Marcus*, 696 F.2d 1016, 1024-25 (2d Cir. 1982) (holding that a half-sister who had been raising her younger half-siblings as a foster parent had a compelling liberty interest in "preserving the integrity and stability of her family," such that Connecticut could not remove the children from her home without an adequate pre-deprivation hearing); *Bellet v. City of Buffalo*, 2009 WL 2930464, at *4-5 (W.D.N.Y. Sept. 11, 2009) (holding that a grandfather who "was his grandson's primary caregiver for approximately seven years" raised a triable issue of fact as to "whether he possessed a protected liberty interest" in "preserving the family unit he established with the grandson"). But these cases are of limited assistance to plaintiff Yunus, who has never had a custodial or other quasi-parental relationship with his minor nieces and cousins. Nor does he cite any authority for the proposition that he has a

fundamental right to visit them simply because he is related to them. [47] Moreover, while the no-contact-with-minors rule undoubtedly burdens plaintiff's relationship with their parents —his sisters and uncle—it does not bar him from seeing his adult relatives, nor prevent them from "com[ing] together" with plaintiff "for mutual sustenance." *Moore*, 431 U.S. at 505. I therefore cannot find that defendants interfered with a fundamental right when they refused to make any exceptions to Special Condition No. 15.

[47]     At oral argument, plaintiff pointed out that he had no ability to establish a close pre-parole relationship with his nieces and cousins. *See* Oral Arg. Tr. at 23:15-24:11 ("He's been in jail since 2002 and hasn't been allowed to [see his minor nieces and cousins] since he's come out."). This assertion, while no doubt accurate, is not particularly relevant to the due process analysis, which—except in cases involving parents and their own children—turns on the actual relationship between the extended family members, not the relationship that the plaintiff wishes to develop. Moreover, both the parent-child cases and the extended-family cases frequently stress the interests of the children themselves in maintaining the stability of established custodial arrangements or emotional bonds. *See, e.g., Rivera*, 696 F.2d at 1026 ("The Ross children surely possess a liberty interest in maintaining ... the family environment that they have known since birth."); *Kia P. v. McIntyre*, 235 F.3d 749, 759 (2d Cir. 2000) ("children have a ... constitutionally protected liberty interest in not being dislocated from the emotional attachments that derive from the intimacy of daily [family] association.") (alteration in the original) (internal quotation marks and citations omitted). Plaintiff's minor nieces and cousins have no comparable interests at stake.

**\*35** This does not necessarily end the inquiry. The Due Process Clause requires that the parole conditions imposed by the State of New York or its agents be "reasonably related to [the parolee's] prior conduct or to the government's interest in his rehabilitation." *Singleton*, 210 F. Supp. 3d at 374. Because parolees indisputably "possess fewer constitutional rights" than ordinary citizens, *United States v. Polito*, 583 F.2d 48, 54 (2d Cir. 1978), including "diminished due process rights." *Robinson v. New York*, 2010 WL 11507493, at *6 (N.D.N.Y. Mar. 26, 2010) (quoting *United States v. Cabot*, 325 F.3d

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 85 of 236

384, 385 (2d Cir. 2003) ), this standard is highly deferential, particularly in the absence of any identifiable fundamental right. *See Walker v. Mattingly*, 2012 WL 1160772, at *6 (W.D.N.Y. Apr. 5, 2012) (the decision of a state parole board or parole office "is not subject to judicial review in the absence of a showing that the board or its agents acted in an arbitrary and capricious manner") (quoting *Pena v. Travis*, 2002 WL 31886175, at *9 (S.D.N.Y. Dec. 27, 2002) ); *Robinson v. New York*, 2010 WL 11507493, at *3 (N.D.N.Y. Mar. 26, 2010) ("the imposition of conditions—whether imposed prior to or subsequent to release, by the parole board or a field parole officer—must be upheld as long as they are reasonably related to a parolee's past conduct, are not arbitrary and capricious, and are designed to deter recidivism and prevent further offenses."). Nonetheless, a parolee may seek judicial intervention—including "tailoring or invalidation"—where "the condition is not related to the parolee's criminal history or to the State's interests." *Robinson*, 2010 WL 11507493, at *6. This "limited due process right," which entitles a parolee to "conditions of parole that are reasonably related to his prior conduct or to the government's interest in his rehabilitation," *Singleton*, 210 F. Supp. 3d at 374, may be enforced in federal court. [48]

[48] Defendants suggest otherwise, arguing that challenges to state-imposed parole conditions should be brought in state court. *See, e.g.*, Def. MTD Mem. at 16 ("[T]his Court should not supplant the jurisdiction of state courts which provide the proper avenue of relief to challenge state parole conditions,"). In support of that contention, defendants cite *Maldonado v. Fischer*, 2013 WL 5487429 (W.D.N.Y. Sept. 30, 2013), which (they say) "directed plaintiff to file an Article 78 proceeding if he wishes to contest his special condition." Def. MTD Mem. at 16-17. In fact, *Maldonado* reaffirmed the availability of a federal forum for claims such as these. After dismissing Maldonado's challenges to various parole conditions as moot (because his parole had been revoked following a new felony conviction) the court advised him that should he once again be granted parole, "and should parole officials impose similar conditions, plaintiff may seek review of those conditions through an article 78 petition *or another action in this Court.*" *Maldonado*, 2018 WL 5497429 at *4 (emphasis added).

As recently noted by the Hon. Paul A. Engelmayer when reviewing the same parole condition at issue here, Special Condition No. 15 "expressly authorized parole authorities to give written permission" for plaintiff to have contact with minors, and thus "anticipated" that requests for such contact could be made and would be considered rationally rather than denied capriciously. *Lima*, 270 F. Supp. 3d at 703. In this case, it appears that no such rational consideration took place when plaintiff requested permission to attend his uncle's Thanksgiving dinner in 2017. Plaintiff alleges that PO Lewis-Robinson told him "he would go to prison if there were children there." SAC ¶ 104. *See also* Yunus Decl. ¶ 39 (Lewis-Robinson told plaintiff that he would be " 'locked up' if there were any children there"). Defendant Lewis-Robinson does not deny these events. Nor does she assert that she gave any thought to whether plaintiff's request to attend his uncle's Thanksgiving dinner presented any risks to the minor children expected to be present there. [49]

[49] To the contrary: in her declaration, PO Lewis-Robinson asserts flatly that plaintiff "is not permitted to visit with members of his family who are minors—most specifically, his nieces, nephews, and cousins." Lewis-Robinson Decl. ¶ 21.

Given the modest nature of the proposal and the extremely low-risk setting—a single family dinner with multiple adults present—I conclude that plaintiff has raised a plausible (if narrow) claim that his current parole officer, acting in her individual capacity, abused her discretion and violated his due process rights by refusing even to consider his request to attend his uncle's Thanksgiving dinner in 2017. Because plaintiff is entitled to "all reasonable inferences from the facts alleged," including "those that defeat the immunity defense," *Doe v. Annucci*, 2015 WL 4393012, at *12, I do not recommend that the claim against Lewis-Robinson be dismissed, at this stage, on qualified immunity grounds. I therefore recommend, respectfully, that insofar as the Fifth Claim for Relief seeks damages, it be dismissed as to all defendants except PO Lewis-Robinson.

**\*36** Similarly, insofar as the Fifth Claim seeks injunctive relief, it should not be dismissed on the pleadings, because plaintiff has plausibly alleged facts suggesting that—notwithstanding the permissive language of Condition No. 15—his POs view it as an absolute bar and will never permit him to see his minor relatives. However, there is no *evidence* that plaintiff specifically requested permission to see his minor

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

nieces and cousins more than once. Thus, I cannot conclude that plaintiff has demonstrated a clear and substantial right to relief as to his Fifth Claim, which must await further factual development before any consideration of the remedies, if any, to which plaintiff may be entitled.

### H. Sixth Claim—Arbitrary and Capricious

In his Sixth Claim for Relief, plaintiff alleges that the Parole Officer Defendants acted arbitrarily and capriciously when they "refused to consider alternative proposed residences in good faith," thereby effectively "creating a condition of parole that Mr. Yunus must live at a DOCCS-designated homeless shelter." SAC ¶ 172. In addition, plaintiff uses his Sixth Claim to challenge a number of his parole conditions as arbitrary and capricious, including Special Condition No. 24, governing his relationships with consenting adults; Nos. 31 and 32, which prohibit him from owning, operating, or being a passenger in a motor vehicle without the permission of his PO; No. 14, which prohibits him from purchasing or possessing sexually explicit materials; No. 19, which prevents him from owning a pet; and No. 37, which prohibits him from renting a post office box without his PO's prior approval. SAC ¶ 173.[50] In his preliminary injunction motion, however, plaintiff requests equitable relief only as to the "relationship" restriction, arguing that it is "wholly unrelated" to his prior criminal conduct, Pl. Prelim. Inj. Mem. at 25, and the automobile restriction, arguing that it should be "invalidated or tailored" because "his single bad act using a motor vehicle" cannot justify a broad rule "preventing him from setting foot in a motor vehicle." *Id.* I address each component of the Sixth Claim for Relief in turn.

[50] Additionally, the Sixth Claim for Relief challenges the restrictions on plaintiff's cellphone, computer, camera, and internet access as arbitrary and capricious. SAC ¶ 173(i)-(ii). Since I considered the same issues in Part V(F) of this Report (in the context of plaintiff's First Amendment challenge), I will not repeat that analysis here.

#### 1. Alternative Proposed Residences

Plaintiff requested permission to move out of the Willow Avenue Men's Shelter three times. The first two addresses he proposed were within 1,000 feet of at least one school, and for that reason were not SARA-compliant. At the time he proposed those addresses, plaintiff was a registered sex offender and therefore subject to EL § 259-c(14), which in turn made Special Condition No. 4 (the 1,000-foot rule) mandatory. Since the statute gave the Parole Officer Defendants no discretion to exercise, they cannot be held individually liable for "refusing to consider" those proposed residences "in good faith." SAC ¶ 172. I therefore recommend, respectfully, that the Sixth Claim for Relief be dismissed to the extent it seeks damages stemming from the Parole Officer Defendants' denial of plaintiff's first two requests to move.

The third address that plaintiff proposed—Ms. Blake's apartment—was SARA-compliant, but PO Lewis-Robinson nonetheless denied him permission to move on the ground that Ms. Blake was "uncooperative." SAC ¶ 77. In fact, plaintiff alleges, this was pretext; the real reason for the denial was simply that it was more convenient for his PO to keep all of her parolees together in the shelter. SAC ¶¶ 72-78. The Sixth Claim for Relief therefore raises the question whether PO Lewis-Robinson acted so arbitrarily as to violate plaintiff's rights under the Due Process Clause. Defendants' moving brief in support of their motion to dismiss does not discuss this portion of the Sixth Claim for Relief. *See* Def. MTD Mem. at 16-17. Because I find that the well-pleaded facts set out in the SAC plausibly make out the elements of a cognizable damages claim against defendant Lewis-Robinson (the only named defendant personally involved in the discretionary denial of plaintiff's third request to move out of a homeless shelter), I recommend, respectfully, that defendants' motion to dismiss be denied as to this aspect of plaintiff's Sixth Claim for Relief. It should also be denied insofar as it seeks prospective injunctive relief against what he describes as a de facto parole condition requiring him to remain in a DOCCS-designated homeless shelter for the convenience of his parole officers.

**\*37** I now turn to the evidence relevant to plaintiff's request for preliminary injunctive relief. Citing PO Lewis-Robinson's two declarations, defendants argue vigorously that plaintiff's proposal to move in with Ms. Blake was "properly rejected" because "neither plaintiff nor Ms. Blake have been willing to provide the most basic details about the housing arrangement." Def. Prelim Inj. Opp. Mem. at 19; *see also* Def. MTD Reply Mem. at 6 (arguing that Lewis-Robinson took appropriate steps to consider plaintiff's request to move until Blake "became uncooperative and the address was rejected on September 16, 2017"). The declarations themselves, however, fail to substantiate defendants' position.

Case 9:23-cv-01114-DNH-MJK Document 31 Filed 04/22/24 Page 87 of 236
Yunus v. Robinson, Not Reported in Fed. Supp. (2018)
2018 WL 3455408

After initially submitting an incorrect address for Ms. Blake's apartment—which defendants do not characterize as anything more than an innocent mistake—plaintiff complied with all of his PO's requests, including obtaining two letters from Ms. Blake confirming her offer and outlining the financial terms of his proposed tenancy. This is undisputed. *See* Lewis-Robinson Reply Decl. ¶¶ 5-9, 15-16; Blake Decl. ¶¶ 4-6. In addition, the parties agree that either plaintiff or Ms. Blake provided DOCCS with a copy of her lease. *See* Lewis-Robinson Reply Decl. ¶ 19 (attesting that plaintiff gave the lease to PO Morillo); Blake Decl. ¶ 13 (attesting that Ms. Blake provided the lease to PO Lewis-Robinson). Moreover, PO Lewis-Robinson's broad assertion that Ms. Blake "refused to permit a site inspection of the property," Lewis-Robinson Decl. ¶ 18, is undercut by the more detailed account that Ms. Blake provides in her reply declaration. PO Lewis-Robinson concedes that Ms. Blake agreed to meet for an interview on Wednesday, September 20, 2017, at "the Bronx II area office." Lewis-Robinson Reply Decl. ¶ 21. Four days before the appointment—on Saturday evening, September 16—plaintiff's PO telephoned Ms. Blake to see "if she was available the following evening," that is, Sunday evening, September 17. *Id.* ¶ 26. Ms. Blake objected to moving the interview forward on short notice, speaking in "an aggressive tone" and stating, "You're calling me 24 hours in advance to set up an interview for tomorrow, I'm not even home." *Id.* ¶¶ 26-27. Ms. Blake did not cancel the originally-scheduled date on September 20 (just three days later). She did not refuse to permit a site inspection. There is no evidence that PO Lewis-Robinson ever asked her (or plaintiff) for additional "details about the housing arrangement," Def. Prelim Inj. Opp. Mem. at 19, much less that they refused to provide any requested information.

Nonetheless, after the Saturday evening telephone call, Lewis-Robinson spoke to her supervisor, Senior PO Medina, who "rejected the proposed residence" based on "the uncooperative nature of Ms. Blake and my inability to confirm the information provided by Plaintiff about the housing arrangements." Lewis-Robinson Decl. ¶ 28. Thereafter, PO Lewis-Robinson (not Ms. Blake) cancelled the September 20 appointment. *See* Blake Decl. ¶ 10. Moreover, Ms. Blake attests—and PO Robinson does not deny—that she made phone calls and sent text messages in an effort to reschedule the appointment, but never heard another word from plaintiff's PO. *Id.* ¶ 12.

The parties' declarations thus tend to support plaintiff's allegation that PO Lewis-Robinson and her supervisor, Senior PO Medina (who is not a defendant herein) were looking for a reason to say no to plaintiff's third request to move out of the shelter system. Had the homeowner actually refused to permit a site visit—or otherwise refused to cooperate with reasonable requests for information—that could well furnish a rational reason to reject her apartment as a residence for a parolee.[52] In this case, however, the evidence shows that Ms. Blake provided all of the information requested, and stood ready and willing to meet with PO Lewis-Robinson on September 20, 2017, as they had agreed. At worst (and assuming the truth of PO Lewis-Robinson's reply declaration), Ms. Blake was guilty of reacting impolitely, during a single phone conversation on a Saturday evening, when she was asked on short notice to move that appointment up to the following Sunday evening. In my view, it would be arbitrary and capricious for a parole officer to refuse a parolee's request to move into otherwise-appropriate, SARA-compliant housing on this basis alone.

[52] Similarly, a PO could rationally reject an apartment that the parolee could not possibly afford. In this case, Ms. Blake originally proposed to charge plaintiff $400 per month in rent. Blake Decl. ¶ 5; Lewis-Robinson Decl. ¶ 16. However, when Ms. Blake learned that plaintiff did not have a full-time job she offered to permit him to reside in her apartment "free of charge." Blake Decl. ¶ 6; Lewis-Robinson Decl. ¶ 17. There is nothing inherently suspicious in such an offer, particularly when made by a relative of plaintiff's fiancée. Moreover, although Lewis-Robinson states that she "inquired as to why he was permitted to live at the property rent-free," Lewis-Robinson Decl. ¶ 17, she does not allege that she received an unsatisfactory answer. The no-rent offer therefore cannot have furnished a rational reason to refuse plaintiff's request.

**\*38** That said, plaintiff has only made one request to move into SARA-compliant housing, and Ms. Blake's declaration is silent as to whether she is still willing to have plaintiff reside in her apartment. I am reluctant to conclude, on the basis of a single incident, that PO Lewis-Robinson (or any other defendant) has effectively imposed an unwritten rule confining plaintiff to a DOCCS-approved homeless shelter. Moreover, the relief he seeks with respect to this aspect of the Sixth Claim for relief—that his POs "be enjoined to perform a good faith assessment of any proposed residency Mr. Yunus submits going forward," Pl. Prelim. Inj. Mem. at 20—would itself be vague to the point of unenforceability. *See* Fed. R.

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 88 of 236

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

Civ. P. 65(d)(1) (injunction must "state its terms specifically" and "describe in reasonable detail ... the act or acts restrained or required"). I therefore cannot conclude that plaintiff has demonstrated a clear and substantial likelihood of success on this issue.

### 2. Relationships

I have previously concluded that Special Condition No. 24, requiring plaintiff to disclose sexual relationships to his PO —and disclose his supposed history of "sexual abuse" to his partners, in his PO's presence—is not unconstitutionally vague. As applied to a parolee who has no history of sexual abuse, however, the rule (which by its terms is absolute, admitting no exceptions) is not "reasonably related to his prior conduct or to the government's interest in his rehabilitation," *Singleton*, 210 F. Supp. 3d at 374, and for this reason is arbitrary and capricious. I therefore recommend, respectfully, that defendants' motion to dismiss the Sixth Claim for Relief be denied insofar as it seeks prospective injunctive relief against Special Condition No. 24.

Defendants do not dispute any of the facts relevant to this challenge, and do not make any effort to tie the relationship rule to plaintiff's criminal history or conduct. Instead, PO Lewis-Robinson suggests that she has never enforced the rule, *see* Lewis-Robinson Decl. ¶ 30, and defendants' argument goes straight to irreparable harm, insisting that plaintiff has suffered none because "he has already informed his fiancée of his 'sex offender' status." Def. Prelim. Inj. Opp. Mem. at 22. I therefore conclude that plaintiff has demonstrated a clear and substantial likelihood of success on the merits as to the unconstitutionality of Special Condition No. 24 as applied to him.

Insofar as plaintiff seeks money damages for the imposition of Special Condition No. 24, however, I reach a different conclusion. Plaintiff's injury allegations are thin at best, *see* SAC ¶ 121 (alleging that when plaintiff disclosed his sex offender status to his fiancée it caused a "strain on his relationship"), as is the causal connection between those injuries and any specific condition of his parole.[54] Nor can I conclude, on the sparse facts alleged, either that Condition No. 24 violated "clearly established" constitutional rights or that that a reasonable parole officer assigned to supervise plaintiff would have understood its infirmity. *Gonzalez*, 728 F.3d at 154. I therefore recommend, respectfully, that the

Sixth Claim be dismissed insofar as it seeks money damages against any of the Parole Officer Defendants named therein.

54    It is implausible that a recently-released parolee, who is required to register as a sex offender, would have kept that fact from his fiancée in the absence of Special Condition No. 24.

### 3. Motor Vehicles

As plaintiff concedes, he used a motor vehicle to commit the kidnappings to which he pleaded guilty in 2002. *See* Pl. Prelim. Inj. Mem. at 25; *see also* SORA Tr. at 8:20-9:2; *Vincent v. Smith*, 2010 WL 23324, at *3. Consequently, there is a rational connection—wholly independent of his designation as a sex offender—between plaintiff's criminal history and Special Conditions No. 31 and 32, which prevent him from obtaining a driver's license or owning, driving, or being a passenger in a motor vehicle without the permission of his PO.

**\*39**  Moreover, these conditions are not absolute, and it is undisputed that PO Lewis-Robinson has permitted plaintiff to be a passenger in cars, including his fiancée's car. *See* Lewis-Robinson Decl. ¶ 30; Def. MTD Opp. Mem. at 21 (conceding that plaintiff "has sometimes been allowed to ride in vehicles"). Plaintiff does not allege that he ever asked for permission to engage in any of the other activities regulated by Special Conditions No. 31 and 32, much less that such requests were denied in an arbitrary or capricious manner. I therefore conclude that the Parole Officer Defendants did not act arbitrarily and capriciously in imposing these conditions, nor in administering them, and have not threatened arbitrary or capricious enforcement in the future. For these reasons, I respectfully recommend that the Sixth Claim for Relief be dismissed to the extent it seeks either damages or injunctive relief in connection with Special Conditions No. 31 and 32.

### 4. Pornography, Pets, Post Office Boxes

Defendants make no effort to connect Special Condition No. 14 (no sexually explicit materials), No. 19 (no pets) or No. 37 (no post office boxes) to plaintiff's "past conduct and future chances of recidivism." *See* Def. MTD Mem. at 16. Nor do they argue that these conditions are "designed to deter recidivism and prevent further offenses." *Robinson*, 2010 WL 11507493, at *5. Instead, they insist that it is plaintiff's burden

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 89 of 236

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

to prove the opposite; that is, that he must establish the *lack* of a rational relationship between these parole conditions and his criminal history by "describ[ing] in detail the facts underlying his crime of conviction as found at trial" and "explain[ing] why the parole conditions are unreasonable or unnecessary despite the actions for which he was convicted." *Id.* at 17 (quoting *Trisvan v. Annucci*, 284 F. Supp. 3d 288, 304 (E.D.N.Y. 2018) ).

I disagree. In this case, unlike *Trisvan*, plaintiff did not stand trial and thus could not describe the facts "found at trial." More fundamentally, there is no heightened pleading standard applicable to § 1983 actions challenging parole conditions. This case is governed by Fed. R. Civ. P. 8(a)(3), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief," and by *Iqbal*, which requires the plaintiff to "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 556 U.S. at 678. Thus, while a plaintiff who claims that his parole conditions are arbitrary and capricious must provide enough information concerning his underlying crimes to plausibly allege that those conditions are not "reasonably related to his prior conduct," *Singleton*, 210 F. Supp. at 374; *accord Robinson*, 2010 WL 11507493, at *5, he need not ordinarily provide the degree of "detail" demanded by the *Trisvan* court. [55] Nor is the pleader required to anticipate and refute all conceivable penological purposes for a given condition.

[55]    *Trisvan* was an unusual case. Plaintiff was convicted of manslaughter after a trial at which he was identified as the "second shooter" in a gang-related killing. 284 F. Supp. 3d at 294; *see also Trisvan v. Ercole*, 2015 WL 419685, at *2-3 (E.D.N.Y. Jan. 30, 2015) (recounting crime in detail and dismissing Trisvan's petition for habeas corpus). Years later, proceeding *pro se*, he challenged virtually all of his parole conditions as unconstitutional (including standard conditions such as those prohibiting him from possessing firearms and associating with felons) without making any effort to explain why—if at all—those conditions were unreasonable or unnecessary in his case. *Trisvan*, 284 F. Supp. 3d at 294. After being given two opportunities to amend his pleading for this purpose, *Id.* at 295, plaintiff filed a Third Amended Complaint which once again "fail[ed] to present any factual allegations explaining how or why the release conditions are

not reasonably or necessarily related to legitimate state interests in light of the crime and conduct underlying his conviction." *Id.* at 297. Instead, plaintiff "continue[d] to argue that any condition that abridges a constitutional right is *per se* unreasonable." *Id.* Against this backdrop, the court gave Trisvan "one last opportunity" to amend, *Id.* at 304, instructing him to "describe in detail the facts underlying his crime of conviction as found at trial and also, more importantly, explain why the parole conditions are unreasonable or unnecessary despite the actions for which he was convicted." *Id.* In context, the *Trisvan* court's admonition is properly read not as an announcement of a new pleading requirement for cases challenging parole conditions but rather as an effort to assist a particular *pro se* plaintiff in focusing on—and pleading facts relevant to—the arbitrary and capricious standard governing his challenge.

**\*40**  Plaintiff Yunus has adequately disclosed his criminal past, for pleading purposes, by naming the crimes to which he pled guilty, SAC ¶¶ 22-24, and by attaching the complete transcript of his SORA hearing, during which the district attorney described the kidnappings in detail (based on the "grand jury minutes and the plea minutes") and summarized plaintiff's prior criminal record. SORA Tr. at 8:17-10:8. Plaintiff has also adequately explained why (in his view) Special Conditions No. 14, 19, and 37 are not reasonably related to his prior conduct: his crimes had no "sexual component," SAC ¶ 23, making the ban on sexually explicit materials arbitrary, and he has never been charged with any crimes "related to" pornography, pets, or post office boxes. SAC ¶ 173. In my view, nothing more is required.

However, plaintiff has alleged no injury whatsoever—past or prospective—in connection with these conditions, which insofar as the record reflects have had no impact on his life. He does not allege, for example, that he ever wanted a pet. Nor does he allege—must less establish through competent evidence—that he ever asked for a pet, much less that his PO unreasonably denied such request in reliance on Special Condition No. 19. The same is true with respect to Nos. 14 and 37. This Court does not sit to decide abstract questions concerning arguably irrational parole conditions that have produced no identifiable injury and do not threaten to produce such injury in the future. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (a plaintiff seeking prospective injunctive relief must have suffered an "injury in fact"). I therefore recommend, respectfully, that defendants' motion to

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

dismiss be granted with respect to the portion of the Sixth Claim for Relief challenging Special Conditions No. 14, 19, and 37.

### I. Preliminary Injunctive Relief

Having found that plaintiff has shown a clear or substantial likelihood of success on the merits as to his substantive due process claim, I must now consider whether he has also shown (a) irreparable harm, and (b) that a preliminary injunction —in this case, a preliminary injunction directing that his designation as a sex offender be set aside and that he no longer be required to comply with SORA and with the special parole conditions imposed as a result of his sex offender status— is in the public interest. *N. Am. Soccer League*, 883 F.3d at 37. I must then repeat the same analysis for the individual parole conditions as to which he has met the heightened merits standard required for mandatory injunctive relief. [56]

[56]    Those conditions are: No. 4 (the 1,000-foot rule), to the extent it is more than a residency restriction; No. 17 (the 300-yard rule); Nos. 12, 22, 39, and 48 (the cellphone, computer, camera, and internet restrictions), to the extent they bar plaintiff from the "modern town square"; and No. 24 (the "consenting adult" rule).

### 1. Registration under SORA

Proof of "irreparable harm" requires "an injury that is not remote or speculative but actual [or] imminent and for which a monetary award cannot be adequate compensation." *Tom Doherty Assocs., Inc. v. Saban Entm't Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) (internal quotation marks and citation omitted). Plaintiff bears the burden of showing that "irreparable harm is likely in the absence of an injunction." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008).

Ordinarily, as plaintiff notes, *see* Pl. Prelim. Inj. Mem. at 26, and as defendants concede, *see* Def. Prelim Inj. Opp. Mem. at 8, the ongoing deprivation of a constitutional right is proof enough of irreparable harm. *See, e.g., Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("it is the alleged violation of a constitutional right that triggers a finding of irreparable harm"). Moreover, there is no question here but that plaintiff's designation as a sex offender has already caused him to suffer harm for which money damages cannot compensate, and will continue to do so as long as is he is

designated a "sex offender" under SORA. In addition to the registration requirements themselves, plaintiff has suffered and will continue to suffer from the attendant civil disabilities and criminal risks discussed in Part V(D) of this Report, together with the profound reputational injury flowing from being publicly labeled as a sex offender. *See, e.g.*, Yunus Decl. ¶ 13 (plaintiff was stigmatized after PO Vasquez told "everyone I came into contact with, including other persons at the shelter and administrators at my college, that I am a sex offender").

**\*41** Moreover, it is plaintiff's sex offender designation that triggered EL § 259-c(15), subjecting him to a mandatory parole condition that would not otherwise burden a parolee with his criminal history. The evidence also supports plaintiff's contention that the discretionary parole conditions at issue in this action were imposed upon him by the Parole Officer Defendants as a direct result of his designation as a sex offender under SORA. *See id.* ¶ 9 (PO Smith "informed me that he gives all sex offenders the same restrictions"); *Id.* ¶ 11 (POs Vasquez and Lewis-Robinson also told plaintiff that "all sex offenders are given the same prohibitive restrictions"); Ex. C at ECF pages 4-10 (6-page, 48-item list of special conditions "for Sex Offenders"). [57]

[57]    Defendants' reliance on a 2007 district court decision from Connecticut for the proposition that "the classification alone does not constitute irreparable harm for the purposes of a preliminary injunction," *see* Def. Prelim. Opp. Mem. at 8 (quoting *Vega v. Lantz*, 2007 WL 3025285, at *3 (D. Conn. Oct. 16, 2007)) is misplaced. Vega was serving a 60-year prison sentence when he filed suit to challenge his internal prison classification as a sex offender. He was not required to register under SORA, did not bear the civil consequences and criminal risks flowing from the registration requirement, and was not (nor ever likely to be) subject to mandatory "sex offender" parole conditions. Moreover, the district court's irreparable harm analysis rested directly on its conclusion that case law in our Circuit—as of 2007 —did not establish that a prison inmate had any protectable liberty interest in "the classification of inmates by the Connecticut DOC." *Vega*, 2007 WL 3025285, at *2. As discussed in detail in Part V(C)(1) of this Report, *supra*, it is now beyond dispute in this Circuit that a parolee has a protectable liberty interest in not being designated

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 91 of 236

a sex offender under SORA. *See Doe v. Pataki*, 3 F. Supp. 2d at 468 (holding that a class of parolees and probationers had "a protected liberty interest that entitled them to procedural due process"); *Dep't of Pub. Safety*, 271 F.3d at 49 (holding that a convicted sex offender had a cognizable liberty interest at stake, notwithstanding his conviction, because the registry "implies that each person listed is more likely than the average person to be currently dangerous," which "stigmatizes every person listed on the registry"). Even as to prison inmates, the Second Circuit has now confirmed—in an appeal from a later decision by the same trial court—that "wrongly classifying an inmate as a sex offender may have a stigmatizing effect which implicates a constitutional liberty interest." *Vega v. Lantz*, 596 F.3d at 81-82. Similarly, defendants' contention that "the alleged harm is caused by the already publicly available information concerning the criminal conviction, not the need to register as a sex offender," Def. Prelim Inj. Opp. Mem. at 8, is demonstrably untrue. The publicly-available information concerning plaintiff's conviction for kidnapping in the second degree does not brand him as a sex offender, restrict his job and housing choices, put him at risk whenever he walks within a few blocks of a school, or prevent him from following the President of the United States on Twitter.

Defendants urge the Court to reject plaintiff's irreparable harm showing on the ground that his "one and a half year delay" in seeking a preliminary injunction is "all-but conclusive evidence that there is no irreparable harm warranting the extraordinary relief sought." Def. Prelim. Inj. Opp. Mem. at 9 (citing *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) ). I decline the invitation.

**\*42** In non-constitutional cases, a delay in seeking injunctive relief "undermines" the claim that the harm alleged is irreparable, and may be grounds for denying such relief on an emergency basis. *See, e.g., KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.*, 2012 WL 1521060, at \*4 (S.D.N.Y. Apr. 30, 2012) (denying preliminary injunction to remedy alleged bullying and harassment of child at school where child's parents "affirmatively rejected a number of options offered by the school district to remedy the violation, thus rendering the alleged harm to be speculative," and "delayed bringing their action for injunctive relief for nearly 6 months, thus negating the existence of imminent

harm"). However, delay alone is rarely (if ever) fatal where a parolee or supervised releasee mounts a constitutional challenge to the conditions imposed on him. As explained in *Hardy v. Fischer*, "Ongoing unlawful deprivations of liberty and the threat of unlawful detention and reimprisonment would violate plaintiffs' constitutional rights and therefore constitute quintessential irreparable harm." 701 F. Supp. 2d 614, 619 (S.D.N.Y. 2010). *Hardy* rejected the same delay argument that defendants make here, holding that former prisoners challenging their conditions of post-release supervision (PRS) adequately demonstrated irreparable harm notwithstanding their delay in bringing that challenge:

> The possibility that plaintiffs already have suffered injuries by being subjected to allegedly illegal PRS does not eliminate the irreparable nature of any injuries that they will suffer in the future without injunctive relief, and the Court does not find that any delay in filing this lawsuit justifies the denial of interim relief from an ongoing alleged constitutional violation.

*Id.* For the same reasons, I conclude that plaintiff's failure to file this action the moment he was paroled does not negative the requisite irreparable injury. I also note that plaintiff never simply ignored the harm of which he now complains. Rather, he made repeated efforts to obtain relief from the Sex Offender Conditions from his POs and their supervisors before turning to litigation, which he originally filed *pro se*. *See* Yunus Decl. ¶¶ 12, 14, 32; Yunus Reply Decl. ¶¶ 20-22.

Finally, I conclude that the injunction sought is in the public interest. Plaintiff is concededly a sex offender in name only. But for the "administrative burden" of sorting ordinary kidnappers from "dangerous sex offenders," *Knox*, 12 N.Y.3d at 69, he would never have been swept in by the "blanket rule" for kidnappers contained within CL § 168-a(2)(a)(i). *Id.* Defendants' argument that "SORA and the challenged parole conditions" are designed to "protect[ ] the public, and particularly children, from violent criminals such as plaintiff," Def. Prelim. Inj. Opp. Mem. at 10, misses the point: SORA is unconstitutional, as to plaintiff, because he indisputably does *not* present the *sexual* risks that sex offender registration, and the Sex Offender Conditions, are designed to combat. To be sure, he presents significant risks, but they are the

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 92 of 236

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

ordinary risks arising from paroling a prisoner with a (non-sexual) history of violent crime. These risks can and will be addressed through the ordinary parole conditions assigned to similar parolees.[58] Defendants' fears for "the potential harm to innocent children and the public," *id.*, thus do not require plaintiff to remain registered as a sex offender under SORA or subject to parole conditions designed to ameliorate the risk of future sex offending, which, insofar as the record discloses, is simply not among the risks presented by this plaintiff. *See* SORA Tr. at 22:14-16 ("Under the circumstances presented here, I am satisfied that there is virtually no likelihood that [plaintiff] will commit a sex crime ever.").

[58] Plaintiff does not seek to be free of parole altogether, nor to be relieved from parole conditions that do not presuppose that he is a "sex offender."

### 2. Individual Parole Conditions

For substantially the same reasons discussed above, I conclude that plaintiff has adequately demonstrated that he faces continuing irreparable harm so long as he is at risk of parole revocation for simply entering or being within 1,000 feet of a school (Special Condition No. 4) or within 300 yards of "places where children congregate" (Special Condition No. 17), and so long as he is barred from the "modern town square" of social media by a constellation of parole conditions (Special Conditions No. 12, 35, 39, and 48) which not only prohibit him from accessing social networking sites like Facebook and Twitter, but make it difficult for him to go online at all—or to use smart phones, home computers, email, or the other ordinary tools of modern communication. Because plaintiff has no history of sexual misconduct (with children or adults), much less a history of electronic stalking, distribution of pornography, or other internet-enabled sex offenses, he does not fall into the very narrow class of offenders for whom the public interest demands that the First Amendment take a back seat to public safety.

**\*43** However, I cannot conclude that plaintiff is suffering or will suffer irreparable harm as a result of Special Condition No. 24. He has already introduced his fiancée to his parole officer and has told his fiancée about his criminal history, and he does not allege that he has formed or anticipates forming new sexual relationships during the remaining term of his parole supervision. Thus, even though Condition No. 24 (like many of the Sex Offender Conditions) bears

no obvious relationship to plaintiff's individual history and characteristics, once it is properly understood to apply only to sexual relationships, it poses only a theoretical possibility of harm to plaintiff.

## VI. CONCLUSION

For the reasons set forth above, I respectfully RECOMMEND that Your Honor GRANT defendants' motion to dismiss the Second Amended Complaint IN PART, and dismiss the following Claims for Relief pursuant to Rule 12(b)(6):

The First Claim, in its entirety;

The Third Claim, to the extent it alleges that Special Condition No. 24 (the "consenting adult" rule) is void for vagueness;

The Third Claim, to the extent it seeks damages against any of the Parole Officer Defendants for their past enforcement of any of the parole conditions challenged in that claim as void for vagueness;

The Fourth Claim, to the extent it seeks damages against the Parole Officer Defendants other than PO Lewis-Robinson for their past enforcement of the cellphone, computer, and social media restrictions contained in Special Conditions No. 12, 22, 35, 39, and 48;

The Fourth Claim, to the extent it seeks damages against PO Lewis-Robinson arising from her conduct prior to the decision in *Packingham*;

The Fifth Claim, to the extent it seeks damages against the Parole Officer Defendants other than PO Lewis-Robinson for their past enforcement of Special Condition No. 15 (no contact with minors);

The Sixth Claim, to the extent it seeks damages against any of the Parole Officer Defendants for their past conduct in denying plaintiffs' requests to move in with his fiancée and his uncle;

The Sixth Claim, to the extent it seeks damages against the Parole Officer Defendants other than PO Lewis-Robinson in connection with the denial of plaintiffs' request to move in with Ms. Blake;

The Sixth Claim, to the extent it seeks damages against any of the Parole Officer Defendants for their past enforcement of Special Condition No. 24;

Yunus v. Robinson, Not Reported in Fed. Supp. (2018)

2018 WL 3455408

The Sixth Claim, to the extent it seeks either damages or injunctive relief in connection with Special Conditions No. 31 and 32 (motor vehicles), No. 14 (sexually explicit materials), No. 19 (pets) or No. 37 (Post Office boxes).

If Your Honor agrees with my recommendations as to the motion to dismiss, only one of the Parole Officer Defendants —PO Lewis-Robinson—will remain in the case, and only as to the Fourth, Fifth and Sixth Claims for Relief.

Because plaintiff has already amended his complaint twice (the second time with the assistance of counsel, after reviewing defendants' initial motion to dismiss), and because he does not seek leave to replead, I FURTHER RECOMMEND that any dismissal be WITH PREJUDICE.

I FURTHER RECOMMEND that Your Honor GRANT plaintiff's preliminary injunction motion IN PART, and that defendants, together with their agents, employees, and all persons acting in concert with them:

Be preliminarily enjoined, pending the final resolution of this action, from enforcing, as against plaintiff, the registration and notification provisions made applicable to designated sex offenders by SORA (CL §§ 168a-168w), or the mandatory conditions prescribed by EL §§ 259-c(14) and (15) for parolees sentenced for an offense for which registration as a sex offender is required; and

**\*44** Be directed to rescind the discretionary provisions of the Sex Offender Conditions (Yunus Decl. Ex. C, at ECF pages 4-10) except to the extent they deem those conditions appropriate for plaintiff in light of his *non-sexual* criminal history and characteristics.

If and to the extent Your Honor determines to dismiss the Second Claim for Relief, or determines for other reasons not to issue the preliminary restraints outlined above, I FURTHER RECOMMEND that defendants, together with their agents, employees, and all persons acting in concert with them be preliminarily enjoined, pending the final resolution of this action, from enforcing, as against plaintiff:

Special Condition No. 4 (the 1,000-foot rule), to the extent it functions as more than a residency restriction;

Special Condition No. 12 (prohibiting access to online computer services that "involve the exchange of electronic messages") to the extent it prohibits him from accessing email services or social media websites;

Special Condition No. 17 (the 300-yard rule);

Special Condition No. 22 (prohibiting possession of photographic or video equipment), to the extent it prevents plaintiff from possessing an ordinary smartphone with camera function;

Special Condition No. 35 (restricting beepers, scanners, and cellphones, and prohibiting camera-equipped phones) to the extent it prevents plaintiff from possessing an ordinary smartphone with camera function;

Special Condition No. 39 (restricting computer ownership and usage), to the extent it requires prior PO approval to possess or use a computer, a computer network, or an internet browser); or

Special Condition No. 48 (prohibiting access to any "commercial social networking website") to the extent it prohibits plaintiff from accessing mainstream social media. [59]

[59]     Nothing in this Report is intended to prevent plaintiff's parole officers from requiring plaintiff to disclose his phone, computer and internet passwords or otherwise monitoring his usage, if such restrictions are reasonably related to his past conduct and designed to deter recidivism and prevent further offenses. *See, e.g., Mutter,* 811 S.E. 2d at 873; *Maxson,* 281 F. Supp. 3d at 600-01.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3455408

---

**End of Document**     © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Dickson v. Schenectady Police Department, Not Reported in Fed. Supp. (2022)

2022 WL 1091615

2022 WL 1091615
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Simone M. DICKSON, Plaintiff,

v.

SCHENECTADY POLICE
DEPARTMENT, et al., Defendants.

1:21-CV-0825 (LEK/DJS)
|
Signed 04/12/2022

**Attorneys and Law Firms**

Simone M. Dickson, Albany, NY, Pro Se.

Gregg T. Johnson, Hannah Hyde Hage, Johnson Laws,
LLC, Clifton Park, NY, for Defendants Schenectady Police
Department, McDonald, Verret.

Hannah Hyde Hage, Johnson & Laws LLC, Clifton Park, NY,
for Defendant Brenson.

**MEMORANDUM-DECISION AND ORDER**

LAWRENCE E. KAHN, United States District Judge

**I. INTRODUCTION**

 **\*1**  On July 9, 2021, Plaintiff Simone Dickson initiated
this action against the City of Schenectady [1], and three
officers employed by the Schenectady Police Department:
Andrew MacDonald, Patrick Verret, and a third officer
referred to as "Brenson." [2]  See Dkt. Nos. 1 ("Complaint");
1-1 ("Complaint Exhibit"). Plaintiff's claims arise from
circumstances surrounding two interactions she had with
police from the Schenectady Police Department, one
involving MacDonald on June 21, 2021, and the other
involving Verret and Brenson in 2016. Compl. at 5–6.

[1]      The Complaint names the Schenectady Police
         Department as a defendant. Compl. at 1. However,
         the Schenectady Police Department is an agency
         of the City of Schenectady and not an independent
         entity subject to suit, thus the proper party is
         the City of Schenectady. See Krug v. Cty. of
         Rennselaer, 559 F. Supp. 2d 223, 247 (N.D.N.Y.
         2008) ("A city police department is not an

independent, suable entity separate from the
municipality in which the police department is
organized."); Wilson v. City of N.Y., 800 F. Supp.
1098, 1101 (E.D.N.Y. 1992) (police department
"cannot be sued independently because it is an
agency of the City of New York"), aff'd, 32 F.3d
989 (2nd Cir. 1994).

[2]      Defendants assert that there is no Officer Brenson
         employed by the Schenectady Police Department,
         and that they do not know who the "Brenson"
         designated in Plaintiff's Complaint refers to. Dkt.
         No. 17-1 ¶ 2.

Now before the Court is Defendants' Motion to Dismiss.
Dkt. Nos. 17 ("Motion"); 17-1 ("Johnson Decl."); 17-2
("Letter to Plaintiff"); 17-3 ("Defendants' Memorandum").
Plaintiff has responded, Dkt. Nos. 25 ("Response") and 30
("Supplemental Response"), and Defendants have replied,
Dkt. No. 36 ("Reply").

For the reasons set forth below, Defendants' Motion is granted
in part and denied in part.

**II. BACKGROUND**

 **A. Factual Background**
Plaintiff's Complaint alleges that, on June 21, 2021, she was
on State Street in Schenectady, New York, when Defendant
MacDonald asked her to move to the right side of the street.
Id. at 5. Plaintiff refused his request and proceeded in the
direction she had already been walking, "to the left," instead.
Id. Plaintiff further alleges that, at this point, MacDonald
"struct [sic] [her] throat with force for no reason" and had
"hate in his eyes." Id. Plaintiff referred to the strike as a
"karate move." Id. Plaintiff proceeded to file a grievance at the
police station that same day. Id. In the police grievance, which
is attached as an exhibit to the Complaint, Plaintiff states that
MacDonald "pushed [Plaintiff] with his arm in [her] neck ...
near choking [her] for no reason." Compl. Ex. at 11.

Plaintiff also attaches to her Complaint a copy of a doctor's
visit summary issued by St. Peter's Health Partners relating to
a visit made June 21, 2021, with Lindsay Nicole Stokes, MD.
Compl. at 8. The visit summary lists as a diagnosis "contusion
of throat, sequela" and lists ibuprofen under "Medications
Given." Id. Plaintiff alleges she suffered a "contusion to
the neck," has problems breathing, and that the incident
"traumatized [her] for life." Id. at 6

Dickson v. Schenectady Police Department, Not Reported in Fed. Supp. (2022)

2022 WL 1091615

**\*2** The Complaint also details an unrelated incident, ostensibly involving Officers Verret and Brenson, that occurred in 2016 when Schenectady Police Officers allegedly "kicked a door in on [Plaintiff's] stomach while [she] was pregnant." Id.

Plaintiff filed her Complaint on July 9, 2021. See Compl. On August 18, 2021, Plaintiff filed two "return receipts" from two pieces of certified mail, purportedly showing that documents were sent to Officers McDonald, Verret, and Brenson. See Dkt. Nos. 15, 16. The receipts indicate the documents were mailed to the Schenectady Police Department, received on August 5, 2021, and signed for by non-party Amanda Penny. Id.

On September 3, 2021, Defendants filed the present motion to dismiss under Rule 12 of the Federal Rules of Civil Procedure ("F.R.C.P."). See Mot.

## III. LEGAL STANDARD

In evaluating a motion to dismiss made under Rule 12, a court must accept as true the factual allegations contained in the complaint and draw all inferences in favor of the plaintiff. See Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005) (dealing with motion to dismiss under Rule 12(b)(1)); Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006) (same, dealing with motion to dismiss under Rule 12(b)(6)). "Nonetheless, conclusory allegations are not entitled to the assumption of truth." Francis v. Kings Park Manor, Inc., 992 F.3d 67, 72 (2d Cir. 2021).

Further, when a plaintiff is unrepresented by counsel, it is well established that their submissions "must be construed liberally and interpreted 'to raise the strongest arguments that they suggest' " to protect the pro se litigant from inadvertent forfeiture of important rights due to a lack of legal training. Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474–75 (2d Cir. 2006); see also Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994) (stating that a court must "read [a pro se plaintiff's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest").

## IV. DISCUSSION

Defendants argue that Plaintiff's Complaint should be dismissed (1) pursuant to Rule 12(b)(6) on the grounds that Plaintiff has failed to state a claim regarding any allegations made against the City of Schenectady and regarding the alleged 2016 incident, (2) pursuant to Rule 12(b)(1) on

the grounds that the Court does not have subject matter jurisdiction over the action, and (3) pursuant to Rule 12(b)(5) on the grounds that Plaintiff has failed to properly effectuate service upon Defendants. See Defs.' Mem. at 3.

### A. Rule 12(b)(6) Failure to State a Claim[3]

[3] Where a defendant brings a motion to dismiss asserting lack of subject matter jurisdiction under Rule 12(b)(1) as well other grounds, a court should generally consider the 12(b)(1) motion first because "if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." United States ex rel. Kreindler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1156 (2d Cir. 1993). However, where, as here, the court must determine jurisdiction by asking whether the complaint is drawn so as to seek recovery under federal law, see Section IV(B) infra, a court may "assume or find a sufficient basis for jurisdiction and reserve further scrutiny for an inquiry on the merits." Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1189 (2d Cir. 1996). Because the Court finds that diversity jurisdiction is not present, and thus subject matter jurisdiction may only be exercised pursuant to federal question jurisdiction, the Court makes such an assumption here, and proceeds to analyze Defendants' 12(b)(6) arguments regarding claims made against Verret, Brenson, and the City of Schenectady.

**\*3** To defeat a motion to dismiss for failure to state a claim a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. As stated above, a court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of a plaintiff. See Allaire, 433 F.3d at 249–50.

Defendants argue that the Complaint does not contain sufficient factual matter to state a claim against the City of Schenectady or against Officers Verret and Brenson. Defs.' Mem. at 6–8.

Dickson v. Schenectady Police Department, Not Reported in Fed. Supp. (2022)

2022 WL 1091615

### 1. Monell Claim Against City of Schenectady

Construed broadly, the only claim the Complaint raises against the City of Schenectady is for liability under the doctrine set forth in Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978). Pursuant to Monell, a local governing body may be sued directly under 42 U.S.C. § 1983 where "a violation of rights resulted from the 'government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.' " Nagle v. Marron, 663 F.3d 100, 116 (2d Cir. 2011). To state a claim under Monell, a plaintiff must plausibly allege, in addition to a violation of constitutional rights, "(1) the existence of a municipal policy or custom ... that caused [the] injuries beyond merely employing the misbehaving officer[s]; and (2) a causal connection—an 'affirmative link'—between the policy and the deprivation of [the] constitutional rights." Harper v. City of New York, 424 F. App'x 36, 38 (2d Cir. 2011) (citing Vippolis v. Vill. of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985)) (internal quotation marks omitted). A complaint must plead facts supporting the existence of a municipal policy, and cannot rely on conclusory allegations that a policy exists. See Bishop v. City of N.Y., No. 13-CV-9203, 2016 WL 4484245, at *4 (S.D.N.Y. Aug. 18, 2016) ("[B]oilerplate assertions of municipal policy are insufficient to state a claim for Monell liability.") (collecting cases).

Here, the Complaint does not specifically allege the existence of a policy or custom. See generally Compl. However, it does allege two unrelated incidents, occurring five years apart, where police officers allegedly used excessive force against Plaintiff. See Compl. at 5–6. Even interpreting the Complaint broadly and accepting all factual assertions as true, the allegation of two incidents involving a single person is insufficient to plausibly allege the existence of a municipal policy or custom. See Iacovangelo v. Corr. Med. Care, Inc., 624 F. App'x 10, 14 (2d Cir. 2015) (affirming dismissal of Monell claim, where the complaint merely alleged two incidents); Rodriguez v. City of N.Y., 2012 WL 234380, at *4 (S.D.N.Y. Jan. 24, 2012) (dismissing Monell claim where complaint "allege[d] nothing that can be construed as a municipal policy or custom ... [because it] described only the conduct of individual employees of the City of New York"). Thus, the Court grants Defendants' motion regarding claims against the City of Schenectady.

### 2. Claims Against Verret and Brenson Stemming from the 2016 Incident

Defendants argue that any 42 U.S.C. § 1983 claims arising from the incident that occurred on August 24, 2016, must be dismissed because it is time-barred. See Defs.' Mem. at 7–8.

**\*4** It is well settled that Section 1983 claims filed in federal court in New York are subject to New York State's three-year statute of limitations for personal injury actions. See Owens v. Okure, 488 U.S. 235, 251 (1989) (holding that New York's three-year statute of limitations for general personal injury actions is applicable to § 1983 actions filed in federal courts in New York); Helwing v. Pszeniczny, No. 21-CV-0843, 2022 WL 610341, at *2 (2d Cir. Mar. 2, 2022) (upholding dismissal of excessive force and false arrest claims against police officer because "Section 1983 actions filed in New York are ... subject to a three-year statute of limitations.") (quoting Hogan v. Fischer, 738 F.3d 509, 517 (2d Cir. 2013)). "A § 1983 claim 'accrues when the plaintiff knows or has reason to know of the harm.' " Helwing, 2022 WL 610341 at *2 (quoting Eagleston v. Guido, 41 F.3d 865, 871 (2d Cir. 1994)).

The incident that gave rise to Plaintiff's claims against Verret and Brenson occurred on August 24, 2021. Compl. Ex. at 6. Nearly five years passed between the date of the alleged use of excessive force, when Plaintiff would have known of the harm, and the commencement of this action on July 9, 2021. Further, the Complaint and its supporting paperwork do not contain any allegations that lead to a plausible inference that the statute of limitations should be tolled. See generally Compl. Thus, the Court holds that Plaintiff's claims against Verret and Brenson are time-barred and must be dismissed.[4]

---

4       To the extent the Complaint could be interpreted to raise claims under state law for battery and assault against Verret and Brenson, over which the Court could potentially exercise supplemental jurisdiction, the Court notes that the statute of limitations for these claims is only one year and has likewise expired. See New York Civil Practice Law and Rules § 215(3).

### B. Rule 12(b)(1) Subject Matter Jurisdiction

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 97 of 236

Dickson v. Schenectady Police Department, Not Reported in Fed. Supp. (2022)

2022 WL 1091615

"It is a fundamental precept that federal courts are courts of limited jurisdiction." Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 374 (1978). Article III of the Constitution grants federal courts jurisdiction over suits involving citizens of different states (referred to as diversity jurisdiction) and cases "arising under the Constitution, laws, or treaties of the United States" (referred to as federal question jurisdiction). See U.S. Const. art. III, § 2; 28 U.S.C. §§ 1331, 1332; see also Bartlett v. Honeywell Int'l, Inc., 737 F. App'x 543, 546–47 (2d Cir. 2018) (same).

A plaintiff bears the burden of proving that subject-matter jurisdiction exists by a preponderance of the evidence. Makarova v. U.S., 201 F.3d 110, 113 (2d Cir. 2000).

### 1. Diversity Jurisdiction

Diversity jurisdiction exists only where there is complete diversity between the parties, in other words, when "all plaintiffs ... [are] citizens of states diverse from those of all defendants." Logan v. Town of Windsor, 833 F. App'x 919, 920 (2d Cir. 2021) (quoting Pa. Pub. Sch. Emps.' Retirement Sys. v. Morgan Stanley & Co., 772 F.3d 111, 118 (2d Cir. 2014)). Defendants are correct that complete diversity is not present here and thus the Court does not have diversity jurisdiction over this matter. The Complaint specifies that Plaintiff resides in Albany, New York. See Compl. at 3, and that each of the Defendants each also reside in New York. Id. at 3–4.

### 2. Federal Question Jurisdiction

"Under the longstanding well-pleaded complaint rule, ... a suit 'arises under' federal law ... only when the plaintiff's statement of his own cause of action shows that it is based upon [federal law]." Wright v. Musanti, 887 F.3d 577, 584 (2d Cir. 2018) (quoting Vaden v. Discover Bank, 556 U.S. 49, 60 (2009)).

**\*5** Defendants argue that the Court does not have federal question jurisdiction because the Complaint "does not specify any federal statute." Defs.' Mem. at 5. However, because of the special consideration due pro se litigants, a court is obligated to interpret a complaint to raise arguments that confer subject matter jurisdiction to the extent they are "suggested" by the complaint, even if they are not explicitly articulated by the plaintiff. See Triestman, 470 F.3d at 475–76 (overturning 12(b)(1) dismissal where assertions in complaint "suggest[ed]" claims over which the court properly had jurisdiction, and the fact plaintiff did not articulate the theories himself was "of no moment" because "it was the obligation of the district court below to interpret [the pro se plaintiff's] complaint to raise the strongest arguments that they suggest." (quotation marks omitted)).

The question then becomes whether the assertions in Plaintiff's Complaint suggests claims over which the Court may properly exercise subject matter jurisdiction. The Court finds that they do.

Plaintiff's Complaint alleges that, on June 21, 2021, she was physically assaulted while walking down the street by an officer employed by the Schenectady Police Department. See Compl. at 5. While Defendants argue this would merely constitute "common assault," such allegations may properly state a claim for excessive force in violation of the Fourth or Fourteenth Amendments and may be remediable under 42 U.S.C. § 1983.

### a. Excessive Force Analysis

To state a claim for excessive force a plaintiff must allege facts that meet different standards depending on whether the force was used in the context of an arrest or not. If the alleged force was used by an officer during an arrest or seizure, the Fourth Amendment is implicated, and a plaintiff must allege facts sufficient to plausibly infer that the force was "objectively unreasonable 'in light of the facts and circumstances confronting [the officer], without regard to their underlying intent or motivation.' " Biswas v. City of N.Y., 973 F. Supp. 2d 504, 529 (S.D.N.Y. 2013) (quoting Maxwell v. City of New York, 380 F.3d 106, 108 (2d Cir. 2004)). However, where excessive force is not related to an arrest or seizure, a plaintiff must meet the standard set by the Fourteenth Amendment. Morgan v. Cty. of Nassau, 720 F. Supp. 2d 229, 237 (E.D.N.Y. 2010) ("Generally, the Second Circuit has held that courts should analyze an excessive force claim related to an arrest or seizure under the Fourth Amendment, and analyze all other excessive force claims under the Fourteenth Amendment.") (citing Hemphill v. Schott, 141 F.3d 412, 418 (2d Cir. 1998)). The Fourteenth Amendment standard requires that the government official's action "shock the conscience" and is generally considered to be more stringent than the Fourth Amendment standard. Id. ("[A] Fourteenth Amendment claim relies on a more

Case 9:23-cv-01114-DNH-MJK Document 31 Filed 04/22/24 Page 98 of 236

Dickson v. Schenectady Police Department, Not Reported in Fed. Supp. (2022)

2022 WL 1091615

stringent 'shocks the conscience' test."); See also Dancy v. McGinley, 843 F.3d 93, 117 (2d Cir. 2016) (observing that "[U]nlike § 1983 claims under the Due Process Clause, ... Fourth Amendment claims are tied to reasonableness, which is considerably less demanding").

The Court need not determine if the alleged force used by MacDonald was employed in relation to an arrest or seizure because Plaintiff has alleged facts that could plausibly support an excessive force claim even under the higher Fourteenth Amendment standard. See Morgan, 720 F. Supp. 2d at 238 ("At present, the Court need not resolve which test to apply, because the Court is satisfied that the plaintiff has alleged facts that could plausibly support an excessive force claim under the more stringent 'shocks the conscience' test").

The Supreme Court and Second Circuit have recently refined the analysis of whether an official's use of force "shocks the conscience" and violates the Fourteenth Amendment. See Edrei v. Maguire, 892 F.3d 525, 537–38 (2d Cir. 2018) (stating that recent Supreme Court precedent "is best read as elaborating on [the shocks the conscience] standard, not abandoning it." (citing Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015))). Pursuant to this refinement, the Fourteenth Amendment requires a two-part inquiry. First, the official's use of force must be undertaken "purposefully, knowingly, or (perhaps) recklessly" as opposed to negligently or accidentally. Id. at 534 (citing Kingsley, 135 S. Ct. at 2472). Second, the force used must be "objectively unreasonable," and a plaintiff is not required to show that the force was subjectively malicious or meant to cause harm. See id. at 534 ("[T]he objective standard [Kingsley] announced confirms that the subjective mental state ... is not a necessary showing.").

**\*6** In determining if force is "objectively unreasonable" sufficient to meet the second prong of the Fourteenth Amendment excessive force standard, courts may look to four non-exhaustive factors:

> (1) the need for force, including the threat reasonably perceived by the officer and whether the plaintiff was actively resisting, (2) the relationship between the need and the degree of force used, (3) the extent of the plaintiff's injury, and (4) any effort made by the officer

to temper or to limit the amount of force.

Abujayyab v. City of New York, No. 15-CV-1008, 2018 WL 3978122, at \*6 (S.D.N.Y. Aug. 20, 2018) (citing Kingsley, 135 S. Ct. at 2473 and Edrei, 892 F.3d at 537–38). Further, while it is not required that force be applied maliciously, the existence of malice may indicate that the force used was excessive, Edrei, 892 F.3d at 537, and the Fourteenth Amendment standard is "most readily satisfied when conduct is 'intended to injure in some way unjustifiable by any government interest,' " id. at 533 (quoting County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)).

The Complaint, liberally construed, alleges that Plaintiff was walking in a public area when confronted by MacDonald. Compl. at 5. When Plaintiff continued to walk in the direction she was already heading, rather than heeding MacDonald's instruction to move to the right side of the street, it is alleged that MacDonald struck Plaintiff in the throat with sufficient force to cause a contusion and persistent breathing difficulties. Id. at 5–6.

If all material factual allegations are taken to be true and all inferences are made in Plaintiff's favor, these allegations are sufficient to state a claim for excessive force under the Fourteenth Amendment.

Regarding the first prong of the Fourteenth Amendment analysis, it could reasonably be inferred from the Complaint that MacDonald struck Plaintiff purposefully or knowingly given the circumstances of the strike and Plaintiff's account that MacDonald was looking at her as he did it. See Compl. at 5 (stating that during the alleged assault "the hate in his eyes I will never forget").

Regarding the second prong, the facts as alleged in the Complain do not give any indication that Plaintiff posed a threat to MacDonald and there was no need to strike an individual merely walking down the street.[5] Indeed, the disparity between the alleged force used and the need is stark. While Plaintiff's injuries were not life threatening, it could be inferred that they were somewhat severe given the alleged persistent symptoms. Cf. Robison v. Via, 821 F.2d 913, 924 (2d Cir. 1987) ("If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe."). Further, it does not appear from the Complaint that MacDonald made any

Case 9:23-cv-01114-DNH-MJK   Document 31   Filed 04/22/24   Page 99 of 236

**Dickson v. Schenectady Police Department, Not Reported in Fed. Supp. (2022)**

2022 WL 1091615

effort to temper his use of force. Finally, MacDonald's alleged actions could plausibly be viewed as unjustifiably and maliciously intended to cause injury, and thus conscience-shocking. See Morgan v. Cty. of Nassau, 720 F. Supp. 2d 229, 237 (E.D.N.Y. 2010) ("[Defendant's] alleged actions could plausibly be viewed as unjustifiably intended to injure Morgan, and thus conscience-shocking.").

5      Defendants assert that Plaintiff was walking down the middle of State Street, "one of the busiest streets in the City of Schenectady," carrying a sign, and thus posed a safety hazard. See Defs.' Mem. at 2. Further, Defendants argue MacDonald did not actually use any level of force against Plaintiff, but merely instructed that she needed to walk on the sidewalk. Id. While the need to protect Plaintiff or others from a hazard could potentially justify the use of some level of physical contact, the resolution of competing factual narratives is not proper at this stage of litigation. See Allaire, 433 F.3d at 249-50 ("We review de novo the grant of a motion to dismiss under Rule 12(b)(6), accepting as true the factual allegations in the complaint and drawing all inferences in the plaintiff's favor.").

 **\*7** Thus, the Court finds that the Complaint plausibly alleges facts that give rise to a claim for excessive force under the Fourth and Fourteenth Amendments, remediable under 42 U.S.C. § 1983, and the Court therefore has federal question jurisdiction over Plaintiff's claims against MacDonald.

### A. Rule 12(b)(5) Insufficient Service

Once a defendant makes a Rule 12(b)(5) [6] motion to dismiss for insufficient service of process, "the plaintiff bears the burden of establishing that service was sufficient." Khan v. Khan, 360 Fed App'x. 202, 203 (2d Cir. 2010). To determine if the plaintiff has met that burden, a court "may look beyond the pleadings, including to affidavits and supporting materials." Ozuzu v. Greenpoint Mortg. Funding, No. 19-CV-03783, 2020 WL 5658776, at \*7 (E.D.N.Y. Sept. 23, 2020).

6      While Defendants move to dismiss under both 12(b)(5) (insufficient service of process) and Rule 12(b)(2) (lack of personal jurisdiction), their motion argues only that the method of service of process was insufficient. See Defs.' Mem. at 5–6. Because the proper method for challenging the

mode of delivery of a summons and complaint is via a Rule 12(b)(5) motion, the Court will treat the motion as seeking dismissal under Rule 12(b)(5) only. See Koulkina v. City of New York, 559 F. Supp. 2d 300, 310 n.9 (S.D.N.Y. 2008) (treating similar motion as one brought only under Rule 12(b)(5) because "[m]otions challenging the sufficiency of service of process are properly made under Rule 12(b)(5), not Rule 12(b)(2)" (collecting cases)); see also Hubert v. Dep't of Corr., No. 21-CV-0094, 2022 WL 657622, at \*3 (D. Conn. Mar. 4, 2022) (treating similar motion as one made only under Rule 12(b)(5) where it "include[d] arguments based only on insufficient process"); Madej v. Yale Univ., No. 20-CV-0991, 2021 WL 6497218, at \*2 n.2 (D. Conn. Jan. 20, 2021) (same); Charles A. Wright & Arthur Miller, 5B Federal Practice & Procedure § 1353, at 334 (3d ed. 2004) ("A Rule 12(b)(5) motion is the proper vehicle for challenging the mode of delivery or the lack of delivery of the summons and complaint.").

The Federal Rules of Civil Procedure require a plaintiff to serve a summons and complaint on an individual [7] in one of the manners prescribed in Rule 4(e) within 90 days after the complaint is filed. F.R.C.P. 4(c), (e), and (m). Rule 4(e) in turn allows for service under the laws of the state wherein the district court is located or where service is made. Because this court sits in New York, and service was allegedly effected in New York, additional appropriate methods of service under state law are set forth in New York Civil Practice Law and Rules ("C.P.L.R.") § 308.

7      Because the Court has dismissed all claims against the City of Schenectady, it need not address service on a local government.

Defendants argue that Plaintiff's service upon them does not meet the requirements of either Rule 4 or C.P.L.R. § 308. See Defs.' Mem. at 5.

Plaintiff has not submitted any affidavit of service or other proof that Defendants were properly served. See Dkt. There is likewise no evidence that Plaintiff requested that Defendants waive service as provided for in Rule 4(d). The only evidence on the record tending to show that Defendants received the summons and Complaint are four United States Postal Service return receipts, indicating that mailings were sent via certified mail to the Schenectady Police Department in Schenectady, New York, addressed respectively to Officers MacDonald,

2022 WL 1091615

Verret, and Brenson, as well as Chief Clifford, and received August 5, 2021. See Dkt. Nos. 15, 16 ("Return Receipts").

**\*8** None of the methods set forth in Rule 4 or C.P.L.R. § 308 allow for service to be performed merely by mailing documents to a defendant's place of work. Pruthi v. Empire City Casino, 2022 WL 596370, at \*4 (S.D.N.Y. Feb. 28, 2022) (finding service insufficient under both federal and New York law where plaintiff mailed summons and complaint via certified mail). Thus, the Court finds Plaintiff has not yet properly served any of the Defendants.

However, the fact that Plaintiff did not serve Defendants within the 90-day time period set forth in Rule 4(m) does not necessarily require dismissal. Rule 4(m) states that, if a Plaintiff fails to serve the complaint within the 90-day time period, a court may either "dismiss the action without prejudice ... *or* order that service be made within a specified time." (emphasis added). If a plaintiff shows good cause for their failure to serve within the allotted time, an extension of time is mandatory. See Rule 4(m) ("[I]f the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period."); see also Zapata v. City of N.Y., 502 F.3d 192, 197 (2d Cir. 2007) ("It is clear under the second clause of Rule 4(m) that an extension is always warranted upon a showing of 'good cause,' because the rule commands that an 'appropriate' extension 'shall' be granted upon such a showing."). However, even absent good cause, a court maintains discretion to grant an extension of time to effect service of process. Zapata, 502 F.3d at 196 ("We hold that district courts have discretion to grant extensions [under Rule 4(m)] even in the absence of good cause").

Plaintiff has not shown any explanation or good cause for failing to serve process within the 90-day window. Thus, the Court must determine whether it should exercise its discretion to extend the time for service. In making this determination, the Court must consider the following factors:

> (1) whether the applicable statute of limitations would bar the refiled action; (2) whether the defendant had actual notice of the claims asserted in the complaint; (3) whether the defendant had attempted to conceal the defect in service; and (4) whether the defendant would be prejudiced by the

granting of plaintiff's request for relief from the provision.

Soos v. Niagara Cty., 195 F. Supp. 3d 458, 467 (W.D.N.Y. 2016); Ebanks v. Ebanks, 2007 WL 2591196 at \*4 (S.D.N.Y. July 27, 2007).

The first factor does not favor granting an extension under Rule 4(m). No applicable statute of limitations would bar a refiled action should the Court order dismissal. The incident in question occurred in July of 2021, less than one year ago, and, as stated above, the statute of limitations concerning Section 1983 claims is three years in the state of New York. See Owens, 488 U.S. at 251. Should Plaintiff also choose to pursue state law claims for battery or assault, such actions must be brought within one year, C.P.L.R. § 215(3), and Plaintiff would still have time to refile her complaint and properly serve Defendants.

The second factor favors Plaintiff. It is apparent that Defendants had actual notice of the claims in the Complaint, given that they appeared in this matter on September 3, 2021, and wrote a letter to Plaintiff referencing the Complaint and Plaintiff's attempted service. Johnson Decl. ¶ 7, Ex. A. See Von Britton v. Connecticut, No. 14-CV-00133, 2016 WL 308774, at \*6 (D. Conn. Jan. 25, 2016) (finding the second factor favored plaintiff where defendants had filed an appearance in the action).

**\*9** The third factor favors Defendants. They did not attempt to conceal the defect in service, but instead contacted Plaintiff by letter on August 24, 2021, to advise her that they did not believe service had been properly executed. See Johnson Decl. Ex. A.

The fourth factor favors the grant of an extension. While Defendant may experience some prejudice from having to defend an action after the original service period has passed, if any such prejudice exists is slight given that the failure to properly serve has only delayed the case for a matter of months. See Hubert, 2022 WL 657622 at \*5 (D. Conn. Mar. 4, 2022) (finding prejudice due to extension "slight" where failure to properly serve delayed case for less than a year); John v. City of Bridgeport, 309 F.R.D. 149, 156 (D. Conn. 2015) (finding prejudice due to extension slight where "[p]laintiff's failure to timely serve defendants delayed the case for less than two months, not for years"); Klinker v. Furdiga, No. 12-CV-254, 2013 WL 1705106, at \*4 n.5

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 101 of 236

Dickson v. Schenectady Police Department, Not Reported in Fed. Supp. (2022)

2022 WL 1091615

(D. Vt. Apr. 19, 2013) (finding delay insufficient to show prejudice because "the case was only a couple months older than it would have been if [the] plaintiff hadn't been given this extension" (internal quotation marks omitted)).

In weighing the above factors, the court is cognizant of "the strong federal policy in favor of resolving claims on the merits." Hubert, 2022 WL 657622 at *5 (citing John, 309 F.R.D. at 156); see also Mason Tenders Dist. Counsel Pension Fund v. Messera, No. 95-CV-9341, 1997 WL 221200, at *5 (S.D.N.Y. Apr. 1, 1997) ("The Second Circuit has clearly expressed its preference that litigation disputes be resolved on the merits."). Thus, the Court finds that an extension of time for service should be granted in this case and denies Defendants' motion to dismiss under Rule 12(b)(5).

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion (Dkt. No. 17) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED**, that Defendants' motion to dismiss pursuant to F.R.C.P. 12(b)(6) for failure to state a claim against Defendants Verret, Brenson, and the Schenectady Police Department/City of Schenectady is hereby **GRANTED**; and it is further

**ORDERED**, that Defendants Verret, Brenson, and the Schenectady Police Department/City of Schenectady are hereby **DISMISSED** from this action; and it is further

**ORDERED**, that Defendants' motion to dismiss pursuant to F.R.C.P. 12(b)(1), 12(b)(2), and 12(b)(5) is **DENIED**; and it is further

**ORDERED**, that Plaintiff is granted an extension of time until May 16, 2022, to effectuate service of her Complaint and summons on Defendant MacDonald; on or before that date, Plaintiff must serve Defendant in a manner set forth in Federal Rule of Civil Procedure 4(e) or in New York C.P.L.R. § 308; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

## All Citations

Not Reported in Fed. Supp., 2022 WL 1091615

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 102 of 236

Gordon v. Parole Officer Semrug, Not Reported in Fed. Supp. (2016)

2016 WL 259579

2016 WL 259579
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Eric M. GORDON, Plaintiff,

v.

PAROLE OFFICER SEMRUG,
Parole Officer Himmelsboch, Parole
Specialist Cynthia Mooney, Defendants.

14-CV-324S(F)

|

Signed 01/21/2016

**Attorneys and Law Firms**

Eric M. Gordon, 564 Dodge Street, Apartment 204, Buffalo, New York 14208, Pro Se.

Eric T. Schneiderman, New York State Attorney General, Kim S. Murphy, George M. Zimmermann, Assistant Attorney General, of Counsel 350 Main Street, Suite 300A, Buffalo, New York 14202, for Defendants.

**DECISION and ORDER**

LESLIE G. FOSCHIO, UNITED STATES MAGISTRATE JUDGE

 **\*1** In this § 1983 action, Plaintiff claims his designation by Defendants as a Discretionary Sex Offender for purposes of his state parole and Defendants' alleged refusal to permit Plaintiff to challenge such designation violated Plaintiff's Fourteenth Amendment rights to due process, particularly notice and a hearing. [1]

[1]    Plaintiff also asserts violations of the Fourth and Eighth Amendments. *See* Complaint ¶ 2.

Before the court is Plaintiff's motion requesting authorization to conduct Defendants' depositions by telephone pursuant to Fed.R.Civ.P. 30(b)(4) ("Rule 30(b)(4)"), for audio recording of Defendants' depositions pursuant to Fed.R.Civ.P. 30(b)(3)(A) ("Rule 30(b)(A)"), and to authorize Plaintiff to designate a person to perform the duties required by Fed.R.Civ.P. 30(b)(5) ("Rule 30(b)(5)") filed June 1, 2015 (Doc. No. 29) ("Plaintiff's Rule 30(b) motion"), and Plaintiff's motion for leave to file an amended complaint, pursuant to Fed.R.Civ.P.

15(a)(2) ("Rule 15(a)(2)") filed June 1, 2015 (Doc. No. 30) ("Plaintiff's motion to amend").

1. Plaintiff's Rule 30(b) Motion.
In support of Plaintiff's Rule 30(b) motion, Plaintiff contends that given Plaintiff's then incarcerated status at the Franklin Correctional Facility in Malone, New York (Plaintiff has, since filing his motion, been released [2]), Plaintiff's conduct of Defendants' depositions telephonically, audio recorded, and before a person designated by Plaintiff, is the "only means by which the taking of [Defendants'] depositions can be effectuated," at the Franklin prison. Plaintiff's Rule 30(b) motion (Doc. No. 29) at 1. It is apparently the case that Defendants are located in Buffalo, New York. Complaint ¶ 2 ("[A]cts complained of occured [*sic*] in the City of Buffalo.").

[2]    The court takes judicial notice that Plaintiff was released on parole from Franklin Correctional Facility where he had previously resided on July 28, 2015.

In opposition, Defendants contend that Plaintiff's 30(b) motion seeks, without authority, to impose the costs of Defendants' depositions on Defendants, Declaration of Kim S. Murphy, Assistant N.Y. Attorney General, (Doc. No. 35), ("Murphy Declaration I") ¶¶ 2-3 (citing *Nowlin v. Lusk,* 2014 WL 298155, at \*9 (W.D.N.Y. Jan. 28, 2014) (citing cases)), and that Plaintiff's motion "overlook[s]" Fed.R.Civ.P. 30(b)(5)(B)'s requirement that the deposition be conducted by an officer designated to administer oaths and to assure that a non-stenographic deposition be properly conducted, a requirement which Defendants assert cannot be waived. Declaration of Kim S. Murphy, Assistant N.Y. Attorney General (Doc. No. 45) ("Murphy Declaration II") ¶¶ 2-3.

Because Plaintiff has, as noted, since Plaintiff's motion was filed, been released, the usual prison security concerns and practical difficulties in conducting oral depositions attendant on Plaintiff's ability to do so as a *pro se* prisoner, *see* *Nowlin,* 2014 WL 298155, at \*9 (citing cases), are no longer present. Although Defendants assert Plaintiff's motion seeks to shift to Defendants the costs of conducting oral depositions of Defendants Semrug, Himmelsboch, and Mooney, *see* Murphy Declaration I ¶ 3, a careful reading of Plaintiff's motion shows this is not the relief Plaintiff seeks. Instead, Plaintiff's motion requests that the court permit (1) pursuant to Rule 30(b)(4), taking Defendants' depositions telephonically, Plaintiff's motion at 1; (2) pursuant to Fed.R.Civ.P. 30(b)(3)(A), recording of the depositions by audio (tape recorder)

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 103 of 236
Gordon v. Parole Officer Semrug, Not Reported in Fed. Supp. (2016)

2016 WL 259579

rather than stenographic - the more typical - means; and (3) pursuant to Fed.R.Civ.P. 28(A)(1), authorizing Plaintiff to designate an individual at the Franklin Correctional Facility to operate the audio recording device and to administer the oath as required by Fed.R.Civ.P. 30(b)(5)(A)(iv) and to otherwise oversee the depositions in compliance with Fed.R.Civ.P. 30(b)(5)(A)-(C). First, although Plaintiff seeks permission to conduct Defendants' depositions by telephone pursuant to Rule 30(b)(4), as it now appears that since Plaintiff's motion was filed Plaintiff has been released [3] and that Defendants reside in the Buffalo, New York area, *see* Complaint at 3 (indicating Defendants were located in Buffalo at time Defendants designated Plaintiff as a Discretionary Sex Offender), [4] Plaintiff's need to conduct such depositions by telephone rather than in person has been obviated by Plaintiff's release and his presumed residence in Buffalo. Accordingly, Plaintiff's motion insofar as it requests permission to conduct Defendants' depositions by telephone pursuant to Rule 30(b)(4) is moot and, as such, should be DISMISSED. [5]

[3]    It is, as Defendants argue, however, established law, that any costs associated with conducting Defendants' depositions telephonically and by audio recording are borne by the deposing party, in this case, Plaintiff. *See Nowlins*, 2014 WL 298155, at *9 (citing *Beckles v. Artuz*, 2005 WL 702728, at *2 (S.D.N.Y. Mar. 25, 2005)). Plaintiff provides no information regarding his capacity to make such recording arrangements.

[4]    By papers filed November 4, 2014 (Doc. No. 48), Defendants have moved to compel Plaintiff's deposition based on Plaintiff's refusal to answer Defendants' questions at a deposition scheduled to be conducted at Defendants' attorney's office in Buffalo, New York.

[5]    Although a telephonic deposition may be conducted under Rule 30(b)(4) by stipulation, Defendants' opposition to Plaintiff's motion makes clear no such stipulation is to be expected.

 *2  As to Plaintiff's motion seeking permission to record Defendants' depositions by audio tape recorder - means pursuant to Rule 30(b)(3)(A), the rule does not, contrary to Plaintiff's apparent misreading of the rule, require such permission. *See Hudson v. Spellman High Voltage*, 178 F.R.D. 29, 31 (E.D.N.Y. 1998) (Rule 30(b) does not require court

approval for an audio recorded deposition). Rather, Rule 30(b)(3)(A) requires that (a) unless the court orders otherwise, the party noticing an oral deposition must state in the notice the method of recording to be utilized, *i.e.*, by audio, audio-visual, or stenographic means, (b) the noticing party shall bear the costs of such recording, and (c) any party may "arrange to transcribe" the deposition. Rule 30(b)(5)(C) also provides that the presiding officer shall state the stipulations of the parties with respect to custody of the audio recording of the deposition testimony and related exhibits. Thus, absent a motion by Defendants to require a stenographic recording of Defendants' depositions, *see Hudson*, 178 F.R.D. at 30 (upon defendant's motion for a protective order, court may vary requirements of Rule 30(b)), if Plaintiff's deposition notices indicated Defendants' depositions shall be recorded by audio tape only, such notices comply with Rule 30(b)(3) (A), and no permission by the court to do so is required. Thus, Plaintiff's motion seeking permission to record Defendants' depositions by audio means is unnecessary, and as such, should be DISMISSED.

Turning to Plaintiff's motion to permit Plaintiff to select a person to officiate the depositions, Rule 30(b)(5) provides that unless the parties stipulate otherwise the officiating officer must be designated or appointed pursuant to Rule 28, or as stipulated to pursuant to Fed.R.Civ.P. 29(a). *See Popular Imports, Inc. v. Wong's International, Inc.*, 166 F.R.D. 276, 279-80 (E.D.N.Y. 1996). Here, Plaintiff does not propose any specific person to preside at Defendants' depositions and perform the duties required by Rule 30(b)(5)(A)-(C). Without such specifications, the court is unable to properly carry out its obligation to designate a specific person to do so as Rule 28 ("the rule") contemplates. As noted, in opposition, Defendants contend, without citation to authority, Murphy Declaration II ¶ ¶ 2-3, that the requirements of Rule 30(b) (5) cannot be waived. However, Plaintiff's motion, carefully read, does not request such requirements be waived; only, as indicated, that Plaintiff be allowed, without providing any further identifying details, to designate a person of his choosing to perform these functions required by the rule. Accordingly, Plaintiff's motion should be DENIED without prejudice to renewal to include the required identifying details.

2. Plaintiff's Motion to Amend.

In support of Plaintiff's motion to amend, Plaintiff explains that he has recently learned that the Department of Parole, as named in the Complaint, is in actuality part of the proposed defendant N.Y. State Department of Corrections

Case 9:23-cv-01114-DNH-MJK     Document 31     Filed 04/22/24     Page 104 of 236
Gordon v. Parole Officer Semrug, Not Reported in Fed. Supp. (2016)
2016 WL 259579

and Community Supervision Services, and that proposed individual defendants, DOCCS Commissioner Anthony J. Annucci, Deputy Commissioner Jeffrey McKoy, and DOCCS Public Information Director Thomas Mailey ("Proposed State Defendants") should be named as additional defendants as they had authority to promulgate and apply regulations which provided the basis for Plaintiff's designation, without notice and hearing, as a Discretionary Sex Offender for Plaintiff's parole supervision purposes by Defendants Semrug, Himmelsbach, and as later enforced by Defendant Mooney against Plaintiff for parole violations based on this designation, and that such Proposed State Defendants were therefore responsible for Plaintiff's Discretionary Sex Offender designation without due process as Plaintiff further alleges. Affidavit of Eric M. Gordon in Support of Motion to Amend Complaint (Doc. No. 30) dated June 1, 2015 ("Gordon Affidavit I") ¶ ¶ 4-6. In opposition, Defendants maintain Plaintiff's motion to amend should be denied as Plaintiff's motion failed to include a copy of Plaintiff's proposed amended complaint as required by Local R.Civ.P. 15(a). Murphy Declaration I ¶ 3. Thereafter, on June 24, 2015, Plaintiff mailed to the court a signed copy of Plaintiff's Proposed Amended Complaint (Doc. No. 52), together with Plaintiff's affidavit of service to Defendants, which was received by the court on June 26, 2015, but was not filed at that time. [6] In response, Plaintiff contends that his motion provided sufficient notice of his request to amend and that as a result Defendants will suffer no prejudice. To date, Defendants have not submitted any further opposition to Plaintiff's motion to amend directed to the Proposed Amended Complaint which, based on Plaintiff's affidavit of service, was, as stated, served on Defendants on June 24, 2015.

[6]     To facilitate a proper understanding of the court's analysis and potential further review, the Proposed Amended Complaint has been filed.

**\*3** Under Fed.R.Civ.P. 15(a)(2) leave to file an amended complaint should be freely granted unless the proposed amended complaint alleges claims or seeks to add parties that are untimely, prejudicial, or futile. *See Foman v. Davis,* 371 U.S. 178, 181 (1962). A proposed amended complaint is futile if the claims alleged are time-barred by the applicable statutes of limitations. *See Becnel v. Deutsche Bank,* 507 Fed.Appx. 71, 73 (2d Cir. Jan. 11, 2013) ("The district court did not err in concluding that such an amendment would be futile because appellants' claims would be time-barred even if such an amendment were allowed"); *Rodriguez v. United States,* 286 F.3d 972, 980 (7th Cir. 2002; (same).

Here, the Proposed Amended Complaint alleges Plaintiff's procedural due process and other constitutional claims against Proposed State Defendants, and requests compensatory and punitive damages. Plaintiff also alleges new claims against Defendants Semrug, Himmelsbach, and Mooney and Proposed State Defendants for intentional infliction of mental distress based on Defendants and Proposed State Defendants causing WBEN-TV Channel 4 News to name Plaintiff as a sex offender in a February 2, 2011 TV news broadcast prior to Plaintiff's arrest in Nebraska on a governor's warrant. Proposed Amended Complaint Counts VI and VII. Plaintiff further alleges, without specifics, that Defendants' and Proposed State Defendants' actions and omissions caused Plaintiff to suffer pain including a "staff/ marsa" [*sic*] infection. Proposed Amended Complaint ¶ 22.

By Decision and Order filed October 24, 2014 (Doc. No. 11) ("the D&O"), District Judge Frank P. Geraci, Jr. dismissed Plaintiff's § 1983 claims against former Defendants New York State Department of Parole and Andrea A. Evans, Chairwoman and WBEN-TV Channel 4 News, with prejudice, and Plaintiff's defamation claim against former Defendant WBEN-TV without prejudice. D&O at 7. As discussed, Discussion, *supra,* at 5-7, the Proposed Amended Complaint does not purport to including a state law defamation claim against former Defendant WBEN-TV Channel 4 News. [7]

[7]     Although Plaintiff indicates Plaintiff also seeks to add Channel 4 News as a party, Gordon Affidavit ¶ 3, a careful reading of the Amended Complaint fails to reveal any claim against this former party. *See* Proposed Amended Complaint (*passim*).

Proposed amended claims that, based on the allegations in a proposed amended complaint must be dismissed as time-barred, are considered futile requiring denial of a motion for leave to amend pursuant to Rule 15(a)(2). *See Becnel,* 507 Fed.Appx. at 73; *Rodriguez,* 286 F.3d at 980. Claims alleging violations of federal constitutional rights brought pursuant to § 1983 are subject to the state's statute of limitations for personal injury torts in the state where the action arose, here, a three-year period of limitations. *Wallace v. Kado,* 549 U.S. 384, 387 (2007); *Smith v. Campell,* 782 F.3d 93, 100 (2d Cir. 2015) (citing and quoting *Shomo v. City of New York,* 579 F.3d 176, 181 (2d Cir. 2009)); *Jewell v. County of Nassau,* 917 F.2d 739, 740 (2d Cir. 1990) (§ 1983 claims based on conduct within New York state subject to three-year limitations period). For statute of limitations purposes, such § 1983

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 105 of 236

Gordon v. Parole Officer Semrug, Not Reported in Fed. Supp. (2016)

2016 WL 259579

actions accrue when a plaintiff knows or should have known the predicate injury caused by the alleged constitutional violations. *See Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980). Intentional torts, such as Plaintiff's proposed claim for intentional infliction of emotional distress against Proposed State Defendants and Defendants Semrug, Himmelsboch, and Mooney, Proposed Amended Complaint ¶¶ VI and VII, are subject to a one-year period of limitations. *Patterson v. Balsamico*, 440 F.3d 104, 112 n. 4 (2d Cir. 2006) (New York courts have held that a claim for damages for intentional infliction of emotional distress is subject to the one-year statute of limitations in C.P.L.R. Section 215(3) (citing cases)). Intentional tort claims, under applicable New York law, also accrue when a plaintiff knows or reasonably should have acquired knowledge that plaintiff suffered an injury as a result of the alleged intentional conduct by a defendant. *See Passucci v. Home Depot, Inc.*, 889 N.Y.S.2d 353, 355 (4 th Dep't 2009) (status of limitations for intentional infliction of emotional distress claim accrues on the date of the injury).

**\*4** Here, according to the Proposed Amended Complaint, the Proposed State Defendants violated Plaintiff's 14 th Amendment right to procedural due process, when, without notice or hearing, Defendants Semrug and Himmelsboch designated Plaintiff as a Discretionary Sex Offender, based on regulations and policies promulgated by Proposed State Defendants on August 26, 2010, despite the fact that Plaintiff's underlying conviction was for attempted burglary, a non-sex related crime. Proposed Amended Complaint ¶¶ 13, 15. [8] According to Plaintiff, Plaintiff protested such designation at that time but his protest was, *id.* ¶ 15, rejected by Defendant Semrug, and Plaintiff, believing the designation to be "illegal," subsequently refused to comply with the additional parole conditions resulting from the designation and Plaintiff's parole revocation. *Id.* ¶ 16. Accordingly, based on Plaintiff's allegations, Plaintiff's due process claim (as well as his Fourth and Eighth Amendment claims) against the Proposed State Defendants accrued when Plaintiff first was informed of Defendants Semrug and Himmelsboch's decision to impose his Discretionary Sex Offender Designation on August 26, 2010, more than three years prior to the filing of Plaintiff's motion to amend on June 1, 2015, and the receipt of the Proposed Amended Complaint on June 26, 2015. Although Plaintiff alleges that following parole revocation proceedings and after serving a period of an additional 15 months of incarceration for such violations, upon his later release to parole on June 6, 2013, he was again classified by Defendants Semrug and Himmelsboch as a Discretionary Sex Offender resulting in another parole violation, Proposed Amended Complaint ¶ 20, where the alleged constitutional violation results in an improper restraint on a plaintiff's protected liberty interest, assuming Plaintiff has such an interest, a § 1983 claim based on alleged constitutional violations accrues for purposes of the applicable three-year statute of limitations when the restraint is initially imposed, in this case on or about August 26, 2010, and not when a subsequent violation by a defendant, based on the same, initial unconstitutional conduct, occurs. *See Smith*, 782 F.3d at 99 (plaintiff's First Amendment retaliation claim accrued when defendant first served plaintiff with traffic tickets subjecting plaintiff to an unlawful restraint, not when plaintiff's guilt was subsequently adjudicated). Accordingly, Plaintiff's § 1983 claims against Proposed State Defendants are time-barred and, as such, are futile. *See Becnel*, 507 Fed.Appx. at 73. [9] Plaintiff's further parole violation in 2013, Proposed Amended Complaint ¶ 20, does not, for the same reason, postpone the accrual of Plaintiff's Fourth and Eighth Amendment and Fourteenth Amendment Due Process claims against Proposed State Defendants. Additionally, Plaintiff's proposed intentional tort state law claim is also futile as time-barred under the applicable one-year statute of limitations as to Defendants Semrug, Himmelsboch and Mooney and Proposed State Defendants. [10]

[8]     The exact nature of additional parole conditions imposed on Plaintiff as a result of the designation is not described in either the Complaint or the Proposed Amended Complaint.

[9]     That Plaintiff's claims against Defendants are by the same analysis subject to dismissal does not avoid denying Plaintiff's motion to amend on the futility ground as Defendants have pleaded that Plaintiff's present claims against Defendants are barred by the statute of limitations, *see* Answer (Doc. No. 19) ¶ 16, and Defendants' time to file dispositive motions does not expire until January 29, 2016 (Doc. No. 24). Accordingly, it cannot be said that Defendants have waived such defense. The court therefore does not address whether the Proposed Amended Complaint is subject to dismissal and thus equally futile for failure to sufficiently allege such proposed state defendant's personal involvement in the alleged constitutional violations.

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 106 of 236

Gordon v. Parole Officer Semrug, Not Reported in Fed. Supp. (2016)

2016 WL 259579

10    Even if the Proposed Amended Complaint intended to assert an intentional mental distress claim against WBEN-TV, such claim is equally time-barred.

## CONCLUSION

Based on the foregoing, Plaintiff's 30(b) motion (Doc. No. 29) is DISMISSED in part, and DENIED in part; Plaintiff's motion to amend (Doc. No. 30) is DENIED.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 259579

---

**End of Document**                                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 7352664

2020 WL 7352664
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Derrell AUSTIN, Plaintiff,

v.

Andrew CUOMO, Governor of the State of New
York; and Anthony Annucci, Acting Commissioner
of the New York State Department of Corrections
and Community Supervision, in their Official
capacities; Joseph Noeth, as Superintendent of Attica
Correctional Facility in his Official and, Individual
Capacity, New York State Department of Parole
Bureau Chief Thomas Degal, former, NYS Senior
Officer Andrew Amato, and NYS Parole Officers
Brian Bailey, Corey Ricca, and OFC. Miller—in
their individual and official capacities, Defendants.

Case No. 1:20-cv-00893
|
Signed 12/15/2020

**Attorneys and Law Firms**

Matthew A. Albert, Darien Center, NY, for Plaintiff.

Joel J. Terragnoli, New York State Attorney General, Buffalo,
NY, for Defendants.

**OPINION AND ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS AND DENYING PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

Christina Reiss, District Judge

**\*1** Plaintiff Derrell Austin brings this action pursuant
to 42 U.S.C. § 1983 against Defendants Andrew Cuomo,
Governor of the State of New York ("NYS") and Anthony
Annucci, Acting Commissioner of the New York State
Department of Corrections and Community Supervision, in
their official capacities, and Joseph Noeth, Superintendent of
Attica Correctional Facility, Thomas Degal, [1] New York State
Department Parole Bureau Chief, Andrew Amato, former
NYS Senior Officer, and Brian Bailey, Corey Ricca, and
Officer Miller, parole officers, in their individual and official
capacities (collectively "Defendants").

[1]    In Plaintiff's reply to Defendants' motion to
dismiss, Plaintiff consents to the dismissal of any
and all claims against Defendants Noeth and Degal.

Plaintiff alleges violations of his procedural and substantive
due process rights as well as violations of the First
Amendment and Ex Post Facto Clause of the United States
Constitution relating to his designation as a sex offender under
New York's Sex Offender Registration Act ("SORA") and the
attending parole conditions imposed upon him.

Pending before the court is Plaintiff's September 10, 2020
motion for a preliminary injunction seeking his release
from prison and further requesting the court to strike his
designation as a sex offender and certain parole conditions.
On September 18, 2020 Defendants opposed the motion
and moved to dismiss Plaintiff's Amended Complaint. On
October 31, 2020, Plaintiff opposed the motion to dismiss and
Defendants replied on November 16, 2020 at which time the
court took the pending motions under advisement. The parties
have waived an evidentiary hearing.

Plaintiff is represented by Matthew A. Albert, Esq.
Defendants are represented by Assistant Attorney General
Joel J. Terragnoli.

**I. Defendants' Motion to Dismiss.**
The court addresses Defendants' motion to dismiss first as
it may obviate the need to resolve Plaintiff's request for
preliminary injunctive relief. See Grocery Mfrs. Ass'n v.
Sorrell, 102 F. Supp. 3d 583, 593 (D. Vt. 2015) ("Because
the State's motion to dismiss winnows the claims for which
Plaintiffs may seek a preliminary injunction, the court
addresses that motion first."). In adjudicating a motion to
dismiss, the court considers the allegations in the Amended
Complaint, any exhibits attached thereto, and documents
referenced therein or otherwise integral to the Amended
Complaint. See Chambers v. Time Warner, Inc., 282 F.3d 147,
152-53 (2d Cir. 2002) (observing that in adjudicating a motion
to dismiss "the complaint is deemed to include any written
instrument attached to it as an exhibit or any statements or
documents incorporated in it by reference. Even where a
document is not incorporated by reference, the court may
nevertheless consider it where the complaint relies heavily
upon its terms and effect, which renders the document integral
to the complaint.") (internal citations and quotation marks
omitted). As applied to the case at bar, Plaintiff's parole
conditions and the Wyoming County State Supreme Court's
habeas decision are properly before the court.

2020 WL 7352664

**\*2**  To survive a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), Plaintiff's Amended Complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The sufficiency of a complaint is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not "weigh the evidence" nor "evaluate the likelihood" that a plaintiff's claims will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017).

**A. The Allegations in Plaintiff's Amended Complaint.**
In 1996, Plaintiff alleges he was convicted of the crimes of kidnapping-for-ransom, two counts of burglary in the first degree, and robbery in the first degree. The kidnapping allegedly arose in the context of a drug trade and had no sexual component, but because the kidnapping victim was under the age of seventeen, Plaintiff asserts he was automatically classified as a sex offender under SORA and required to register as a sex offender upon his release from prison.

In February 2017, prior to his release from prison, Plaintiff participated in a hearing before the New York State Supreme Court to determine what risk level he would be assigned under SORA, At that hearing, Plaintiff was designated a Level II offender. Plaintiff contends that the presiding judge did not have the option of refusing to designate him as a sex offender on the grounds that his crimes of conviction had no sexual component.

On March 28, 2017, Plaintiff was released on parole at which time he was subject to numerous parole conditions including the following special parole conditions related to his status as a sex offender:

- Plaintiff may not "act in any fiduciary capacity" without the permission of his parole officer. (Doc. 9-3 at 3, ¶ 15.)

- Plaintiff may not have a checking, savings, debit, or credit card account without the permission of his parole officer.

- Plaintiff is not permitted to operate a motor vehicle or apply for, renew, or possess a New York State driver's license without the permission of his parole officer.

- Plaintiff is required to turn in his driver's license upon his first office visit to his parole officer.

- Plaintiff is not permitted to frequent any establishment where alcohol is sold or served as its main business without the permission of his parole officer.

- Plaintiff is not permitted to rent, own, or possess a cellular phone, pager, caller ID or answering service without the permission of his parole officer. If given permission, the cellular phone must be the most basic style available and cannot be used to access the internet or to store or take photos, videos, or audio recordings.

- Plaintiff is required to notify his parole officer when he establishes a "significant relationship" and to inform the other consenting adult of his prior criminal offenses. (Doc. 9-3 at 6, ¶ 31.)

- Plaintiff is not permitted to have an email address or account or to rent or have access to a U.S. Post Office Box without the permission of his parole officer.

- Plaintiff is not permitted to purchase or possess a computer or another device that allows access to the internet, contains a camera, or plays DVDs without the permission of his parole officer. If he is permitted to possess DVDs, he may not possess more than ten.

**\*3**  • Plaintiff is not permitted to participate in or gain access to any online computer service or internet without the permission of his parole officer. He is not permitted under any circumstances to communicate in any way with chat line or dating lines.

- Plaintiff is not permitted to have any premium channels on any of the televisions that he has access to in his residence, including The Movie Channel, Showtime, Cinemax, and Home Box Office.

- Plaintiff is not permitted to be within 1,000 feet of places where any person under the age of 18 may congregate, including but not limited to: libraries, book stores, schools, colleges, playgrounds, parks, walking/

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 109 of 236

Austin v. Cuomo, Not Reported in Fed. Supp. (2020)

2020 WL 7352664

jogging/bicycle paths, beaches, golf courses/miniature golf centers, picnic areas, boating/marina/fishing areas, child care centers, festivals, concerts, video arcades, community centers, art/craft galleries, paint ball/laser tag type centers, internet cafes, sports fields, snow skiing/sledding/tubing areas, malls, movie theaters, yard/garage/estate sales, professional/college/amateur sporting events/venues, or child oriented restaurants without prior approval from his parole officer. If given permission to visit a department store or grocery store, Plaintiff may not enter the child oriented areas therein.

- Plaintiff is not permitted to have direct or indirect contact with any person under the age of 18 without the permission of his parole officer.

- Plaintiff is not permitted to be employed in a capacity where he would be required to visit occupied dwellings or where he would have frequent contact with the public (ex. cashier).

- Plaintiff is required to maintain an accurate written log of his daily activities during the hours that he is permitted to leave his residence, including dates, times, and destinations, and must bring this log to each scheduled parole officer report.

At the time that the parole conditions were imposed, Plaintiff asserts that he informed his parole officer that his prior conduct had no sexual component. Thereafter, Plaintiff claims he filed a grievance related to his parole conditions with DOCCS, but "[t]he grievances went unanswered." (Doc. 4 at 6, ¶ 49.)

In November of 2019, Plaintiff was found "guilty of violating three conditions of his release on parole[,]" each of which relates to his status as a sex offender. *Id.* at 2, ¶ 12. Plaintiff was found to have not been in his approved residence between the hours of 7:00-8:00 a.m. on July 7, 2019, in violation of his curfew. Plaintiff was also found to be within 1,000 feet of a park where children congregate on that same date, and to have possessed a cell phone with internet access on August 2, 2019 without the permission of his parole officer.

Plaintiff's parole was subsequently revoked, he was sentenced to a term of imprisonment, and he is currently incarcerated. On or about March 6, 2020, Plaintiff filed a petition for a writ of habeas corpus with the Wyoming County Supreme Court, seeking his immediate release to parole and an order striking the special parole conditions that might apply to him upon

his release. By decision and order dated June 2, 2020, the Wyoming County Supreme Court denied the petition for the following reasons:

[T]his Court agrees that the proper place to challenge the application of SORA to a kidnapping defendant is at the SORA hearing. SORA operates solely through the sex offender designation and risk level determination which are the result of the SORA hearing held pursuant to Correction Law § 168-n. Until the hearing decision is made, SORA has no direct effect upon the defendant who stands convicted of a registerable sex offense. Therefore, a constitutional challenge to the application of SORA ought to be made to the SORA hearing Court, if it is to be made anywhere.

**\*4** [Plaintiff] received a SORA hearing in 2017, at which he contested the imposition of a level two risk level, Upon his appeal of the SORA hearing decision, it was affirmed. (Austin, supra). Although he evidently did not raise his constitutional claims at the hearing or on appeal, he certainly could have done so ... To the extent that [Plaintiff] seeks a ruling in this proceeding that SORA does not apply to him – and an order striking the special parole conditions on that basis – he is asking this Court to nullify the SORA hearing Court's sex offender decision – a decision which has been affirmed by the Fourth Department. The Court declines to do so.

...

To the extent that [Plaintiff] seeks to challenge the parole revocation, the Court also finds that the petition must be denied because he commenced this proceeding without first exhausting his available administrative remedies. The Court notes that this deficiency is not cured by the belated perfecting of [Plaintiff]'s administrative appeal. "[T]he fact that petitioner may have ultimately perfected his administrative appeal does not absolve him of this requirement or validate this petition nunc pro tunc" (Matter of Whitehead v. Russi, 201 A.D.2d 825 [3rd Dept., 1994]).

...

Alternatively, the Court finds that the petition must be denied because [Plaintiff]'s claims are lacking in merit. With respect to the constitutional claims, the application of SORA to a kidnapping defendant is not constitutionally prohibited in the absence of evidence of a sexual component to the crime ... and SORA has been held not to implicate the ex post facto clause (Doe v. Pataki, 120 F.3d 1263, 1285 [2nd Cir. 1997]). [Plaintiff] is lawfully

Austin v. Cuomo, Not Reported in Fed. Supp. (2020)

2020 WL 7352664

held pursuant to his sentence following the revocation of his parole. He has not demonstrated that his parole was revoked in error or that the special parole conditions to which he was subject were improperly imposed.

(Doc. 11-1 at 4-5).

### B. Whether Plaintiff's Claims are Barred by the *Rooker-Feldman* Doctrine.

Under the *Rooker-Feldman* doctrine, federal district courts lack subject matter jurisdiction to hear "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those arguments." *Exxon Mobile Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). The Second Circuit has held that "[a] claim is barred under the doctrine when (1) the federal court plaintiff lost in state court, (2) the plaintiff complains of injuries caused by a state court judgment, (3) the plaintiff invites the federal court to review and reject that judgment, and (4) the state court judgment was rendered prior to the commencement of proceedings in the district court." *Graves v. Goodnow Flow Ass'n, Inc.*, 746 F. App'x 45, 47 (2d Cir. 2018). "The first and fourth of these requirements may be loosely termed procedural; the second and third may be termed substantive." *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005).

Defendants argue that Plaintiff's claims are barred by *Rooker-Feldman* because they effectively challenge the Wyoming County Supreme Court's decision denying Plaintiff's petition for a writ of habeas corpus. At the time Plaintiff filed the instant action, he had already lost in state court and although he complains that the constitutional violations he alleges "were unaddressed" in the state court habeas proceeding, (Doc. 4 at 3), the Wyoming County Supreme Court's decision reveals that the judge found that Plaintiff's constitutional claims were not raised in the proper forum and were "lacking in merit." (Doc. 11-1 at 3.)

**\*5** "[A] federal suit is not free from *Rooker-Feldman*'s bar simply because the suit proceeds on legal theories not addressed in state court." *Hoblock*, 422 F.3d at 87. On the other hand, "if a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached" then that claim is not barred by *Rooker-Feldman*. *Exxon Mobil*, 544 U.S. at 293 (internal quotation marks and brackets omitted). "[T]he key to resolving this uncertainty lies in the second substantive *Rooker-Feldman*

requirement" which addresses whether the Plaintiff's injuries were caused by the state court judgment. *Hoblock*, 422 F.3d at 87.

The crux of Plaintiff's claims allege an injury caused by his designation as a sex offender and the attending parole conditions. He does not claim to have been injured by the state court judgment. "The fact that the state court chose not to remedy the injury does not transform the subsequent suit on the same matter into an appeal, forbidden by *Rooker-Feldman*, of the state court judgment." *Id.* at 88 (footnote omitted). [2]

[2]
> As the Second Circuit explained:
>> Suppose a plaintiff sues his employer in state court for violating both state anti-discrimination law and Title VII and loses. If the plaintiff then brings the same suit in federal court, he will be seeking a decision from the federal court that denies the state court's conclusion that the employer is not liable, but he will not be alleging injury from the state judgment. Instead, he will be alleging injury based on the employer's discrimination.
>
> *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 87-88 (2d Cir. 2005).

In other words, "a party is not complaining of an injury 'caused by' a state-court judgment when the exact injury of which the party complains in federal court existed *prior* in time to the state-court proceedings, and so could not have been 'caused' by those proceedings." *McKithen v. Brown*, 481 F.3d 89, 98 (2d Cir. 2007). Here, the injury of which Plaintiff complains, his designation as a sex offender and its related parole conditions, occurred prior to and independently of his state court habeas petition challenging that designation. [3] Accordingly, despite the fact that Plaintiff seeks a result in this court that is opposed to the one he received in his state court habeas petition, his claims are not barred by *Rooker-Feldman*. *See Hoblock*, 422 F.3d at 87 (holding that "a plaintiff who seeks in federal court a result opposed to the one he achieved in state court does not, for that reason alone, run afoul of *Rooker-Feldman*").

[3]
> The *Rooker-Feldman* doctrine is a jurisdictional bar only. The subsequent federal suit may still be barred by ordinary preclusion principles. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 282 (2005) (holding that "[i]f a federal

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 111 of 236

Austin v. Cuomo, Not Reported in Fed. Supp. (2020)

2020 WL 7352664

plaintiff presents an independent claim, even one that denies a state court's legal conclusion in a case to which the plaintiff was a party, there is jurisdiction, and state law determines whether the defendant prevails under preclusion principles").

**C. Whether Plaintiff's Claims are Barred by *Heck v. Humphrey*.**

"When a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Heck v. Humphrey*, 512 U.S. 477, 487 (1994). This is because "Congress has determined that habeas corpus is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement, and that specific determination must override the general terms of [§] 1983." *Preiser v. Rodriguez*, 411 U.S. 475, 490 (1973). Thus, a section 1983 claim cannot serve "as a collateral attack upon a prior conviction or sentence." *Webster v. Himmelbach*, 271 F. Supp. 3d 458, 464 (W.D.N.Y. 2017). "Courts have applied *Heck* to prevent a state prisoner from bringing a [s]ection 1983 action challenging a parole revocation unless that revocation decision is reversed or the underlying conviction is set aside." *Lee v. Donnaruma*, 63 F. App'x 39, 41 (2d Cir. 2003). The relevant inquiry "is whether a prisoner's victory in a § 1983 suit would necessarily demonstrate the invalidity of his conviction or sentence[.]" *McKithen*, 481 F.3d at 102 (emphasis omitted).

 **\*6** Plaintiff admits that he is currently incarcerated because his parole was revoked based on violations of the special conditions that were imposed due to his status as a sex offender. He argues that because those conditions violate his constitutional rights, this court should enjoin their enforcement and order his immediate release from imprisonment. Under *Heck*, this constitutes a direct challenge to the validity of Plaintiff's confinement which cannot be brought under section 1983. *See Muhammad v. Close*, 540 U.S. 749, 750 (2004) (holding that "[c]hallenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus"); *Halsey v. Thompson*, 2017 WL 1532582, at \*4 n.3 (E.D.N.Y. April 27, 2017) (holding that "[b]ecause [p]laintiff is incarcerated, to the extent he seeks release from prison, [p]laintiff cannot utilize a section 1983 claim but must instead bring a petition for habeas corpus pursuant to 28 U.S.C. § 2254").

Even if Plaintiff's claims were confined to his request for compensatory damages, *Heck* would still apply because this "would necessarily imply the invalidity of his parole revocation, which–according to Plaintiff's own allegations– was based upon the violation of the special condition[s]" placed upon him due to his sex offender status, *Webster*, 271 F. Supp. 3d at 470; *see also Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005) (holding that a section 1983 action is barred "no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)–*if* success in that action would necessarily demonstrate the invalidity of confinement or its duration") (emphasis in original).

Plaintiff's claims are therefore barred by *Heck* insofar as they challenge the validity of his parole revocation. *See Davis v. Cotov*, 214 F. Supp. 2d 310, 316 (E.D.N.Y. 2002) (holding that a plaintiff's suit was barred by *Heck* where plaintiff "remained incarcerated[,]" his claims "challenged the validity of the parole revocation procedures," and he had not shown that the revocation had been "reversed, expunged, or declared invalid"). Defendants' motion to dismiss Plaintiff's Amended Complaint to the extent it challenges his confinement and parole conditions is therefore GRANTED.

**D. Whether Plaintiff's Claims are Untimely.**

"Claims alleging violations of federal constitutional rights brought pursuant to § 1983 are subject to the state's statute of limitations for personal injury torts in the state where the action arose, here, a three-year period of limitations." *Gordon v. Parole Officer Semrug*, 2016 WL 259579, at \*3 (W.D.N.Y. Jan. 21, 2016) (citing *Wallace v. Kado*, 549 U.S. 384, 387 (2007)). For statute of limitations purposes, section 1983 actions accrue "from the time a plaintiff knows or has reason to know of the injury giving rise to the claim[.]" *Milan v. Wertheimer*, 808 F.3d 961, 963 (2d Cir. 2015) (internal quotation marks and citations omitted). "[T]he proper focus is on the time of the [unlawful] act, not the point at which the consequences of the act become[] painful." *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994) (internal quotation marks, citation, and emphasis omitted), "[W]here the alleged constitutional violation results in an improper restraint on a plaintiff's protected liberty interest, assuming [a p]laintiff has such an interest, ... the claim] accrues for purposes of the applicable three-year statute of limitations when the restraint is *initially imposed* ... and not when a subsequent violation by a defendant, based on the same, initial unconstitutional

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 112 of 236

Austin v. Cuomo, Not Reported in Fed. Supp. (2020)

2020 WL 7352664

conduct, occurs." *Webster*, 271 F. Supp. 3d at 467 (alterations in original).

Plaintiff's Amended Complaint alleges that he was adjudicated a Level II sex offender in February 2017; his original Complaint was filed on July 14, 2020. Claims relating to a plaintiff's designation as a sex offender accrue "when [the p]laintiff was informed of [the] decision to impose his [sex offender designation.]" *Gordon*, 2016 WL 259579, at *4; *see also Fowlkes v. Parker*, 2010 WL 5490739, at *9 (N.D.N.Y. Dec. 9, 2010) (holding that "any claim associated with [plaintiff's SORA] registration itself ... would be untimely since plaintiff was plainly on notice" when he signed a sex offender registration form). Plaintiff was therefore on notice of his injury in February of 2017 but failed to assert a claim based thereon within the three year statute of limitations.

**\*7** Assuming *arguendo* that Plaintiff was not on notice of his injuries at the time of his designation as a Level II sex offender, his claims remain untimely because Plaintiff admits in his Amended Complaint that on March 28, 2017 he was released on parole and assigned the special conditions of parole about which he now complains. Plaintiff signed each page of these special conditions of parole and allegedly informed Defendant Miller, his parole officer at the time, that "his prior conduct had nothing to do with sex," (Doc. 4 at 6, ¶ 48.) On that same date, Plaintiff knew the source of his present injuries and therefore failed to file his Complaint within the three-year statute of limitations. *See Webster*, 271 F. Supp. 3d at 466, 468 (finding that a plaintiff's section 1983 action was untimely where "[p]laintiff was informed of his [sex offender] status on or about the date of his initial release to [p]arole" and "knew or had reason to know of the purported constitutional violation because he immediately indicated to the parole officers that he believed this designation was made in violation of his due process rights" therefore "[p]laintiff's due process claims accrued for purposes of this § 1983 action on that date").

A continuing violation theory does not cure the untimeliness of Plaintiff's claims because "[t]he fact that the detrimental effects of [the] discrete decision [to designate plaintiff as a sex offender] may be continuing does not extend the statute of limitations indefinitely." *Munsch v. Evans*, 2012 WL 528135, at *13 (E.D.N.Y. Feb. 17, 2012). Plaintiff's argument that equitable tolling applies fares no better. Equitable tolling applies only in "rare and exceptional circumstances" where "extraordinary circumstances prevented a party from timely performing a required act, and that party acted with

reasonable diligence throughout the period he sought to toll." *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (internal quotation marks, alterations, and citation omitted). Plaintiff makes no argument that exceptional circumstances prevented him from timely asserting his claims. In any event, "equitable tolling does not apply where plaintiff has commenced a timely state court action based upon the same facts as his federal claim." *Libbett v. Superintendent of Attica Corr. Facility*, 2013 WL 599568, at *1 (W.D.N.Y. Jan 14, 2013). Because Plaintiff did not commence this action until July 14, 2020, all claims relating to his designation as a sex offender under SORA and the attending special conditions of his parole are barred by the applicable three-year statute of limitations. Defendants' motion to dismiss is therefore GRANTED on this alternative basis as well.

### E. Whether Plaintiff is Entitled to a Preliminary Injunction.

"A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.' " *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)) (internal citation omitted). "A party seeking a preliminary injunction must generally show a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, that the balance of equities tips in the party's favor, and that an injunction is in the public interest." *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015). "Because the violation of a constitutional right is the irreparable harm asserted here, the two prongs of the preliminary injunction threshold merge into one: in order to show irreparable injury, plaintiff must show a likelihood of success on the merits." *Turley v. Giuliani*, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000).

Plaintiff admits that he seeks a "mandatory" injunction, one that changes the "status quo," therefore he must shoulder a heightened burden of persuasion and demonstrate " 'a clear or substantial likelihood of success on the merits.' " *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (quoting *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)). Because Plaintiff's claims as currently framed are barred by both *Heck* and the applicable statute of limitations, he has not established a clear or substantial likelihood of success on the merits. For this reason, his request for injunctive relief must be DENIED.

2020 WL 7352664

**F. Whether to Grant Plaintiff Leave to Amend.**

**\*8**  Pursuant to Fed. R. Civ. P. 15(a), courts "should freely give leave" to amend a complaint "when justice so requires." However, "[l]eave may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.' " *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). Plaintiff is hereby GRANTED leave to amend within twenty (20) days of the date of this Opinion and Order consistent with the Federal Rules of Civil Procedure and this court's Local Rules.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's Amended Complaint (Doc. 10) is GRANTED and Plaintiff's motion for a preliminary injunction (Doc. 9) is DENIED.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 7352664

**Footnotes**

---

End of Document            © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 5490739
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Felipe Oteze FOWLKES, Plaintiff,
v.
Commissioner Chauncey G. PARKER, et al., Defendants.

Civil Action No. 9:08–CV–1198 (LEK/DEP).
|
Dec. 9, 2010.

**Attorneys and Law Firms**

Felipe Oteze Fowlkes, Shirley, MA, pro se.

Goldberg, Segalla Law Firm, Jonathan Bernstein, Esq., William J. Greagan, Esq., of Counsel, Albany, NY, for Rensselaer County Defendants.

Hon. Andrew M. Cuomo, Office of the Attorney General, State of New York, Adele Taylor–Scott, Esq., Assistant Attorneys General, of Counsel, Albany, NY, for State Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Felipe Oteze Fowlkes, a former New York State inmate who is presently incarcerated in Massachusetts, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights. The focus of plaintiff's complaint is upon a number of events spanning a period of more than eight years and involving both state and local government employees. Fowlkes attributes defendants' conduct toward him to his race, his membership in a group claimed by him to be religious in nature but regarded by law enforcement officials as a gang, and retaliatory animus based upon his commencement of a civil rights action against the Superintendent of the Rensselaer Correctional Facility and various other local government employees. Among the claims asserted by the plaintiff and implicated by the motion now before the court are causes of action for of deprivation of his right to due process, unlawful retaliation, and conspiracy, all of which relate to plaintiff's designation as a level three sex offender under New York's registration regime.

Plaintiff's complaint seeks various forms of relief including compensatory and punitive damages.

Following a transfer of the action to this district four of the named defendants, including the Commissioner and three other employees of the New York State Division of Criminal Justice Services ("DCJS"), have moved for judgment on the pleadings, arguing that the complaint fails to state a cognizable claim against them. For the reasons set forth below I recommend that the DCJS defendants' motion be granted.

I. *BACKGROUND* [1]

[1]   In light of the procedural posture of this case the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion. *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.), *cert. denied,* 513 U.S. 816, 115 S.Ct. 73 (1994); *see also* See *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007)). Portions of the background description which follows have been derived from the exhibits attached to plaintiff's complaint, which may also properly be considered in connection with a dismissal motion. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561 (1992); *see also Samuels v. Air Transp. Local 504,* 992 F.2d 12, 15 (2d Cir.1993), as well as other public documents of which the court is entitled to take judicial notice. *See* Federal Rules of Evidence 201 and 1005; *see also, Wilson v. Limited Brands, Inc.,* 08 CV 3431, 2009 W L 1069165 at \*1 n. 1 (S.D.N.Y. April 17, 2009). It is well-established that a district court may rely on matters of public record in deciding whether to dismiss a complaint. *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 75 (2d Cir.1998) (citations omitted); *see also Anderson v. Coughlin,* 700 F.2d 37, 44 n. 5 (2d Cir.1983).

Prior to his release on May 23, 2003 plaintiff was an inmate at the Arthur Kill Correctional Facility ("Arthur Kill"), located in Staten Island, New York. Complaint (Dkt. No. 1) § 6, ¶ 19. On May 3, 2003 defendant Daniel Keating, the Rensselaer County Sheriff, and defendant Johnny Mae, one of Keating's deputy sheriffs, contacted Regina Rodriguez, plaintiff's corrections counselor at Arthur Kill, and advised

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 115 of 236
Fowlkes v. Parker, Not Reported in F.Supp.2d (2010)
2010 WL 5490739

her that Fowlkes would be required to sign a sex offender registration form prior to his release from prison based upon a 1996 Troy City Court conviction for having sexual contact with an individual over the age of seventeen but incapable of consent, in violation of New York Penal Law § 130.60. Complaint (Dkt. No. 1) at § 6 ¶¶ 2, 18. According to the plaintiff, when the form was presented he signed it, after having been assured by Ms. Rodriguez that he would be assigned the lowest risk level of one for sex offenders subjected to New York's Sex Offender Registration Act, ("SORA"), N.Y. Corr. Law § 168 *et seq.* [2] *Id.* Plaintiff claims the actions of the Rensselaer defendants were in furtherance of a scheme to violate his civil rights based upon his race and membership in the "Nation of Gods and Earths: The Five Percent" (the "Five Percenters") and in retaliation for his having brought a prior action against various county employees. Complaint (Dkt. No. 1) at ¶ 19. Plaintiff maintains that, armed with the sex offender registration, Rensselaer county employees engaged relatives and friends to pursue Fowlkes in an effort to entrap him into a situation where he could be prosecuted for additional sex crimes. Complaint (Dkt. No. 1) at ¶¶ 20–26. Plaintiff asserts that as a result of the level three registration he has also been denied business and employment opportunities, *id.* at ¶¶ 12 and 19 and Exhs. N, O, and P, and that the level three designation has endangered him during the course of his present incarceration in Massachusetts. *Id.* at ¶ 30.

[2] The SORA represents a comprehensive statutory provision under which convicted sex offenders are required to register with law enforcement authorities so that information regarding registered offenders can be disseminated, including to local law enforcement authorities, particularly vulnerable potential victims and, under certain circumstances, the general public. *See Doe v. Pataki,* 481 F.3d 69 (2d Cir.2007). The various requirements imposed under the SORA are discussed in more detail further on in this report. *See* pp. 15–23, *post.*

**\*2** The record now before the court reflects that plaintiff's signing of the sex registration at Arthur Kill was not the culmination of the process contemplated under the SORA. Instead, following the plaintiff's execution of the sex offender registration form it was sent by prison officials at Arthur Kill to the DCJS. Complaint (Dkt. No. 1) § 6, ¶ 2. In accordance with the procedures outlined under the SORA, the DCJS Board of Examiners of Sex Offenders in turn

forwarded the registration, together with a recommendation regarding the level to assign to Fowlkes, to the Troy City Police Court, the court that sentenced him on the 1996 sex offense conviction on October 6, 2003. [3] *See* Defendants' Memorandum (Dkt. No. 45) Exh. A. The form was signed on May 28, 2004 by an acting Troy City Court judge who was not the sentencing judge but who at the time sat on the sentencing court; that court designated plaintiff a level three offender, but found no basis to also label him as a sexually violent offender, a predicate sex offender, or a sexual predator. *See* Defendants' Memorandum (Dkt. No. 45) Exh. A. Plaintiff was therefore listed by the DCJS as a level three sex offender, and information regarding him was distributed and made available pursuant to the governing provisions of the SORA. Complaint (Dkt. No. 1) § 6, ¶ 5.

[3] According to the Board of Examiners of Sex Offenders form, after completion by the sentencing court copies were to be forwarded to the DCJS and to Fowlkes. Defendants' Memorandum (Dkt. No. 45) Exh. A.

According to the plaintiff, he did not become aware of the designation until reading a news article, in which he was described as a level three sex offender, in January of 2005. Complaint (Dkt. No. 2) § 6, ¶ 6. Since learning of the designation plaintiff has written to DCJS officials, including the moving defendants, requesting that he be removed from the sex registry, without success. *Id.* at ¶¶ 6–11 and Exhs. D– G.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action in or about January of 2007 in the Southern District of New York. [4] The matter was subsequently transferred to the Eastern District of New York by order entered on March 5, 2007. Dkt. Nos 2, 3.

[4] It is difficult to ascertain from the court's records precisely when plaintiff's complaint, which is dated January 16, 2007, was first received by that court. Dkt. No. 2.

Plaintiff's complaint named many defendants falling into three groups, including 1) defendants Regina Rodriguez, Edward M. Adler, Dennis Breslin, and Commissioner Glenn S. Goord, all employees of the New York State Department of Correctional Services ("DOCS") (the "DOCS Defendants"); 2) Commissioner Chauncey G. Parker, Kenneth J. Connolly, Gerard Murphy, Lorraine Felegy, Kimberly Szady, and

Scott Steinhardt, all of whom are employees of the DCJS (collectively, the "DCJS defendants"); and 3) Sheriff Daniel Keating, Robert Loveridge, Harold Smith, Anthony Patricelli, Johnny Mae, and Officer Aldrich, all employees of Rensselaer County (collectively, the "County defendants"). Complaint (Dkt. No. 2) § 3. In his complaint plaintiff asserts various constitutional claims, alleging a denial of equal protection, unlawful retaliation for having exercised protected First Amendment rights, and conspiracy to interfere with his civil rights. [5] *See id.* at § 7.

[5]    Plaintiff's first cause of action is described in his complaint as follows:
   [t]o seek relief and damages to defend and protect [plaintiff's] rights against erroneous registration as a risk level '3' sex offender which has caused [him] to sustain injuries and deprivations from being targeted as a member of a suspect class of level '3' sex offenders. Complaint (Dkt. No. 2) § 7. Liberally construed, that cause of action appears to encompass a procedural due process claim associated with the level three determination.

**\*3** Following the transfer of the action to the Eastern District, three motions were filed on behalf of the various defendants in response to plaintiff's complaint. Dkt. Nos. 20, 41, 45. Defendants' motions sought dismissal of plaintiff's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on a variety of bases, and a transfer of the action to this court pursuant to 28 U.S.C. §§ 1391(b) and 1404(a). *Id.* In response to those motions, District Judge Nina Gershon issued an opinion and order on November 7, 2008 in which she 1) granted dismissal of plaintiff's claims against the DOCS defendants and two of the DCJS defendants, Kimberly Szady and Scott Steinhardt, on the basis of lack of personal involvement; 2) dismissed plaintiff's procedural due process and retaliation claims against the County defendants arising from the SORA registration; 3) dismissed plaintiff's conspiracy claim under 42 U.S.C. § 1985; and 4) transferred the action to this district. Dkt. No. 50. Judge Gershon's opinion left intact plaintiff's erroneous sex offender registration claims against remaining DCJS defendants Parker, Connolly, Murphy and Felegy, based solely upon the fact that those defendants did not seek dismissal of plaintiff's claims in the 12(b)(6) motion filed in the Eastern District, *see* Dkt. No. 50, *slip op.* at p. 19, n. 18, as well as plaintiff's claim of retaliation based upon the County defendants' alleged interference with Fowlkes' ability

to prosecute his claims in *Fowlkes v. Loveridge, et al.,* No. 97–CV–1503 (LEK/DEP), an action filed in this court in 1997. [6]

[6]    Following issuance of that order plaintiff filed a notice of appeal of Judge Gershon's order and the resulting partial judgment to the United States Court of Appeals for the Second Circuit. Dkt. No. 62. That appeal was dismissed on motion of the plaintiff seeking voluntary dismissal based upon the lack of entry of a final appealable order. Dkt. No. 77. In addition, plaintiff moved in this court for amendment of the resulting partial judgment, purporting to invoke Rules 52(b) and 59 of the Federal Rules of Civil Procedure, in essence requesting reconsideration of Judge Gershon's order. Dkt. No. 61. That motion was denied by decision and order of Senior District Lawrence E. Kahn dated February 3, 2009. Dkt. No. 76.

On June 18, 2009 the remaining DCJS defendants, including Chauncy G. Parker, Kenneth J. Connolly, Gerard Murphy, and Lorraine Felegy, filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, seeking dismissal of plaintiff's claims against them and a protective order barring discovery as against those defendants pending resolution of their motion. [7] In their motion the DCJS defendants argue that the reasoning supporting Judge Gershon's dismissal of plaintiff's claims against the DOCS defendants and defendants Szady and Steinhardt applies with equal force to Fowlkes' claims against them and warrants their dismissal from the action. *Id.* Those defendants also argue that plaintiff's due process claims lack merit based upon the adequacy of remedies provided under the SORA for challenging determinations associated with the required sex registration under the Act. *Id.* Plaintiff has since responded in opposition to the pending motion. Dkt. No. 88, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

[7]    In response to the request for a stay the court has since exercised its discretion by entering an order staying the obligation of the DCJS defendants to respond to plaintiff's discovery demands pending determination on their motion. Dkt. No. 86. A similar request by the County defendants for a stay

of discovery, however, was denied. *See* Dkt. No. 87.

### III. *DISCUSSION*

#### A. *Standard of Review*

Defendants' motion is brought pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, which governs the entry of judgment on the pleadings.[8] When analyzing a Rule 12(c) motion, the court must apply the same standard as that applicable to a motion under Rule 12(b)(6). *See, e.g., Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.), *cert. denied,* 513 U.S. 816, 115 S.Ct. 73 (1994); *Wynn v. Uhler,* 941 F.Supp. 28, 29 (N.D.N.Y.1996) (Pooler, J.).

[8]    Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Rule 12(d) further mandates that:

> [i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed.R.Civ.P. 12(d).

**\*4** A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949 (2009) (citing *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1964–65). In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964); *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). In the wake of *Twombly* and *Iqbal,* however, it is clear that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal,* 129 S.Ct. at 1949.

The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion "is not whether [the] plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted). Accordingly, a complaint should be dismissed on a Rule 12(b)(6) motion only where the plaintiff has failed to provide some factual basis for the allegations that support the elements of his or her claim. *See Twombly,* 550 U.S. at 563, 570,127 S.Ct. at 1974; *see also Patane v. Clark,* 508 F.3d 106, 111–12 (2d Cir.2007) ("In order to withstand a motion to dismiss, a complaint must plead 'enough facts to state a claim for relief that is plausible on its face.' ") (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200 (2007) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976)) (" '[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' ") (internal quotations omitted); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.).

**\*5** In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) ("The court should freely give leave [to amend] when justice so requies.").

#### B. *Merits of Defendants' Motion*

In their motion defendants maintain that the reasoning that prompted Judge Gershon to dismiss plaintiff's due process and retaliation claims arising from the SORA registration and

2010 WL 5490739

level three designation as against the two DCJS defendants on whose behalf the earlier dismissal motion was brought, as well as the County defendants, equally applies to plaintiff's claims against the remaining DCJS defendants. The DCJS defendants therefore argue that Judge Gershon's decision represents the law of the case with respect to those issues and should be followed by this court in dismissing plaintiff's remaining claims against them.

Generally speaking, law of the case principles dictate that when a court rules upon an issue, that decision should continue to govern the same issues during subsequent stages of that case. *Pescatore v. Pan American World Airways, Inc.,* 97 F.3d 1, 7–8 (2d Cir.1996). Although the doctrine is admittedly discretionary and a court is always free to modify its own pretrial rulings at any time before it enters a final judgment, based upon jurisprudential principles underlying the law of the case doctrine—including the desire that litigants be able to rely on judicial rulings and adjust their conduct accordingly—courts are generally reluctant to reexamine issues previously decided in a case absent compelling circumstances, such as an intervening change of controlling law, the introduction of new evidence, or the need to correct a clear error or prevent manifest injustice. *Doe v. New York City Dep't of Soc. Servs.,* 709 F.2d 782, 789 (2d Cir.) (citations omitted), *cert. denied sub nom., Catholic Home Bureau v. Doe,* 464 U.S. 864, 104 S.Ct. 195 (1983).

Judge Gershon's dismissal of plaintiff's SORA and retaliation claims was based upon lack of personal involvement, the applicable three-year statute of limitations, and the fact that under the SORA sex registrants like the plaintiff are afforded ample due process when it comes to challenging the requirement of registration and the designated level to be applied.

### 1. *Due Process*

Plaintiff's claim against the remaining DCJS defendants related to his registration as a sex offender arises principally under the due process clause of the Fourteenth Amendment. In order to prevail on such a due process claim, asserted under 42 U.S.C. § 1983, a plaintiff must prove that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). Plaintiff's due process claim is comprised of two elements. First, Fowlkes contends that he should not have

been required to register as a sex offender at all. Plaintiff further argues that in any event he should have been assigned a risk level of one, rather than the resulting designation as a level three sex offender.

**\*6** The SORA, which is codified in New York Correction Law §§ 168–a to 168–w, took effect in 1996, though it has since been amended several times. The Act requires individuals who have been convicted of certain designated sex crimes to register with the DCJS. Information regarding registered offenders is then disseminated to law enforcement authorities and others, depending upon the offender level assigned to the individual. The purpose for enacting the SORA was described as follows by the United States Court of Appeals for the Second Circuit:

> The SORA aims both to protect members of the public, especially vulnerable populations, from sex offenders by notifying them of the presence of sex offenders in their communities and to enhance law enforcement authorities ability to investigate and prosecute sex offenses.

*Doe v. Pataki,* 481 F.3d 69, 70 (2d Cir.2007) (citing 1995 N.Y. Laws 2870, § 1).

Under the SORA, a sex offender scheduled to be released from a correctional facility must be informed of his or her duty to register under the Act and required to read and complete a registration form and provide the requested information. N.Y. Corr. Law § 168–e(1). Three copies of the registered form are then generated; one is retained by the facility, another is provided to the inmate, and the third is forwarded to the DCJS. [9] *Id.* The SORA further provides that the Board of Examiners of Sex Offenders must next make a recommendation to the sentencing court concerning the appropriate designation for an offender being registered, and sets out the criteria to be applied in determining which of the three levels to assign. N.Y. Corr. Law § 168–l. The procedures to be followed by the sentencing court in making a judicial determination regarding sex offense level are also detailed in the SORA. N.Y. Corr. Law § 168–n. [10] Under the Act, a registered offender has a right of appeal from the sentencing

2010 WL 5490739

court's determination pursuant to New York Civil Practice Law and Rules, Articles 55, 56, and 57. *Id.* at § 168–n (3).

9      The duty to register is reaffirmed further on in the SORA. N.Y. Corr. Law §§ 168–f, 168–n.

10     Plaintiff does not allege that the procedures outlined in section 168–n were not followed in this case, other than to argue, without legal support either in the statute or otherwise, that only the sentencing judicial officer may make the required designation.

An offender who is registered under the SORA is assigned a risk level of one, two, or three, depending upon the perceived risk of recidivism. N.Y. Corr. Law § 168–l; *see also Doe,* 481 F.3d at 71. Level three offenders, deemed to be the most likely to commit new offenses, are subject to a lifetime registration requirement and dissemination of their relevant information to a wide range of law enforcement and publicly accessible sources. [11] N.Y. Corr. Law § 168–l (6)(b), 168–h (2); *see Doe,* 481 F.3d at 71. Under the SORA, the New York State Board of Sex Offenders first makes a recommendation regarding the risk level utilizing "risk assessment guidelines, developed with the assistance of a group of experts with experience of dealing with sex offenders ...". *Doe v. Pataki,* 3 F.Supp.2d 456, 461–62 (S.D.N.Y.1998). Those factors "include whether the offender has a mental abnormality or personality disorder, whether the offender's conduct was characterized by repetitive and repulsive behavior, the age of the offender and of the victim, the use of weapons, and the number of prior offenses." *Woe v. Spitzer,* 571 F.Supp.2d 382, 385 (E.D.N.Y.2008) (citing N.Y. Corr. Law § 168–l (5)). The ultimate designation is made by the sentencing court based upon the Board's recommendation. N.Y. Corr. Law § 168–n; *see Kominski v. Rapsatt,* No. 07–CV–01119, 2009 WL 1707124, at *9 (N.D.N.Y. June 17, 2009) (McAvoy, S. J.). [12]

11     Since 2002 the SORA has also permitted additional designations of individuals as a "sexual predator", a "sexually violent offender", or a "predicate sex offender." *Doe,* 481 F.3d at 71. The designation form completed the Troy City Court did not place the plaintiff in any of these categories.

12     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

**\*7** As was noted above, plaintiff's due process claim challenges both the requirement that he register as a sex offender and the designated level three determination. As Judge Gershon found in her earlier decision in this action, plaintiff's complaint reveals that he signed a sex offender registration form on May 5, 2003 relating to his 1996 sexual abuse conviction. Since that registration occurred more than three years prior to commencement of this action, any claim that he was wrongfully registered as a sex offender is precluded by the applicable three-year statute of limitations. [13] *See Wynder v. McMahon,* 360 F.3d 73, 76 (2d Cir.2004).

13     Consistent with the Supreme Court's pronouncement that in actions brought under 42 U.S.C. § 1983 the applicable limitations period is derived from the general or residual statute of limitations for personal injury actions under the laws of the forum state, *see Owens v. Okure,* 488 U.S. 235, 249–50, 109 S.Ct. 573, 582 (1989), plaintiff's federal claim in this action is governed by the three-year statute of limitations which applies in New York to personal injury claims of an otherwise unspecified nature. *See* N .Y. C.P.L.R. § 214(5); *see also Ormiston v. Nelson,* 117 F.3d 69, 71 (2d Cir.1997) (quoting *Owens*); *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1156 (2d Cir.1995); *Lugo v. Senkowski,* 114 F.Supp .2d 111, 113 (N.D.N.Y.2000) (Kahn, J.) (citing *Pinaud* and *Owens).* For purposes of gauging the timeliness of his claims, I have deemed plaintiff's complaint in this action to have been filed on January 16, 2007. Plaintiff's claims are thus untimely because they accrued before January 16, 2004.

Even if plaintiff's sex offender registration claim were timely, it would nonetheless fail on the merits. The offense for which plaintiff was convicted is specifically defined under the SORA as a sex offense for which registration is required. N.Y. Corr. Law § 168–a (2). Any potential claim that the requirement of registration was not accompanied by due process would lack merit since the requirements of due process were presumably satisfied in connection with plaintiff's underlying conviction. *See* Woe, 571 F.Supp.2d at 389. As was noted by the Ninth Circuit Court of Appeals in *Neal v. Shimoda,* a case cited by the plaintiff in his opposition papers, "[a]n inmate who has been convicted in a sex crime in a prior adversarial setting, whether as a result of a bench trial, jury trial, or plea agreement, has received the minimum

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 120 of 236
Fowlkes v. Parker, Not Reported in F.Supp.2d (2010)
2010 WL 5490739

protections required by due process." 131 F.3d 818, 831 (9th Cir.1997); *see also Connecticut Dep't of Public Safety v. Doe,* 538 U.S. 1, 123 S.Ct. 1160 (2003) (where Connecticut Sex Registration Law requires registration of all individuals solely based upon their conviction, without a showing of dangerousness, due process clause does not require a further hearing to establish facts not relevant to the state's statutory scheme); *see also United States v. Senogles,* 570 F.Supp.2d 1134, 1155 (D.Minn.2008) ("SORNA defines a 'sex offender' as 'an individual who was convicted of a sex offense,' and an offender is placed in one of three tiers, based upon the nature of his past conduct, and not on an assessment of his current level of dangerousness or his risk of recidivism. As a consequence, a[h]earing on those issues would not be material to the SORNA registration requirements, and we find that the Defendant has failed to state a procedural Due Process claim.") (citations omitted). In short, I concur with Judge Gershon's determination that plaintiff's due process challenge to the requirement that he register as a sex offender, even if timely raised, lacks merit, and recommend this court accord deference to that determination.

The second prong of plaintiff's SORA claim challenges the determination that he should be regarded as a level three sex offender. At the outset I note that it is not altogether clear that the decision of what level to assign to a registered sex offender implicates a cognizable liberty interest for purposes of the Fourteenth Amendment. *See Henderson v. Heffler,* No. 07–CV–04870, 2010 WL 2854456, at *5 (W.D.N.Y. Jul. 19, 2010). Indeed, there is not unanimity on the question of whether the requirement to register as a sex offender in and of itself implicates such a liberty interest. *See Roe v. Goldman,* No. 02 CV 5370, 2009 WL 4891810 (E.D.N.Y. Dec. 9, 2010) (noting that the Second Circuit has not addressed the issue and the district courts are split); *but see Vega v. Lantz,* 596 F.3d 77, 81–82 (2d Cir.2010) ("[I]t continues to the be the case that wrongly classifying an inmate as a sex offender may have a stigmatizing affect which implicates a constitutional liberty interest") (citations omitted) and *Blake v. Fischer,* No. 09–CV–266, 2010 WL 2522198, at * 10 (N . D.N.Y. Mar. 5, 2010) (Homer, M.J.) ("courts within the Second Circuit appear to be reaching a consensus that recommendations for sex offender classification and programming do not trigger due process rights") (citing *Vega,* 2008 WL 3992651, at *15–17; *Fitfield v. Eaton,* No. 07–CV–6521 L, 2009 WL 3429791, at *2–3 (W .D.N.Y. Oct. 20, 2009) (granting motion to dismiss inmate's claim that he was denied parole opportunities due to his refusal to participate in SOP because inmate had no liberty interest in parole, conditional release, discretionary good time credits, or choosing his programming); *Tinsley v. Goord,* No. 05 Civ. 3921(NRB), 2006 WL 2707324, at *5 (S.D.N.Y. Sept. 20, 2006) (finding no constitutionally protected right, either federally or state-created, which allows "prisoners [to] ... avoid classification as sex offenders or participat[e] in related treatment programs.")), report and recommendation adopted, 2010 WL 2521978 (N.D.N.Y. Jun 15, 2010) (Hurd, J.). For purposes of the instant motion I will assume that plaintiff possesses a cognizable liberty interest in the proper sex offender designation to be made.

***8** Plaintiff's due process claim nonetheless lacks merit. When a person's liberty interests are implicated, due process requires at a minimum notice and an opportunity to be heard. *Hamdi v. Rumsfeld,* 542 U.S. 507, 533, 124 S.Ct. 2633, 2648–49 (2004) (plurality opinion) (The "central meaning of procedural due process" is that parties "whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner.") (citations and internal quotation marks omitted); *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191 (1965); *see also United States v. James Daniel Good Real Property,* 510 U.S. 43, 53, 114 S.Ct. 492, 500–501 (1993); *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510 (1971). The SORA provides an elaborate procedural scheme for making and challenging sex offender level designations. Once the Board of Examiners of Sex Offenders makes a recommendation regarding the appropriate level to be assigned the matter is remitted to the sentencing court to make the actual determination. N.Y. Corr. Law § 168–n(2). Prior to that determination the offender is provided notification of the recommendation and an opportunity to be heard, with counsel to be assigned in appropriate circumstances. N.Y. Corr. Law § 168–n(3). Once the designation is made by the sentencing court, the offender can then appeal the determination. *Id.; see Simms v. Sperrazza,* 28 A.D.3d 944, 800 N.Y.S.2d 486 (4th Dep't.2005). The SORA procedures thus provided plaintiff with a meaningful opportunity to be heard regarding his classification both prior to and after that determination was made, and plaintiff makes no claim that he was denied the use of these procedures. It seems clear that the availability of these procedural safeguards satisfies the Fourteenth Amendment's procedural due process requirements and demonstrates that plaintiff's due process claim lacks merit. [14] *Cf. Kansas v. Hendricks,* 521 U.S. 346, 360, 117 S.Ct. 2072, 2081 (1997) (noting procedures in civil commitment statute relating to sex

2010 WL 5490739

offenders sufficient for due process purposes); *United States v. Waters,* 23 F.3d 29, 32 (2d Cir.1994) (noting that New York Mental Hygiene Law § 9.07(a) provides an involuntarily admitted patient with "a rather elaborate procedural scheme for notice, hearing, review, and judicial approval of continued retention in a mental health facility", which have withstood challenges that it was facially unconstitutional.) (citing *Project Release v. Prevost,* 722 F.2d 960, 971–81 (2d Cir.1983)), *cert. denied,* 513 U.S. 867, 115 S.Ct. 185 (1994); *McQuilkin v. Central New York Psychiatric Ctr,* No. 9:08–CV–00975, 2010 WL 3765847, at * 20 (N .D.N.Y. Aug. 27, 2010) (Peebles, M.J.) (finding that since defendants followed the procedures outlined in N.Y. Correction Law 402 the prison inmate plaintiff was afforded adequate due process prior to his involuntary commitment of to a mental health facility), report and recommendation adopted, 2010 WL 3765715 (N.D.N.Y. Sep 20, 2010) (McAvoy, S.J.).

14      Even if plaintiff was denied or did not avail himself of the procedural safeguards associated with the initial termination of his risk level, he is nonetheless not without recourse. The SORA provides a mechanism by which a defendant may challenge his or her level designation at any time, though not more than once per year, and may pursue that issue into the appellate courts. *See* N.Y. Corr. Law § 168–o.

### 2. *Personal Involvement*

**\*9**  There is a second, independent ground upon which dismissal of plaintiff's claims against the remaining DCJS defendants is warranted, as Judge Gershon concluded. As the foregoing demonstrates, the determination of the appropriate level to be assigned to the plaintiff was the responsibility of the sentencing court, in this case the Troy City Court. While the DCJS, through its Board of Examiners of Sex Offenders, plainly had input into that decision, the final determination rested elsewhere. It is well-established that in order to be held accountable for a civil rights violation under section 1983 an individual must have had personal involvement in the deprivation alleged. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). Since the moving DCJS defendants did not make the final determination regarding plaintiff's sex offender level designation, they are entitled to dismissal of plaintiff's claims against them on the additional basis that they lacked the requisite involvement in the conduct alleged to have violated plaintiff's constitutional rights.

### III. *SUMMARY AND CONCLUSION*

Plaintiff's procedural due process claim, which is addressed to his registration as a level three sex offender, implicates two separate determinations, one requiring his registration, and the second assigning an appropriate offender level. With regard to the first, that requirement was automatic upon plaintiff's criminal conviction for an offense designated under the SORA as a sex offense, thereby precluding any viable procedural due process claim with regard to that aspect of the registration requirement. Moreover, as Judge Gershon found in her earlier decision, any claim associated with the registration itself in this action would be untimely since plaintiff was plainly on notice more than three years prior to commencement of suit that he was being required to register.

Turning to the issue of the level designation, it is clear that it was made pursuant to a comprehensive scheme providing adequate procedural safeguards, including the right to a hearing, the provision of assigned counsel under appropriate circumstances, and an appeal mechanism, thus satisfying any potential due process concerns even assuming the existence of a constitutional cognizable liberty interest in what level designation is to be assigned. The moving DCJS defendants are therefore entitled to dismissal of plaintiff's due process claims against them on this basis as well as the separate, independent ground that they were not personally involved in the determination which, under the SORA, was relegated to the responsibility of the sentencing court.

Based upon the foregoing it is therefore hereby respectfully

RECOMMENDED, that the motion of defendants Parker, Connolly, Murphy and Felegy for judgment on the pleadings dismissing all claims against them in this action (Dkt. No. 81) be GRANTED, and that all claims against those defendants set forth in plaintiff's complaint be DISMISSED.

**\*10**  NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

2010 WL 5490739

It is further ORDERED that the clerk of the court serve a copy of this report, recommendation and order upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 5490739

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Overruling Risk - Negative Treatment

Overruling Risk   National R.R. Passenger Corp. v. Morgan,   U.S.,   June 10, 2002

2000 WL 193625
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Marguerite KEDDY, Plaintiff,

v.

SMITH BARNEY, INC., Defendant.

No. 96 Civ. 2177 DABSEG.
|
Feb. 16, 2000.

OPINION

GRUBIN, Magistrate J.

**\*1** This is an action under the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq. ("the ADEA"). Plaintiff was hired as a temporary secretary by defendant Smith Barney in 1989. She was employed in Smith Barney's "In-House Temporary Employment Program," being assigned on a temporary basis to various persons in various departments as need arose. Plaintiff filed this action pro se, but thereafter obtained counsel and was permitted to amend her complaint. In her first amended complaint, plaintiff alleged three instances of discrimination: in 1989 plaintiff applied for but did not receive a permanent position as secretary to Treasurer Henry Mayer; in 1992 she applied for but did not receive a permanent position as secretary to Public Relations "Spokesman" Robert Connor; and in 1995 she applied for but did not receive a permanent position as a Senior Communications Analyst. In all three instances the position was given to a younger woman.

Defendants moved to dismiss the claims based on the 1989 and 1992 incidents as time-barred because plaintiff had not filed a complaint with the Equal Employment Opportunity Commission ("the EEOC") within 300 days of their occurrence, as required by the ADEA, 29 U.S.C. § 626(d)(2). Plaintiff acknowledged that she had not met the 300-day deadline but argued that her claims could be considered under the "continuing violation" doctrine. As the Second Circuit has recently explained,

The continuing-violation theory extends the statute of limitations where there is "proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue for so long as to amount to a discriminatory policy or practice."

Cruz v. Coach Stores, Inc., 2000 WL 122117, at \*6 n. 4, 2000 U.S.App. LEXIS 889, at \*17 n. 4 (2d Cir. Jan. 20, 2000), quoting Quinn v. Green Tree Credit Corp., 159 F.3d 759, 766 (2d Cir.1998). In Keddy v. Smith Barney, 1998 WL 108009, 1998 U.S. Dist. LEXIS 2833 (S.D.N.Y. March 12, 1998) ("Keddy I"), I held that the allegations in plaintiff's amended complaint did not establish a continuing violation, but granted her leave to replead, advising that "facts must be included that would tend to indicate there is a basis for the claim."

Plaintiff responded by submitting a second amended complaint purporting to add six additional instances of alleged discrimination against her on account of her age for a total of nine separate claims. Defendant again moved to dismiss all except the 1995 claim as time-barred. In Keddy v. Smith Barney, 1999 WL 102812, 1999 U.S. Dist. LEXIS 1937 (S.D.N.Y February 26, 1999) ("Keddy II"), I allowed plaintiff to proceed with the three original claims:

[W]hile it is a close issue, I believe that plaintiff has stated enough to be allowed to proceed with the case at this point. The complaint does state facts that could be seen, together with the litany of incidents, as part of a company policy to hire and promote persons younger than plaintiff if adequate proof were presented.

**\*2** While it is true that "multiple failures to promote are usually viewed as discrete incidents of discrimination that do not constitute a continuing violation," some discovery should be allowed which would flesh out whether plaintiff can establish facts to present a genuine issue for trial. If, upon a motion for summary judgment, we find that plaintiff cannot do so, her claims would fail then.

1999 WL 102812, at \*2, 1999 U.S. Dist. LEXIS 1937, at \*6–\*8 (citations omitted). However, I found that "[t]he additional six alleged discriminatory acts, while possibly evidence of a pattern or policy of discrimination, cannot be added as bases for relief...." 1999 WL 102812, at \*3, 1999 U.S. Dist. LEXIS 1937, at \*8. Discovery has now been completed,

2000 WL 193625

and defendant has moved for summary judgment on all three claims.

The standards for summary judgment are well established. Under Fed.R.Civ.P. 56(c) a motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." On a motion for summary judgment the court must "resolve all ambiguities and draw all reasonable factual inferences in favor of the party opposing the motion," *Bicker-staff v. Vassar College,* 196 F.3d 435, 448 (2d Cir.1999); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59 (1970); *O'Gorman v. Holland,* No. 97 Civ. 842(WHP), 2000 WL 134514, at *3, 2000 U.S. Dist. LEXIS 1009, at *7 (S.D.N.Y. Feb. 3, 2000).

The moving party must initially satisfy a burden of demonstrating the absence of a genuine issue of material fact, which can be done merely by pointing out that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25 (1986). The nonmoving party then must meet a burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), by "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. at 322. The court is to inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986), and to grant summary judgment where the nonmovant's evidence is irrelevant or merely colorable, conclusory, speculative or not significantly probative. *Id.,* at 249–50; *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.), *cert. denied,* 524 U.S. 911 (1998); *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), *quoting First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968).

**\*3** The continuing violation doctrine only extends "the commencement of the statute of limitations period 'until the last discriminatory act in furtherance of it,' " *Harris v. City of New York,* 186 F.3d 243, 248 (2d Cir.1999), *quoting Gomes v. Avco Corp.,* 964 F.2d 1330, 1333 (2d Cir.1992).

On February 3, 2000, oral argument was had on the question of what evidence existed concerning plaintiff's 1995 claim. Although plaintiff claims a younger woman was promoted to Senior Communications Analyst, defendant contends that that woman was never given that job and that the position did not even exist. If the defendant were able to properly support its contention, summary judgment would have been warranted on that one concededly timely claim, and judgment dismissing the two earlier claims as time-barred would have been mandated. However, after argument I found that the issue of fact remained as to whether the woman had been given that position and denied summary judgment on that claim from the bench, reserving judgment on the other two claims. I now grant defendant's motion for summary judgment on those other two claims.

Ordinarily a claim for employment discrimination accrues when the "plaintiff knows or has reason to know of the injury which is the basis of his action." *Cornwell v. Robinson,* 23 F.3d 694, 703 (2d Cir.1994), *quoting Singleton v. New York,* 632 F.2d 185, 191 (2d Cir.1980), *cert. denied,* 450 U.S. 920 (1981). The continuing violation exception to the statute of limitations is "designed to 'accommodate plaintiffs who can show that there has been a pattern or policy of discrimination continuing from outside the limitations period into the statutory limitations period, so that all discriminatory acts committed as part of this pattern or policy can be considered ... timely.' " *Hardin v. S.C. Johnson & Son, Inc.,* 167 F.3d 340, 344 (7th Cir.), *cert. denied,* 120 S.Ct. 178 (1999), *quoting* Ramona L. Peatzold and Anne M. O'Leary–Kelly, *Continuing Violations and Hostile Environment Sexual Harassment: When Is Enough, Enough?,* 31 Am. Bus. L.J. 365 (1993). The chief purpose of the doctrine is to protect the rights of plaintiffs where "the earlier discrimination may only be recognized as actionable in the light of 'events that occurred later.' " *Hardin v. S.C. Johnson & Son, Inc.,* 167 F.3d at 344, *quoting Galloway v. General Motors Service Parts Operations,* 78 F.3d 1164, 1167 (7th Cir.1996). As Judge Kaplan has explained:

Discriminatory or allegedly discriminatory behavior in the employment context takes many forms. Some acts, if taken in isolation, may be ambiguous. The apparent existence of a discriminatory motive or effect may be perceptible only with repetition or over time.

Even unambiguously biased behavior in the workplace is not all alike. Some consists of acts directed at the employee by co-workers, but which reflect no more than the individual prejudices of the actors. Some

2000 WL 193625

involves the product of explicit, employer-promulgated policies, practices or mechanisms. There are a myriad of intermediate situations, which may include employer tolerance of employee bias, covert employer-sponsored discrimination and other variations. Nor are these categories neat and mutually exclusive. Rather, they are points along a continuum ranging from no employer involvement through employer awareness to employer tolerance and ultimately employer sponsorship.

**\*4** The situation of the individual employee, particularly with reference to the prospect of litigation, can vary tremendously depending upon circumstances such as these. The employee at first may not be certain that he or she is confronting discrimination at all. Even where the prejudice is manifest, it may be unclear whether the employer fairly can be taxed with responsibility. And even where the employer is responsible, an employee who seeks to hold on to his or her job may face a difficult choice in deciding whether or not to sue.

*Johnson v. Nyack Hosp.,* 891 F.Supp. 155, 163–64 (S.D.N.Y.1995), *aff'd,* 86 F.3d 8 (2d Cir.1996). Because a continuing violation arises only where there is an ongoing policy or practice, the defendant is not prejudiced by the lack of timeliness. "Where the challenged violation is a continuing one, the staleness concern disappears." *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 380 (1982). "The continuing violation theory is available only if circumstances are such that a reasonable person in the plaintiff's position would not have sued earlier." *Jenkins v. Arcade Bldg. Maintenance,* 44 F.Supp.2d 524, 531 (S.D.N.Y.1999); *see Morris v. Amalgamated Lithographers of America, Local One,* 994 F.Supp. 161, 164 (S.D.N.Y.1998).

In this Circuit the continuing violation exception is not favored and is invoked only under compelling circumstances. *See Curtis v. Airborne Freight Corp.,* No. 98 Civ. 4062(SAS), 2000 WL 20701, at \*10, 2000 U.S. Dist. LEXIS 143, at \*33 (S.D.N.Y. Jan. 11, 2000); *Rucci v. Thoubboron,* 68 F.Supp.2d 311, 320 (S.D.N.Y.1999); *Pellei v. International Planned Parenthood Federation/Western Hemisphere Region, Inc.,* No. 96 Civ. 7014(WHP), 1999 WL 787753, at \*7, 1999 U.S. Dist. LEXIS 15338, at \*21 (S.D.N.Y. Sept. 30, 1999); *Rose v. Port Authority of New York and New Jersey,* 13 F.Supp.2d 516, 520 (S.D.N.Y.1998); *Brilal v. Medical Associates of Woodhull, P.C.,* No. 98 Civ. 2972(AGS), 1998 WL 386435, at \*2, 1998 U.S. Dist LEXIS 10199, at \*5 (S.D.N.Y. July 9, 1998). Thus, "[t]he continuing violation doctrine

does not generally apply in discriminatory hiring cases." *Mareno v. Madison Square Garden,* No. 98 Civ. 2719(WHP), 1999 WL 777952, at \*5, 1999 U.S. Dist. LEXIS 15265, at \*14 (S.D.N.Y. Sept. 29, 1999); *see Equal Employment Opportunity Commission v. Cushman & Wakefield, Inc.,* 643 F.Supp. 209, 214 (S.D.N.Y.1986); *Leiman v. Fashion Institute of Technology,* 441 F.Supp. 854, 857 (S.D.N.Y.1977), *aff'd,* 591 F.2d 1330 (2d Cir.1978). Similarly, "multiple failures to promote are usually viewed as discrete incidents of discrimination that do not constitute a continuing violation." *Lloyd v. WABC–TV,* 879 F.Supp. 394, 400 (S.D.N.Y. 1995); *see Nasr v. Daiwa Bank,* 96 Civ. 9244(SHS), 1998 WL 142133, at \*3, 1998 U.S. Dist. LEXIS 3899, at \*7 (S.D.N.Y. March 25, 1998); *Nicholas v. Nynex, Inc.,* 974 F.Supp. 261, 268 (S.D.N.Y.1997); *Samuel v. Merrill Lynch Pierce Fenner & Smith,* 771 F.Supp. 47, 49 (S.D.N.Y.1991). [1] This is because in contrast to a claim of harassment or hostile environment, each discriminatory failure to hire or promote is a completed act for which a plaintiff can sue at the time. For such hiring or promotion decisions by the employer to amount to a continuing violation there must be either an ongoing policy of discrimination, such as a discriminatory seniority list or employment test, or "a 'dogged' pattern of disparate treatment that persisted unremedied, despite [plaintiff's] complaints, over a number of years." *Wang v. New York City Dep't of Finance,* No. 96–CV–5170(JG), 1999 WL 529559, at \*10, 1999 U.S. Dist. LEXIS 11256, at \*35 (E.D.N.Y. July 21, 1999). *See Rose v. Port Authority of New York and New Jersey,* 13 F.Supp.2d at 520; *Cable v. New York State Thruway Authority,* 4 F.Supp.2d 120, 125 (N.D.N.Y.1998); *Valenti v. Carten Controls Inc.,* No. Civ. 3:94CV1769 AHN, 1997 WL 766854, at \*5, 1997 U.S. Dist LEXIS 19722, at \*16 (D.Conn. December 4, 1997).

[1]  In September 1994 Olsten Staffing Services was given responsibility for staffing temporary positions with defendant, and although plaintiff's working conditions remained unchanged, she formally, according to defendant, was an employee of Olsten. It is unclear whether plaintiff's unsuccessful efforts to move from her temporary position to a permanent slot should be categorized as refusals to promote or refusals to hire. However, the analysis herein is the same in either case.

**\*5** As I noted in *Keddy I* and *Keddy II,* the employment decisions at issue appear to have been made by different individuals each time, and now, after full opportunity for

discovery, plaintiff still has not shown any connection among them. Nothing on their face ties them together as a continuing policy or practice. Plaintiff's assertion that "[a]ll final authority to hire the younger women came from the same decision makers in defendant's Personnel Department," Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 18, lacks record support and is contradicted by plaintiff's own testimony. Plaintiff ascribed the decision to hire or promote in each of the three instances to the particular executive who supervised that position. With respect to the 1989 claim plaintiff testified:

Q. Did you apply for the position?

A. Well, I told Frank O'Leary, yes, I was interested and I told Hank Mayer that I'm interested in a position on a permanent basis. So I believe that's applying when both people, especially the one who has the hiring authority, knew I wanted the position.

Q. Did Mr. Mayer or Mr. O'Leary tell you you were not selected because of your age?

A. No.

Q. Did they make any age-related remarks to you?

A. No, they just hired a younger person.

Declaration of Scott Michael Mishkin, dated July 8, 1999, Exhibit A, Deposition of Marguerite Keddy, July 15, 1998 ("Keddy Dep."), at 43, 45. Similarly, with respect to the 1992 claim, she testified:

Q. Are you contending that Mr. Connor discriminated against you because [sic] your age?

A. Definitely.

Q. How?

A. I worked for him maybe two days and he says, "Marge, would you please commit to me on staying on until my secretary comes back from maternity leave?" He said, "I had other temps," and he told me two in particular, he said they were awful. He said, "I had to have personnel get me new temps." He said, "You know what you are doing, you're very good, you're very efficient, would you please commit to staying on?" And I did.

And his secretary never returned from maternity leave, she didn't come back to work. He hired somebody younger than me.

Keddy Dep. at 76. Finally, with respect to the 1995 position she testified:

Q. And how were you discriminated against in June of '95?

A. That was well—well, what happened, a very young, very attractive woman got a position as what's called a client manager, a senior communications analyst. Her name was Sabrina Braisin. She was hired in November of '95 as a clerical.

A. Right. She was hired permanent. She was a temp November '95, she was hired permanent in '96. March '96. [2]

[2]   It is clear, as plaintiff's counsel has acknowledged, that plaintiff misspoke on these dates. "November '95" and "March '96" should read "November '94" and "March '95," as confirmed by the complaint herein, the EEOC complaint and plaintiff's Declaration.

Two months later, her superior, Ben Fortunato, promoted her to senior communications analyst with the job title client manager in the corporate area.

Keddy Dep. at 94–95. To be sure, plaintiff's testimony is not dispositive; it is possible she was not entirely familiar with the intricacies of defendant's personnel practices. However, even after full discovery plaintiff has presented no evidence that hiring decisions were coordinated. The only reasonable inference is that we are dealing with discrete employment decisions, which do not give rise to a continuing violation. "[M]ultiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir.1993), *cert. denied,* 511 U.S. 1052 (1994).

**\*6**  As discussed above, plaintiff can overcome this inference and show a continuing violation by proving either that defendant had a specific discriminatory policy or that defendant knew of continuing discriminatory practices and permitted them to continue. Plaintiff proffers two pieces of evidence to demonstrate that there is at least a factual dispute over whether defendant had a policy of discriminating based

on age. The first relates to her 1992 claim, the secretarial position with Mr. Connor. Plaintiff states:

> I complained to Dorothy Szczesny, one of the original secretary's [sic] for the founder of Smith Barney. Ms. Szczesny asked Mr. Connor why plaintiff was not hired for the permanent position as his secretary. Mr. Connor told Szczesny that older people cost the company money.

Declaration of Marguerite Keddy, dated July 8, 1999 ("Keddy Dec."), ¶ 9. *See also* Keddy Dep. at 74–77.

Fed.R.Civ.P. 56(e) requires that affidavits in support of or in opposition to a motion for summary judgment "set forth such facts as would be admissible in evidence." The evidence presented here is double hearsay. Plaintiff asserts that Mr. Connor, identified only as Public Relations "Spokesman," Second Amended Complaint ¶ 25, reported directly to defendant's CEO. Keddy Dep. at 74. But even assuming we could draw an inference that Mr. Connor's statement might have been made within the scope of his employment or meet any of the other requirements of Fed.R.Evid. 801(d)(2) so as to render it not hearsay, Ms. Keddy's account is of what Ms. Szczesny said Mr. Connor said and is plainly inadmissible hearsay. Plaintiff does not submit an affidavit or deposition of Ms. Szczesny. "[I]t is well-settled that a party 'cannot rely on inadmissible hearsay in opposing a motion for summary judgment.' " *AD/SAT v. Associated Press,* 181 F.3d 216, 236 (2d Cir.1999), *quoting Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 924 (2d Cir.1985); *see Hollander v. American Cyanamid Co.,* 172 F.3d 192, 198 (2d Cir.), *cert. denied,* 120 S.Ct. 399 (1999); *McNamara v. Guazzoni,* No. 98 Civ. 4085(HB), 1999 WL 322648, at *3, 1999 U.S. Dist. LEXIS 7373, at *8– *9 (S.D.N.Y. May 20, 1999); *Ali v. Mount Sinai Hosp.,* No 92 Civ. 6129(JGK) (NG), 1996 WL 325585, at *9, 1996 U .S. Dist. LEXIS 8079, at *26– *27 (S.D.N.Y. June 12, 1996); *Reyes v. Koehler,* 815 F.Supp. 109, 113 (S.D.N.Y.1993). Plaintiff's other piece of evidence of a discriminatory policy is the following:

> In 1994, I worked on a project and reported to Bill Cusano. In 1995

> I complained to Mr. Cusano that I believed I was being discriminated against because of my age. He replied, "It's here." And that you couldn't put your finger on it but the company is definitely discriminating against age.

Keddy Dec. ¶ 12; *see also* Keddy Dep. at 123. Again, plaintiff submits no direct testimony from Mr. Cusano. Nor does plaintiff put forward evidence to explain who Mr. Cusano was, what his responsibilities were, or whether his remark was within the scope of his employment. Indeed, it is unclear from plaintiff's account whether Mr. Cusano's alleged remarks were meant to describe some overall policy of defendant or to offer his own hypothesis to explain the rebuff plaintiff had allegedly suffered at the time, which would appear to have been in connection with the alleged 1995 Senior Communications Analyst position. *Id.* In any event, plaintiff, as proponent of the hearsay, has failed to show that the statement is admissible even if it would be enough to defeat summary judgment. Thus, plaintiff has not raised a disputed issue of fact over whether defendant had a specific ongoing policy of discrimination based on age at the times in question.

**\*7** Plaintiff also argues the existence of an implicit discriminatory policy by asserting that defendant ignored many instances of age discrimination, although she does not present evidence or allegations of such age discrimination against anyone except for the alleged incidents against herself. She contends that she brought the discrimination to the attention of defendant, and that defendant nonetheless permitted it to continue. There is a dispute in this district over whether an alleged pattern of discrimination against one person may ever establish a continuing violation. *See Katz v. City of New York Dep't of Transportation,* No. 94 Civ. 8319(RPP), 1996 WL 599668, at *5, 1996 U.S. Dist. LEXIS 15430, at *17 (S.D.N.Y. Oct. 17, 1966). According to some decisions, "[t]he doctrine does not apply in cases that involve only a discriminatory 'policy' targeting an individual employee." *Franklin v. New York Law Publ'g Co.,* No. 95 Civ. 1024(JSM), 1995 WL 408390, at *3, 1995 U.S. Dist. LEXIS 9566, at *10– *11 (S.D.N.Y. July 11, 1995); *see, e.g., Cohn v. New York City Dep't of Parks,* Nos. 91 Civ. 6943(AGS), 91 Civ. 7879(AGS), 1996 WL 449539, at *5, 1996 U.S. Dist. LEXIS 11394, at *15– *16 (S.D.N.Y. Aug. 9, 1996); *Vergara v. Bentsen,* 868 F.Supp. 581, 590–91 (S.D.N.Y.1994). Other decisions have held that there can be a continuing violation

"when no more was shown than a discriminatory policy directed towards a single plaintiff." *Brennan v. City of White Plains,* No. 97 Civ. 2709(RWS), 1998 WL 75692, at *6, 1998 U.S. Dist. LEXIS 1931, at *18 (S.D.N.Y. Feb. 20, 1998); *see, e.g., Graaf v. North Shore Univ. Hosp.,* 1 F.Supp.2d 318, 322 (S.D.N.Y.1998); *Yaba v. Roosevelt,* 961 F.Supp. 611, 618–19 (S.D.N.Y.1997). We need not join the debate, however, because, even assuming a continuing violation might be found based on discrimination against a single plaintiff, no such situation can be found here.

While plaintiff reports she frequently asked why she did not get a particular job, *see, e.g.,* Keddy Dep. at 38–39, 45–46, 55, 68–69, 80, 85–86, she relates only three times when she mentioned age discrimination. Two were in 1995—her "complaint" to Mr. Cusano, discussed above, and a complaint to Ms. Barbara Silvan, defendant's Divisional Director of Human Resources, both apparently after her failure to gain the position as Senior Communications Analyst—and thus manifestly do not serve as evidence of earlier complaints. *See* Keddy Dec. ¶¶ 12, 14, 16, 18; Keddy Dep. at 107–09, 123. Plaintiff's third alleged complaint of age discrimination was in 1991. She describes the events as follows:

> My next assignment was from December 1990 up to April 1991 as a Secretary in defendant's Law Department. Ed Turan, Esq. was my manager. I advised him that if the position I was temping went permanent that I would like to be included in the interview process. The position did go permanent. I was not included in the interview process. Mr. Turan hired a person who was again younger than me. I stated that defendant had an ongoing policy that people were hired younger than me, and it was hard for me to understand why this was happening.

**\*8** Keddy Aff. ¶ 7; *see also* Keddy Dep. at 56–58, 61–62. She does not explain to whom she made her statement about defendant's "ongoing policy," nor does she describe the response to it. Thus, it does not serve to demonstrate that defendant was made aware of her complaint and that

by failing to remedy it, had a continuing discriminatory policy. "Where a plaintiff fails to report incidents of alleged discrimination to his or her supervisors, it cannot fairly be said that the employer permitted the discrimination to continue unremedied." *Curtis v. Airborne Freight Corp.,* 2000 WL 20701, at *10, 2000 U.S. Dist. LEXIS 143, at *34 (citation omitted). Moreover, "[f]or the knowledge of a supervisor to be imputed to the company, that supervisor must be at a sufficiently high level in the hierarchy of the company." *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996) (citation omitted).

Finally, plaintiff offers a general description of her meetings with defendant's Human Resources Department.

> ... [F]rom August 1989 through 1995 defendant's Human Resources Department was always aware that I was not getting the permanent positions I was temping for, and that they were being given to women younger than me. From August 1989 through 1995 each time I was not selected for a permanent position I spoke to Human Resources about why I was not given the position. I stated to Human Resources that there was a definite trend going on, meaning discrimination against me because of my age.... When it finally hit me like a ton of bricks that I was being discriminated against by defendant because of my age I complained to Barbara Silvan, Senior Vice President, Divisional Director of defendant's Human Resources.

Keddy Dec. ¶ 10; *see also* Keddy Dep. at 80, 107. I note that plaintiff's assertion is self-contradictory. She maintains on this motion and in her deposition—perhaps because she wished to indicate why she did not assert her rights earlier for statute of limitations purposes—that in 1995, in connection with the Senior Communications Analyst position, "it hit [her] like a ton of bricks" that she was had been discriminated against because of her age. Yet, this appears inconsistent with her testimony that she believed she was subjected to age discrimination earlier, much less that she let her beliefs be

known. [3] In sum, there is nothing presented in the record from which a reasonable factfinder could infer "a dogged pattern of disparate treatment that persisted unremedied despite [plaintiff's] complaints, over a number of years." *See Wang v. New York City Dep't of Finance,* 1999 WL 529559, at [*]10, 1999 U.S. Dist. LEXIS 11256, at [*]36– [*]37; *Cable v. New York State Thruway Authority,* 4 F.Supp.2d at 125–26; *Valenti v. Carten Controls Inc.,* 1997 WL 766854, at [*]5, 1997 U.S. Dist LEXIS 19722, at [*]16.

[3]    Moreover, as already discussed, whatever plaintiff told Silvan in 1995 is not evidence of what she might have said or what defendant might have been aware of at earlier times, and I might also note that her telling Silvan "there was a definite trend going on" cannot be characterized as informing defendant of a pattern of age discrimination, whatever plaintiff may or may not have *meant* by her statement. (Indeed, plaintiff has maintained herein that, apart from age, she was not given positions for which she applied because she was not slim and attractive.)

As plaintiff has not shown there is any genuine disputed issue of material fact with respect to the existence of an ongoing policy or practice of age discrimination by defendant in the years prior to 1995, the 1989 and 1992 claims are time-barred, and defendant is granted summary judgment on those two claims. The parties shall submit a joint pretrial order with respect to the remaining claim in this case by March 17, 2000.

**\*9**  SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 193625

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 2904380
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael Tony VELEZ, Plaintiff,

v.

C. PAREDEZ, et al., Defendants.

9:22-CV-0362 (LEK/ML)
|
Signed July 22, 2022

**Attorneys and Law Firms**

Michael Tony Velez, Dannemora, NY, Pro Se.

**DECISION AND ORDER**

LAWRENCE E. KAHN, United States District Judge

## I. INTRODUCTION

**\*1** *Pro se* plaintiff Michael Tony Velez ("Plaintiff") commenced this action by filing a complaint pursuant to 42 U.S.C. § 1983 ("Section 1983") in the United States District Court for the Southern District of New York ("Southern District") in March 2022, Dkt. No. 2 ("Complaint"), together with an application to proceed *in forma pauperis* ("IFP"), Dkt. No. 1 ("IFP Application"). In the Complaint, Plaintiff asserts claims for the violation of his federal constitutional rights arising out of his confinement in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). See generally Compl.

By Order filed on March 29, 2022, Southern District Chief Judge Laura Taylor Swain granted Plaintiff's IFP Application. Dkt. No. 4. By Order filed on April 12, 2022, Chief Judge Swain transferred the action to the Northern District of New York. Dkt. No. 5.

## II. SUFFICIENCY OF THE COMPLAINT

### A. Governing Legal Standard

Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). "An action is frivolous when either: (1) the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir. 1998) (cleaned up). An action "is malicious if it was filed with the intention or desire to harm another." Tafari v. Hues, 473 F.3d 440, 442 (2d Cir. 2007) (quoting Andrews v. King, 398 F.3d 1113, 1121 (9th Cir. 2005)).

Separately, an action fails to state a claim when the complaint does not "plead 'enough facts to state a claim to relief that is plausible on its face.' " Hardaway v. Hartford Pub. Works Dep't, 879 F.3d 486, 489 (2d Cir. 2018) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The Court accepts as true all facts described in the complaint but need not accept "conclusory allegations or legal conclusions couched as factual ... allegations." Nielsen v. Rabin, 746 F.3d 58, 62 (2d Cir. 2014) (quoting Rothstein v. UBS AG, 708 F.3d 82, 94 (2d Cir. 2013)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). Therefore, a pleading that only "tenders 'naked assertion[s]' devoid of 'further factual enhancement' " will not suffice. Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).

**\*2** Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." Branum v. Clark, 927 F.2d 698, 704–05 (2d Cir. 1991); see also Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000); see also Cortec Indus. Inc.

Velez v. Paredez, Not Reported in Fed. Supp. (2022)

2022 WL 2904380

Case 9:23-cv-01114-DNH-MJK     Document 31     Filed 04/22/24     Page 131 of 236

v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). "Where it appears that granting leave to amend is unlikely to be productive ... it is not an abuse of discretion to deny leave to amend." Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993).

**B. Summary of the Complaint** [1]

[1]
    The Complaint includes exhibits. Compl. at 25–180. To the extent that the exhibits are relevant to the incidents described in the Complaint, the Court will consider the Complaint as well as any documents attached as exhibits. See Cortec, 949 F.2d at 47 (noting "that the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference" under Fed. R. Civ. P. 10(c)).

The following facts are set forth as alleged by Plaintiff in his Complaint.

In July 2002, Plaintiff was arrested and charged with assaulting three police officers. Compl. at 4, 25–26. At the time, Plaintiff was on parole. Id. Defendant Paredez ("Paredez"), a parole officer assigned to the Manhattan II, III, and IV offices of the New York State Division of Parole, charged Plaintiff with violating the conditions of his parole. Id. at 2–3, 25–26. In 2003, after a jury trial, Plaintiff was convicted and sentenced as a persistent violent felony offender to an aggregate prison term of 15 years to life upon his convictions of assault in the second degree (two counts), criminal possession of a weapon in the third degree, criminal possession of a controlled substance in the fifth degree, and criminal possession of a controlled substance in the seventh degree. People ex rel. Velez v. Artus, 856 N.Y.S.2d 891 (2008).

In September 2017, Defendant New York State Board of Parole ("NYS BOP") denied Plaintiff parole. Compl. at 4.

In April 2019, Plaintiff was transferred to Shawangunk Correctional Facility ("Shawangunk C.F."). Compl. at 4–5, 29. Prior to arriving at Shawangunk C.F., Plaintiff had not received "a single [m]isbehavior [r]eport" in five years. Id. at 5. At Shawangunk C.F., Plaintiff was confined to the "[h]igh classification unit," and "addressed" Defendant Superintendent Collado ("Collado") "personally" during

weekly rounds, and discussed "her officers['] actions and her inactions and the arbitrary and capricious actions being taken against [him]." Id. at 5–6.

On August 22, 2019, Plaintiff received a misbehavior report charging him with violent conduct, refusing a direct order, and harassment. Compl. at 51. Plaintiff was confined in keeplock from August 2019 until December 2019. Id. at 41. In September 2019, Plaintiff filed a grievance, numbered SHG-31962-19, claiming that the misbehavior report was false. Compl. at 53. After the superintendent denied the grievance, Defendant IGRC Director Shelly Mallozzi ("Mallozzi") issued a decision on behalf of the Central Office Review Committee ("CORC") upholding the determination. Id.

In September 2019 and November 2019, the NYS BOP denied Plaintiff parole. Compl. at 5.

**\*3** In October 2019 and December 2019, Plaintiff filed additional grievances, numbered SHG-32025-19 and SHG-32117-19, related to his religious rights. Compl. at 69, 71.

In January 2020, officers searched Plaintiff's cell and uncovered several items of contraband. Compl. at 55. As a result of the search, Plaintiff received a misbehavior report. Id. at 57. After a disciplinary hearing, Plaintiff was found guilty of possessing an altered item, alcohol, unauthorized medication and tools, contraband, and flammable materials. Id. at 59. Plaintiff was sentenced to keeplock, with a corresponding loss of privileges. Id.

On February 3, 2020, Collado stopped at Plaintiff's cell during rounds and "stared at [him] ... and stated we are done with you now, your [sic] out." Compl. at 33. Plaintiff was then transferred from Shawangunk C.F. to Clinton Correctional Facility ("Clinton C.F."). Id. at 49.

On March 4, 2020, Plaintiff filed another grievance, numbered CL-0271-20, accusing Collado of allowing her officers to "invent misbehavior reports" in retaliation for filing grievances. Compl. at 29–35, 39. On June 4, 2020, Mallozzi issued a decision denying Plaintiff's grievance. Id. at 3, 49.

On June 7, 2021, Plaintiff filed a grievance, numbered CL-0542-21, and claimed that Defendant Nurse S. Devlin-Varin ("Devlin-Varin") refused to provide medical treatment

Velez v. Paredez, Not Reported in Fed. Supp. (2022)
2022 WL 2904380

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 132 of 236

for his serious medical needs. Compl. at 73, 77. Mallozzi issued a decision and concluded that Plaintiff refused to comply with his treatment plan. Id. at 79.

On June 21, 2021, Plaintiff sent a letter to Mallozzi regarding his "grievance appeals." Compl. at 137–39. Plaintiff accused Defendant IGRC Supervisor C. Gregory ("Gregory") and Mallozzi of refusing to address his grievances. Id.

On June 30, 2021, after a disciplinary hearing, Plaintiff was sentenced to keeplock. Compl. at 111. On July 7, 2021, Plaintiff filed a grievance, numbered CL-0632-21, claiming he was denied recreation, telephone privileges, kosher meals, and showers while in keeplock. Id. at 109. Mallozzi issued a decision denying the grievance. Id. at 115.

On August 11, 2021, Plaintiff filed a grievance, numbered CL-0789-21, and claimed that, on August 10, 2021, he was placed in the Special Housing Unit ("SHU") because he refused to "give blood" in connection with a "T.B. test." Compl. at 121. Plaintiff alleged he was in "SHU under the guise of quarantine," without a misbehavior report, and "in retaliation for my grievance complaints against medical for their refusal to address my serious medical needs." Id. The IGRC denied the grievance and Plaintiff appealed. Compl. at 125. Mallozzi found that Plaintiff "was appropriately placed on a TB hold." Id. at 129.

On September 17, 2021, Plaintiff field a grievance claiming he was "being deprived of commissary" and enduring "harsher conditions then [sic] those in SHU." Compl. at 131.

By September 23, 2021, "Plaintiff had [b]oth a chest X-ray and spit samples taken, all of which came back negative for T.B." Compl. at 7–8. Despite this, Defendants Devlin-Varin, Nurse John Doe, Nurse Jane Doe, A. Bodrogi, M.D. ("Bodrogi"), Morley, M.D. ("Morley"), Dr. John Doe, and Dr. Jane Doe placed Plaintiff in "OBS" and continued to have Plaintiff confined in the SHU and long-term keeplock "under the guise of an alleged T.B. hold." Id. at 6–8. While confined, Plaintiff was denied clean clothes, hygiene products, access to the law library, access to courts, access to his family and friends, access to a television or radio or any form of communication, commissary, the ability to observe religious holidays, and meetings with the Parole Board. Id.

**\*4** On September 25, 2021, Plaintiff filed a grievance claiming that he was not permitted to appear before the Parole Board "under the guise of having T.B." Compl. at 143. Plaintiff also complained of his conditions of confinement. Id.

On September 28, 2021, Plaintiff received a misbehavior report charging him with making threats to Bodrogi while in the infirmary. Compl. at 81. After a disciplinary hearing, Plaintiff was found guilty of the charge and sentenced to time previously served in keeplock. Id. at 83.

On October 22, 2021, Plaintiff filed a grievance claiming he was confined to the OBS in a "filthy cell" for one month in retaliation for filing two grievances, numbered CL-0542-21 and CL-0789-21. Compl. at 153–58.

On January 25, 2022, Plaintiff was escorted to a televised parole hearing. Compl. at 8. But the "Defendant Parole Commissioners refuse[d] to conduct a hearing" and then informed Plaintiff that it was being adjourned until July 2022. Id.

On January 31, 2022, Plaintiff sent a letter to Mallozzi claiming that grievance supervisors refused to file his grievances. Compl. at 141.

On March 3, 2022, Plaintiff wrote to Morley and advised that he was placed in OBS "under the guise of allegedly having T.B." Compl. at 168.

Construed liberally,[2] Plaintiff's Complaint contains the following: (1) claims against Paredez; (2) claims against the NYS BOP and Manhattan II, III, and IV; (3) Fourteenth Amendment due process claims related to Plaintiff's parole denials; (4) First Amendment claims related to Plaintiff's free exercise rights; (5) First Amendment retaliation claims; (6) Eighth Amendment claims related to Plaintiff's conditions of confinement; (7) claims related to the grievance process and violations of DOCCS Directives; and (8) civil rights conspiracy claims. See generally Compl. Plaintiff seeks a declaratory judgment, injunctive relief, and monetary damages. See id. at 19–21. For a complete statement of Plaintiff's claims and the facts he relies on in support of those claims, reference is made to the Complaint.

2    "[W]hen a plaintiff proceeds *pro se*, ... a court is obliged to construe his pleading liberally." Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) (emphasis in original) (cleaned up) (quoting McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir. 2004)). See also Phillips v. Girdich,

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 133 of 236

Velez v. Paredez, Not Reported in Fed. Supp. (2022)

2022 WL 2904380

408 F.3d 124, 130 (2d Cir. 2005) ("We leave it for the district court to determine what other claims, if any, [plaintiff] has raised. In so doing, the court's imagination should be limited only by [plaintiff's] factual allegations, not by the legal claims set out in his pleadings.").

### C. Nature of the Action

Plaintiff primarily seeks relief pursuant to 42 U.S.C. § 1983 ("Section 1983"), [3] which "provides a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 508 (1990). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993).

[3]     Plaintiff also seeks relief pursuant to 42 U.S.C. § 1985 ("Section 1985"). Compl. at 2.

### III. ANALYSIS

**\*5** "It is well-settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). A Section 1983 plaintiff must "allege a tangible connection between the acts of the defendant and the injuries suffered." Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986). The Second Circuit has held that "there is no special rule for supervisory liability," and, as such, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020).

### A. Claims Against Paredez

Plaintiff alleges that Paredez withheld information "from the court, [t]rial [j]ury, and Plaintiff" related to Plaintiff's July 2002 arrest and 2003 trial in violation of his due process rights. Compl. at 13. "In [S]ection 1983 actions, the applicable limitations period is found in the 'general or residual [state] statute [of limitations] for personal injury actions[.]' " Pearl v. City of Long Beach, 296 F.3d 76, 79 (2d Cir. 2002) (quoting Owens v. Okure, 488 U.S. 235, 249–50 (1989)). In New York, a three-year statute of limitations applies for personal injury actions and thus to Section 1983 actions. Id.; see also N.Y. C.P.L.R. § 214(5).

Although the statute of limitations is an affirmative defense, and must generally await a defense motion, dismissal at this stage is appropriate when the facts supporting the statute of limitations defense are set forth in the papers that a plaintiff submits. Pino v. Ryan, 49 F.3d 51, 53 (2d Cir. 1995) (holding that, for purposes of an initial review under 28 U.S.C. § 1915, a court "may" find "that a complaint is based on an indisputably meritless legal theory" if an affirmative defense, such as the statute of limitations, "appears on the face of the complaint"); see also Akassy v. Hardy, 887 F.3d 91, 95 (2d Cir. 2018) (confirming that *sua sponte* dismissals for failure to state a claim under the *in forma pauperis* statute are appropriate when the "inclusion of dates in the complaint indicat[e] that the action is untimely") (quoting 5B Wright & Miller, Federal Practice and Procedure § 1357, at 721 (3d ed. 2004)).

Federal law determines when a Section 1983 action accrues, which has been held to be the time "when the plaintiff knows or has reason to know of the harm." Connolly v. McCall, 254 F.3d 36, 41 (2d Cir. 2001) (citation omitted). Thus, in determining when a particular claim accrues, courts must focus on when "the plaintiff knows or has reason to know the injury which is the basis of his action." Covington v. New York, 171 F.3d 117, 121 (2d Cir. 1999) (citation omitted). Here, Plaintiff's alleged due process violations occurred prior to, or in the course of, his arrest and trial in 2002 and 2003. See Dellutri v. Vill. of Elmsford, 895 F.Supp.2d 555, 563 (S.D.N.Y. 2012).

Under the "prison mailbox" rule, the date of filing is the date the prisoner-plaintiff delivered his complaint to a prison guard for mailing to the court, which is presumed to be the date that the complaint was signed. See Houston v. Lack, 487 U.S. 266, 274–76 (1988); Noble v. Kelly, 246 F.3d 93, 97 (2d Cir. 2001). Plaintiff signed and presumedly delivered his complaint to a prisoner guard on March 18, 2022. See Compl. at 178. Accordingly, in this action, any Section 1983 claim, to be considered timely filed, must have accrued no earlier than March 18, 2019. Plaintiff's claims against Paredez are thus subject to dismissal as untimely, unless Plaintiff can demonstrate the limitations period with respect to any of these claims was tolled, or that any of these claims is otherwise timely. See Abbas v. Dixon, 480 F.3d 636, 640 (2d Cir. 2007) ("conclud[ing] that the District Court should not have [*sua sponte*] dismissed [a *pro se* plaintiff's] complaint [with prejudice] on the basis of an anticipated statute-of-limitations defense without granting [the plaintiff] notice and an opportunity to be heard" as to "whether he might have

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 134 of 236

Velez v. Paredez, Not Reported in Fed. Supp. (2022)

2022 WL 2904380

meritorious tolling arguments"); see also Abbas v. Dixon, No. 02-CV-0809, 2004 WL 2202640, at *1 (W.D.N.Y. Sept. 30, 2004) (noting that "all of plaintiff's claims were [*sua sponte*] dismissed with prejudice as time barred with the exception of" one claim, before defendants brought their motion to dismiss the one surviving claim).

**\*6** Plaintiff has alleged no facts implicating Paradez in a continuing violation of Plaintiff's due process rights. Rather, the claims against Paradez are based on discrete events that occurred before March 18, 2019. Moreover, equitable tolling is only available in "rare and exceptional" cases where "extraordinary circumstances prevented a party from timely performing a required act, and ... the party acted with reasonable diligence throughout the period he sought to toll." Walker v. Jastremski, 430 F.3d 560, 564 (2d Cir. 2005) (cleaned up). As the Second Circuit recognized in Abbas, New York law recognizes the equitable tolling doctrine where a plaintiff demonstrates that he was induced by fraud, misrepresentations, or deception to refrain from timely commencing an action, and that he acted with due diligence throughout the period to toll. Abbas, 480 F.3d at 642; see also Gonzalez v. Hasty, 651 F.3d 318, 322 ("Equitable tolling is an extraordinary measure that applies only when plaintiff is *prevented from filing* despite exercising that level of diligence which could reasonably be expected in the circumstances." (emphasis in original)). "[E]quitable tolling is [also] applicable to the time period during which a prisoner-plaintiff is exhausting his administrative remedies pursuant to the" Prison Litigation Reform Act. Gonzalez, 651 F.3d at 323. The plaintiff bears the burden of establishing equitable tolling. Abbas, 480 F.3d at 642.

Here, Plaintiff does not invoke equitable tolling, nor does he "articulate any acts by defendants that prevented him from timely commencing suit." Abbas, 480 F.3d at 642 (cleaned up). But now that Plaintiff has been "made aware of the [statute] of limitations issue," Muhammadali v. City of New York, 795 Fed. App'x 70, 71 (2d Cir. 2020), he is entitled to an "opportunity to be heard" as to "whether he might have meritorious tolling arguments." Abbas, 480 F.3d at 640. The Court therefore dismisses Plaintiff's claims against Paredez without prejudice and grants him leave to amend. Cf. id. (finding error where a district court *sua sponte* "dismissed [a *pro se* plaintiff's] complaint [with prejudice] on the basis of an anticipated statute-of-limitations defense without granting [the plaintiff] notice and an opportunity to be heard" as to "whether he might have meritorious tolling arguments").

**B. Claims Against Manhattan II, III, and IV**

"It is well settled that a state agency is not a 'person' within the meaning of [Section] 1983." Martin v. UConn Health Care, No. 99-CV-2158, 2000 WL 303262, at *1 (D. Conn. Feb. 9, 2000); see also Ferguson v. Morgan, No. 90-CV-6318, 1991 WL 115759, at *1 (S.D.N.Y. June 20, 1991) (finding that "Otisville Correctional Facility Medical Staff" does not qualify as a person under Section 1983). Plaintiff's claims against "Manhattan II, III, and IV" thus fail to state a claim upon which relief may be granted under 28 U.S.C. § 1915(e)(2)(B)(ii) because the named entities do not qualify as "persons" under Section 1983. Accordingly, the Court dismisses those claims with prejudice since the defects are substantive, rendering amendment futile. See Cuoco, 222 F.3d at 112.

**C. Claims Against NYS BOP**

Plaintiff's claims against NYS BOP similarly fail to state a claim upon which relief may be granted because the state entity does not qualify as a "person" under Section 1983. They also fail to state a claim for the independent reason that Plaintiff is seeking monetary relief from an entity that "is immune from suit under the Eleventh Amendment." Massey v. N.Y. State Parole, No. 18-CV-0842, 2019 WL 181317, at *2 (E.D.N.Y. Jan. 10, 2019).

The Eleventh Amendment restricts the ability of citizens to bring suit against states in federal court, under the principle of sovereign immunity. U.S. Const. amend. XI; see also Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267 (1997) ("The Amendment ... enacts a sovereign immunity from suit, rather than a nonwaivable limit on the Federal Judiciary's subject-matter jurisdiction."). Sovereign immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. Gollomp v. Spitzer, 568 F.3d 355, 366 (2d Cir. 2009). Congress did not abrogate states' sovereign immunity for the purposes of Section 1983, see Quern v. Jordan, 440 U.S. 332, 342–45 (1979), and New York State has not waived its immunity from suit on the type of claims asserted in Plaintiff's complaint, see generally Trotman v. Palisades Interstate Park Comm'n, 557 F.2d 35, 38–40 (2d Cir. 1977).

**\*7** With respect to suits brought under Section 1983, "[i]t is well-established that, as an agency or arm of the State of New York, the New York State Board of Parole ... is immune from suit under the Eleventh Amendment." Massey, 2019 WL 181317, at *2. Plaintiff's claims against NYS BOP thus

2022 WL 2904380

fail under 28 U.S.C. § 1915(e)(2)(B)(ii), (iii). Accordingly, the Court dismisses Plaintiff's claims against NYS BOP with prejudice since the defects are substantive, rendering amendment futile. See Cuoco, 222 F.3d at 112.

### D. Claims for Damages Against All Defendants in Their Official Capacities

Actions for damages against a state official in his or her official capacity are essentially actions against the state and are thus barred by the Eleventh Amendment. See Will v. Mich. Dep't. of State Police, 491 U.S. 58, 71 (1989). Therefore, Plaintiff's Section 1983 claims for money damages against Defendants in their official capacities, see Compl. at 3 ("Each/ All Defendant is sued ... in their official capacities"), fail under 28 U.S.C. § 1915(e)(2)(B)(ii), (iii). The Court dismisses those claims with prejudice since the defects are substantive, rendering amendment futile. See Cuoco, 222 F.3d at 112.

### E. Fourteenth Amendment Claims Related to Plaintiff's Parole Denials

Prisoners do not have a constitutional right to parole. Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 7 (1979). Where a state has created a statutory scheme for parole, the Due Process Clause of the Fourteenth Amendment protects prisoners insofar as they "have a legitimate expectancy of release that is grounded in the state's statutory scheme." Barna v. Travis, 239 F.3d 169, 170 (2d Cir. 2001) (per curiam). "The New York parole scheme is not one that creates in any prisoner a legitimate expectancy of release" before the expiration of a valid sentence. Id. at 171; see also Maldonado v. Mattingly, No. 11-CV-1091, 2019 WL 5784940, at *7 (W.D.N.Y. Nov. 6, 2019). "An inmate's federally-protected liberty interest in parole release is [thus] limited to not being denied parole for arbitrary or impermissible reasons." Villalobos v. New York Div. of Parole, No. 09-CV-8431, 2010 WL 3528926, at *3 (S.D.N.Y. Aug. 23, 2010) (cleaned up). "The arbitrary or capricious reasons must be based on inappropriate consideration of a protected classification or an irrational distinction, or on any other unconstitutional grounds." Mabry v. Cuomo, No. 11-CV-4456, 2012 WL 1711549, at *2 (S.D.N.Y. May 9, 2012) (cleaned up).

Here, Plaintiff states, in a conclusory manner, that the decision to deny him parole was arbitrary and capricious, but fails to offer detailed facts in support of that conclusion. Plaintiff does not identify himself as a member of a protected class; nor does he allege with sufficient particularity that he was denied parole release based upon an "irrational distinction" having been made between himself and other inmates. Rather, Plaintiff generally alleges that in the fall of 2019, "[r]apists" were granted parole, while he and other "non[-r]apist[s]" were denied. Compl. at 5. [4] While denying parole to Plaintiff based on an "irrational distinction" privileging "rapists" over "non-rapists" would violate his due process rights, Plaintiff's allegations on this point lack the necessary factual detail to suggest this claim is plausible. See generally Iqbal, 556 U.S. at 677–83. Accordingly, Plaintiff's Section 1983 due process claims are dismissed without prejudice for failure to state a claim upon which any relief can be granted pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). The Court grants Plaintiff leave to amend, however, since a valid claim might be stated should Plaintiff allege with more detail as to how his parole denials were based on constitutionally impermissible grounds, such as his race, sex, or an "irrational distinction" privileging those who had committed crimes of sexual violence. See Branum, 927 F.2d at 704–05; see also Fed. R. Civ. P. 15(a)(2).

[4]    Plaintiff also alleges on page 4 of his Complaint that in September 2017, "Defendant New York State Board of Parole, denied Plaintiff and all non[-r]apist and all non[-]white save the openly [g]ay one, [p]arole, utilizing the very same reason for denial[,] [c]learly demonstrating their predetermination." Putting aside the defects related to suing an entity immune from suit, let alone two years after the relevant statute of limitations period has passed, these factual allegations still fail to plausibly allege that he was denied parole for a constitutionally impermissible reason. Plaintiff does not identify himself as a member of a constitutionally protected class of persons. Nor does he allege with any specificity the "predetermination" of the unidentified parole officers.

### F. First Amendment Claims Related to Plaintiff's Free Exercise Rights

**\*8** Construing the Complaint liberally, Plaintiff alleges that Collado deprived him of his right to exercise his religious beliefs while he was confined at Shawangunk C.F. Compl. at 33, 45, 69.

"Prisoners have long been understood to retain some measure of their rights under the Free Exercise Clause." Brandon v. Kinter, 938 F.3d 21, 32 (2d Cir. 2019) (cleaned up). To state a First Amendment free exercise claim upon which

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 136 of 236

Velez v. Paredez, Not Reported in Fed. Supp. (2022)

2022 WL 2904380

relief may be granted, an inmate "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." Holland v. Goord, 758 F.3d 215, 220 (2d Cir. 2014).[5] "Determining whether a plaintiff's free exercise rights have been substantially burdened 'requires courts to distinguish important from unimportant religious beliefs, a task for which ... courts are particularly ill-suited.' " Brandon, 938 F.3d at 32 (quoting Ford, 352 F.3d at 593). Therefore, courts in the Second Circuit should be "wary of making 'conclusory judgments about the unimportance of the religious practice to the adherent.' " Brandon, 938 F.3d at 32 (quoting Ford, 352 F.3d at 593). While certain "belief[s] or practice[s]" may be "so peripheral to the plaintiff's religion that any burden can be aptly characterized as constitutionally de minimis," Ford, 352 F.3d at 593, establishing a substantial burden is "not a particularly onerous task," McEachin, 357 F.3d at 202. For instance, a "relatively small number of violative incidents" should "not prevent" a court "from finding that the prisoner's religious beliefs were substantially burdened." Brandon, 938 F.3d at 35.

[5]   It remains unclear whether the substantial burden requirement for proving a free exercise violation under the First Amendment remains good law. In Employment Division v. Smith, 494 U.S. 872 (1990), the Supreme Court "took issue with the premise that courts can differentiate between substantial and insubstantial burdens." Ford v. McGinnis, 352 F.3d 582, 582 (2d Cir. 2003) (citing Smith, 494 U.S. at 887). Other circuits have disagreed over whether the substantial burden test continues to apply to free exercise claims. Compare Williams v. Morton, 343 F.3d 212, 217 (3d Cir. 2003) (finding "no support for" defendants' argument that it is "a prerequisite for the inmate to establish that the challenged prison policy 'substantially burdens' his or her religious beliefs"), with Levitan v. Ashcroft, 281 F.3d 1313, 1320–21 (D.C. Cir. 2002) (requiring prisoners demonstrate that free exercise of religion be substantially burdened). This Court proceeds on the assumption that the substantial burden requirement applies, in part because establishing a substantial burden is "not a particularly onerous task," McEachin v. McGuinnis, 357 F.3d 197, 202 (2d Cir. 2004).

Here, Plaintiff has sufficiently pled that his sincerely held religious beliefs were substantially burdened. Plaintiff alleges

that "Collado would not allow me to attend any Jewish services," that she did "not allow Shab[b]os [s]ervices," and that as a Catholic, she only accommodated Catholic inmates. Compl. at 33, 45. Plaintiff also claims that on October 18, 2019, he was denied matzah and grape juice for "Shabbos siddur." See Brandon, 938 F.3d at 35 ("In the context of religious feasts and fasting, [the Second] Circuit has previously held that a smaller number of noncompliant meals —even a single violation—can be a substantial burden."); cf. Kravitz v. Fischer, No. 9:12-CV-1011, 2014 WL 4199245, at *13 (N.D.N.Y. Aug. 22, 2014) (Kahn, J.) (dismissing the plaintiffs' First Amendment claim on the grounds that denying the plaintiffs Chanukah candles on a single occasion was de minimis and did not substantially burden their sincerely held religious beliefs).

**\*9**  Accordingly, Plaintiff's First Amendment free exercise claim against Collado survives initial review under 28 U.S.C. § 1915(e)(2)(B) and requires a response from Collado.[6] The Court also grants Plaintiff leave to amend should he wish to raise a new claim for injunctive relief against certain prison officials under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"),[7] which provides greater protection for religious exercise than is available under the First Amendment. See Holt v. Hobbs, 574 U.S. 352, 356–58 (2015); see also Lloyd v. City of New York, 43 F.Supp.3d 254, 263 (S.D.N.Y. 2014) (observing that defendants sued under the RLUIPA have to show that "the challenged action or policy furthers a compelling state interest in the least restrictive manner," whereas the First Amendment only requires the action or policy to be "reasonably related to legitimate penological interests").

[6]   The Court's refusal to dismiss a claim *sua sponte* for failure to state a claim under 28 U.S.C. § 1915(e)(2)(B)(ii) does not preclude a defendant from moving to dismiss the same claim for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) after being served with the Complaint. Presently, the Court does not have the benefit of adversarial briefing on the claim's sufficiency, which may possibly lead the Court to a different conclusion.

[7]   Plaintiff alleges that "this facility continues to deny me congregational prayer for all holy days," and requests that he "be afforded the very same religious rights as all other beliefs." Compl. at 69. These general allegations suggest Plaintiff may

2022 WL 2904380

have a viable claim for injunctive relief under the RLUIPA, should he plead such a claim with sufficient factual detail.

### G. First Amendment Retaliation Claims

To state a claim of retaliation under the First Amendment, an inmate must allege facts plausibly suggesting "the following: '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (quoting Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002)). The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." Dawes, 239 F.3d at 491.

The filing of a grievance or lawsuit is protected speech. See Graham v. Henderson, 89 F.3d 75, 80 (2d Cir. 1996); Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995). With respect to the second element, the Second Circuit has defined "adverse action *objectively*, as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights." Gill, 389 F.3d at 381 (cleaned up) (emphasis in original). The "objective test applies even where a particular plaintiff was not himself subjectively deterred" from exercising his rights. Id. "A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2001). While there is no "bright line ... defin[ing] the outer limits" of the "temporal relationship," courts in the Second Circuit have held that an adverse action taken as much as eight months after the protected activity indicated a causal connection. Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45–46 (2d Cir. 1980); but see Hollander v. American Cyanamid Co., 895 F.2d 80, 85–86 (2d Cir. 1990) (finding a lack of evidence that an adverse action, taken three months after the plaintiff's protected activity, was in response to it).

### 1. Claim Against Collado

**\*10** Plaintiff alleges that Collado "allowed her officers to fabricate multiple misbehavior reports" in retaliation for the filing of grievances. Compl. at 5. For the purposes of this review, Plaintiff has sufficiently alleged that he engaged in protected conduct when he filed grievances in late 2019 and that he suffered an adverse action when he received a misbehavior report in January 2020 that resulted in keeplock confinement. Compl. at 53, 57, 69, 71. With respect to causation, Plaintiff claims that Collado, as the superintendent of the facility, responded to Plaintiff's grievances and allegedly told Plaintiff, "we are done with you now, your [sic] out." Id. at 33.

Upon review and with due regard for Plaintiff's status as a *pro se* litigant, the Court finds that Plaintiff's First Amendment retaliation claim against Collado survives initial review and requires a response from Collado.

### 2. Claims Against Devlin-Varin, Nurse John Doe, and Nurse Jane Doe

Examining the facts in a light most favorable to Plaintiff, he alleges that Devlin-Varin, Nurse John Doe, and Nurse Jane Doe placed Plaintiff in the SHU for filing a grievance against Devlin-Varin in June 2021. See Compl. at 6. At this juncture, Plaintiff has sufficiently pled a First Amendment retaliation claim against Devlin-Varin to warrant a response.

The Court reaches a different conclusion, however, with respect to Nurses John and Jane Doe. Generally, alleged retaliation motivated by an action the prisoner took which did not personally involve the prison officials is insufficient for a retaliation claim. See Ortiz v. Russo, No. 13-CV-5317, 2015 WL 1427247, at \*11 (S.D.N.Y. Mar. 27, 2015) (granting motion to dismiss retaliation claim where plaintiff "fail[ed] to allege any facts that would support a finding that [defendants] were personally motivated by the dismissal of an earlier grievance they have no apparent connection with").

Plaintiff has not pled how or when Nurses John and Jane Doe became aware of the grievance against Devlin-Varin or why they would be motivated to retaliate against Plaintiff due to the grievance. Accordingly, the Court dismisses Plaintiff's First Amendment retaliation claims against Nurses John and Jane Doe without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii), and grants Plaintiff leave to amend.

2022 WL 2904380

**H. Eighth Amendment Claims Related to Plaintiff's Conditions of Confinement**

Plaintiff claims that Devlin-Varin, Nurse John Doe, Nurse Jane Doe, Bodrogi, Morley, Dr. John Doe, and Dr. Jane Doe violated his Eighth Amendment rights because he endured unconstitutional conditions of confinement while confined in the SHU, OBS, and keeplock from August 2021 until October 2021. See Compl. at 17 (alleging he was "plac[ed] ... in ... a [f]ilthy [h]ospital [r]oom with [d]ried [b]lood in the toilet, black dirt all over the edge of the entire cell, and denied from sending ... mail ... to family or friends, denied a change of clothes, shampoo, deodorant," among other alleged deprivations).

While the United States Constitution " 'does not mandate comfortable prisons,' ... neither does it permit inhumane" treatment of those in confinement. Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Rhodes v. Chapman, 452 U.S. 337, 349 (1981)). "To state an Eighth Amendment claim based on conditions of confinement, an inmate must allege that (1) objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind, such as deliberate indifference to inmate health or safety." Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (cleaned up). With respect to the first prong, "there is no static test to determine whether a deprivation is sufficiently serious; the conditions themselves must be evaluated in light of contemporary standards of decency." Jabbar v. Fischer, 683 F.3d 54, 57 (2d Cir. 2012) (cleaned up). Therefore, "conditions of confinement may be aggregated to rise to the level of a constitutional violation, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need." Walker, 717 F.3d at 125 (cleaned up). As for the second element, evidence that a risk was "obvious or otherwise must have been known to a defendant" may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk. Brock v. Wright, 315 F.3d 158, 164 (2d Cir. 2003).

**\*11** Plaintiff sufficiently alleges that he was deprived of an "identifiable human need"—"safe and sanitary living conditions." Walker, 717 F.3d at 125; see also Compl. at 17. And in light of the liberality afforded to pro se litigants, the Court finds that these alleged conditions would have been so "obvious" to the Defendants that a fact finder could conclude that they were actually aware of the risk. Brock, 315 F.3d at 164.

Accordingly, Plaintiff's Eighth Amendment conditions-of-confinement claims against Devlin-Varin, Nurse John Doe, Nurse Jane Doe, Bodrogi, Morley, Dr. John Doe, and Dr. Jane Doe survive *sua sponte* review and require a response. [8]

[8]    Because Plaintiff's claims are asserted against nurses and doctors whose names are not known to Plaintiff, service of process cannot be effected on them unless and until these individuals have been identified by name. If Plaintiff wishes to pursue his claims against defendants Nurse John Doe, Nurse Jane Doe, Dr. John Doe, and Dr. Jane Doe, he must take reasonable steps to ascertain through discovery the identity of those individuals. Defendants Devlin-Varin, Bodrogi, and Morley are directed to respond to reasonable discovery demands from Plaintiff that are aimed at identifying the John/Jane Doe defendants.

**I. Claims Related to the Grievance Process**

"The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances." Shell v. Brzezniak, 365 F. Supp. 2d 362, 369 (W.D.N.Y. 2005). "However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures do[ ] not give rise to a cognizable [Section] 1983 claim." Id. at 370. "If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of th[ose] claim[s,]" id., as Plaintiff has done here by filing his Complaint.

Plaintiff's claims that Gregory and Mallozzi failed to properly process his grievances does not rise to the level of a constitutional deprivation. Accordingly, the Court dismisses those claims with prejudice since the defects are substantive, rendering amendment futile. See Cuoco, 222 F.3d at 112.

**J. Claims Related to Violations of DOCCS Directives**

A Section 1983 claim brought in federal court is not the appropriate vehicle by which to raise violations of prison regulations. See Hyman v. Holder, No. 96-CV-7748, 2001 WL 262665, at *6 (S.D.N.Y. Mar. 15, 2001) (holding that allegations of prison regulation violations "are not cognizable under [Section] 1983" because "Section 1983 imposes liability for violations of rights protected by the

Velez v. Paredez, Not Reported in Fed. Supp. (2022)
Case 9:23-cv-01114-DNH-MJK   Document 31   Filed 04/22/24   Page 139 of 236
2022 WL 2904380

Constitution and laws of the United States, not for violations arising solely out of state or common-law principles"); see also Sanders v. Gifford, No. 11-CV-0326, 2014 WL 5662775, at *4 (N.D.N.Y. Nov. 4, 2014) (holding that failure to follow a DOCCS directive does not give rise to a § 1983 claim). Accordingly, the Court dismisses those claims with prejudice since the defects are substantive, rendering amendment futile. See Cuoco, 222 F.3d at 112.

### K. Civil Rights Conspiracy Claims

Plaintiff claims that Defendants conspired to deny him parole. Compl. at 5. To maintain a civil rights conspiracy action under Section 1983 or Section 1985, a plaintiff, at a minimum, "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003) (Section 1985); see also Dorsey v. Fisher, No. 09-CV-1011, 2009 WL 4985421, at *3 (N.D.N.Y. Dec. 15, 2009) (Section 1983).

 *12 Here, Plaintiff does not allege any facts giving rise to a conspiracy, but instead makes conclusory statements that Defendants conspired with each other. Plaintiff's conclusory allegations do not support a "meeting of the minds" or a plausible conspiracy claim involving any of the defendants.

Accordingly, the Court dismisses Plaintiff's conspiracy claims with prejudice for failure to state a claim upon which any relief can be granted pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). The Court grants Plaintiff leave to amend, however, since a valid conspiracy claim might be stated should Plaintiff allege with more detail a "meeting of the minds" that sought to deprive him of a specific constitutional protection or right.

### IV. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that pursuant to the Court's review under 28 U.S.C. § 1915, the following claims are **DISMISSED with prejudice** for failing to state a claim or seeking monetary relief against defendants immune from suit: (1) claims for monetary damages against Defendants, in their official capacity; and (2) claims against the NYS BOP and Manhattan II, III, and IV; and (3) claims related to the grievance process and violations of DOCCS directives; and it is further

**ORDERED**, that the following claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii)

for failing to state a claim upon which relief may be granted: (1) claims against Paredez; (2) Fourteenth Amendment due process claims related to Plaintiff's parole denials; (3) First Amendment retaliation claims against Nurses John and Jane Doe; and (4) civil rights conspiracy claims;[9] and it is further

[9]     Should Plaintiff seek to pursue one or more of the claims dismissed without prejudice by the Court herein, or to bring a new claim under the RLUIPA, he must file an amended complaint. An amended complaint is intended to completely replace the prior complaint in the action, and thus it "renders [any prior complaint] of no legal effect." Int'l Controls Corp. v. Vesco, 556 F.2d 665, 668 (2d Cir. 1977), cert. denied sub nom., Vesco & Co., Inc. v. Int'l Controls Corp., 434 U.S. 1014 (1978). Therefore, any amended complaint must include all of the claims and allegations Plaintiff wishes to bring against the defendants so that *the amended complaint may stand alone as the sole complaint* in this action.

**ORDERED**, that the following claims survive the Court's *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B) and require a response: (1) First Amendment free exercise claim against Collado; (2) First Amendment retaliation claims against Collado and Devlin-Varin; and (3) Eighth Amendment conditions-of-confinement claims against Devlin-Varin, Nurse John Doe, Nurse Jane Doe, Bodrogi, Morley, Dr. John Doe, and Dr. Jane Doe; and it is further

**ORDERED**, that NYS BOP, Manhattan II, III, and IV, Paredez, Gregory, Mallozzi, Commissioner John Doe, and Commissioner Jane Doe are **DISMISSED** as defendants herein; and it is further

**ORDERED**, that Plaintiff shall take reasonable steps through discovery to ascertain the identity of the Doe defendants. **Plaintiff's failure to timely serve those defendants will result in dismissal** of the claims asserted against them and termination of those defendants from the action; and it is further

**ORDERED**, that the Clerk shall issue summonses and forward them, along with copies of the Complaint, to the United States Marshal for service upon the remaining Defendants. The Clerk shall forward a copy of the summonses and Complaint to the Office of the Attorney General, together with a copy of this Decision and Order; and it is further

Velez v. Paredez, Not Reported in Fed. Supp. (2022)

2022 WL 2904380

**\*13  ORDERED**, that a response to the Complaint be filed by the remaining Defendants, or their counsel, as provided for in the Federal Rules of Civil Procedure;

**ORDERED**, that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions.

**Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; failure to do so will result in the dismissal of his action**; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Decision and Order on Plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 2904380

---

2016 WL 8732638

2016 WL 8732638
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Damian TRAPANI, Plaintiff,

v.

M. CORYER; et al., Defendants.

No. 14-CV-683 (GTS/CFH)
|
Signed 06/06/2016

**Attorneys and Law Firms**

DAMIAN TRAPANI, 32911, Schenectady County Jail, 320 Veeder Avenue, Schenectady, NY 12307, pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, OF COUNSEL: NICOLE E. HAIMSON, ESQ., Assistant Attorney General, The Capitol, Albany, New York 12224-0341, Attorney for Defendant.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Christian F. Hummel, U.S. Magistrate Judge

*1  Plaintiff Damian Trapani ("Trapani" or "Plaintiff"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983. Dkt. No. 1 ("Compl."). Presently before the Court is defendants' motion, pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 41(b) and 12(b)(6), to dismiss Trapani's complaint. Dkt. No. 38. Trapani has opposed the motion. Dkt. No. 41. For the following reasons, it is recommended that defendants' motion to dismiss be granted in part and denied in part.

**I. BACKGROUND**

The facts are related herein in the light most favorable to Trapani as the non-moving party. See subsection II(A) infra.

At the relevant time, Trapani was confined in the Special Housing Unit ("SHU") at Auburn Correctional Facility ("Auburn C.F."). Compl. ¶ 54. Trapani suffered from various mental health disorders including Intermittent Explosive Disorder. Id. ¶ 141. On February 8, 2011, after several suicide attempts, Trapani was removed from his SHU cell and escorted to the Mental Health Unit ("MHU"). Id. ¶ 55. While Trapani was in an observation cell, he yelled, used vulgar language, and covered up his cell door with a sheet. Dkt. No. 1-1 at 26. During a private interview, Trapani refused to talk and threatened to "bang his head." Id. Trapani's "vitals" and blood pressure were monitored by a nurse. Compl. ¶¶ 56, 57. Shortly after arriving in the MHU, Trapani was advised that he would be returning to the SHU. Id. While enroute to his SHU cell, Trapani experienced sharp pains in his chest and fell to the floor. Id. ¶ 58. Defendants, Correction Officers, Gary Steinberg ("Steinberg"), Bryan Vantassell ("Vantassell"), and James Elser ("Elser") ignored Trapani's request for medical attention, picked him up, and dragged him forward. Id. ¶ 59. Trapani attempted to free himself by kicking defendants. Id. ¶ 60. When Trapani was inside his cell, Steinberg, Vantassell, and Elser "mercilessly and savagely" beat him by throwing him, head first, into the wall. Id. ¶ 63. Defendants kicked and beat Trapani with closed fists. Id. As a result of the incident, Trapani sustained two chipped teeth and an injured toe. Id. ¶ 64.

On February 18, 2011, Trapani filed a grievance related to the February 8, 2011 incident. [2] Dkt. No. 1-1 at 8. The Superintendent denied Trapani's grievance and, on June 1, 2011, the Central Office Review Committee ("CORC") upheld the decision. [3] Id.

[2]    The grievance was not annexed to the complaint and is not part of the record on the within motion.

[3]    The Superintendent's Decision was not annexed to the complaint and is not part of the record on the within motion.

On March 31, 2011, Trapani threatened to harm himself and was placed in the Residential Crisis Treatment Program ("RCTP") for observation. Compl. ¶ 69. On April 4, 2011, Trapani felt suicidal and asked to remain in the RCTP. Id. ¶ 70. When Trapani was advised that he was being discharged from the RCTP, Trapani refused to leave the observation cell and threatened the staff. Id. ¶¶ 70, 71; Dkt. No. 1-1 at 22. Defendants, Correction Officer Nicholas Wiwsianyk ("Wiwsianyk"), Correction Officer Sean Reilly ("Reilly"),

2016 WL 8732638

Sergeant J. Wright ("Wright"), Correction Officer T. Clark ("Clark"), and Correction Officer C. Novak ("Novak") used chemical agents to extract Trapani from his cell. Compl. ¶¶ 74, 75. As a result of the incident, Trapani experienced "excruciating and debilitating pain." Id. ¶ 76.

**\*2** On May 25, 2011, Trapani sent a written complaint to defendant M. Coryer ("Coryer"), the nurse administrator, stating that "something is wrong with my liver and I have yet to be properly screened for cancer or auto immune hepatitis." Compl. ¶ 83; Dkt. No. 1-1 at 1. Trapani advised that he made his complaints known to mental health staff and "told them specifically if I find out something is wrong with me, when I get out in seven more months, and if my condition becomes irreversible, I am going to hunt the people who are responsible down and kill them." Dkt. No. 1-1 at 1.

In June 2011, Coryer issued a misbehavior report charging Trapani with making threats.[4] Compl. ¶¶ 89, 178. Trapani was found guilty of the charges. Id. ¶ 90. In June 2011, Trapani filed a grievance complaining that he received the misbehavior report in retaliation for "exercising his right to be free from cruel and unusual punishment."[5] Id. ¶ 96.

[4]   The misbehavior report was not annexed to the complaint and is not part of the record on the within motion.

[5]   The grievance was not annexed to the complaint and is not part of the record on the within motion.

On October 17, 2011, Trapani was admitted to the RCTP because he threatened to harm himself. Compl. ¶ 103. Over his objection, Trapani was discharged from the RCTP and taken to a cell without his personal belongings. Id. On October 25, 2011, after threatening to harm himself, Trapani was removed from his cell and received a tear-resistant safety gown and mat. Id. ¶ 106. On October 26, 2011, while confined in his SHU cell, Trapani used a piece of corroded metal and paint, that he picked off of the wall, to cut wrists "numerous times." Id. ¶¶ 110, 111. Trapani was removed from his SHU cell and placed in SHU-D-P3 ("P-3"), a cell used to conduct strip searches. Id. ¶ 111.

On October 27, 2011, while confined in P-3, Trapani smeared feces "all over the cell." Compl. ¶¶ 114, 115. Officers told Trapani that the MHU was under renovation and that he would not be admitted to RCTP. Id. ¶ 114. Officers removed Trapani from the cell and placed him in the SHU shower. Id. ¶ 115.

While in the shower, Trapani removed a metal hook. Id. Later that day, while confined in P-3, Trapani used the metal hook to cut his wrist. Id. ¶ 116.

On November 4, 2011, after suicidal threats, Trapani was placed in P-3, instead of the RCTP. Compl. ¶ 120; Dkt. No. 1-1 at 24. Upon entering the cell, Trapani defecated on the floor and smeared feces inside the cell. Compl. ¶ 122. Trapani also spread feces over his body. Dkt. No. 1-1 at 24. Plaintiff threatened the staff and ripped a mattress in an attempt to make a noose and hang himself. Compl. ¶ 122. Unidentified officers entered the cell, removed the piece of mattress wrapped around Trapani's neck, and took Trapani to the showers. Id. ¶ 123. When Trapani returned from the shower, he received an injection of psychotropic medication. Id. ¶ 124. Despite Trapani's objection, defendant Mohammad Masud Iqbal ("Iqbal"), a psychiatrist at Auburn C.F., ordered the injection. Id. ¶¶ 124, 128.

On November 18, 2011, Trapani threatened to harm himself and was admitted to the facility hospital. Compl. ¶ 130. On November 18, 2011, Iqbal ordered another injection of psychotropic medication. Id. ¶ 130. On November 19, 2011, Trapani defecated on the floor and smeared feces in the ward. Id. ¶ 131. Over Trapani's objection, he received the second psychotropic injection. Id. ¶ 135.

Trapani alleges that: (1) Steinberg, Vantassell, and Elser violated his constitutional rights under the Eighth Amendment with the use of excessive force on February 8, 2011; (2) Wright, Clark, Novak, Reilly, and Wiwsianyk violated his constitutional rights under the Eighth Amendment with the use of chemical agents on April 4, 2011; (3) Coryer retaliated against him in violation of his First Amendment rights when she issued the June 2011 Misbehavior Report; and (4) Iqbal violated his Fourteenth Amendment due process rights when he arranged for psychotropic injections in November 2011. See generally, Compl.

## II. DISCUSSION[6]

[6]   All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Report–Recommendation.

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 143 of 236

Trapani v. Coryer, Not Reported in Fed. Supp. (2016)

2016 WL 8732638

**\*3** Defendants move to dismiss the complaint arguing that: (1) Trapani failed to comply with the Court's Orders and Local Rules; (2) Trapani's excessive force claims and retaliation claim are barred by the statute of limitations; (3) Trapani's retaliation claim against Coryer fails to state a cause of action; and (4) Trapani's Fourteenth Amendment claims against Iqbal fail to state a cause of action. See generally Dkt. No. 38-1.

### A. Legal Standards

#### 1. Fed. R. Civ. P. 41(b)

Fed. R. Civ. P. 41(b) provides that a court may dismiss an action "[i]f the plaintiff fails to prosecute or comply with [the Federal Rules of Civil Procedure] or a court order ..." Fed.R.Civ.P. 41(b); see Link v. Wabash R.R. Co., 370 U.S. 626, 629 (1962); MT V Networks v. Lane, 998 F.Supp. 390, 393 (S.D.N.Y. 1998); see also N.D.N.Y.L.R. 41.2(b). Since a Rule 41(b) dismissal is a "harsh remedy ... [it] is appropriate in extreme situations." Lucas v. Miles, 84 F.3d 532, 535 (2d Cir. 1996) (citations omitted). Furthermore, courts should be "especially hesitant" to dismiss an action of a pro se plaintiff for "procedural deficiencies." Spencer v. Doe, 139 F.3d 107, 112 (2d Cir. 1998) (internal citations omitted); see also Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). To determine whether dismissal for failure to prosecute is appropriate, courts should consider whether:

> (1) plaintiff's failure to prosecute caused a delay of significant duration; (2) the plaintiff was given notice that further delay would result in dismissal; (3) the defendant was likely to be prejudiced by further delay; (4) the need to alleviate court calendar congestion was carefully balanced against plaintiff's right to an opportunity for a day in court; and (5) the trial court adequately assessed the efficacy of lesser sanctions.

Lucas, 84 F.3d at 535; see also Lewis v. Rawson, 564 F.3d 569, 576 (2d Cir. 2009) (citations omitted).

#### 2. Fed. R. Civ. P. 12(b)(6)

Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir. 1994). However, this "tenet ... is inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 555 (2007) (holding that "entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action ... [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.") (citation omitted)).

To defeat a motion to dismiss or a motion for judgment on the pleadings, a claim must include "facial plausibility ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]")); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ...") (citations omitted).

**\*4** Still, "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " Twombly, 550 U.S. at 555 (citations omitted). While a complaint attacked under the standard set forth in Rule 12(b)(6) does not require detailed factual allegations, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. (citations omitted).

### B. Failure to File Change of Address

Defendants move for dismissal of Trapani's complaint based upon Fed. R. Civ. P. 41(b) due to Trapani's failure to abide by

Trapani v. Coryer, Not Reported in Fed. Supp. (2016)

2016 WL 8732638

the Local Rules of Practice for this district ("Local Rules") and notify the Court of his current address. Dkt. No. 38-1 at 4.

According to the Local Rules, "[a]ll attorneys of record and pro se litigants must immediately notify the court of any changes of address." N.D.N.Y.L.R. 10.1(c)(2) (emphasis omitted). Failure to do so will subject the action to dismissal under Rule 41(b) of the Federal Rules of Civil Procedure and Local Rule 41.2(b) for lack of prosecution. See e.g., Fenza v. Conklin, 177 F.R.D. 126, 127 (N.D.N.Y. 1998).

On November 19, 2015, the Court mailed a copy of a Text Order to Trapani. Dkt. No. 32. On December 7, 2015, the aforementioned mailing was returned to the Court and marked "RTS." Dkt. No. 37. On December 18, 2015, defendants filed the within motion. Dkt. No. 38. On December 28, 2015, the Court received a Notice from Trapani indicating that he was confined at Schenectady County Jail ("Schenectady C.J.") after being temporarily released in September 2015. Dkt. No. 40. Trapani explained that he could not update his address during that time because he was homeless. Id.

Defendants do not claim that they suffered or are likely to suffer prejudice by Trapani's delay in updating his address. Generally, the duration of time at issue herein, less than four months, is not long enough to warrant dismissal. Hale v. Rao, No. 9:08-CV-612 (DNH/GHL), 2009 WL 3698420, at *9 (N.D.N.Y. Nov. 3, 2009). Moreover, while Trapani failed to comply with this district's Local Rules requiring him to "immediately" notify the Court and defendants of any change of address, Trapani's explanation that he was incapable of providing an address change due to being homeless, weighs against dismissal of his complaint.

Based upon the facts and procedural posture of this matter, the undersigned is not persuaded by the holdings of the cases cited by defendants in support of the within motion. See Fenza, 177 F.R.D. at 126 (dismissing the complaint where the Court received no communication from the plaintiff for nine months and the defendants' motion papers were undeliverable); see also Dansby v. Albany Cty. Corr. Staff, No. 95-CV-1525 (RSP/RWS) 1996 WL 172699, at *1 (N.D.N.Y. Apr. 10, 1996) (dismissing the complaint because the plaintiff failed to sign the complaint, file a Rule 11 affidavit, or change his address). Here, Trapani received defendant's motion to dismiss and submitted opposition thereto. Defendants' reply memorandum of law was served upon plaintiff at Schenectady C.J. on January 11, 2016. Dkt.

No. 42-1. The docket does not indicate and defendants do not allege that Trapani did not receive the submission.

Accordingly, defendants' motion to dismiss all claims pursuant to Rule 41(b) should be denied.

### C. Statute of Limitations

**\*5** Defendants argue that Trapani's excessive force claims and retaliation claim should be dismissed because they are time barred by the three-year statute of limitations. Dkt. No. 38-1 at 7. Trapani claims that the statute was tolled while he pursued administrative remedies, as required by the Prison Litigation Reform Act ("PLRA"). Dkt. No. 41 at 7.

The statute of limitations period for section 1983 claims brought in federal court in New York is three years, which accrues from the date "the plaintiff 'knows or has reason to know of the injury which is the basis of his action.' " Bradley v. Rell, 703 F. Supp. 2d 109, 125 (N.D.N.Y. 2010) (quoting Singleton v. City of N.Y., 632 F.2d 185, 191 (2d Cir. 1980), cert. den., 450 U.S. 920 (1981)) (additional citations omitted). However, the Second Circuit has held that equitable tolling is applicable to claims brought under the PLRA, otherwise a prisoner would risk the dismissal of his or her complaint based on untimeliness if he or she were to wait to receive a final administrative decision before filing suit. Gonzalez v. Hasty, 651 F.3d 318, 323–24 (2d Cir. 2011) (noting that the Ninth, Fifth, Seventh, and Sixth Circuits have all held that equitable tolling applies to the time period in which a prisoner is exhausting his or her administrative remedies). Under the Second Circuit's rule, the equitable tolling period begins when a plaintiff first raises his administrative claim, and ends when the plaintiff's administrative remedies are deemed exhausted. Gonzalez, 651 F.3d at 324. The statute of limitations, however, is only tolled during the period when a prisoner is "actively exhausting" his administrative remedies. See id. at 322 n.2. The statute of limitations is not tolled during the period between the accrual of the claims and when the plaintiff began the administrative remedy process. Id. at 324.

### 1. Claims Arising from February 8, 2011 Incident

Trapani's excessive force claim accrued on February 8, 2011, the date on which he learned of the alleged constitutional violation. On February 18, 2011, Trapani filed a grievance regarding the February 8, 2011 incident. Dkt. No. 1-1 at 8. On

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 145 of 236

Trapani v. Coryer, Not Reported in Fed. Supp. (2016)
2016 WL 8732638

June 1, 2011, Trapani received notice of the Central Office Review Committee's ("CORC") decision on his grievance.[7] Id. On June 1, 2014, Plaintiff signed his complaint in this action.[8] Dkt. No. 1 at 50. Based on Trapani's assertions, because he was actively pursuing administrative remedies, the statute of limitations period for the February 8, 2011 incident was tolled between February 18, 2011 and June 1, 2011. Defendants argue that since Trapani waited until February 18, 2011 to file his grievance, the statute of limitations ran for nine days before it was tolled. Dkt. No. 42 at 4. Therefore, defendants contend that the statute of limitations on the excessive force claims arising from the February 8, 2011 incident expired on May 24, 2014. Id.

[7]    CORC review is the last step in the administrative grievance process. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(d). Once CORC issues its decision, the claim is deemed exhausted, and the grievant may file suit in federal court. See Amador v. Andrews, 655 F.3d 89, 102 (2d Cir. 2011).

[8]    Defendants concede that Trapani submitted the complaint through the prison mail system on or about June 1, 2014, but contend that it was returned to him on June 2, 2014 for lack of postage. Dkt. No. 1-1 at 6. Under the "prison mailbox rule," the date of filing is deemed to be the date that the prisoner-plaintiff delivered his complaint to a prison guard for mailing to the court, which is presumed to be the date that the complaint was signed. See Houston v. Lack, 487 U.S. 266, 276 (1988); Noble v. Kelly, 246 F.3d 93, 97 (2d Cir. 2011) (citation omitted).

**\*6** Here, the statute of limitations was tolled for a total of 101 days from February 18, 2011 until June 1, 2011. However, because Trapani did not file a grievance regarding the alleged constitutional violation until ten days after the incident occurred, the statute of limitations was not tolled between February 8, 2011 and February 18, 2011. See Gonzalez, 651 F.3d at 322 n.2 (noting that, "if an inmate's claim accrues on January 1, 2010, and the inmate does not begin pursuing administrative remedies until December 1, 2010, any subsequent tolling that may be applicable would not include this eleven month period."). Accordingly, the statute of limitations on Trapani's excessive force claims arising out of the February 8, 2011 incident lapsed on May 20, 2014. Trapani signed his complaint on June 1, 2014, eleven days after the statute of limitations expired. See Compl. at

50. Accordingly, these claims are barred by the statute of limitations.

Trapani received notice and an opportunity to be heard with respect to tolling arguments. See Abbas v. Dixon, 480 F.3d 636, 640 (2d Cir. 2008). Trapani opposed the motion to dismiss and presented arguments related to tolling based upon his attempts to exhaust his administrative remedies. Dkt. No. 41. Trapani did not present any further arguments in support of equitable tolling. From the facts alleged in the complaint, Trapani's excessive force claims arising from the February 8, 2011 incident are time barred.

### 2. Excessive Force Claims Arising from April 4, 2011 Incident and Retaliation Claim Based upon June 2011, Misbehavior Report

Defendants argue that the excessive force claims arising out of the April 4, 2011 incident and retaliation claim based upon the June 2011 Misbehavior Report are barred by the statute of limitations because plaintiff provided, "insufficient information regarding how long, if at all, the statute of limitations should be tolled for these claims." Dkt. No. 42 at 5. Defendants misconstrue Trapani's burden of proof in this regard.

"The statute of limitations is an affirmative defense, and on a motion to dismiss pursuant to such defense, the defendant has the burden of demonstrating, based on the allegations in the complaint, that the claim is untimely." Egan v. Kennedy, No. 04-CV-6626, 2008 W L 4647740, at \*3 (W.D.N.Y. Oct. 17, 2008). "If the defendant meets this burden, then the plaintiff has the burden to show that the limitations period should be tolled." Id. (quoting Omollo v. Citibank, N.A., No. 07 Civ. 9259, 2008 WL 1966721, at \*3 (S.D.N.Y. May 6, 2008)); see also Ellington Long Term Fund, Ltd. v. Goldman, Sachs & Co., No. 09 CIV. 9802, 2010 WL 1838730, at \*4 (S.D.N.Y. May 4, 2010) ("Plaintiffs' obligation to produce evidence at the motion to dismiss stage is even further reduced in the context of a motion to dismiss premised on the statute of limitations—an affirmative defense on which the defendant bears the burden of proof.").

Construing the complaint liberally, with the "special solicitude" a court must afford the non-movant, see Triestman, 470 F.3d at 477, dismissal of these claims, based upon the statute of limitations, is not warranted. With respect to the accrual date for the retaliation claim, the record before

Case 9:23-cv-01114-DNH-MJK Document 31 Filed 04/22/24 Page 146 of 236

Trapani v. Coryer, Not Reported in Fed. Supp. (2016)

2016 WL 8732638

the undersigned lacks any information related to the June 2011, Misbehavior Report, including the date that it was issued. Therefore, the undersigned is unable to determine when the retaliation claim accrued. Further, Trapani alleges that the statute was tolled during the time that he actively pursued his administrative remedies with respect to the excessive force claims and retaliation claim. Dkt. No. 41 at 7-8. On April 21, 2011 and June 26, 2011, Trapani filed grievances. See Compl. ¶¶ 144, 145. The complaint does not contain facts specifying which incidents were addressed in these grievances. At this juncture, Trapani has alleged sufficient facts that render his excessive force claims and retaliation claim timely.

**\*7** Accordingly, the undersigned recommends that defendants' motion to dismiss Trapani's excessive force claims related to the February 8, 2011 as untimely be granted. It is further recommended that defendants' motion to dismiss the excessive force claims related to the April 4, 2011 incident and the retaliation claim based upon the June 2011 Misbehavior Report, as untimely, be denied. [9]

[9] Defendants do not present any further argument in support of dismissal of Trapani's excessive force claims.

### D. First Amendment

Defendants contend that Trapani has failed to state a cause of action for retaliation against Coryer. Dkt. No. 38-1 at 8. Specifically, defendants allege that the complaint lacks any facts suggesting a causal connection between any protected speech and any retaliatory act by Coryer. Dkt. No. 38-1 at 9.

To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotation marks and citation omitted); Tafari v. McCarthy, 714 F.Supp.2d 317, 347 (N.D.N.Y. 2010). The Second Circuit has stated that courts may approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a

constitutionally proscribed retaliatory act." Dawes v. Walker, 239 F.3d 489 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002) (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983)); Franco v. Kelly, 854 F.2d 584, 590 (2d Cir. 1988).

As to the first element of the retaliation claim, it is well settled that the filing of grievances constitutes protected activity for purposes of a First Amendment retaliation analysis. See Johnson v. Eggersdorf, 8 Fed.Appx. 140, 144 (2d Cir. 2001) ("It is undisputed that retaliation by prison officials against an inmate for the filing of a grievance can act as a deprivation of a constitutionally protected right."). In the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003). A plaintiff can establish a causal connection that suggests retaliatory intent by showing that his protected activity was close in time to the complained-of adverse action. Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2001) (citations omitted). While there is no "bright line" defining the limits of the temporal relationship, courts in this Circuit have held that an adverse action taken within three months after a protected activity can reasonably be perceived as retaliatory. See Gorman-Bakos v. Cornell Coop. Extn. of Schenectady Cty., 252 F.3d 545, 554 (2d Cir. 2001); see also Ashok v. Barnhart, 289 F.Supp.2d 305, 314 (E.D.N.Y. 2003) (reasoning that the interval between a protected activity and an adverse action that results in a finding of retaliation is generally no more than several months).

Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. Jackson v. Onondaga Cnty., 549 F. Supp. 2d 204, 214–15 (N.D.N.Y. 2008). To that end, there is a "presumption that a prison official's acts to maintain order are done for a proper purpose." Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998) (citation omitted). The Second Circuit has explained that "the conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage." Id. If a plaintiff satisfactorily alleges that an improper motive played a substantial part in the defendant's action, the defendant must show that it would have taken "exactly the same action absent the improper motive." Scott v. Coughlin, 344 F.3d 282, 288 (2d Cir. 2003)

Trapani v. Coryer, Not Reported in Fed. Supp. (2016)

2016 WL 8732638

(citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)).

**\*8**  On May 25, 2011, Trapani sent a written complaint to Coryer. Dkt. No. 1-1 at 1. Therefore, he was engaged in constitutionally protected conduct. Johnson, 8 Fed.Appx. at 144. In June 2011, Coryer authored a misbehavior report charging Trapani with making threats. At this juncture, the allegations are sufficient to satisfy the second prong of the retaliation analysis. See Gill, 389 F.3d at 384 (holding that the filing of a false misbehavior report constitutes an adverse action). With regard to the third element, the temporal proximity between the protected activity and adverse action is sufficiently alleged to defeat a motion seeking dismissal of a retaliation claim. See, e.g., Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (citation omitted).

Defendants claim that Coryer would have taken the same action against Trapani absent the protected speech or retaliatory motive. Dkt. No. 38-1 at 10. However, defendants have not presented any explanation of Coryer's alleged non-retaliatory motives. The Court is unable, on a motion to dismiss, to resolve factual disputes regarding whether Coryer would have issued the misbehavior report in the absence of retaliatory motive. See Carl v. Dirie, No. 9:09-CV-0724 (GTS/RFT), 2010 WL 3338566, at \*6 (N.D.N.Y. Mar. 29, 2010) (denying the defendant's motion to dismiss a retaliation claim due to factual issues regarding whether the defendants would have taken the same actions in the absence of retaliatory motives).

Accordingly, it is recommend that defendants' motion to dismiss Trapani's retaliation claim against Coryer be denied.

### E. Due Process

Defendants move to dismiss Trapani's Fourteenth Amendment claim against Iqbal for failure to state a claim. Dkt. No. 38-1 at 11. Defendants argue that Iqbal arranged for Trapani to receive psychotropic intramuscular injections because Trapani was a danger to himself and DOCCS staff. Dkt. No. 38-1 at 13.

"[G]iven the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." Washington

v. Harper, 494 U.S. 210, 227 (1990). Further. "[t]he Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if he is dangerous to himself or others and the treatment is in his medical interest." Id. at 227-229 (holding that the procedural protections required must be determined with reference to the rights and interests at stake in the particular case). "[T]here must be a showing that the inmate has a serious mental illness, that he poses a danger to himself or others, and that the proposed treatment is in the inmate's medical interest." U.S. v. Hardy, 724 F.3d 280, 296 (2d Cir. 2013). "[C]ourts have determined that substantive due process dictates that psychotropic drugs be administered to an involuntarily committed patient over objection only where: (1) the patient is incompetent to make medical decisions, (2) the patient is dangerous to himself or others, and (3) the treatment is in the patient's medical interest." Meyers v. New York Atty. Gen., No. 12-CV-04450 CBA LB, 2013 W L 244934, at \*7 (E.D.N.Y. Jan. 17, 2013) (citation and internal quotation marks omitted); see also Inesti v. Hogan, No. 11 CIV. 2596, 2013 W L 5677046, at \*11 (S.D.N.Y. Sept. 30, 2013) ("[I]t is well settled that a patient's liberty interest in not being involuntarily medicated is overridden in an emergency, where failure to medicate forcibly would result in a substantial likelihood of physical harm to that patient, other patients, or to staff members of the institution.") (citations omitted). The Second Circuit has cautioned that "deference ... is owed to medical professionals who have the fulltime responsibility of caring for mentally ill inmates ... and who possess, as courts do not, the requisite knowledge and expertise to determine whether the drugs should be used in an individual case." Hardy, 724 F.3d at 295 (citing Washington, 494 U.S. at 231) (internal quotation marks omitted).

**\*9**  In the present case, Trapani claims that Iqbal forcibly administered an injection of "psychotropic" medication, over his objection, "even though substantial time had passed since Trapani tried hanging himself with [a] piece of ripped mattress and there was [sic] no more problems out of him during the interim." Compl. ¶ 166. Trapani argues that the November 19, 2011 injection was ordered one day prior, upon his admission to the hospital, without a "precipitating event justifying such an order." Dkt. No. 1-1 at 21. Trapani contends that Iqbal issued "prearranged" and "advance standing orders for force administration of anti-psychotic medications" to punish him without notice or a hearing. Dkt. No. 41 at 10.

"It is important to recognize the difference between disposing of a case on a [motion to dismiss] and resolving the case

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 148 of 236

Trapani v. Coryer, Not Reported in Fed. Supp. (2016)

2016 WL 8732638

later in the proceedings, for example by summary judgment." See McGuire v. Warren, 207 Fed.Appx. 34, 35 (2d Cir. 2006) (internal quotation marks and citation omitted). "At the [motion to dismiss] stage, the issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test." Id. (citations and internal quotation marks omitted). At this stage of the litigation, the complaint, when liberally construed, sufficiently alleges that Iqbal administered psychotropic drugs over Trapani's objections in violation of the due process clause. Trapani concedes that he made several attempts to harm himself and repeatedly threatened suicide. Despite those attempts and threats, Trapani alleges that defendants continually refused to admit him to the MHU and RCTP. See Compl. ¶ 94, 109, 114, 119, 120. In the instances when he was admitted to the MHU or RCTP, Trapani contends that he was prematurely discharged despite his continued threats to harm himself. See id. ¶¶ 55, 57, 70-72, 74, 103-105, 120. Accordingly, the issue of whether defendants reasonably believed that Trapani was a threat to himself or others, is a question of fact that cannot be resolved on the record before the undersigned on a motion to dismiss.

Accordingly, defendants' motion on this ground should be denied.

### III. CONCLUSION

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that defendants' motion to dismiss based upon Fed. R. Civ. P. 41(b) (Dkt. No. 38) be **DENIED**; and it is further

**RECOMMENDED**, that defendants' motion to dismiss based upon Fed. R. Civ. P. 12(b)(6) (Dkt. No. 38) be **GRANTED** as to:

a. Excessive force claims arising from the February 8, 2011 incident against Steinberg, Vantassell, and Elser; and it is further

**RECOMMENDED**, that defendants' motion to dismiss based upon Fed. R. Civ. P. 12(b)(6) (Dkt. No. 38) be **DENIED** as to plaintiff's:

a. Excessive force claims arising from the April 4, 2011 incident against Wright, Clark, Novak, Reilly, and Wiwsianyk; and

b. Retaliation claim against Coryer; and

c. Fourteenth Amendment claims against Iqbal; and it is further

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1( c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 8732638

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Trapani v. Coryer, Not Reported in Fed. Supp. (2016)

2016 WL 8732640

2016 WL 8732640
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Damian TRAPANI, Plaintiff,

v.

M. CORYER, Nurse Admin., Auburn Corr. Facility;
Nicholas Wiwsianyk, Corr. Officer, Auburn Corr.
Facility; Sean Reilly, Corr. Officer, Auburn Corr.
Facility; Gary Steinberg, Corr. Officer, Auburn Corr.
Facility; Bryan Vantassell, Corr. Officer, Auburn Corr.
Facility; James Elser, Corr. Officer, Auburn Corr.
Facility; J. Wright, Sergeant, Auburn Corr. Facility;
T. Clark, Corr. Officer, Auburn Corr. Facility; C.
Novak, Corr. Officer, Auburn Corr. Facility; John Doe
#7, Lieutenant, Auburn Corr. Facility; John Doe #10,
Captain, Auburn Corr. Facility; and Mohammad Masud
Iqbal, Psychiatrist, Auburn Corr. Facility, Defendants.

9:14-CV-0683 (GTS/CFH)
|
Signed 07/15/2016

**Attorneys and Law Firms**

DAMIAN TRAPANI, No. 32911, Schenectady County
Jail, 320 Veeder Avenue, OF COUNSEL: NICOLE E.
HAIMSON, ESQ., Assistant Attorney General, Schenectady,
New York 12307, Pro Se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for the
State of New York, The Capitol, Albany, New York 12224,
Counsel for Defendants.

**DECISION and ORDER**

HON. GLENN T. SUDDABY, Chief United States District
Judge

 **\*1**  Currently before the Court, in this *pro se* prisoner civil
rights action filed by Damian Trapani ("Plaintiff") against
the twelve above-captioned employees of the New York
State Department of Corrections and Community Supervision
("Defendants"), are Defendants' motion to dismiss Plaintiff's
Complaint for failure to state a claim upon which relief
can be granted pursuant to Fed. R. Civ. P. 12(b)(6) and for
failure to comply with a Court Order pursuant to Fed. R.

Civ. P. 41(b), and United States Magistrate Judge Christian
F. Hummel's Report-Recommendation recommending that
Defendants' motion be granted in part and denied in part. (Dkt.
Nos. 38, 44.) None of the parties have filed an Objection
to the Report-Recommendation, and the deadline in which
to do so has expired. (*See generally* Docket Sheet.) After
carefully reviewing the relevant papers herein, including
Magistrate Judge Hummel's Report-Recommendation, the
Court can find no clear-error in that thorough Report-
Recommendation. [1] Magistrate Judge Hummel has employed
the proper standards, accurately recited the facts, and
reasonably applied the law to those facts. As a result,
the Report-Recommendation is accepted and adopted in its
entirety for the reasons set forth therein. [2]

[1]     When no objection is made to a report-
        recommendation, the Court subjects that report-
        recommendation to only a clear error review. Fed.
        R. Civ. P. 72(b), Advisory Committee Notes: 1983
        Addition. When performing such a "clear error"
        review, "the court need only satisfy itself that there
        is no clear error on the face of the record in order to
        accept the recommendation." *Id.*; *see also Batista
        v. Walker*, 94-CV-2826, 1995 WL 453299, at *1
        (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am
        permitted to adopt those sections of [a magistrate
        judge's] report to which no specific objection is
        made, so long as those sections are not facially
        erroneous.") (internal quotation marks omitted).

[2]     The Court notes that it agrees that Plaintiff
        filed his excessive force claim against Defendants
        Steinberg, Vantassell and Elser eleven days late
        for slightly different reasons than those offered
        by Magistrate Judge Hummel. Specifically, by the
        Court's count, 103 days (not 101 days) elapsed
        between February 18, 2011, and June 1, 2011,
        meaning that the statute of limitations appears to
        have expired on May 22, 2014 (not May 20, 2014).
        However, while Plaintiff's Complaint appears to be
        dated June 1, 2014, his Civil Cover Sheet is clearly
        dated June 2, 2014, indicating that he initially
        submitted his package for mailing on Monday, June
        2, 2014 (not on Sunday, June 1, 2014). (Dkt. No.
        1, Attach. 2.) Even if the Court's calculations are
        in error, however, eleven days elapsed between
        the expiration of the limitations period and the
        filing of Plaintiff's referenced excessive force

claim, according to Magistrate Judge Hummel's calculations.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Hummel's Report-Recommendation (Dkt. No. 44) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**\*2  ORDERED** that Defendants' motion to dismiss Plaintiff's Complaint for failure to comply with a Court Order pursuant to Fed. R. Civ. P. 41(b) (Dkt. No. 38) is **DENIED**; and it is further

**ORDERED** that Defendants' motion to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) (Dkt. No. 38) is **GRANTED in part** and **DENIED in part** in the following respects:

(1) Plaintiff's Eighth Amendment excessive force claims against Defendants Steinberg, Vantassell and Elser arising from the incident on February 8, 2011, are **DISMISSED**, and those individuals are **TERMINATED** as Defendants in this action; but

(2) Plaintiff's three remaining claims (i.e., Plaintiff's Eighth Amendment excessive force claims against Defendants Wright, Clark, Novak, Reilly and Wiwsianyk arising from the incident of April 4, 2011, his First Amendment retaliation claim against Defendant Coryer, and his and Fourteenth Amendment due process claim against Defendant Iqbal) **SURVIVE** Defendants' motion to dismiss.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 8732640

---

**End of Document**                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 5813689

2021 WL 5813689
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Gerald J. MOBLEY, Plaintiff,

v.

Sergeant CRANE, et al., Defendants.

9:21-CV-299 (BKS/ATB)
|
Signed 11/03/2021

**Attorneys and Law Firms**

GERALD J. MOBLEY, Plaintiff, pro se.

BRENDA T. BADDAM, Asst. Attorney General, for defendants.

**REPORT and RECOMMENDATION**

Andrew T. Baxter, United States Magistrate Judge

**\*1** Presently before the court is defendants' motion to dismiss plaintiff's pro se civil rights complaint on statute-of-limitations grounds, pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 14). This matter has been referred to me for Report and Recommendation by the Honorable Brenda K. Sannes, United States District Judge. Plaintiff has not filed any opposition to the motion.[1] For the following reasons, this court recommends that the defense motion to dismiss be granted, unless plaintiff files an objection to this Report and Recommendation that articulates viable grounds for equitable tolling of the applicable statute of limitations.

[1]     Plaintiff contacted the Clerk's Office by telephone on the day his response was due, and sought an extension of his deadline to respond, claiming that his submission to the court had been returned by the post office for insufficient postage. (7/12/2021 staff note). He was advised by the Clerk that he would be required to submit his request for an extension in writing, but plaintiff, thereafter, did not file anything further. (Id.)

**I. Procedural History and Relevant Facts**
Plaintiff signed his complaint on February 18, 2021, alleging that the defendants failed to protect him from an assault by another inmate, while plaintiff was incarcerated at the at the Marcy Correctional Facility ("Marcy"). (Complaint ("Compl."), Dkt. No. 1 at 9).[2] The complaint alleges that, on February 9, 2018, while "80 to 100 inmates" were walking through Marcy from the gym to the housing units, plaintiff was attacked by another inmate, who cut him on his face with a sharp object. (Compl., Dkt. No. 1 at 7). Defendant Correctional Officers Weaver and Jensen, who were not at their assigned posts near the location of the assault, belatedly responded to the incident. (Id.). Plaintiff was treated for his injuries with 22 stitches at an outside hospital. (Id.). When plaintiff arrived back at Marcy, defendant Security Supervisor Sergeant Crane told plaintiff that prison officials had "3 days of prior" warning of the assault because they had received "slips from informants which were dropped throughout the week to security personnel[.]" (Id. at 8).

[2]     Plaintiff used a form-complaint of the Eastern District of New York in initiating this action, but inserted additional pages in between the numbered pages of the form. Thus, the court will cite to the page of the complaint as assigned by the court's electronic filing system ("CM/ECF").

Plaintiff's complaint was received by the U.S. District Court for the Eastern District of New York ("E.D.N.Y.") and filed on March 2, 2021. (Dkt. No. 1).[3] On March 16, 2021, E.D.N.Y. District Judge Joanna Seybert issued an Order transferring the action to this district, because the named defendants all worked at Marcy, located in the Northern District of New York ("N.D.N.Y."), and because the incidents on which plaintiff's claims were based all occurred while he was incarcerated at Marcy. (Dkt. No. 5). Based on an initial review of the complaint by N.D.N.Y. District Judge Sannes, defendants were ordered to respond to plaintiff's Eighth Amendment failure-to-protect claim against defendants Weaver, Jensen, and Crane remain. (4/26/21 Decision and Order, Dkt. No. 7).[4] Those defendants then filed their motion to dismiss.

[3]     The complaint was stamped as filed on March 2, **2020** by the E.D.N.Y., but it is clear from the docket that it was received and filed in **2021**.

[4]     Plaintiff's claim against the Superintendent of Marcy--designated as "John Doe" in the complaint--was dismissed by Judge Sannes

2021 WL 5813689

without prejudice, but plaintiff never sought to amend his claims against that defendant.

## II. Motion to Dismiss

**\*2** To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555). When considering a motion to dismiss pursuant to Rule 12(b)(6), the court's consideration is limited to the factual allegations as stated in the complaint, any documents attached to the complaint as exhibits or incorporated by reference, and matters of which the court may take judicial notice. *Portillo v. Webb*, No. 16 Civ. 4731 (VEC/GWG), 2017 WL 4570374, at \*1 (S.D.N.Y. Oct. 11, 2017) (citing, inter alia, *Brass v. Am. Film Tech.*, 987 F.2d 142, 150 (2d Cir. 1993)).

"Plaintiff's failure to oppose the motion to dismiss does not relieve the Court of its obligation to consider the merits of plaintiff's claims." *Bloom v. Fischer*, 840 F. Supp. 2d 691, 692 (W.D.N.Y. 2012). "If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal." *McCall v. Pataki*, 232 F.3d 321, 322 (2d Cir. 2000). The Second Circuit has repeatedly "reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally[ ]' " "particularly ... when the pro se plaintiff alleges that [his/]her civil rights have been violated." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).

## III. Statute of Limitations

### A. Legal Standards

Federal courts apply the state law, personal injury statute of limitations period to the filing section of 1983 actions. *Wilson v. Garcia*, 471 U.S. 261, 276 (1985). In New York State, the relevant limitations period is three years. *Owens v. Okure*, 488 U.S. 235, 250-51 (1989). *See* N.Y. Civ. Prac. L & R. § 214(5). Thus, unless the limitations period is tolled for some reason, a plaintiff must file his section 1983 civil rights action within three years of the accrual of each cause of action.

Federal law governs the question of when a section 1983 claim accrues. *Covington v. City of New York*, 171 F.3d 117, 121 (2d Cir. 1999) (citation omitted). Generally, under federal law, a cause of action accrues when " 'the plaintiff knows or has reason to know of the injury which is the basis of his action.' " *Id.* (citation omitted). "Although federal law determines when a section 1983 claim accrues, state tolling rules determine whether the limitations period has been tolled, unless state tolling rules would 'defeat the goals' of section 1983." *Abbas v. Dixon*, 480 F.3d 636, 641 (2d Cir. 1997).

The Supreme Court has held that an inmate's papers may be deemed "filed" as of the time of delivery to prison authorities for forwarding to the district court. *Houston v. Lack*, 487 U.S. 266 (1988). This rule became known as the "prison mailbox rule," and has been applied to complaints filed by inmates for purposes of the statute of limitations. *See Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir. 1993), modified on other grounds, 25 F.3d 81 (2d Cir. 1994).

In "rare and exceptional" cases, the doctrine of equitable tolling may apply to defeat an argument that the action was not timely filed. *Abbas v. Dixon*, 480 F.3d at 642. *See also Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 322 (2d Cir. 2004) ("Equitable tolling is an extraordinary measure that applies only when plaintiff is prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances."). Equitable tolling allows the court to extend the statute of limitations past the time of expiration as necessary to avoid inequitable circumstances. *Johnson v. Nyack Hospital*, 86 F.3d 8, 12 (2d Cir. 1996) (citation omitted). In order to apply equitable tolling, the court must find that "extraordinary circumstances" prevented the plaintiff from performing the required act, and that plaintiff acted "with reasonable diligence" during the period that he seeks to toll. *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (quoting *Doe v. Menefee*, 391 F.3d 159 (2d Cir. 2004)).

**\*3** Equitable tolling is applicable to the time period during which a prisoner-plaintiff is exhausting his administrative remedies pursuant to the Prison Litigation Reform Act of 1995 ("PLRA"). *Gonzalez v. Hasty*, 651 F.3d 318, 323 (2d Cir. 2011). However, the statute is tolled only while the plaintiff is "actively exhausting," and is not tolled between the time that the cause of action accrues and the time that plaintiff begins the administrative exhaustion process. *Id.* at 324.

Because the failure to file an action within the limitations period is an affirmative defense, a plaintiff is generally not required to plead that the case is timely filed. *See Abbas*, 480 F.3d at 640. However, "a statute of limitations defense

2021 WL 5813689

may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Thea v. Kleinhandler,* 807 F.3d 492, 501 (2d Cir. 2015). " '[W]hen the allegations of the complaint make clear that the claim is barred by the limitations period, the plaintiff has the burden of establishing a basis to toll the applicable statute.' " *Rusyniak v. Gensini,* 629 F. Supp. 2d 203, 232 (N.D.N.Y. 2009) (citing *Eickhorst v. E.F. Hutton Group, Inc.,* 763 F. Supp. 1196, 1202 (S.D.N.Y. 1990)). However, before a complaint may be dismissed on statute-of-limitations grounds, the plaintiff should have notice and an opportunity to be heard with respect to any argument for tolling. *Abbas,* 480 F.3d at 640.

### B. Application

Defendants assert that plaintiff's failure-to-protect claim "began to accrue on February 9, 2018, when the inmate-on-inmate attack took place [and] ... Plaintiff suffered injuries." [5] (Def.s' Mem. of Law at 3, Dkt. No. 14-1). Defense counsel notes that plaintiff's complaint was filed "on March 2, 2021--approximately 3 years and 21 days after the assault took place"--and his complaint "was dated February 18, 2021--approximately three years and 9 days after he was assaulted." (*Id.*). Accordingly, defense counsel argues, "Plaintiff's claims ... should be dismissed as untimely under the applicable [three-year] statute of limitations." (*Id.*).

[5]     It is unclear from the complaint when plaintiff was returned from the hospital and allegedly learned from defendant Crane that facility security personnel at Marcy had advance notice of a planned assault. Even if it was not until several days after he suffered injury from the assault, that plaintiff learned of specific evidence of defendant's deliberate indifference to an imminent risk of harm to plaintiff, that would not extend the accrual date of the failure-to-protect claim. Accrual of a section 1983 claim generally occurs " 'when the plaintiff knows or has reason to know of the injury which is the basis of his action.' " *Fairley v. Collins,* No. 09 CIV. 6894, 2011 WL 1002422, at *3 (S.D.N.Y. Mar. 15, 2011) (citations omitted). The " 'discovery of the injury, not discovery of the other elements of the claim, ... starts the clock.' " *Id.* (citing, inter alia, *Whitfield v. O'Connell,* No. 09 Civ. 1925, 2010 WL 1010060, at *5 (S.D.N.Y. Mar. 18, 2010), *aff'd,* 402 F. App'x 563 (2d Cir. 2010)). Even if plaintiff's claim did not accrue until his alleged conversation with defendant Crane, it seems unlikely, based on the facts as alleged in the complaint, that the delay between the assault and that conversation would have been long enough to cure the untimeliness of plaintiff's filing of his complaint.

Plaintiff was no longer in state custody when he filed his complaint (*see* Dkt. No. 1), so the prison mailbox rule would not apply to move back his imputed filing date to February 18, 2021, when he signed his pleading. The apparent twelve-day mailing delay in delivery of his complaint to the Clerk of the E.D.N.Y. would not appear to support equitable tolling, particularly because plaintiff did not even date his complaint until nine days after the filing deadline. In *Diaz v. Kelly,* 515 F.3d 149, 155-56 (2d Cir. 2008), the Second Circuit held that a delay in mailing can qualify as an extraordinary circumstance warranting equitable tolling in the context of a prisoner habeas petition, but the delay in mailing in that case was several months. In *Saunders v. Senkowski,* 587 F.3d 543, 550 (2d Cir. 2009), the Second Circuit narrowed the reach of the *Diaz* case, stating: "We are aware of no case holding that a delay occasioned by the normal course of the mail ... constitutes an "extraordinary" circumstance for purposes of equitable tolling, and we decline to so hold now." Following this reasoning, *Simmons v. Brown,* No. 08-CV-01425, 2011 WL 2133844, at *9-11 (E.D.N.Y. May 26, 2011) held that an eight-day delay in the mails "[did] not present extraordinary circumstances warranting equitable tolling," particularly because the habeas petitioner waited almost a year before attempting to file a critical document. [6]

[6]     The cited cases all consider equitable tolling in the context of prisoner habeas petitions and the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). However, similar analysis would appear to be instructive in the context of a federal civil action. *See, e.g., Ko v. JP Morgan Chase Bank, N.A.,* 730 F. App'x 62, 64 (2d Cir. 2018) (in the context of an employment discrimination case, rejecting plaintiff's argument that a short, routine delay in mail service supported equitable tolling, particularly in light of the plaintiff's lack of diligence during the prior time period). To the extent standards for equitable tolling under New York law would apply in this case, they are even more restrictive than the federal law cited above. *See, e.g., Zumpano v. Quinn,* 6 N.Y.3d 666, 674, 849 N.E.2d 926, 929 (2006) ("this Court has held that equitable estoppel [to toll a statute of

Case 9:23-cv-01114-DNH-MJK   Document 31   Filed 04/22/24   Page 154 of 236
Mobley v. Crane, Not Reported in Fed. Supp. (2021)
2021 WL 5813689

limitations] will apply 'where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action'[;] [m]oreover, the plaintiff must demonstrate reasonable reliance on the defendant's misrepresentations") (citations omitted); *Platzman v. Munno*, 184 Misc. 2d 201, 204, 706 N.Y.S.2d 846, 849 (Sup. Ct. Rockland Cty. 2000), aff'd, 282 A.D.2d 539, 722 N.Y.S.2d 886 (2d Dept. 2001) (Zoning Board of Appeals was not barred by equitable estoppel from relying on a statute of limitations defense even though the petitioner asserted that neither he, nor his lawyer, ever received, in the mail, the zoning variance decision that triggered the 30-day filing deadline to seek Article 78 review; it was incumbent upon petitioners to diligently inquire as to the status of the decision after submitting the variance application).

**\*4** If plaintiff filed a grievance relating to the claims in his complaint while still incarcerated,[7] that could support a viable argument for equitable tolling of the statute of limitations by more than the 21 days by which plaintiff missed his filing deadline.[8] Plaintiff was not required to allege in his complaint that he filed a grievance, or otherwise exhausted his administrative remedies, which would have been a prerequisite to filing a federal civil rights action, as long as he was still incarcerated.[9] See *Jones v. Bock*, 549 U.S. 199, 216 (2007) ("failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints"). In their motion to dismiss, defendants do not state whether plaintiff ever actively pursued a grievance with respect to his failure-to-protect claim.

[7]     According to the Inmate Lookup feature of the New York Department of Corrections and Community Supervision ("DOCCS"), plaintiff was granted "MERIT RELEASE TO PAROLE" on September 27, 2018. http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ2/WINQ120. Plaintiff's deadline for filing a grievance would have been 21 days following the February 9, 2018 incident, 7 N.Y.C.R.R.§ 701.5(a)(1), so he would still have been in DOCCS custody for at least six months when he could have been pursuing his administrative remedies.

[8]     Under DOCCS grievance procedures, a grievance relating to staff misconduct may be submitted directly to the facility superintendent. The superintendent has 25 days to respond to the grievance. Within seven days of the superintendent's response, the inmate must initiate an appeal to the Central Office Review Committee ("CORC"), which then has 30 days to render a final decision. *See, e.g., Moore v. Mansueto*, No. 9:19-CV-624 (GTS/ML), 2021 WL 3710736, at *2-3 (N.D.N.Y. Aug. 20, 2021); *Hayes v. Dahlke*, 976 F.3d 259, 264 (2d Cir. 2020); 7 N.Y.C.R.R.§ 701.5. Thus, for an inmate to fully exhaust his administrative remedies, as required to pursue a civil rights action in federal court, he would typically have a grievance actively pending for well more than 21 days.

[9]     Once plaintiff was released from DOCCS custody, the exhaustion requirement under the PLRA no longer applied as a prerequisite for filing a federal civil rights action. *Greig v. Goord*, 169 F.3d 165, 167 (2d Cir. 1999).

The defendants would presumably argue that plaintiff had an opportunity to make any argument supporting equitable tolling by opposing the motion to dismiss, and that he forfeited that opportunity by failing to respond. *See, e.g., Trapani v. Coryer*, No. 14-CV-683 (GTS/CFH), 2016 WL 8732638, at *6 (N.D.N.Y. June 6, 2016), report and recommendation adopted, 2016 WL 8732640 (N.D.N.Y. July 15, 2016) (plaintiff had notice and an opportunity to be heard with respect to tolling arguments through his response to the defense motion to dismiss).[10] However, it is notable that defendants' motion papers made no reference to the possibility that plaintiff could overcome the statute-of-limitations defense by asserting viable grounds for equitable tolling, e.g., based on his pursuit of a grievance while he was still confined by DOCCS.[11] A pro se litigant might well be confused as to what extrinsic information beyond the scope of his complaint he was allowed to offer in opposition to a motion to dismiss based on the statute of limitation. *See Ellington Long Term Fund, Ltd. v. Goldman, Sachs & Co.*, No. 09 CIV. 9802, 2010 WL 1838730, at *4 (S.D.N.Y. May 4, 2010) ("Plaintiffs' obligation to produce evidence at the motion to dismiss stage is even further reduced in the context of a motion to dismiss premised on the statute of limitations--an affirmative defense on which the defendant bears the burden of proof.").

2021 WL 5813689

10    Plaintiff Trapani responded in opposition to the defense motion to dismiss his claims on statute-of-limitations grounds. The district court found that plaintiff's arguments for equitable tolling were insufficient to overcome the statute-of-limitations defense with respect to one claim. However, the facts regarding equitable tolling with respect to two other claims were not sufficiently clear to warrant granting the motion to dismiss with respect to those claims. *Id.*, 2016 WL 8732638, at *5-7.

11    Defense counsel did file a Notice of Motion, which advised the plaintiff: "where a properly filed motion is unopposed and the Court determines that the moving party has demonstrated its entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown." (Dkt. No. 14). That warning tracks the language of a general provisions in the N.D.N.Y. local rules regarding motion practice (N.D.N.Y. L.R. 7.1(a)(3)). The N.D.N.Y. local rules direct parties moving for summary judgment against a pro se party, under Fed. R. Civ. P. 56, to provide a specific warning regarding the failure to respond. N.D.N.Y. L.R. 56.1(a), 56.2. However, the local rules do not direct that any such notice should be provided to pro se litigants in connection with a motion to dismiss under Rule 12(b)(6), reflecting the case law that indicates that failing to respond to a motion to dismiss does not, by itself, constitute consent to granting that motion.

*5    Based on the current record, and given the defendant's failure to respond to defendants' motion to dismiss, this court will recommend that the motion be granted. However, because the defense papers arguably provided plaintiff with insufficient notice regarding how he could or should respond to the motion to dismiss, I would also recommend that the District Court allow plaintiff a further opportunity to raise any arguments in support of equitable tolling in any objection he chooses to file to this Report and Recommendation. If plaintiff makes plausible claims that he properly pursued a grievance relating to the claims in this case while still incarcerated, or if he presents some other viable grounds for equitable tolling, the District Court may consider denying the defense motion or referring the matter back to me for further consideration. If plaintiff fails to object to this Report and Recommendation, he would be more clearly forfeiting his opportunity to argue for equitable tolling, and dismissal of his remaining claims would be justified.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the defendants' motion to dismiss the remaining claims in this case pursuant to Fed. R. Civ. P. 12(b)(6) (Dkt. No. 14) be **GRANTED** unless, in objections to this Report and Recommendation, plaintiff asserts plausible grounds supporting equitable tolling of the applicable statute of limitations for a sufficient time period to render the filing date of his complaint timely. 12

12    The Clerk is directed to serve a copy of this Report and Recommendation on plaintiff by mail at his address of record, and to also serve a copy on him via the e-mail address set forth on his complaint -- GERALDMOBLEY18@gmail.com.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**All Citations**

Not Reported in Fed. Supp., 2021 WL 5813689

---

End of Document                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 5810406

2021 WL 5810406
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Gerald J. MOBLEY, Plaintiff,

v.

Sergeant CRANE, et al., Defendants.

9:21-cv-299 (BKS/ATB)
|
Signed 12/07/2021

**Attorneys and Law Firms**

Plaintiff pro se: Gerald J. Mobley, Brooklyn, NY 11205.

For Defendants: Letitia James, Attorney General of the State of New York, Brenda T. Baddam, Assistant Attorney General, of Counsel, The Capitol, Albany, NY 12224.

### MEMORANDUM-DECISION AND ORDER

Brenda K. Sannes, United States District Judge:

**\*1** Plaintiff pro se Gerald J. Mobley commenced this action under 42 U.S.C. § 1983 asserting claims arising out of his incarceration at Marcy Correctional Facility. (Dkt. No. 1). On June 21, 2021, Defendants filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) asserting that Plaintiff's claims were barred by the statute of limitations. (Dkt. No. 14). Plaintiff did not file a response to the motion. This matter was referred to United States Magistrate Judge Andrew T. Baxter who, on November 3, 2021, issued a Report and Recommendation recommending that Defendants' motion to dismiss be granted unless, in objections to the Report

and Recommendation, plaintiff asserted plausible grounds supporting equitable tolling of the applicable statute of limitations for a sufficient time period to render the filing date of his complaint timely. (Dkt. No. 16). Magistrate Judge Baxter advised the parties that under 28 U.S.C. § 636(b)(1), they had fourteen days within which to file written objections to the report, and that failure to object to the report within fourteen days would preclude appellate review. (*Id.* at 10–11). No objections were filed.

As no objections to the Report and Recommendation were filed, and the time for filing objections has expired, the Court reviews the Report and Recommendation for clear error. *See Petersen v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); Fed. R. Civ. P. 72(b) advisory committee's note to 1983 amendment. Having reviewed the Report and Recommendation for clear error and found none, the Court adopts the Report and Recommendation in its entirety.

For these reasons, it is

**ORDERED** that the Report and Recommendation (Dkt. No. 16) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 14) is **GRANTED**; and it is further

**ORDERED** that the Clerk serve a copy of this Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2021 WL 5810406

---

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 157 of 236

Ellington Long Term Fund, Ltd. v. Goldman, Sachs & Co., Not Reported in F.Supp.2d...

2010 WL 1838730, 71 UCC Rep.Serv.2d 630

🚩 KeyCite Yellow Flag - Negative Treatment

Declined to Extend by  Hopkinson v. Estate of Siegal,  S.D.N.Y.,  July 12, 2011

2010 WL 1838730
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

ELLINGTON LONG TERM FUND, LTD. and
Ellington Overseas Partners, Ltd., Plaintiffs,
v.
GOLDMAN, SACHS & CO., Defendant.

No. 09 Civ. 9802(RJS).
|
May 4, 2010.

*MEMORANDUM AND ORDER*

RICHARD J. SULLIVAN, District Judge.

**\*1** Plaintiffs Ellington Long Term Fund, Ltd. and Ellington Overseas Partners, Ltd. (collectively, "Ellington") bring this action against Goldman, Sachs & Co. ("Goldman"), alleging that Goldman failed to deliver warrants that Ellington is owed based on its purchase of certain bonds from Goldman. Goldman has moved to dismiss claims relating to some of those purchases as time-barred. For the reasons stated herein, the motion is denied.

**I. BACKGROUND**

**A. Facts**

In 1990, Venezuela issued so-called Brady Bonds, named for the then–U.S. Treasury Secretary Nicholas Brady. (Compl.¶ 6.) For each $1,000 of bonds purchased, the buyer also received five Oil–Indexed Payment Obligations, or warrants. (*Id.* ¶ 7.) The value of the warrants largely depended upon the price of oil. (*Id.*) From 1990 through 2001, traders in the secondary market followed the convention that a trade of the underlying bonds included a trade of the warrants that attached to the bonds upon issuance, unless the warrants were specifically excluded from the trade. (*Id.* ¶ 8.)

In 1998 and again in 2001, Ellington purchased bonds from Goldman. (*Id.* ¶ 12.) Because the warrants were not specifically excluded, they were included in the transactions. (*Id.*) The following table summarizes the amounts and dates of the trades:

| Bond Amount | Trade Date | SettlementDate | Warrants Due |
| --- | --- | --- | --- |
| $30 million | Apr. 15, 1998 | Apr. 20, 1998 | 150,000 |
| $5 million | Jan. 4, 2001 | Jan. 9, 2001 | 25,000 |
| $5 million | Jan. 4, 2001 | Jan. 9, 2001 | 25,000 |
| $5 million | Jan. 31, 2001 | Feb. 5, 2001 | 25,000 |
| $5 million | Jan. 31, 2001 | Feb. 5, 2001 | 25,000 |
| $10 million | May 2, 2001 | May 7, 2001 | 50,000 |

(*Id.* ¶ 13.) On each of these settlement dates, having received payment from Ellington, Goldman delivered the bonds, but not the warrants. (*Id.* ¶ 17.)

Goldman regularly sent Ellington customer statements reflecting securities positions maintained by Ellington with Goldman, including fully paid-for positions with respect to the warrants. (*Id.* ¶ 18.) In other words, although the warrants had not been delivered, Goldman credited Ellington's accounts with the fully paid-for warrants while carrying "fails," or notations of undelivered securities, on the statements. (*Id.* ¶ 19.) As the warrants increased in value, Goldman marked up the value on Ellington's account statements. (*Id.* ¶ 20.) Ellington continued to receive these statements until 2005. (*Id.* ¶ 26.)

In the first quarter of 2005, Venezuela began making dividend payments on the warrants. (*Id.* ¶ 27.) In the spring of

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 158 of 236

Ellington Long Term Fund, Ltd. v. Goldman, Sachs & Co., Not Reported in F.Supp.2d...

2010 WL 1838730, 71 UCC Rep.Serv.2d 630

2005, Ellington asked Goldman to confirm that its records showed the continuing fails. (*Id.* ¶ 29.) Goldman confirmed to Ellington that it was still carrying the fails, and that all of the 2001 trades continued to be matched in Euroclear, the clearing corporation responsible for matching the trades. (*Id.*) Goldman then conveyed to Euroclear new settlement instructions, telling Euroclear to re-match the trade with a new settlement date of April 6, 2005. (*Id.*)

**\*2** Despite the new settlement instructions, Goldman lacked sufficient warrants to settle the trades. (*Id.* ¶ 30.) Thus, in late 2005 or early 2006, Ellington asked Goldman how it proposed to resolve the open trades. (*Id.*) Goldman "told Ellington to be patient," as it was waiting for the Emerging Markets Trading Association to recommend a market-wide resolution. (*Id* ) Goldman, however, "acknowledged that it was failing to deliver to Ellington a total of 300,000 warrants, and the dividend payments made by Venezuela on those warrants." (*Id.*)

As of the date of the Complaint, Goldman had neither delivered the warrants nor remitted the dividend payments from Venezuela. (*Id.* ¶ 36.)

### B. Procedural History

Ellington initiated this action by filing a Complaint on November 25, 2009. After the parties appeared before the Court for a pre-motion conference on January 15, 2010, Goldman moved to dismiss claims arising out of the 1998 transactions on February 16, 2010. The motion was fully submitted on April 6, 2010.

### II. STANDARD OF REVIEW

In deciding a motion to dismiss under Rule 12(b)(6), this Court must accept all well-pleaded allegations contained in the complaint as true, and it must draw all reasonable inferences in favor of the plaintiff. *See Bell Atl, Corp. v. Twombly,* 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Ultimately, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). In

contrast, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (quoting *Twombly,* 550 U.S. at 555) (citations omitted).

The statute of limitations is an affirmative defense on which the defendant bears the burden of proof. *See* Fed.R.Civ.P. 8(c); *Overall v. Estate of Klotz,* 52 F.3d 398, 403 (2d Cir.1995). While a Court may grant a motion to dismiss on statute of limitations grounds "if a complaint clearly shows the claim is out of time," *Harris v. City of N.Y.,* 186 F.3d 243, 250 (2d Cir.1999), a complaint's "survival of a Rule 12(b)(6) motion to dismiss on statute of limitations grounds requires only allegations consistent with a claim that would not be time-barred." *Id.* at 251.

### III. DISCUSSION

Ellington brings claims under (1) Article 8 of the Uniform Commercial Code ("UCC"), and (2) the common law for breach of contract. Goldman contends that each claim is time-barred with respect to the 1998 transaction. The Court disagrees for the reasons stated herein.

### A. Article 8 of the UCC

New York law provides that claims brought under Article 8 of the UCC are subject to a six-year statute of limitations. *See* N.Y. C.P.L.R. § 213.1; *see also Wood v. Wood,* 312 F.Supp. 762, 764 (S.D.N.Y.1970). Ellington contends that Goldman violated two provisions of Article 8:

**\*3** (1) Section 8–505(a), which provides that "[a] securities intermediary shall take action to obtain a payment or distribution made by the issuer of a financial asset," N.Y. U.C.C. Law § 8–505(a); and

(2) Section 8–507, which provides that "[a] securities intermediary shall comply with an entitlement order," [1] N.Y. U.C.C. Law § 8–507.

[1]    An entitlement order is "a notification communicated to a securities intermediary directing transfer or redemption of a financial asset

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 159 of 236

Ellington Long Term Fund, Ltd. v. Goldman, Sachs & Co., Not Reported in F.Supp.2d...

2010 WL 1838730, 71 UCC Rep.Serv.2d 630

to which the entitlement holder has a security entitlement." N.Y. U.C.C. Law § 8–102(8).

Both provisions of Article 8 are premised on Goldman's status as a "securities intermediary," which the UCC defines as "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity." N.Y. U.C.C., Law § 8–102(14)(ii). A "securities account," in turn, is "an account to which a financial asset is or may be credited in accordance with an agreement under which the person maintaining the account undertakes to treat that person for whom the account is maintained as entitled to exercise the rights that comprise the financial asset." N.Y. U.C.C. Law § 8–501(a).

The Complaint specifically pleads that at "all relevant times, Goldman maintained securities accounts in Ellington's name, and regularly sent Ellington customer statements with respect to such accounts.... Although Goldman failed to deliver the warrants to Ellington on the original settlement dates, Goldman nevertheless credited Ellington's securities accounts with the fully-paid for warrants, and continued to carry those fails on Ellington's customer statements for years following the original settlement dates." (Compl. ¶¶ 18–19.) The Complaint thus alleges that at "all relevant times between 1998 and the date of this Complaint, Goldman has been a securities intermediary with respect to the Ellington Customer Accounts." (*Id.* ¶ 40.)

Goldman now argues that it "was simply selling securities to Ellington, not serving as a securities intermediary" and that Ellington "well knows that its account with Goldman was a non-custodial account." (Def.'s Reply at 9 n. 9.) Discovery may at some point vindicate this argument. Yet as defense counsel rightly recognized at the pre-motion conference, the Court is bound on a motion to dismiss to accept the Complaint's factual assertions as true:

> MR. BROSTERMAN: So let me deal now with the issue of securities intermediary. What that is, really, [is] a securities firm among other things that carries positions as a custodian for the customer. That didn't occur here. Goldman never carried these positions for Ellington.
>
> THE COURT: But this is a Complaint.
>
> MR. BROSTERMAN: I understand but it is irrelevant whether they did or didn't for the purposes of this motion because—and I realize this is a Complaint—because even assuming, as they say, *which we will dispute but we can't do it on the motion to dismiss, that we credit the securities,*

the issue under Article VIII of the UCC [is] when were we obligated to deliver those securities?

(Tr. Jan. 15, 2010, at 12:11–13:7 (emphasis added)). Accordingly, for the purpose of resolving the instant motion, the Court will assume that Goldman was acting as a securities intermediary with respect to the undelivered warrants.

**\*4** Proceeding from this assumption, the Court finds that if Goldman was acting as a securities intermediary and had duties under Sections 8–505 and 8–507 of the UCC, its breach of these duties would have occurred each and every time that Goldman either (1) failed to deliver dividends issued by Venezuela to Ellington, or (2) failed to follow Ellington's entitlement orders. As Venezuela did not begin paying dividends on the warrants until 2005, and Ellington did not seek the warrants from Goldman until 2005, Goldman's alleged breach of its duties as a securities intermediary did not occur until 2005. Thus, "all of the facts necessary to sustain the cause of action" did not occur until that date. *See Vigilant Ins. Co. of Am. v. Hous. Auth. of El Paso,* 87 N.Y.2d 36, 43, 637 N.Y.S.2d 342, 660 N.E.2d 1121 (1995). Ellington brought this lawsuit within six years of 2005, and accordingly, its UCC claims will be timely if it succeeds in demonstrating that Goldman was acting as a securities intermediary. The Court will thus not dismiss Ellington's UCC claims as time-barred.

### B. Breach of Contract

In New York, a claim for breach of contract is subject to a six-year statute of limitations. *See* N.Y. C.P.L.R. § 213.2. Goldman argues, relying on *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.,* 618 F.Supp.2d 280 (S.D.N.Y.2009), and other cases, that the breach of contract claim accrued upon the original non-delivery of the warrants in 1998.

Regardless of when the breach of contract claim first accrued, however, New York law provides that an "acknowledgement or promise contained in a writing signed by the party to be charged ... take[s] an action out of the operation of the provisions of limitations of time for commencing actions under the civil practice law and rules." N.Y. Gen. Oblig. Law § 17–101(a). In this case, Ellington has adequately pleaded that Section 17–101(a) renders its claims timely.

The Complaint pleads that in 2005, Goldman submitted written instructions to Euroclear, telling it to re-match the

failed transactions with an April 2005 settlement date. (Compl.¶ 29.) The Complaint also pleads that from 1998 through 2009, Goldman sent Ellington monthly statements crediting its account with warrants from the 1998 trades. (*Id.* ¶¶ 18–21, 26, 42.)

With respect to the settlement instructions, Goldman contends that Ellington has not satisfied Section 17–101 because Ellington has failed to provide the Court with a writing sent from Goldman to Euroclear. With respect to the account statements, Goldman argues that Ellington has not satisfied Section 17–101 because the statements' indications (1) that the warrants had not been delivered, and (2) that they were "not guaranteed for accuracy, or as realizable gains," are both inconsistent with an intention to pay.

The Court rejects these arguments. With respect to the Euroclear settlement instructions, while Ellington has not attached a writing from Goldman to Euroclear to its Complaint, the Complaint pleads that the instructions were conveyed "in electronic or other written form" (Compl.¶ 29), and it is black-letter law that in resolving a motion to dismiss, the Court must accept Plaintiffs' factual allegations as true. *See Twombly,* 550 U.S. at 555–56. Plaintiffs' obligation to produce evidence at the motion to dismiss stage is even further reduced in the context of a motion to dismiss premised on the statute of limitations—an affirmative defense on which the defendant bears the burden of proof. *See Take–Two Interactive Software, Inc. v. Brant,* No. 06 Civ. 5279(LTS), 2010 WL 1257351, at *4 (S.D.N.Y. Mar.31, 2010).

 **\*5** With respect to the account statements, courts have held that "an acknowledgment on the company books is sufficient to toll the statute of limitations." *Daewoo Int'l (Am.) Corp. Creditor Trust v. SSTS Am. Corp.,* No. 02 Civ.

9629(NRB), 2004 WL 1488511, at *4 (S.D.N.Y. Jul.2, 2004); *accord Candelarie v. Scientific Innovations, Inc.,* No. 08 Civ. 1714(JS)(AKT), 2009 WL 2824727, at *3 (E.D.N.Y. Aug. 28, 2009) ("[T]he continued carrying of an item on corporate or financial records operates to revive the statute of limitations, under a theory that the records reflect the continued validity of an old debt."). While Goldman may ultimately be able to convince a factfinder that the account statements at issue here did not reflect an acknowledgment of a debt to Ellington, the Court is unable to so hold on a motion to dismiss. [2]

> [2] In light of the Court's conclusion that Plaintiffs' breach of contract claims are timely under Section 17–101, the Court need not address Plaintiffs' alternative argument that the contract claim is not time-barred because Goldman had a continuing obligation to deliver.

Because Ellington has sufficiently pleaded that Section 17–101 renders its claims timely, the Court will not dismiss the contract claims as time-barred.

### IV. CONCLUSION

For the reasons stated above, Defendant's motion to dismiss claims arising from the 1998 warrant transactions as time-barred is denied. The Clerk of the Court is respectfully directed to terminate the motion located at docket number 13.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1838730, 71 UCC Rep.Serv.2d 630

---

    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Medina v. Cuomo, Not Reported in Fed. Supp. (2015)**

2015 WL 13744627

2015 WL 13744627
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Richard D. MEDINA, Plaintiff,

v.

Andrew CUOMO, Governor, State of New
York, Dean G. Skelos, Former Senate Majority
Leader Deputy Majority Leader and Current
Member of the NYS Senate, Defendants.

7:15-CV-01283 (GTS/TWD)
|
Signed 11/09/2015

**Attorneys and Law Firms**

RICHARD D. MEDINA, Plaintiff, Pro Se, 1729 Burns
Avenue Apt. C, Watertown, NY 13601.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

**\*1** The Clerk has sent Plaintiff Richard D. Medina's pro
se civil rights complaint, brought under 42 U.S.C. § 1983,
together with an application to proceed in *forma pauperis*
("IFP Application"), to the Court for review. (Dkt. Nos. 1 and
2.) Plaintiff's lawsuit, commenced against the Governor of
New York State, Andrew Cuomo ("Governor Cuomo") and
New York State Senator Dean G. Skelos ("Senator Skelos"),
challenges, among other things, the constitutionality of the
New York Sex Offender Registration Act of 1995, commonly
referred to as "Megan's Law" and codified at New York
Correction Law ("Corr. Law") §§ 168 to 168-w ("SORA").
(*See generally* Dkt. No. 1.)

In his rambling 256 page complaint, Plaintiff has asserted
thirty-four numbered causes of action, which include
federal constitutional and statutory claims, a New York
state constitutional claim, and a number state law tort
claims. Plaintiff seeks compensatory and punitive damages,
injunctive and declaratory relief, and an award of attorney's
fees. [1] (Dkt. No. 1 at ¶¶ 373-86.)

[1]  Plaintiff is seeking relief against not only the named
Defendants but their "agents, persons working with
them or on their behalf, their servants, who in their
individual capacity and official capacity, and who
knew or should have known, while acting under
color of state law," of the deprivation of Plaintiff's
rights and the irreparable harm suffered by him
as a result of the "enactment, implementation,
administration, and enforcement" of SORA. (Dkt.
No. 1 at 1-2.) The Court's initial review of the
complaint under 28 U.S.C. § 1915(e)(2)(B)(i)-(iii)
is limited to the named Defendants.

**I. IFP APPLICATION**
A court may grant in *forma pauperis* status if a party "is
unable to pay" the standard fee for commencing an action.
28 U.S.C. § 1915(a)(1) (2006). After reviewing Plaintiff's IFP
Application (Dkt. No. 2), the Court finds that he meets the
standard and his IPF Application is granted. [2]

[2]  Plaintiff should note that although the application
to proceed in *forma pauperis* has been granted,
Plaintiff will still be required to pay fees that he
may incur in this action, including copying and/or
witness fees.

**II. LEGAL STANDARDS FOR INITIAL REVIEW**
Even when a plaintiff meets the financial criteria for *in forma
pauperis*, 28 U.S.C. § 1915(e) directs that when a plaintiff
proceeds in *forma pauperis*, "the court shall dismiss the case
at any time if the court determines that ... the action ... (i)
is frivolous or malicious; (ii) fails to state a claim on which
relief may be granted; or (iii) seeks monetary relief against
a defendant who is immune from such relief." 28 U.S.C. §
1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must
look to see whether the complaint lacks an arguable basis
either in law or in fact. *Neitzke v. Williams*, 490 U.S. 319,
325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). "An action is
frivolous when either: (1) the factual contentions are clearly
baseless such as when the claims are the product of delusion
or fantasy; or (2) the claim is based on an indisputably
meritless legal theory." *Livingston v. Adirondack Beverage
Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (citations and internal
quotation marks omitted). Although extreme caution should
be exercised in ordering *sua sponte* dismissal of a *pro se*
complaint before the adverse party has been served and the

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 162 of 236

Medina v. Cuomo, Not Reported in Fed. Supp. (2015)

2015 WL 13744627

parties must have had an opportunity to respond, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983), the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *See, e.g., Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (per curiam) (holding that a district court has the power to dismiss a complaint *sua sponte* if the complaint is frivolous).

**\*2** To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me accusation." *Id.* In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Where a plaintiff proceeds *pro se*, the pleadings must be read liberally and construed to raise the strongest arguments they suggest. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citation omitted). A *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## III. PLAINTIFF'S COMPLAINT

### A. Factual Allegations [3]

[3] The Court has considered both the complaint and the papers submitted by Plaintiff in support of his pending motion for a preliminary injunction (Dkt. No. 3) in its initial review.

On or about September 10, 2004, Plaintiff, who describes himself as homeless, was convicted of Sexual Abuse First Degree (N.Y. Penal Law § 130.65), a D felony; Sexual Abuse Second Degree (N.Y. Penal Law § 130.60), a class A misdemeanor; and Third Degree Sexual Abuse (N.Y. Penal Law § 130.55), a class B misdemeanor. (Dkt. No. 1 at ¶ 10.) Plaintiff was sentenced to two and a half years in state prison and three years post release supervision. *Id.* Plaintiff is not challenging his conviction, which appears to have been as the result of a guilty plea, in this lawsuit. *Id.* at ¶¶ 11-12.

Plaintiff alleges that he was not advised at the time of his plea allocution that he was being subjected to or sentenced under a "violent offense" statute and was not advised by his attorney or the sentencing court of the imposition or consequences of SORA prior to his sentencing. *Id.* at ¶¶ 12-13. Plaintiff remembers asking his attorney at the sentencing to question the Hon. Kim H. Martusewicz, Jefferson County Court Judge, about his status under SORA and recalls his attorney requesting a level 2 status. *Id.* at ¶¶ 14-15. Judge Martusewicz responded that Plaintiff's status under SORA would be determined at a later time. *Id.* at ¶ 16.

Prior to his release from prison sometime in 2005 or 2006, Plaintiff was transported to Jefferson County Court for a hearing which may have concerned his initial classification under SORA, although he cannot recall any specifics regarding the hearing, except that he did not stand before the court and state that he was "sexually violent, dangerous, or prone to recidivism" during the proceedings. *Id.* at ¶¶ 20-21. Plaintiff has no recollection of having been represented by counsel, and has alleged that while he requested an "appeal" to his legal arguments and defenses, none was provided by the court. *Id.* at ¶¶ 24-25.

**\*3** In or about April 2006 when he was released from prison and placed on post-release supervision, an unknown Department of Corrections and Community Supervision employee gave Plaintiff a form to sign indicating that he was a sex offender and required to comply with SORA. *Id.* at ¶¶ 31-32. Plaintiff was subsequently arrested for the post-supervision release violation of living at other than an approved address and violating his sex offender counseling requirements by failing to write and provide a daily journal to the counselor. *Id.* at ¶ 33. Plaintiff was found guilty of the

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 163 of 236

Medina v. Cuomo, Not Reported in Fed. Supp. (2015)

2015 WL 13744627

sex offender treatment violation and returned to state prison for twenty-three months. *Id.* at ¶ 34.

Plaintiff was released to post-release supervision again in or about November 2008 and believes that sometime between December 2008 and July 2009, he was required to report to Jefferson County Court to be classified as a level 1, 2, or 3 sex offender. *Id.* at ¶ 37. Plaintiff was provided with counsel and following one or more hearings was classified as a level 3 sex offender by Judge Martusewicz. *Id.* at ¶ 40. According to Plaintiff, he again did not stand before the court and state he was "sexually violent, dangerous, or prone to recidivism." *Id.* at ¶ 41.

As a level 3 sex offender, Plaintiff is subject to a number of reporting requirements, including that he report to the local police at statutorily prescribed intervals and provide them with information that, among other things, includes his address. *Id.* at ¶ 44. According to Plaintiff, he had a residence in Jefferson County for two to four months in 2009 but then became homeless because he had no income of any kind for a period, was ineligible for state aid, was unable to reside in public housing, and was not allowed to stay with family members and associates who would not permit their addresses to appear on the SORA website for fear of discrimination, harm, and financial burdens. *Id.* at ¶ 47. Plaintiff claims to have been homeless since that time. *Id.* Plaintiff stays "temporarily wherever he can." *Id.* at ¶ 51.

Plaintiff reported to either the City of Watertown Police Department or Jefferson County Sheriff's Department in satisfaction of the level 3 reporting requirements for five years, and from approximately July 2009 until he reported in August of 2015, had been permitted to put "homeless" as his address. *Id.* at ¶ 48. According to Plaintiff's submission on his pending motion for a preliminary injunction, when he went to the Jefferson County Sheriff's Department to satisfy his ninety day registration and verification under SORA, Corr. Law § 168-f, on or about August 7, 2015, he was subjected to an hour long interview by the interrogating officer who indicated that he wanted to get to know the sex offenders he was required to question. (Dkt. No. 3 at ¶¶ 5-6.) The officer demanded that Plaintiff provide his address, and Plaintiff responded that he was homeless pursuant to New York State law and had been permitted to report as homeless by an officer no longer with the department since July of 2009. *Id.* at ¶ 9.

The interviewing officer made reference to family members of Plaintiff who lived in public housing as a possible address for Plaintiff, and Plaintiff informed him that he did not reside with his family members in a residence status, and advised him against including their address on the duty to register and verify form. *Id.* at ¶ 13. The officer, without Plaintiff's knowledge, nonetheless included what he believed to be the family members' address as Plaintiff's address on the registration and verification form he gave Plaintiff to sign. *Id.* at ¶¶ 19-22. Plaintiff would not have signed the form had he been aware of the address used by the officer because he knew that a false address could result in his being subjected to state and federal penalties. *Id.* at ¶ 24.

**\*4** There are no allegations in Plaintiff's complaint plausibly showing any involvement by Governor Cuomo or Senator Skelos, in their official or individual capacities, in the August 2015 ninety day registration and verification at the Jefferson County Sheriff's Department.

### B. Plaintiff's Claims

In his civil rights claim under 42 U.S.C. § 1983, Plaintiff alleges that Defendants have violated his rights under the First, Fourth, Fifth, Sixth, Eighth, Thirteenth, and Fourteenth Amendments to the United States Constitution. (*See generally* Dkt. No. 1.) In addition to his civil rights claims under 42 U.S.C. § 1983, Plaintiff has asserted civil rights claims under 42 U.S.C. §§ 1981, 1985, and 1986, along with a claim for attorney's fees under 42 U.S.C. § 1988. *Id.* at ¶¶ 315-325. Plaintiff also claims that Defendants have violated the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601-3619, by criminally interfering with his right to fair housing, and 18 U.S.C. §§ 1581, 1584, 1589, 1590, 1594, and 1595 by selling him into involuntary servitude, forced labor, and obstructing enforcement by returning him to a condition of peonage.[4] *Id.* at ¶¶ 326-27, 348-59, 362-63.

4     18 U.S.C. §§ 1581, 1584, 1589, 1590, 1594, and 1595 are criminal statutes, not statutes under which the Defendants could be found civilly liable to Plaintiff. Therefore, the Court finds those claims to be frivolous and recommends dismissal with prejudice on initial review under 28 U.S.C. § 1915(e)(2)(B)(i). The Court likewise finds Plaintiff's claim for criminal interference with the right to fair housing frivolous upon initial review inasmuch as it is the FHA, and not state law, that prohibits owners of federally assisted housing from admitting to such housing "any household that includes any individual who is subject to a lifetime

2015 WL 13744627

registration requirement under a State sex offender registration program." *See* 42 U.S.C. § 13663(a).

Plaintiff has also asserted a number of state law tort claims, most of which he has erroneously identified as being brought under 42 U.S.C. § 1983. Those claims include, false arrest, false or unlawful confinement and detention, misconduct of office, negligence and intentional negligence, intentional infliction of emotional distress, and larceny and fraud. *Id.* at ¶¶ at 328-342. In addition, Plaintiff claims that Defendants have violated his rights under NY Const. art. 1, § 8, which guarantees freedom of speech. *Id.* at ¶¶ 368-70.

### C. Relief Sought

Plaintiff seeks the following relief: (1) punitive damages of $60,000,000 jointly and severally against Defendants, or a minimum of $20,000 per day since Sept. 2004, or the date of the imposition of SORA on Plaintiff; (2) compensatory damages of $10,000,000 jointly and severally against Defendants; (3) costs of the suit commensurate with its importance to the nation; (4) a declaration that the acts and omissions described in the complaint have violated Plaintiff's rights under the United States Constitution; (5) a declaration that the acts and omissions described in complaint have violated Plaintiff's rights under the New York State Constitution; (6) such injunctive relief as is proper; (7) the court direct that all records related to Plaintiff's participation in and classification under SORA be expunged; (8) the court direct that all records and information not lawfully permitted to be released before SORA be expunged and Defendants be directed to enact a law requiring any such person to cease and desist; (9) Defendants be directed to contact all agencies, institutions, organizations and people that have used Plaintiff's images or photographs through SORA and require that they be deleted; (10) Defendants be directed to admit publicly that they have acted inconsistent with the Constitution; and (11) an award of legal fees. *Id.* at ¶¶ 373-386.

### IV. ANALYSIS

### A. SORA

#### 1. Classification Procedure

**\*5** SORA, Corr. Law §§ 168 *et seq.*, became effective on January 21, 1996. *Doe v. Pataki*, 120 F.3d 1263, 1266 (2d Cir. 1997). SORA requires sex offenders, defined to include individuals convicted of certain enumerated crimes,

to register with the New York State Division of Criminal Justice for a specified period of time. *Id.* The time period of required registration and level of community notification depends in part upon the risk level assigned to the offender. The risk levels are level 1 offenders with a low risk of re-offense; level 2 risk of repeat is moderate; and level 3 risk of repeat offense is high and there exists a threat to the public safety. Corr. Law § 168-1(6).

The sex offender must be notified that his case is under review no less than thirty days before the New York State Board of Examiners of Sex Offenders' ("Board") recommendation and is permitted to submit to the Board any information deemed relevant. Corr. Law § 168-n(3). The factors considered by the Board in determining risk level include such things as whether the offender has a mental abnormality or personality disorder, whether the offender's conduct was characterized by repetitive and compulsive behavior, associated with drugs or alcohol, the age of the offender and of the victim, the use of weapons, violence, the infliction of serious bodily injury, the number of prior offenses, response to treatment, and the victim impact statement. Corr. Law § 168-1(5).

While the Board makes a recommendation as to classification level, it is the sentencing court that determines the level of classification after a hearing held prior to the sex offender's release from incarceration. Corr. Law § 168-n(1). At least twenty days before the determination proceeding, the court is required to notify the sex offender and his counsel and the district attorney in writing of the date of the proceeding and also to provide them with a copy of the Board's recommendation and any statement of reasons for the recommendation. Corr. Law § 168-n(3). The sex offender is given notice of the right to a hearing prior to the court's determination, and the right to counsel, and to the appointment of counsel if he is financially unable to retain counsel. *Id.* The sex offender is allowed to appear and be heard in court, and the court is required to grant an adjournment for the offender or district attorney to obtain necessary materials. *Id.* The district attorney bears the burden of proving the facts supporting the determination by clear and convincing evidence. *Id.*

The court is required to render an order setting forth its determination and the findings of fact and conclusions of law on which the determination is based. *Id.* The sex offender is entitled to appeal from the determination. *Id.*

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 165 of 236

Medina v. Cuomo, Not Reported in Fed. Supp. (2015)

2015 WL 13744627

### 2. Level 3 Offender Requirements

A sex offender is given a level 3 classification when "risk of repeat offense is high and there exists a threat to the safety of the public." Corr. Law § 168-1(6)(c). An offender whose risk of re-offense is high is "deemed a sexually violent person." *Id.* As a level 3 sex offender, Plaintiff has a life-time registration requirement. Corr. Law § 168-h(2). A level 3 sex offender may be removed from the registry only if his conviction is overturned or he is pardoned. Corr. Law § 168-f(5).

Level 3 sex offenders are required to register and "shall personally appear at the law enforcement agency having jurisdiction within twenty days of the first anniversary of the sex offenders initial registration and every year thereafter during the period of registration for the purpose of providing a current photograph of such offender...." A level 3 sex offender "shall also personally verify his address every ninety days with the local law enforcement agency having jurisdiction where the offender resides." Corr. Law. § 168-h(3).

### B. Absolute Legislative Immunity – Senator Skelos

**\*6** Defendant Senator Skelos was SORA's sponsor in the New York State Senate. *See Doe v. Pataki*, 120 F.3d at 1277. There are no allegations in Plaintiff's complaint plausibly showing that Skelos had any official or personal involvement in matters related to Plaintiff's claims outside of the scope of his legislative actions in the enactment of SORA.

NY Const. art. III, § 11, echoing the Speech or Debate Clause of US Const. art. I, § 6, provides that "[f]or any speech or debate in either house of the legislature, the members shall not be questioned in any other place." The New York Court of Appeals has held that this clause confers immunity for any acts which are an integral part of the legislative process. *People v. Ohrenstein*, 77 N.Y.2d 38, 563 N.Y.S.2d 744, 752, 565 N.E.2d 493 (1990).

State legislators also have absolute federal common law immunity from civil liability for their legislative activities. *See Bogan v. Scott-Harris*, 523 U.S. 44, 46, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998) ("It is well established that federal, state, and regional legislators are entitled to absolute immunity from civil liability for their legislative activities."); *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 210 (2d Cir. 2003) ("Legislators are entitled to absolute immunity from civil liability for their legislative activities."). The immunity

extends to claims for damages, declaratory, and injunctive relief. *See Tenney v. Brandhove*, 341 U.S. 367, 379, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).

Based upon the foregoing, the Court finds that Defendant Skelos has absolute legislative immunity from Plaintiff's claims and recommends that all of the federal claims asserted again him in this action be dismissed with prejudice under 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim. [5]

[5]    Inasmuch as Plaintiff has alleged no personal involvement by Senator Skelos in the violation of his constitutional rights, the Court's analysis herein of Governor Cuomo's individual liability applies equally to Senator Skelos.

### C. Official Capacity Claims for Money Damages Against Governor Cuomo

The Court has construed Plaintiff's civil rights claims against Defendant Cuomo under 42 U.S.C. § 1981, 1983, 1985, and 1986, and the claim under the FHA as having been brought against the Governor in both his official and individual capacities. With regard to Plaintiff's official capacity claims against Governor Cuomo, the Eleventh Amendment protects states against suits brought in federal court absent their consent or express waiver of sovereign immunity. [6] *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 92-100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state (*Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) ), and bars all money damages claims against state officials acting in their official capacities, including Governor Cuomo. [7] *Kentucky v. Graham*, 473 U.S. 159, 167-68, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003) ("The Eleventh Amendment bars the award of money damages against state officials in their official capacities.")

[6]    Courts have clearly rejected the premise that 42 U.S.C. §§ 1981, 1983, 1985, and 1986 act to abrogate state sovereign immunity. *See Quern v. Jordan*, 440 U.S. 332, 345, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (Congress did not abrogate state sovereign immunity in enacting 42 U.S.C. § 1983); *Fincher v. State of Florida Dep't of Labor, & Employment Sec.*, 798 F.2d 1371, 1371 (11th Cir.

Medina v. Cuomo, Not Reported in Fed. Supp. (2015)

2015 WL 13744627

1986) (same as to *§ 1985*); *Coger v. Connecticut,* 309 F.Supp.2d 274, 281 (D. Conn. 2004) (same as to *§ 1981*); *Seibert v. Oklahoma,* 867 F.2d 591, 594 (10th Cir. 1989) (same as to *§ 1986*), *abrogated on other grounds by Federal Lands Legal Consort, ex rel. Robart Estate v. United States* 195 F.3d 1190 (10th Cir. 1999). Courts have also rejected the contention that the FHA abrogates sovereign immunity. *See Super v. D'Amelia & Assoc.,* No. 3:09cv831 (SRU), 2010 WL 3926887, at *6, 2010 U.S. Dist. LEXIS 103544, at *41 (D. Conn. Sept. 30, 2010) (no congressional abrogation of sovereign immunity in the FHA); *Gregory v. S.C. DOT,* 289 F.Supp.2d 721, 924-25 (D.S.C. 2003) (same).

7 The Eleventh Amendment would also bar official capacity claims against Senator Skelos were the Court not recommending dismissal of the complaint against him on absolute judicial immunity grounds.

**\*7** The Court finds that Plaintiff's official capacity claims for money damages under 42 U.S.C. §§ 1981, 1983, 1985, and 1986, and the FHA are barred by the Eleventh Amendment and recommends dismissal of those claims with prejudice for lack of subject matter jurisdiction.[8]

8 A finding that a defendants is entitled to sovereign immunity means the court lacks subject matter jurisdiction. *See McGinty v. New York,* 251 F.3d 84, 101 (2d Cir. 2001).

### D. Official Capacity Claims Against Governor Cuomo for Injunctive and Declaratory Relief

Plaintiff seeks a declaratory judgment that Governor Cuomo has violated his rights under the United States and New York State Constitutions. (Dkt. No. 1 at ¶¶ 378-79.) Plaintiff asks for such injunctive relief as is proper. *Id.* at ¶ 381. More specifically, Plaintiff seeks relief in the form of a mandatory injunction directing Governor Cuomo to expunge all of the records relating to Plaintiff's participation in SORA; directing that all records and information that could not have been lawfully released prior to SORA be expunged and that Defendants be directed to enact a law directing that those releasing the records cease and desist; directing Governor Cuomo to contact all agencies that have used Plaintiff's images through SORA and ordering that they be deleted; and directing the Governor to admit publically that

his actions have been inconsistent with the Constitution. *Id.* at ¶¶ 382-385.

Under *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), a person may sue a state for prospective injunctive and declaratory relief. *See Mary Jo C. v. New York State and Local Retirement System,* 707 F.3d 144, 166 (2d Cir. 2013) ("Under the well-known exception to the Eleventh Amendment's grant of sovereign immunity from suit first set forth in *Ex parte Young,* a plaintiff may sue a state official acting in his official capacity notwithstanding the Eleventh Amendment for prospective, injunctive relief from violations of federal law.") (citations and internal quotation marks and punctuation omitted). As with injunctive relief, declaratory relief dealing solely with past violations, where there is no present violation, is also barred under the Eleventh Amendment. *See Green v. Mansour,* 474 U.S. 64, 73, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985). Plaintiff's claims for injunctive and declaratory relief can be liberally construed as seeking both retrospective and prospective relief, and to the extent they seek prospective relief they would not be barred under the Eleventh Amendment.

### E. Section 1983 Claims Against Governor Cuomo in his Individual Capacity

Plaintiff's allegations that his rights under the First, Fourth, Sixth, Eighth, Thirteenth, and Fourteenth Amendments to the Constitution have been violated fall under his 42 U.S.C. § 1983 claim. It is well-settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991), *abrogated on other grounds by Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *see also Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir. 1973) ("The rule in this circuit is that when monetary damages are sought under § 1983, the general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendants is required."). The Plaintiff's complaint is devoid of specific allegations of personal involvement by Governor Cuomo in the alleged violation of his constitutional rights, and the Court therefore recommends dismissal of the complaint against the Governor in his individual capacity.

### F. Plaintiff's Individual Claims Against Governor Cuomo Under 42 U.S.C. §§ 1981, 1985, and 1986

Case 9:23-cv-01114-DNH-MJK   Document 31   Filed 04/22/24   Page 167 of 236
Medina v. Cuomo, Not Reported in Fed. Supp. (2015)
2015 WL 13744627

**\*8** Plaintiff has asserted claims against Cuomo under 42 U.S.C. §§ 1981, 1985, and 1986 in addition to his § 1983 claim.

Section 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...." 42 U.S.C. § 1981(a). To establish a claim under § 1981, a plaintiff must show that (1) he is a member of a protected class; (2) defendant intended to discriminate against plaintiff based upon his membership in the protected class; and (3) the discrimination concerned one or more of the activities enumerated in § 1981. *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000). Plaintiff has failed to allege facts in his complaint plausibly showing that his rights have been violated under § 1981.

Furthermore, in order to make out a claim for individual liability under § 1981, "a plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action.... [P]ersonal liability under section 1981 must be predicated on the actor's personal involvement." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000). Plaintiff's complaint is devoid of allegations showing personal involvement by Cuomo in the alleged § 1981 violation.

The elements of a claim under 42 U.S.C. § 1985(3) are "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, ... (3) an act in furtherance of a conspiracy; (4) whereby a person is ... deprived of any right of a citizen of the United States." *Brown*, 221 F.3d at 341 (citation and internal quotation marks omitted). The "conspiracy must also be motivated by some racial or perhaps otherwise class based animus behind the conspirators' action." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993) (per curiam) (citation and internal quotation marks omitted). The law is clear that conclusory, vague, or general allegations of conspiracy are not enough to sustain a claim under § 1985. *See Leon v. Murphy*, 988 F.2d 303, 311 (2d Cir. 1993).

Plaintiff's complaint is devoid of allegations plausibly showing the existence of a conspiracy under § 1985. Moreover, Plaintiff's failure to show personal involvement by Governor Cuomo in any conspiracy under § 1985 is fatal to his claim. *See Keitt v. Hawk*, No. 9:13-cv-850 (GLS/ATB), 2015 WL 1246058, at \* 19, 2015 U.S. Dist. LEXIS 34240, at \*55 (N.D.N.Y. Jan. 8, 2015) (lack of personal involvement is fatal to a claim under 42 U.S.C. § 1985).

42 U.S.C. § 1986 provides that persons with "knowledge of any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured ... for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented...." Absent a violation of § 1985, there can be no violation of § 1986. *Brown*, 221 F.3d at 341.

**\*9** Based upon the foregoing, the Court recommends that Plaintiff's claims against Governor Cuomo under 42 U.S.C. §§ 1981, 1985, and 1986 be dismissed upon initial review for failure to state a claim.[9]

9        As noted above, Senator Skelos would also be entitled to dismissal of any federal claims asserted against him in his individual capacity based upon lack of personal involvement.

### G. First Amendment

Although far from clear, the gist of Plaintiff's claim that SORA violates his rights under the First Amendment appears to be that SORA violates the prohibition on compelled speech and constitutes a violation of his right to privacy.

#### 1. Compelled Speech

According to Plaintiff, SORA deprives him of his rights to freedom of speech, expression, association, and religion through the duty to register and verify because it compels him to appear and speak with law enforcement officials and provide them with certain information and pictures, and impermissibly "compel[s]" his "content, messages, ideas, and subject matter."[10] (Dkt. No. 1 at ¶¶ at 64-71.)

10        In Paragraph 84 of his complaint, Plaintiff alleges that SORA impermissibly allows Defendants:
        to compel him by coercion, threat of force, and actual force, to comply every day, every 10 days, every 90 days, and yearly, and for life, whether by personally reporting form or by

Medina v. Cuomo, Not Reported in Fed. Supp. (2015)

2015 WL 13744627

mailed verification form at "particular places and times" requiring the plaintiff to say the following and is forced to tell them through written, oral, and photographic testimonial admissions that "I live at said address, I live with my family or associations at said address, I work at said address and for said employer, I am homeless, I attend said school at said address, I use the internet at such time and such places with said names and said identifiers, I have changed my appearance, my beard, my hair, my eye color ... and that the plaintiff cannot say to them, I want to stop reporting to you as I don't even know you, as I have no contact with you and I don't want to have any contact with you, but I can't because you have the power to do so without my permission, and to be able to say enough is enough, but I cannot because you deny me my right to use my Freedom of Speech, Freedom of Expression, of the Press, of Association, and of religion ... and that defendants will put me in jail and take away my life, liberty, happiness and property if I want to say to defendants that I will no longer tell you where I live....

The relevant Supreme Court precedent on compelled speech is *Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) and *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). *Barnette* involved a First Amendment challenge to a state statute that required public school students to participate in daily ceremonies honoring the flag. The Supreme Court framed the issue before it as whether "a ceremony so touching matters of opinion and political attitude may be imposed upon the individual by official authority under powers committed to any political organization under our Constitution," and concluded it could not. In doing so, the Court noted with regard to the First Amendment prohibition on compelling such speech that "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642, 63 S.Ct. 1178.

**\*10** *Maynard* involved a New Hampshire law requiring all noncommercial vehicles to bear a license plate with the state motto "Live Free or Die." The plaintiff in *Maynard* challenged the requirement under the First Amendment on the grounds that it conflicted with his faith and coerced him

into "advertising a slogan which [he found] morally, ethically, religiously and politically abhorrent." *Maynard*, 430 U.S. at 713, 97 S.Ct. 1428. The Supreme Court acknowledged the protection of the right to remain silent under the First Amendment found in *Barnette*, and suggested that a state could violate that protection: (1) by forcing an individual through speech to affirm a religious, political, or ideological cause that the individual did not believe in; or (2) by forcing an individual as a part of his daily life to be an instrument for fostering public adherence to an ideological point of view in which he did not believe. *Id.* at 715, 97 S.Ct. 1428.

In *United States v. Arnold*, 740 F.3d 1032 (5th Cir. 2014), the Fifth Circuit rejected the plaintiff's claim that the registration requirements of the Sex Offender Registration and Notification Act "(SORNA")," 42 U.S.C. § 16913, requiring the sex offender to register and keep the registration current in each jurisdiction where he resided, worked, or went to school, violated his First Amendment right against compelled speech. The court explained that the plaintiff had not urged that SORNA required him to "(a) affirm a religious, political, or ideological belief he disagree[d] with or (b) to be a moving billboard for a governmental ideological message." *Id.* at 1035.

The circuit court in *Arnold* found support for its rejection of the First Amendment claim in the decision in *United States v. Sindel*, 53 F.3d 874 (8th Cir. 1995), in which the court rejected a claim that compelled disclosure of information on an IRS form was unlawful compelled speech. The court in *Sindel* had found that "[t]here is no right to refrain from speaking when essential operations of government require it for the preservation of an orderly society as in the case of compulsion to give evidence in court." *Id.* at 878 (citation and internal quotation marks omitted). The court in *Arnold* concluded that "[t]he logic of *Sindel* extend[ed] to the present case," explaining that "when the government, to protect the public, requires sex offenders to register their residence, it conducts an essential operation of the government, just as when it requires individuals to disclose information for tax collection." (internal quotation marks and punctuation omitted). *Id.* at 1035.

The Court finds the reasoning applied in *Arnold* applicable to Plaintiff's First Amendment compelled speech claim and, as in *Arnold*, concludes that Plaintiff has failed to state a First Amendment claim for compelled speech.

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 169 of 236

Medina v. Cuomo, Not Reported in Fed. Supp. (2015)

2015 WL 13744627

### 2. Right to Privacy

To the extent Plaintiff's complaint can be construed to allege a violation of privacy claim under the First Amendment, the Court notes that the Second Circuit concluded in *Doe v. Cuomo*, 755 F.3d 105, 114 (2d Cir. 2014), that the plaintiff's claim that the SORA registration and notification requirements violated any constitutional right to privacy was unsupported "[g]iven the combination of the nature of the information released (consisting in large part of matters of public record) and the State's strong interest in releasing it." The court also recognized that there was no question that SORA's requirements "are rationally related to the aim of protecting the public." *Id. See also Cutshall v. Sundquist*, 193 F.3d 466, 481 (6th Cir. 1999) ("the Constitution does not provide [plaintiff] with a right to keep his registry information [he was required to provide under the Tennessee Sex Offender Registration and Monitoring Act] private.").

Based upon the foregoing, the Court finds that Plaintiff has failed to state a claim under the First Amendment and recommends dismissal on initial review.

### H. Fourth Amendment

**\*11** Plaintiff has asserted a Fourth Amendment claim in his complaint. (Dkt. No. 1 at ¶¶ 95, 297-99.) In *Doe v. Cuomo*, the Second Circuit rejected the plaintiff's argument that the registration requirements under SORA violated his Fourth Amendment right to be free from unreasonable searches and seizures. The Court wrote:

> ... Doe argues that the registration requirements violate his Fourth Amendment right to be free from unreasonable searches and seizures. Even if we assume for argument that SORA's requirements subject Doe to a search or seizure for Fourth Amendment purposes, we cannot agree that any such search or seizure is unreasonable. Here, any searches or seizures required by SORA serve special needs such as the protection of potential future victims and the solving of crimes in the future and purport neither to facilitate the investigation

of any specific crime nor primarily to serve a general interest in crime control. Moreover, the degree of intrusion on convicted sex offenders is reasonable in relation to the interests advanced by SORA. (citation omitted). We therefore conclude that SORA, as amended and as applied to Doe, does not run afoul of the Fourth Amendment. (citations and internal quotation marks omitted).

*Doe v. Cuomo*, 755 F.3d at 115.

Although the plaintiff in *Doe v. Cuomo* was a level 1 sex offender, the Court finds the Second Circuit's rationale in rejecting the plaintiff's Fourth Amendment claim equally applicable to the Fourth Amendment claim of Plaintiff, a level 3 sex offender, and recommends dismissal of the claim on initial review.

### I. Fifth Amendment

Plaintiff appears to allege that his Fifth Amendment rights are violated because the registration and reporting requirements under SORA compel him to be a witness against himself and to incriminate himself. (Dkt. No. 1 at ¶ 95.) The Fifth Amendment prohibits the government from compelling an individual "in any criminal case to be witness against himself." US Const. amend. V. The provision extends to any proceeding in which the answers might incriminate an individual in a future criminal proceeding. *Allen v. Illinois*, 478 U.S. 364, 368, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986).

In *United States v. Simon-Marcos*, 363 F. App'x 726 (11th Cir. 2010), one of the few decisions involving a Fifth Amendment claim similar to that asserted by Plaintiff, the court concluded that none of the information the plaintiff was required to provide under Georgia's sex offender registration statute would "have confronted him with a substantial hazard of self-incrimination" for Fifth Amendment purposes. *Id.* at 728. The information included the plaintiff's name; social security number; age; race; sex; date of birth; height; weight; hair color; eye color; fingerprints; photograph; place of residence; place of employment; vehicle make, model, color and licence plate tag number; e-mail address, username and user passwords; the crime which required registration; and the date released from prison. *Id.*; O.C.G.A. § 42-1-12(a)

2015 WL 13744627

(16)(A)-(L). The information required under SORA, §§ 168-b and 168-f(4) is similar to that under the Georgia statute and includes the sex offender's name and aliases used; date of birth; sex; race; height; weight; eye color; driver's license number; home address or expected place of domicile; internet accounts with internet access providers and the internet identities used by the offender; a photograph, which must be regularly updated and fingerprints; description of the offense for which the offender was convicted and sentence imposed; status of enrollment at an institution of higher education; and employment.

**\*12** The Court finds, as did the Eleventh Circuit in *Simon-Marcos*, that none of the information required under SORA is of the kind that would incriminate Plaintiff in a future criminal proceeding and recommends dismissal of Plaintiff's Fifth Amendment claim on initial review.

### J. Sixth Amendment

Plaintiff has alleged that SORA violates his rights under the Sixth Amendment. (Dkt. No. 1 at ¶¶ 95, 303-05.) The Sixth Amendment provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

US Const. amend. VI.

According to Plaintiff, he was

> [d]enied the due process and designation of a criminal case of the 6th Amendment requiring the plaintiff to be "informed of the nature and cause of the accusation" whereas the defendants claim the crime is merely a penalty

rather than a crime as they are, a trial through an "impartial jury" and that there is no impartiality possible when the defendants have "fraudulently persuaded the jury" the NYS DOC SORA is lawful, denied "to be confronted with the witnesses against him", as the defendants require the plaintiff to be a "witness against himself and to incriminate himself", and to be the person who provides the factual part of a criminal complaint, and to have "the Assistance of Counsel for his defense", when the defendants utilize fear, ostracization, and other political pressure to restrain the plaintiff's defense attorney from challenging the law....

(Dkt. No. 1 at ¶ 95.)

SORA provides for written notice to a sex offender of both the Board determination proceeding and of the right to a hearing before the sentencing court determining the level of classification. Corr. Law § 168-n(3). Therefore, the Court finds Plaintiff's claim that he was not informed of the nature and cause of the accusation against him to be frivolous.

Sex offenders facing a risk classification have been found to have a right to the effective assistance of counsel under both state and federal standards. *See People v. Bowles*, 89 A.D.3d 171, 932 N.Y.S.2d 112, 118 (2d Dep't 2011). SORA acknowledges a sex offender's right to counsel and to the appointment of counsel in the event the offender is financially unable to retain counsel. Corr. Law § 168-n(3). Plaintiff concedes that he was afforded a hearing with representation by counsel when he was classified by the County Court as a level 3 sex offender under SORA. *Id.* at 40.

Therefore, the Court recommends that Plaintiff's Sixth Amendment challenge to SORA be dismissed upon initial review.

### K. Eighth Amendment

Plaintiff claims that SORA violates his Eighth Amendment right to be free from cruel and unusual punishment. (Dkt. No. 1 at ¶¶ 95, 262, 306-08.) Plaintiff complains of the social isolation and discrimination resulting from being perceived as a threat or danger because of his sex offender classification, difficulty in obtaining employment, inability to receive public housing allowances, and fear of his family members' safety if he visits or resides with them. *Id.* at ¶ 262.

**\*13** The Second Circuit has concluded that SORA is regulatory in nature and not punitive. *See Doe v. Pataki*, 120 F.3d at 1284. Therefore, SORA does not violate the Eighth

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 171 of 236

Medina v. Cuomo, Not Reported in Fed. Supp. (2015)
2015 WL 13744627

Amendment's prohibition on cruel and unusual punishment, and the Court recommends that Plaintiff's Eighth Amendment claim be dismissed. *See Maldonado v. Fischer*, No. 11-CV-1091 Sr., 2012 WL 4461647, at * 3, 2012 U.S. Dist. LEXIS 137634, at *9 (W.D.N.Y. Sept. 24, 2012) (recognizing Second Circuit's determination that SORA's registration and community notification provisions were not "punishments" within the meaning of the Ex Post Facto Clause and concluding that accordingly, his allegations of cruel and unusual punishment under SORA failed to state a claim); *see also Cain v. Michigan*, No. 14-12567, 2015 WL 249296, at * 7, 2015 U.S. Dist. LEXIS 5959, at *18 (E.D. Mich. Jan. 20, 2015) (because the Michigan sex offender registration act was found to be regulatory rather than punitive, plaintiff failed to state a claim for cruel and unusual punishment under the Eighth Amendment).

### L. Thirteenth Amendment

Plaintiff claims that SORA constitutes "state sanctioned slavery" in violation of the Thirteenth Amendment. (Dkt. No. 1 at ¶ 175.) Section 1 of the Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude, except as punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." US Const. amend. XIII, § 2 provides that "Congress shall have the power to enforce this article by appropriate legislation." The Court finds Plaintiff's Thirteenth Amendment claim to be frivolous and recommends dismissal.

### M. Fourteenth Amendment Procedural Due Process [11]

[11]    To the extent Plaintiff is challenging the level classification proceedings held before Judge Martusewicz, his procedural due process claim may be barred under the *Rooker-Feldman* doctrine. However, the Court does not have sufficient information before it to make that determination on initial review.

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). When protected liberty or property interests are implicated, "the right to some kind of hearing is paramount." *Id.* at 569-70, 92 S.Ct. 2701.

Although the issue of whether requiring an individual to register as a sex offender implicates a liberty interest does not appear to have been conclusively decided in this Circuit, there are district court decisions that have found that a stigma plus liberty interest is implicated when an individual is required to register under SORA, since the stigma attached may affect the registered person in other areas such as employment. *See Woe v. Spitzer*, 571 F.Supp.2d 382, 387 (E.D.N.Y. 2008) (holding that SORA implicates a liberty interest) (citing *Doe v. Pataki*, 3 F.Supp.2d 456 (S.D.N.Y. 1998) ). Therefore, solely for purposes of this initial review, the Court will assume that Plaintiff possesses a cognizable stigma plus liberty interest.

Plaintiff's procedural due process claim nonetheless lacks merit. Once a liberty interest has been established, a plaintiff must show deprivation of that right without sufficient process. *Woe*, 571 F.Supp.2d at 387. When a person's liberty interests are implicated, due process requires at a minimum notice and an opportunity to be heard. *Hamdi v. Rumsfeld*, 542 U.S. 507, 533, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (plurality opinion). The right to a hearing to determine risk level, prior notice of the hearing, the right to appeal any determination, the right to an attorney during the proceedings and the right to discovery of evidence were established as a result of a litigation agreement between New York State and a class of sex offenders. *See Doe v. Pataki*, 481 F.3d 69, 77-79 (2d Cir. 2007) (finding that all the procedural safeguards suggested by the district court were implemented in the settlement and subsequent amendment to SORA and finding the settlement to be binding and valid); *United States v. Kimble*, 905 F.Supp.2d 465, 475 (W.D.N.Y. 2012) (finding that the settlement put in procedural safeguards of notice and opportunity to be heard to bring SORA in compliance with due process demands); *Woe,* 571 F.Supp.2d at 389 (holding that SORA post-settlement did not violate procedural due process).

**\*14**  It seems clear that the SORA procedures for notice and an opportunity to be heard, assignment of counsel, and the right to appeal, Corr. Law § 168-n(3), which were afforded Plaintiff satisfied the Fourteenth Amendment's procedural due process requirements, and that his due process claim lacks merit. [12] (See Dkt. No. 1 at ¶¶ 37-43.) Therefore, the Court recommends that Plaintiff's Fourteenth Amendment procedural due process claim be dismissed upon initial review.

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 172 of 236

Medina v. Cuomo, Not Reported in Fed. Supp. (2015)

2015 WL 13744627

[12]    Plaintiff has alleged in his complaint that he requested an appeal, but that his attorney failed to file an appeal claiming that the Plaintiff had no chance. (Dkt. No. 1 at ¶¶ 42-43.) The fact that Plaintiff alleges that his lawyer failed to file an appeal is insufficient to state a procedural due process claim since an appeal was available to him under SORA. *See Hefferan v. Corda*, 498 F. App'x 86, 88 (2d Cir. 2012) (finding that "a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies") (citation and internal quotation marks omitted); *Chase Grp. Alliance LLC v. City of N.Y. Dep't of Fin.*, 620 F.3d 146, 152-53 (2d Cir. 2010) ("The fact that a state proceeding is required by due process does not mean that Section 1983 provides a remedy for every error committed in the state proceeding. So long as state appellate remedies are available, a Section 1983 action is not an available vehicle for relief.")

**N. Fourteenth Amendment Substantive Due Process**

Inasmuch as Plaintiff makes reference to substantive rights throughout his complaint, the Court has liberally construed it to allege a substantive due process claim regarding his sex offender classification. Substantive due process protects individuals against governmental action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense. *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994). "It is not enough that the government act be 'incorrect or ill-advised'; it must be conscience-shocking." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011) (citation omitted). "Only the most egregious official conduct can be said to be arbitrary in the constitutional sense and therefore unconstitutional." *Id.* at 275. To satisfy this standard a plaintiff must show that the government decision it challenges "was arbitrary or irrational or motivated by bad faith." *Rosa R. v. Connelly*, 889 F.2d 435, 439 (2d Cir. 1989).

In *Doe v. Pataki*, 120 F.3d at 1266, the Second Circuit noted that "[t]he legislature articulated two goals served by the SORA: (1) protecting members of the community, particularly their children by notifying them of the presence of individuals in their midst who may present a danger, and (2) enhancing law enforcement authorities' ability to investigate and prosecute future sex crimes." Thus the motivation for the enactment of SORA was not arbitrary, irrational, or motivated by bad faith, but rather to protect New York State's vulnerable population and aid law enforcement by facilitating the monitoring of the whereabouts of sex offenders. Therefore, Plaintiff's substantive due process argument is without merit, and the Court recommends dismissal upon initial review.

**O. Equal Protection**

It is not entirely clear from his complaint whether Plaintiff is claiming that SORA violates his equal protection rights. However, because of his pro se status, the Court has liberally construed his complaint to assert an equal protection claim. The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law and guarantees that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In order to prove an equal protection violation, plaintiff must demonstrate that "[he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (citations omitted).

**\*15** Convicted sex offenders have not been found to be a "suspect class" for equal protection purposes, and SORA is therefore subject to scrutiny under the rational basis test. [13] *See Cutshall*, 193 F.3d at 482 (convicted sex offenders are not a suspect class). "Unless the legislation classification under attack involves a suspect class, the classification need only be rationally related to a legitimate government goal to survive constitutional challenge." *Id.* (citing *Chapman v. United States*, 500 U.S. 453, 465, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) ). "[L]egislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249. Given the legislative purpose of SORA protecting vulnerable children and aiding law enforcement the Court cannot say that SORA is irrational and recommends that Plaintiff's equal protection claim be dismissed upon initial review. *See Cutshall*, 193 F.3d at 482 (dismissing claim that sex offender registration act violated plaintiff's equal protection rights); *Does v. Munoz*, 507 F.3d 961, 966 (6th Cir. 2007) (same).

[13]    Presumably those similarly situated to those subject to the requirements of SORA are criminal offenders who are not subject to the registration requirements of SORA.

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 173 of 236
Medina v. Cuomo, Not Reported in Fed. Supp. (2015)
2015 WL 13744627

**P. Conclusion as to Plaintiff's Federal Claims**

For the reasons explained above, the Court recommends that all of federal claims against Governor Cuomo and Senator Skelos, in both their official and individual capacities, be dismissed. While the Court is keenly aware that a *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated," *Gomez,* 171 F.3d at 795, it finds that the problems with Plaintiff's federal claims under against the Defendants are substantive and cannot be cured by a better pleading. Therefore, the Court recommends that the dismissal of the complaint against Governor Cuomo and Senator Skelos be with prejudice.

The Court is cognizant of the fact that Plaintiff has included allegations in his complaint and in his request for a preliminary injunction that an officer of the Jefferson County Sheriff's Department who met with Plaintiff in August of 2005 was unwilling to list Plaintiff's address as "homeless" on the registration and verification form signed by Plaintiff. (Dkt. No. 3 at ¶¶ 13, 19-22.) Instead, the officer inserted an old public housing address for Plaintiff's family against Plaintiff's wishes, placing Plaintiff at risk of state and federal charges for providing an incorrect address. *Id.* at ¶ 19-22, 24. Neither Governor Cuomo nor Senator Skelos has been implicated in the August 2015 registration matter by the allegations in the complaint, and the Court has, therefore, not considered whether Plaintiff can state a federal claim with regard to the address issue. The Court therefore recommends that the District Court allow Plaintiff to amend his complaint to assert any federal claims he may have against properly named defendants with regard to the Jefferson County Sheriff's Department registration matter, and to direct that in the event Plaintiff does file an amended complaint against the proper parties that it be referred to this Court for initial review under 28 U.S.C. § 1915(e)(2)(B).

**Q. Plaintiff's State Law Claims**

Plaintiff has asserted numerous state law tort claims and a New York State Constitution claim against Governor Cuomo and Senator Skelos. In light of the recommendation that all of Plaintiff's federal claims against Governor Cuomo and Senator Skelos be dismissed with prejudice, the Court also recommends that the District Court decline to exercise supplemental jurisdiction over Plaintiff's state law and state constitutional claims against those Defendants, without prejudice subject to refiling in state court and to

reconsideration in the event the District Court does not accept this Court's recommendation for dismissal of Plaintiff's federal claims with prejudice. *See Kolari v. New York Presbyterian Hosp.,* 455 F.3d 118, 120 (2d Cir. 2006).

**\*16** **ACCORDINGLY**, it is hereby

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 2) is granted; and it is hereby

**RECOMMENDED** that Plaintiff's complaint (Dkt. No. 1) be dismissed in its entirety upon initial review pursuant to 18 U.S.C. § 1915(e)(2)(B); and it is further

**RECOMMENDED** that all of Plaintiff's federal claims against Defendants Cuomo and Skelos be dismissed with prejudice. Those federal claims include Plaintiff's claims under:

1. 42 U.S.C. § 1983 violation of Plaintiff's rights under the First, Fourth, Sixth, Eighth, Thirteenth, and Fourteenth Amendments to the United States Constitution;

2. 42 U.S.C. § 1981;

3. 42 U.S.C. § 1985;

4. 42 U.S.C. § 1986;

5. 42 U.S.C. § 1988;

6. 18 U.S.C. §§ 1581, 1584, 1589, 1590, 1594, 1595, 2201; and

7. Criminal Interference with Right to Fair Housing under the FHA, 42 U.S.C. § 3601, *et seq.*; and it is further

**RECOMMENDED** that the District Court decline to exercise supplemental jurisdiction over Plaintiff's state law and state constitutional claims against Defendants Cuomo and Skelos (Causes of Action 15-23, 34), without prejudice, subject to refiling in state court and to reconsideration in the event the District Court does not accept this Court's recommendation for dismissal of Plaintiff's federal claims with prejudice; and it is further

**RECOMMENDED** that Plaintiff be granted leave to amend his complaint to assert any federal claims he may have against the proper defendants with regard to the issue concerning the failure to allow him to use the address "homeless" when he did his ninety day registration and verification under SORA

Case 9:23-cv-01114-DNH-MJK   Document 31   Filed 04/22/24   Page 174 of 236

**Medina v. Cuomo, Not Reported in Fed. Supp. (2015)**

2015 WL 13744627

in or about August 2015, and the inclusion against his wishes of an incorrect address on the registration signed by him, and direct that in the event Plaintiff does file an amended complaint that it be referred to this Court for initial review under 28 U.S.C. § 1915(e)(2)(B); and it is hereby

**ORDERED** that the Clerk provide Plaintiff with copies of all unpublished decisions cited herein in accordance with *LeBron v. Sanders*, 557 F.3d 76, 79 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam) ); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

**All Citations**

Not Reported in Fed. Supp., 2015 WL 13744627

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by Singleton v. Doe, E.D.N.Y., September 28, 2016

2012 WL 4461647
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Angel MALDONADO, Plaintiff,

v.

Brian FISCHER, Commissioner New York State
Department of Correctional Services, Andrea
Evans, Chairwoman CEO New York State Division
of Parole, and Grant Scriven, Bureau Chief,
New York State Division of Parole, Defendants.

No. 11–CV–1091Sr.
|
Sept. 24, 2012.

**Attorneys and Law Firms**

Angel Maldonado, Alden, NY, pro se.

ORDER

JOHN T. CURTIN, District Judge.

### INTRODUCTION

**\*1** Plaintiff, Angel Maldonado, has commenced this action *pro se* (Docket No. 1), and has moved for permission to proceed *in forma pauperis,* and has filed a Signed Authorization (Docket No. 2). Subsequent to filing the complaint, plaintiff filed motions for preliminary injunctive relief (Docket No. 3), and for the appointment of counsel (Docket No.4). The Court grants the Plaintiff leave to proceed as a poor person and, for the reasons set forth below, determines that several of the claims set forth in the complaint must be dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, and that his applications for preliminary injunctive relief and for the appointment of counsel must be denied.

### STANDARD OF REVIEW

Section 1915(e) (2)(B) of 28 U.S.C. provides that the Court shall dismiss a case in which *in forma pauperis* status has been granted if the Court determines that the action (i) is frivolous or malicious; (ii) fails to state a claim upon which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. In addition, 28 U.S.C. § 1915(a) requires the Court to conduct an initial screening of "a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity," *id.,* regardless of whether or not the inmate has sought *in forma pauperis* status under 28 U.S.C. § 1915. of the factual

In evaluating the complaint, the Court must accept as true all allegations and must draw all inferences in plaintiffs favor. *See Larkin v. Savage,* 318 F.3d 138, 139 (2d Cir.2003) (per curiam); *King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999). "Specific facts are not necessary," and the plaintiff "need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (internal quotation marks and citation omitted); *see also Boykin v. Keycorp,* 521 F.3d 202, 213 (2d Cir.2008) (discussing pleading standard in *pro se* cases after *Twombly* ). "A document filed *pro se* is to be liberally construed, ..., and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erikson,* 551 U.S. at 94 (internal quotation marks and citations omitted). Generally, the Court will afford a *pro se* plaintiff an opportunity to amend or to be heard prior to dismissal " 'unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim.' " *Abbas,* 480 F.3d at 639 (quoting *Gomez v. USAA Federal Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999) (per curiam)).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983. "To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton,* 126 F.3d 400, 405 (2d. Cir.1997) (citing *Eagleston v. Guido,* 41 F.3d 865, 875–76 (2d Cir.1994)).

### PLAINTIFF'S ALLEGATIONS

2012 WL 4461647

**\*2** Plaintiff's claims against the defendants-the Commissioner of the New York State Department of Corrections and two officials of the Division of Parolestem from the conditions of parole from a New York State conviction, which was granted in May, 2009. Plaintiff states that he is on parole from 2003 convictions for fraud, grand larceny, petit larceny, compounding a crime, harassment, tampering with physical evidence, bribing a witness and criminal impersonation. Plaintiff alleges that upon his release on parole he was given a series of special conditions that are given to sex offenders, conditions which were renewed after plaintiff's subsequent release from prison following incarceration for parole violations in February and September, 2010, despite the fact that none of his 2003 convictions constituted or related to a sex offense. Plaintiff states that what he refers to as the "sex offender conditions" of his parole ((Docket No. 1, p. 8, ¶ 7) were imposed on him because of a prior 1997 conviction for sexual misconduct, pursuant to § 130.20(2) of the New York State Penal Law, for which he was sentenced to three years probation in March 1997 and from which he was discharged in March, 1999. He further alleges that it was never recommended nor ordered by the Court at the time of his 1997 sentencing on the sexual misconduct conviction that he attend sex offender counseling or that he register under the state Sex Offender Registration Act (SORA), N.Y. Corr. Law § 168 et seq. He states that at the time of his 1997 conviction, the definition of "sex offense" found in SORA did not include the offense of sexual misconduct under N.Y. Penal Law § 130.20(2). However, in 2002, § 168–a of the Correction Law was amended to include sexual misconduct under N.Y. Penal Law § 130.20(2), thereby making anyone convicted of sexual misconduct susceptible to being labeled a sex offender and thereby subjected to SORA. Plaintiff therefore alleges that fourteen years after his conviction for sexual misconduct, the Division of Parole determined that he should be "labeled a sex offender based on the definition pursuant to Correction Law § 168–a and therefore [be supervised] as a sex offender case." (Docket No. 1, p. 9, ¶ 10).

It is not clear whether plaintiff is alleging that all of the "sex offender conditions" of parole were attributable to his having been determined to be a sex offender within the meaning of SORA, or whether some of the conditions to which he objects were attached to his parole as ordinary conditions of parole to be applied by the Division of Parole at its discretion.

Plaintiff argues that the retroactive reclassification of his 1997 sexual misconduct conviction as a sex offense, and the corresponding imposition of sex offender conditions to his parole on his 2003 conviction (1) violates the Ex Post Facto Clause of the Constitution, U.S. Const. art. I, § 9, cl. 3, (2) deprives him of due process under the Fourteenth Amendment, and (3) constitutes cruel and unusual punishment within the meaning of the Eighth Amendment. Plaintiff's complaint seeks injunctive relief, i.e., that the Court direct that all sex offender conditions be removed from the conditions of his parole. Each of the three bases asserted by plaintiff will be treated as a separate claim below.

### DISCUSSION

**\*3** Parole is an "established variation on imprisonment of convicted criminals," Morrissey v. Brewer, 408 U.S. 471, 477, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), which is partof a " 'continuum' of state-imposed punishments." Samson v. California, 547 U.S. 843, 850, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006) (citing United States v. Knights, 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001)). "[T]he practice of releasing prisoners on parole before the end of their sentences has become an integral part of the penological system." Morrissey, 408 U.S. at 477 (citation omitted). The twofold purpose behind parole is "to help individuals reintegrate into society as constructive individuals as soon as they are able ... [while] alleviat[ing] the costs to society of keeping an individual in prison." Id.

"There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). "The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." Morrissey, 408 U.S. at 477 (emphasis added). To ensure the security and effectiveness of release, "those who are allowed to leave prison early are subjected to specified conditions for the duration of their terms ... [which] restrict their activities substantially beyond the ordinary restrictions imposed by law on an individual citizen." Id. at 478. "The enforcement leverage that supports the parole conditions derives from the authority to return the parolee to prison to serve out the balance of his sentence if he fails to abide by the rules." Id. at 478–79.

As a general matter, it is well-established that "the [New York] Parole Board's discretionary imposition of special

conditions is not subject to judicial review in the absence of a showing that the board or its agents acted in an arbitrary and capricious manner. Review of conditions of parole are generally matters for state courts." *Walker v. Mattingly,* 09–CV–845–JTC, 2012 U.S. Dist. LEXIS 48547, at \*18, 2012 WL 1160772 (W.D.N.Y. Apr. 5, 2012) (internal quotation and citations omitted). Moreover, as explained below, the courts in the Second Circuit have addressed and generally rejected constitutional objections to the application of the provisions of SORA to parolees, including the objections asserted by plaintiff.

*Ex Post Facto Clause and Eighth Amendment Claims*

Article I, § 9 of the Constitution prohibits the States from passing any laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts." *Collins v. Youngblood,* 497 U.S. 37, 41, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). The Ex Post Facto Clause of the Constitution "applies only to penal statutes which disadvantage the offender affected by them." *Id.* (emphasis added). In *Doe v. Pataki,* 120 F.3d 1263, 1284–1285 (2d Cir.1997), the Second Circuit held that the SORA's registration and community notification provisions were not "punishments" within the meaning of the Ex Post Facto Clause. See *also Smith v. Doe,* 538 U.S. 84, 105–06, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) (holding that retroactive application of Alaska's sex offender registry statute did not violate the Ex Post Facto clause). *Accord, e.g., Manzullo v. New York,* No. 07 CV 744(SJF), 2010 U.S. Dist. LEXIS 32089, at \*22, 2010 WL 1292302 (E.D.N.Y. Mar. 29, 2010) (denying habeas relief to petitioner claiming that both the registration and notification provisions of the SORA constitute punishment for purposes of the Ex Post Facto clause) (citations omitted). Accordingly, to the extent that plaintiff is challenging any conditions of parole which were attributable to his having been determined to be subject to SORA, his allegations fail to state a claim that the imposition of the conditions violated the Ex Post Facto Clause or, by parity of reasoning, the Eighth Amendment's proscription of cruel and unusual punishments.

\*4 To the extent that the sex offender conditions of parole to which plaintiff objects were or may have been imposed not incident to SORA but rather as special conditions of release falling within the range of conditions that the Division of Parole customarily imposes, see *M.G. v. Travis,* 236 A.D.2d 163, 167–68, 667 N.Y.S.2d 11 (N.Y.App. Div. 1st Dep't 1997) (discussing discretionary authority of New York State Division of Parole to impose special conditions of release), the Court likewise determines that such conditions do not constitute cruel and unusual punishment within the meaning of the Eighth Amendment or the Ex Post Facto Clause. *See Blake v. Fischer,* 09–CV–266, 2010 U.S. Dist. LEXIS 68224, at \*29 (N.D.N.Y. May 5, 2010) (rejecting claim that placement in sex offender training programs or setting special conditions of parole amounted to an infliction of cruel and unusual punishment); *Robinson v. N.Y. State,* 09–CV–455, 2010 U.S. Dist. LEXIS 144553, at \*19–20 (rejecting Eighth Amendment objections to prerelease and special conditions of parole). Accordingly, the Court concludes that plaintiff's objections to the special conditions of parole to which he was subjected do not constitute punishment and thus fail to state a claim under the Eighth Amendment or the Ex Post Facto Clause.

*Due Process Claims*

"To award damages under 42 U.S.C. § 1983 for an alleged violation of procedural due process, a court must find that, as the result of conduct performed under color of state law, the plaintiff was deprived of life, liberty, or property without due process of law." *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). There is no dispute in this case that the defendants acted under color of state law. "What remains is a two-pronged inquiry: (1) whether the plaintiff had a protected liberty interest ... and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Id.* at 351–52 (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460–61, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). The courts have also consistently held that a parolee has no constitutionally protected interest in being free from special conditions of release. *Bod die v. Chung,* 2011 U.S. Dist. LEXIS 48256, at \*4–5, 2011 WL 1697965 (E.D.N.Y. May 4, 2011) (rejecting section 1983 challenge to special conditions); *Cooper v. Dennison,* 08–CV–6238, 2011 U.S. Dist. LEXIS 31221, at \*32, 2011 WL 1118685 (W.D.N.Y. Mar. 24, 2011) (quoting *Pena v. Travis,* 01–CV–8534 2002 U.S. Dist LEXIS 24709, 2002 WL 31886175 (S.D.N.Y. Dec. 27, 2002) ("Because the imposition of special conditions is left to the discretion of the Board of Parole and parole officers, plaintiff does not have a protected liberty interest in being free from special conditions.")); *see also* 9 N.Y. Comp.Codes R. & Regs. ("N.Y.C.R.R."), tit. 9, § 8003.3 ("A special condition may be imposed upon a releasee either prior or subsequent to release. The releasee shall be provided with a written copy of each special condition imposed. Each special condition may be imposed by a member or members of the Board of Parole, an authorized representative of the Division of Parole, or a parole officer."). In addition, "the Parole Board's discretionary imposition of special conditions

2012 WL 4461647

is not subject to judicial review in the absence of a showing that the board or its agents acted in an arbitrary and capricious manner. Review of conditions of parole are generally matters for state courts." *Walker v. Mattingly,* 09–CV–845–JTC, 2012 U.S. Dist. LEXIS 48547, at *18, 2012 WL 1160772 (W.D.N.Y. Apr. 5, 2012)) (internal quotation and citation omitted). "However, where the condition is not related to the parolee's criminal history or to the State's interests, it may be prone to tailoring or invalidation." *Robinson,* 2010 U.S. Dist. LEXIS 144553, at *23 (citing cases invalidating conditions of parole not reasonably related to parolee's offense).

**\*5** Accordingly, to the extent that plaintiff is alleging a protected liberty interest to be free from the special conditions of parole to which he objects, such an "interest" is not protected and is therefore not a sufficient basis for a Fourteenth Amendment due process violation. *See McCloud v. Kane,* 491 F.Supp.2d 312, 317 (E.D.N.Y.2007). However, liberally construing the complaint as the Court is obligated to do, the Court concludes that Maldonado's allegations concerning the restrictions and resulting hardships that the conditions imposed on him have had (see Docket No. 1, p. 10, ¶ 20 [enumerating restrictions upon plaintiff's relationship with his family allegedly caused by conditions of parole] ) "sufficiently allege[ ] a due process claim regarding the *substance* of the special conditions at issue here and the basis for their imposition." *Robinson,* 2010 U.S. Dist. LEXIS 144, at *26 (citing *Bod die v. N.Y. State Div. of Parole,* 285 F.Supp.2d 421, 428–29 (S.D.N.Y.2003)) (emphasis in quotation added). Accordingly, at this early stage of the proceeding, the Court will allow plaintiff's due process claim against the defendants to go forward, to the extent that it can be construed as objecting to the *substance, i.e.,* the nature and extent of, the conditions imposed upon him and their relation to his offenses.

### PLAINTIFF'S MOTIONS

*Preliminary Injunctive Relief*

Plaintiff requests preliminary injunctive relief with respect to the sexual offender-related conditions that have been included in his conditions of parole. (Docket No. 3). While acknowledging that he was incarcerated for a parole violation at the time he filed the motion (*Id.,* p. 2, ¶ 6), he maintains that a temporary restraining order is appropriate because he "risks being violated for one of the unconstitutional conditions imposed upon **him** once released." (*Id.,* p. 6, ¶ 32).

A party seeking a preliminary injunction must demonstrate "(1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief." *Resolution Trust Corp. v. Elman,* 949 F.2d 624, 626 (2d Cir.1991)); *PSC, Inc. v. Reiss,* 111 F.Supp.2d 252, 254 (W.D.N.Y.2000). The " 'serious questions' prong is also frequently termed the 'fair ground for litigation' standard." *N.A.A.C.P., Inc. v. Town East Haven,* 70 F.3d at 223.

Here, the Court determines that plaintiff satisfies neither prong of the preliminary injunction standard. As noted, plaintiff was incarcerated at the time he filed the motion seeking preliminary injunctive relief and he remains incarcerated, and therefore is not presently subject to the conditions of parole that he seeks to have the Court enjoin. Moreover, while the Court is allowing his due process claim against defendants to proceed, plaintiff has not, at this juncture, demonstrated sufficient likelihood of success on the merits of his complaint, or "sufficiently serious questions going to the merits" and a balance of hardships in his favor to warrant the granting of his request for a temporary restraining order. Plaintiff's motion for preliminary injunctive relief is therefore denied.

*Appointment of Counsel*

**\*6** Plaintiff has also moved for the appointment of counsel (Docket No. 4). A more fully developed record will be necessary before the Court can determine whether plaintiffs chances of success warrant the appointment of counsel. Therefore, plaintiffs motion is denied without prejudice to its renewal at such time as the existence of a potentially meritorious claim may be demonstrated. *See Hendricks v. Coughlin,* 114 F.3d 390, 392 (2d Cir.1997) (when determining whether to appoint counsel, the Court must first look to the "likelihood of merit" of the underlying dispute).

### CONCLUSION AND ORDER

In accordance with the foregoing,

IT HEREBY IS ORDERED, that plaintiff's motion to proceed *in forma pauperis* (Docket No. 2) is granted;

FURTHER, that plaintiff's motion for preliminary injunctive relief (Docket No. 3) is denied;

FURTHER, that plaintiff's motion for the appointment of counsel (Docket No. 4) is denied without prejudice;

FURTHER, that plaintiff's Ex Post Facto Clause claims against the defendants are dismissed with prejudice;

FURTHER, that plaintiff's Eighth Amendment claims against the defendants are dismissed with prejudice;

FURTHER, that plaintiff's Due Process claims against the defendants which seek to challenge the substance of the conditions of parole imposed upon plaintiff may go forward;

FURTHER, the Clerk of the Court is directed to file plaintiff's papers, and to cause the United States Marshal to serve copies of the Summons, Complaint and this Order upon the defendants without plaintiff's payment therefore, unpaid fees to be recoverable if this action terminates by monetary award in plaintiff's favor;

FURTHER, that pursuant to 42 U.S.C. § 1997e(g)(2), the defendants are directed to answer the Complaint.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4461647

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 249296
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Derrick CAIN, Plaintiff,
v.
The People of the State of MICHIGAN, Rick Snyder,
Karen Johnson, and Michigan State Police, Defendants.

No. 14–12567.
|
Signed Jan. 20, 2015.

**Attorneys and Law Firms**

Derrick Cain, Detroit, MI, pro se.

Erik A. Grill, Michigan Department of Attorney General,
Lansing, MI, for Defendants.

*OPINION AND ORDER GRANTING
DEFENDANTS' MOTION TO DISMISS*

PATRICK J. DUGGAN, District Judge.

**\*1** *Pro se* Plaintiff Derrick Cain instituted this civil rights
action against Defendants State of Michigan, Governor Rick
Snyder, Karen Johnson, and the Michigan State
Police (collectively, "Defendants") pursuant to 42 U.S.C. § 1983
on June 30, 2014. In his Complaint, Plaintiff challenges the
constitutionality of Michigan's Sex Offender Registration Act
("SORA" or "Act"), as amended in 2011, and seeks monetary
and equitable relief. Plaintiff claims that the Act's provisions
violate his Fourteenth Amendment due process rights, the
constitutional prohibitions on double jeopardy and *ex post
facto* laws, the Eighth Amendment, and also violate state law.

Presently before the Court is Defendants' Motion to Dismiss,
filed pursuant to Federal Rule of Civil Procedure 12(b)(6).
Plaintiff declined to respond to Defendants' Motion despite
being apprised of the timeframe in which to do so. Having
determined oral argument would not significantly aid the
decisional process, the Court dispensed with oral argument
pursuant to Eastern District of Michigan Local Rule 7.1(f)(2).
For the reasons stated herein, the Court will grant Defendants'
Motion and dismiss Plaintiff's Complaint.

**I. BACKGROUND**

**A. Statutory History**
"In 1994, Congress passed the Jacob Wetterling Crimes
Against Children and Sexually Violent Offender Registration
Act, title 17, 108 Stat.2038, as amended, 42 U.S.C. § 14071,
which conditions certain federal law enforcement funding
on the States' adoption of sex offender registration laws and
sets minimum standards for state programs." *Smith v. Doe*,
538 U.S. 84, 89–90, 123 S.Ct. 1140, 1145, 155 L.Ed.2d 164
(2003). Although the federal statute gave the states three years
from September 1, 1994 within which to create registration
programs, 42 U.S.C. § 14071(f)(1) (1994), Michigan first
enacted SORA in 1994. [1] *Doe v. Snyder*, 932 F.Supp.2d 803,
807 (E.D.Mich.2013); *Akella v. Mich. Dep't of State Police*,
67 F.Supp.2d 716, 720 (E.D.Mich.1999).

[1]     By 1996, every State, the District of Colombia,
        and the Federal Government had enacted some
        variation of Megan's Law." *Smith*, 538 U.S. at
        8990, 123 S.Ct. at 1145.

The SORA

> requires individuals convicted of one
> of the enumerated criminal sexual
> offenses to register and to update their
> address within ten days of relocation.
> MICH. COMP. LAWS § 28.723(a),
> (b); MICH. COMP. LAWS § 28.729.
> In the event that an individual fails
> to register, the Act provides such
> conduct constitutes a felony. The
> Michigan Department of State Police
> is required to maintain a repository of
> the information compiled pursuant to
> the Act in the form of a computerized
> database. MICH. COMP. LAWS §
> 28.728.

*Akella*, 67 F.Supp.2d at 720. The law enforcement database,
which is distinct from the publically-accessible website,
contains a wealth of information about individuals required
to register. [2] *Compare* Mich. Comp. Laws § 28.727(1)

2015 WL 249296

(delineating information required upon registration and kept in a law enforcement database) with Mich. Comp. Laws § 28.727(2) (setting forth the required contents for the website. The publically-accessible information kept on the website includes:

2      "The SORA, as it was first enacted, was designed as a tool solely for law enforcement agencies, and registry records were kept confidential. 1994 Mich. Pub. Acts 295 ('[A] registration is confidential and shall not be open to inspection except for law enforcement purposes.'). As of September 1, 1999, however, the SORA was amended to create the [State of Michigan's Public Sex Offender Registry], which can be accessed by anyone via the internet." *Doe XIV v. Mich. Dep't of State Police,* 490 F.3d 491, 495 (6th Cir.2007).

**\*2** (a) The individual's legal name and any aliases, nicknames, ethnic or tribal names, or other names by which the individual is or has been known.

(b) The individual's date of birth.

(c) The address where the individual resides....

(d) The address of each of the individual's employers. For purposes of this subdivision, "employer" includes a contractor and any individual who has agreed to hire or contract with the individual for his or her services....

(e) The address of any school being attended by the individual and any school that has accepted the individual as a student that he or she plans to attend....

(f) The license plate number or registration number and description of any motor vehicle, aircraft, or vessel owned or regularly operated by the individual.

(g) A brief summary of the individual's convictions for listed offenses regardless of when the conviction occurred.

(h) A complete physical description of the individual.

(i) The photograph required under this act....

(j) The text of the provision of law that defines the criminal offense for which the sex offender is registered.

(k) The individual's registration status.

(l) The individual's tier classification.

Mich. Comp. Laws § 28.727(2). While there is overlap between the contents of the database and the website, it suffices to say that the database is far more exhaustive, as one would expect from a law enforcement tool.

"Since its adoption [in 1994, the] SORA has undergone numerous amendments." *Doe,* 932 F.Supp.2d at 807.

In 1997, SORA was amended to require law enforcement agencies to make registry information available to the public during business hours. A 1999 amendment increased the number of offenses for which registration was required and mandated that a less-detailed version of the registry be made available to the public online.

SORA was again amended in 2002, 2004, and 2006. These amendments, among other things, increased reporting requirements for registrants; removed the registration requirement for individuals convicted under the HYTA after October 1, 2004; barred registrants from working, residing, or loitering within 1,000 feet of a school; and created a program whereby members of the public could be notified electronically when a sex offender moved into a particular zip code.

The most recent amendment to SORA came in 2011, which significantly altered the statute to comply with the federal Sex Offender Registration and Notification Act ("SORNA"), 42 U.S.C. § 16901, *et seq.* As amended in 2011, SORA now categorizes registrants into three tiers which determine the length of time individuals must register and the frequency with which they must report. Tier classifications are based solely on a registrant's offense and do not factor in an individualized determination of risk. There is no way to reduce one's tier classification or to remove oneself from the list. SORA 2011 extended the length of registration for most registrants, and individuals who were assigned to Tier III, Plaintiff[ ] included, are now required to register for life. The 2011 amendment also (1) expanded the in-person reporting requirement to require registrants to report to the police station within three days of establishing any new electronic mail address, instant message address, or other designation used in Internet communications or postings; (2) expanded registrants' reporting obligations before traveling; and (3) increases the number of times registrants must regularly report in-person each year.

**\*3** *Id.*

## B. Plaintiff

Plaintiff was convicted of criminal sexual conduct in the third degree on May 16, 1997. (Compl.¶ 10.) Plaintiff served a term of incarceration and was released from custody on February 15, 2011. (*Id.*) As the preceding section makes clear, SORA was amended several times in the years after Plaintiff's conviction. These amendments impacted Plaintiff in various ways, one of which is that at the time of his conviction, Plaintiff was only required to register as a sex offender for ten years, whereas now, Plaintiff is classified as a Tier III offender and must, therefore, register for the duration of his natural life.

As a result of being required to register, Plaintiff lost a job with an employer who "was aware of his background[ ]" but succumbed to pressure from community members who "brought complaints based on subjective fears" of Plaintiff's sex-offender status. (*Id.* ¶ 15.) Plaintiff asserts that the public nature of the sex offender registry has rendered him susceptible to other harms as well. For instance, "[P]laintiff has been followed, his house was shot up in 2012 while he was in it, several breakin [*sic* ] attempts have occurred [.]" (*Id.*) Moreover, "the SORA obligations deprive [P]laintiff of any private life, and are tantamount to being displayed in a video zoo, where [P]laintiff can be tracked, hunted[,] ... monitored, harassed, in all of his every day activities, where he works, travels, ... lives" and further deprive Plaintiff of his "ability to hide or be left alone[ .]" (*Id.*)

## C. Legal Proceedings

Plaintiff instituted the present action on June 30, 2014 challenging the 2011 amendments to SORA, naming as defendants the State of Michigan and the Michigan State Police, as well as Governor Snyder and Karen Johnson, both of whom are named in their individual and official capacities.[3]

[3]    Defendants have indicated that Karen Johnson "is an employee of the Michigan State Police and is the manager of the Sex Offender Registration united within the Department of State Police." (Defs.' Br. 2 n. 1.)

Although Plaintiff's Complaint does not contain separate counts, he appears to generally claim that the retroactive nature of SORA and its extensive reporting requirements violate his constitutional rights. The Court construes Plaintiff's pleading as containing claims arising under: (1)

the *Ex Post Facto* Clause of the United States Constitution; (2) the Double Jeopardy Clause of the Fifth Amendment; (3) the Eighth Amendment; (4) the substantive component of the Fourteenth Amendment's Due Process Clause; and (5) unspecified state laws.

On November 12, 2014, Defendants collectively moved to dismiss the entire action pursuant to Federal Rule of Civil Procedure 12(b) (6). Plaintiff declined to file a response.

## II. GOVERNING LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b) (6) allows the Court to assess whether a plaintiff's pleadings state a claim upon which relief may be granted. As articulated by the Supreme Court of the United States, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 555, 570, 127 S.Ct. 1955, 1974, —— L.Ed.2d ——, —— (2007)). This facial plausibility standard requires claimants to put forth "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the requisite elements of their claims. *Twombly,* 550 U.S. at 557, 127 S.Ct. at 1965. Even though a complaint need not contain "detailed" factual allegations, its "factual allegations must be enough to raise a right to relief above the speculative level." *Ass'n of Cleveland Fire Fighters v. City of Cleveland,* 502 F.3d 545, 548 (6th Cir.2007) (citation omitted).

**\*4** While courts are required to accept the factual allegations in a complaint as true, *Twombly,* 550 U.S. at 556, 127 S.Ct. at 1965, the presumption of truth does not apply to a claimant's legal conclusions, *Iqbal,* 556 U.S. at 678, 129 S.Ct. at 1949. Therefore, to survive a motion to dismiss, a plaintiff's pleading for relief must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Ass'n of Cleveland Fire Fighters,* 502 F.3d at 548 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1964–65) (internal citations and quotations omitted).

Compared to formal pleadings drafted by lawyers, a generally less stringent standard is applied when construing the allegations pleaded in a *pro se* complaint. *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652

(1972); *see also Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (reaffirming rule of more liberal construction of *pro se* complaints less than two weeks after issuing *Twombly* ). The leniency with which courts construe *pro se* plaintiffs' complaints, however, does not abrogate the basic pleading requirements designed to ensure that courts do "not have to guess at the nature of the claim asserted." *Wells v. Brown,* 891 F.2d 591, 594 (6th Cir.1989). *Pro se* plaintiffs still must provide more than bare assertions of legal conclusions to survive a motion to dismiss. *Grinter v. Knight,* 532 F.3d 567, 577 (6th Cir.2008) (citing *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988)). Likewise, "liberal treatment of *pro se* pleadings does not require lenient treatment of substantive law." *Durante v. Fairlane Town Ctr.,* 201 F. App'x 338, 344 (6th Cir.2006).

## III. ANALYSIS

Defendants seek dismissal of Plaintiff's Complaint on several different grounds. First, Defendants contend that Plaintiff's Complaint fails to put them on notice of the nature of the claims Plaintiff has brought and the grounds upon which those claims rest. [4] Second, Defendants contend that the Eleventh Amendment to the United States Constitution bars Plaintiff's claims against the State of Michigan and the Michigan State Police, as well as Plaintiff's claims seeking monetary relief against Snyder and Johnson in their official capacities. Next, Defendants argue that Snyder and Johnson are shielded from suit in their individual capacities by virtue of the doctrine of qualified immunity. [5] Fourth, and lastly, Defendants contend that Plaintiff has failed to state a claim that the SORA, or any of its subsequent amendments, abridges his constitutional rights, thus rendering him incapable of establishing the requisite elements of a claim pursuant to § 1983. [6]

[4]   The Court does not address this line of argumentation, as it is fairly clear what Plaintiff is complaining of. While it is true that "[t]here are no factual allegations stating what actions either Governor Snyder or Karen Johnson performed[,]" given their respective positions, the Court is able to draw the necessary inferences regarding why Plaintiff might have named them as defendants in the present action.

[5]   Unlike the Eleventh Amendment, a defendant's invocation of the defense of qualified immunity is not jurisdictional. Because the Court ultimately concludes that Plaintiff has failed to state a viable legal claim under any theory he has set forth in his pleading, the Court need not address Defendants' contention that Governor Snyder and Johnson are entitled to qualified immunity.

[6]   In order to prevail on a § 1983 claim, a plaintiff must establish: "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Miller v. Sanilac Cnty.,* 606 F.3d 240, 247 (6th Cir.2010) (quotation omitted).

### A. Eleventh Amendment Immunity

#### 1. The State of Michigan and the Michigan State Police
Defendants claim that Plaintiff's maintenance of the suit against the State of Michigan and the Michigan State Police are barred by the Eleventh Amendment, as the State's immunity from suit has been neither abrogated nor waived.

**\*5**  The Eleventh Amendment to the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any foreign state." U.S. Const. amend. XI. This Amendment has been interpreted as "an explicit limitation of the judicial power of the United States." *Missouri v. Fiske,* 290 U.S. 18, 25, 54 S.Ct. 18, 20, 78 L.Ed. 145 (1993). In the absence of consent or congressional abrogation, a suit in which a State or one of its departments or agencies is named as a defendant is proscribed by the Eleventh Amendment. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984) (citing *Fla. Dep't of Health & Rehab. Serv. v. Fla. Nursing Home Ass'n,* 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981)); *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 66, 109 S.Ct. 2304, 2309–10, 105 L.Ed.2d 45 (1989). The applicability of the Eleventh Amendment is a question of law. *Timmer v. Mich. Dep't of Corrs.,* 104 F.3d 833, 836 (6th Cir.1997).

Here, Plaintiff has not identified any facts that would support a finding that the State has waived its immunity or that Congress has expressly overridden it. As such, the Court concludes that Plaintiff's claims against the State of Michigan

2015 WL 249296

and the Michigan State Police are barred by the Eleventh Amendment.[7] *See, e.g., Pennhurst,* 465 U.S. at 100, 104 S.Ct. at 908 ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."). "This jurisdictional bar applies regardless of the nature of the relief sought." *Id.; Cory v. White,* 457 U.S. 85, 91, 102 S.Ct. 2325, 2329, 72 L.Ed.2d 694 (1982) ("[T]he Eleventh Amendment by its very terms clearly applies to a suit seeking an injunction, a remedy available only from equity."). Further, the Eleventh Amendment applies even to state law claims sought to be brought in federal court under pendent jurisdiction. *Pennhurst,* 465 U.S. at 120, 104 S.Ct. at 919 ("The Eleventh Amendment should not be construed to apply with less force to [pendent] jurisdiction than it does to the explicitly granted power to hear federal claims."). As such, the Court must dismiss the State of Michigan and the Michigan State Police from this lawsuit.

[7] The Michigan State Police is a principal department of the State of Michigan. Mich. Const. art. V, § 2 (1963).

### *2. Defendants Snyder and Johnson*

Defendants also seek dismissal of Plaintiff's claims for monetary damages against Defendants Snyder and Johnson, arguing that the State is the "real, substantial party in interest and is entitled to invoke its sovereign immunity." *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974) (quotation omitted). The Court agrees. Accordingly, Defendants Snyder and Johnson are dismissed from the action to the extent that Plaintiff seeks retrospective monetary relief from them in their individual capacities.

### **B. Plaintiff's Individual Claims**

#### *1. Ex Post Facto Clause*

**\*6** Defendants argue that Plaintiff's *ex post facto* claim fails as a matter of law because the SORA, as amended in 2011, is not a criminal statute but rather is a civil, nonpunitive regulatory scheme designed to protect the public, not punish offenders.

The Constitution's *Ex Post Facto* Clause provides, in pertinent part: "No state shall ... pass any ... ex post facto Law[.]" U.S. Const. art. I, § 10, cl. 1. This clause prohibits legislative enactments constituting retroactive punishment. *Smith,* 538 U.S. at 92, 123 S.Ct. at 1146. "To fall within the ex post facto prohibition, a law must be retrospective-that is it must apply to events occurring before its enactment-and it must disadvantage the offender affected by it by altering the definition of criminal conduct or increasing the punishment for the crime." *Cutshall v. Sundquist,* 193 F.3d 466, 476 (6th Cir.1999) (quoting *Lynce v. Mathis,* 519 U.S. 433, 441, 117 S.Ct. 891, 896, 137 L.Ed.2d 63 (1997) (internal quotation marks and citation omitted)).

Judicial inquiry into the underlying purpose of legislative enactments challenged as violative of the *Ex Post Facto* Clause requires an assessment of "whether the legislature meant the statute to establish 'civil' proceedings." *Smith,* 538 U.S. at 92, 123 S.Ct. at 1146–47 (quotation omitted). As the Supreme Court explained in *Smith:*

If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is " 'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.' " *Ibid.* (quoting *United States v. Ward,* 448 U.S. 242, 248–249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)). Because we "ordinarily defer to the legislature's stated intent," *Hendricks, supra,* at 361, " 'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty," *Hudson v. United States,* 522 U.S. 93, 100, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (quoting *Ward, supra,* at 249); *see also Hendricks, supra,* at 361; *United States v. Ursery,* 518 U.S. 267, 290, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996); *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 365, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984).

*Smith,* 538 U.S. at 92, 123 S.Ct. at 1147.

Numerous federal courts, including the Supreme Court, have rejected the argument that sex offender registration and notification constitutes an *ex post facto* punishment forbidden by the Constitutional prohibition against retroactive punishment. *See, e.g., Smith,* 538 U.S. at 105–06, 123 S.Ct. at 1154 (holding, in a case of first impression, that the State of Alaska's sex offender act "is nonpunitive, and its retroactive application does not violate the *Ex Post Facto* Clause"); *Cutshall,* 193 F.3d at 477 ("Because the [Tennessee] Act imposes no punishment, the *Ex Post Facto* Clause is not implicated."). Indeed, the Honorable Robert H. Cleland, another judge in this district, issued an Opinion and Order in March of 2013 addressing the constitutionality of the

2015 WL 249296

2011 amendments to SORA. Upon exhaustively analyzing the plaintiffs' *ex post facto* claim under the framework set forth in *Smith* and *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963), Judge Cleland concluded that the "SORA, as amended in 2011, is a regulatory, not criminal statute. Accordingly, [the plaintiffs' *ex post facto* challenge] must be dismissed because SORA does not, as a matter of law, violate the *Ex Post Facto* Clause." *Doe,* 932 F.Supp.2d at 814.

 *7 Having reviewed the considerable case law on the *ex post facto* implications of sex offender registration and notification statutes, the Court finds Judge Cleland's analysis and rationale persuasive. [8] Therefore, the Court concludes that Plaintiff's challenge to the 2011 amendments to SORA fails to state a claim under the Constitution's *Ex Post Facto* Clause.

[8] The Court notes that it has previously rejected an *ex post facto* challenge to the SORA, *Akella,* 67 F.Supp.2d at 733–34, and references Judge Cleland's more recent opinion because it addresses the 2011 amendments to the Act.

### 2. Double Jeopardy Clause

To the extent that Plaintiff is arguing that the Act punishes him twice for the same offense in violation of the Fifth Amendment's Double Jeopardy Clause, [9] the Sixth Circuit upheld the State of Tennessee's sex offender registration act against a double jeopardy challenge in *Cutshall v. Sundquist,* 193 F.3d 466, 473–76 (6th Cir.1999). Relying on the seven-factor test articulated in *Kennedy,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644—the same test employed in the *Ex Post Facto* Clause setting—the panel concluded "that the Act does not violate the prohibition against double jeopardy." *Cutshall,* 193 F.3d at 476.

[9] The Double Jeopardy Clause of the Fifth Amendment provides, in relevant part, "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Fifth Amendment applies to the states through the Fourteenth Amendment's Due Process Clause and the doctrine known as incorporation. *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

As established in relation to Plaintiff's *ex post facto* claim, the SORA's purpose is regulatory, not punitive. As such, it does not violate the Double Jeopardy Clause, which "protects

only against the imposition of multiple *criminal* punishments for the same offense, ... and then only when such occurs in successive proceedings." *Id.* at 473 (emphasis in original) (quotation omitted).

### 3. Eighth Amendment

Plaintiff alleges that the SORA violates the Eighth Amendment. (Compl.¶ 20.) This amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The contours of Plaintiff's Eighth Amendment claim are not entirely clear, as Plaintiff alleges that enactment of the SORA created "a pervasive risk of harm where plaintiff's house was shot up with plaintiff clinging to the floor for his life, loss of plaintiff's job, attempts to break in his house and him being followed have occurred, defendants had actual knowledge of the subjective risk and failed to take measures and in fact continue to create greater risk of harm where the information plaintiff is obligated to give is given to the public and not limited to law enforcement, leaving plaintiff in continuous fear for his safety, creating a greater problem instead of solving it." (Compl.¶ 20.)

To the extent that Plaintiff argues that the Act violates the Eighth Amendment's prohibition against cruel and unusual punishment, the Court has already concluded that the Act is regulatory in nature, not punitive. In other words, the Act is not punishment, therefore rendering the Eighth Amendment inapplicable. *Cutshall,* 193 F.3d at 477 ("We have already concluded that the Act does not impose punishment; it is regulatory in nature. Therefore, it does not violate the Eighth Amendment's prohibition on cruel and unusual punishment.").

The Court is mindful of its duty to construe *pro se* pleadings more liberally than those drafted by attorneys. While not required to create arguments on behalf of unrepresented litigants, the Court notes that the allegations set forth in Plaintiff's Complaint are capable of being construed as alleging a claim arising from the substantive protections of the Fourteenth Amendment's Due Process Clause. [10] However, to the extent such a construction is possible, the claim fails as a matter of law because "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago Cnty. Dep't of*

*Social Servs.,* 489 U.S. 189, 195, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989).

10    The Due Process Clause of the Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1.

### 4. Right to Privacy

**\*8** According to Plaintiff, the Act infringes on constitutionally protected privacy interests by compiling and disseminating "information that is not a matter of public record[.]" (Compl.¶ 18.) Plaintiff complains that the publically-accessible registry contains highly-private details of his personal life, such as "[his] personal property, private education, medical records, employers, contractors, routes he travels, e-mail address, home address, employer address, where he goes, cars[ ] he may own or use, his address, licences [*sic* ], as well as the very right to control the use of one's own name, picture, or likeness [ ] and to prevent another from using it for commercial benefit without plaintiff's consent." [11] (*Id.*) According to Plaintiff, "[t]his unjustified exploitation an[d] intrusion into one's personal activities impedes the right to just be left alone." (*Id.*)

11    The Court notes that it is entirely unclear from the Complaint how the website commercially exploits images of sex offenders.

As an initial matter, Plaintiff appears to misapprehend the distinction between the information contained in the Michigan State Police law enforcement database and the information made available to the public on the internet website. Michigan Compiled Laws § 28.728, the portion of the SORA describing the information sex offenders must provide upon registering under the Act, makes clear that the information that the Michigan State Police must maintain in "a computerized law enforcement database" is more expansive than the information contained on the "public internet website[,]" which, it bears emphasizing, is "separate from the law enforcement database[.]" Mich. Comp. Laws § 28.728(1)(2). The publically-accessible website does not, contrary to Plaintiff's assertions, contain Plaintiff's medical records, email address, or professional licenses, nor does it describe the routes Plaintiff often travels or places he frequents. The website does, however, provide information regarding Plaintiff's place of residence, employment, and educational institution, as well as the license plate number and description of any motor vehicle owned or regularly

operated by him. The Court must therefore determine whether the information contained on the website infringes Plaintiff's constitutionally-protected privacy rights, rights stemming from the substantive component of the Fourteenth Amendment's Due Process Clause.

"The substantive component of the Due Process Clause protects 'fundamental rights' that are so 'implicit in the concept of ordered liberty' that " 'neither liberty nor justice would exist if they were sacrificed.' " *Doe XIV v. Mich. Dep't of State Police,* 490 F.3d 491, 499 (6th Cir.2007) (quoting *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)). Rights qualifying for such constitutional protection include "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Id.* (quoting *Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772 (1997) (internal citations omitted)). While the Supreme Court has intimated that substantive due process may protect "the individual interest in avoiding disclosure of personal matters," *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977), the right has been construed narrowly, and the Sixth Circuit in *Cutshall* indicated that the constitutional right of privacy "does not provide" sex offenders "with a right to keep [their] registry information private," 193 F.3d at 481.

**\*9** Each federal appellate court considering substantive due process arguments against the registration requirement of sex-offender registries has found that the laws mandating the registry are constitutional. *Doe XIV,* 490 F.3d at 500 (citing *Doe v. Moore,* 410 F.3d 1337, 1345 (11th Cir.2005) (holding that the right to refuse under a sex-offender statute is not a fundamental right); *Doe v. Tandeske,* 361 F.3d 594, 597 (9th Cir.2004) (per curiam) ("[P]ersons who have been convicted of serious sex offenses do not have a fundamental right to be free from ... registration and notification requirements...."); *Gunderson v. Hvass,* 339 F.3d 639, 643 (8th Cir.2003) (concluding that the sex-offender registration statute does not infringe the plaintiff's fundamental right to a presumption of innocence); *Paul P. v. Verniero,* 170 F.3d 396, 405 (3d Cir.1999) (holding that the effects of registering under a sex-offender registration statute fail "to fall within the penumbra of constitutional privacy protection")). Indeed, the Sixth Circuit has "reiterate[d] that 'not all rights of privacy or interests in nondisclosure of private information are of constitutional dimension, so as to require balancing government action against individual privacy.' " *Id.* (quoting

*Kallstrom v. City of Columbus,* 136 F.3d 1055, 1062 (6th Cir.1998) (analyzing the substantive due process rights of undercover police officers in not having their personal identifying information disclosed to criminal defendants)). Because no fundamental right is implicated, the Court applies rational basis review. *Id.* at 501.

Plaintiff's claim that widespread dissemination of information concerning his conviction of a sex offense is somehow violative of his right to privacy ignores the inescapable fact that this information is already the subject of public record. With respect to the other information contained on the website, this Court has previously held that "the dissemination of an offender's address does not violate any constitutionally protected privacy interests." *Akella,* 67 F.Supp.2d at 730. This is because "the 'nature and significance' of the state's interest justifies the intrusion on [Plaintiff's] interests." *Id.* (quotation omitted). The remaining information on the website withstands rational basis review because the public's interest in preventing and protecting against future criminal sexual acts by convicted sex offenders justifies the collection and dissemination of the website's contents. *Doe XIV,* 490 F.3d at 501.

Accordingly, the Court rejects Plaintiff's substantive due process challenge to the SORA.

### 5. State Law Claims

Plaintiff raises two claims that appear to rest in state law: a claim that sex offender registration "encroaches on the final judgment of the sentencing court," therefore violating separation-of-powers principles, and a claim that requiring his signature on registration forms creates some kind of "unconscionable agreement." (Compl.¶¶ 19, 21.)

**\*10** Having dismissed the federal causes of action, the Court declines to exercise supplemental jurisdiction over the state law claims referenced in the Complaint. *See* 28 U.S.C. § 1367(c)(3) ("The district court may decline to exercise supplemental jurisdiction ... if ... the district court has dismissed all claims over which it had original jurisdiction.").

### IV. CONCLUSION AND ORDER

For the reasons stated herein, the Court concludes that Plaintiff's constitutional challenges to the SORA fail to state a plausible claim for relief pursuant to 42 U.S.C. § 1983.

Accordingly,

**IT IS ORDERED** that Defendants' Motion to Dismiss is **GRANTED** and Plaintiff's federal constitutional claims are **DISMISSED WITH PREJUDICE;**

**IT IS FURTHER ORDERED** that Plaintiff's state law claims are **DISMISSED WITHOUT PREJUDICE** to Plaintiff's right to re-file the claims in state court.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 249296

---

End of Document                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3765847
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Rudolph McQUILKIN, Plaintiff,
v.
CENTRAL NEW YORK PSYCHIATRIC
CENTER, J. Taylor, J. Berggren, V. Komareth,
K. Sangani, Dr. Hernandez, D. Sawyer,
S. Hanna, and G. Bodrog, Defendants.

Civil Action No. 9:08–CV–00975 (TJM/DEP).
|
Aug. 27, 2010.

**Attorneys and Law Firms**

Rudolph McQuilkin, New York, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Krista A. Rock, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants CNYPC, J. Taylor, J. Berggren, V. Komareth, Dr., Hernandez, D. Sawyer, S. Hanna, and G. Bodrog.

O'Connor, O'Connor Law Firm, Law Firm—Albany Office, Peter Joslin, Jr., Esq., of Counsel, Albany, NY, for Defendant K. Sangani.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Rudolph McQuilkin, a former New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 against the Central New York Psychiatric Center ("CNYPC" or "Center") and several Center employees as well as the superintendent of one of the correctional facilities in which he was previously housed, claiming that his civil rights were violated during the course of his confinement. In his complaint, as amended, plaintiff alleges that he was civilly committed to CNYPC against his will and forcibly medicated with various psychiatric drugs in retaliation for having served a "notice of summons" on the superintendent of the Gouverneur Correctional Facility ("Gouverneur"), without his consent and in violation of his religious beliefs. Plaintiff

further complains of the seizure and destruction of certain of his personal property. Plaintiff's complaint seeks injunctive relief, elimination of any reference of being a mental health patient from his institutional record, and an award of both compensatory and punitive damages.

In response to plaintiff's complaint one of the defendants, Dr. Kishor R. Sangani, a psychiatrist, has moved for dismissal alleging that plaintiff's complaint fails to assert an actionable claim against him. Those remaining defendants who have been served and appeared in the action have moved for summary judgment on a variety of grounds, both procedural and substantive including, *inter alia,* on the basis of qualified immunity.

Having carefully considered defendants' motions, which McQuilkin has not opposed, I recommend that they be granted and that the second amended complaint be dismissed in its entirety.

I. *BACKGROUND* [1]

[1]     In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

At the times relevant to the claims set forth in his second amended complaint, plaintiff was a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"), and designated to various DOCS prisons as well as the CNYPC, a facility located in Marcy, New York and operated under the authority of the New York State Office of Mental Health ("OMH"). *See generally* Second Amended Complaint. Plaintiff was released from DOCS custody on October 27, 2009. Waldron Aff. (Dkt. No. 66) ¶ 35 and Exh. A. [2]

[2]     Because defendants' summary judgment moving papers were filed traditionally, they do not appear on the docket but collectively have been assigned docket number 66.

Plaintiff was admitted into the CNYPC from the nearby Mid–State Correctional Facility ("Mid–State"), on September 17, 2007, and was diagnosed with schizophrenia, paranoid type. [3] *Id.* at ¶ 6, Exh. B. at P2; Defendants' Rule 7.1(a)(3) Statement ¶ 2. Paranoid schizophrenia can cause a variety

of symptoms, the most prevalent of which are delusions, auditory hallucinations and disorganized thinking. Waldron Aff. (Dkt. No. 66) ¶ 7. Individuals who suffer from this type of schizophrenia frequently suffer from feelings of being persecuted or plotted against and may have grandiose delusions that are associated with protecting themselves from the perceived plot. Waldron Aff. (Dkt. No. 66) ¶ 7. According to his referral from Mid–State, on or about September 17, 2007, plaintiff "started to become irritable and paranoid. He displayed a thought disorder and believed that there was a plan by the mental health staff to murder him. He was refusing medication and mental health treatment." Waldron Aff. (Dkt. No. 66) Exh. B at P289.

| 3 | The 2007 admission to the Center was plaintiff's second, the first having occurred in 1998. Waldron Aff. (Dkt. No. 66) ¶¶ 8–9. During the first admission, which lasted twenty-seven days, plaintiff was diagnosed with schizophrenia paranoid type. *Id.* The notes of that admission reflect that while at Mid–State plaintiff refused to take psychotropic medications. *Id.* at ¶¶ 8–9 and Exh. B at P289. |
|---|---|

**\*2** Upon his arrival at the CNYPC, plaintiff consistently refused his medications. *Id.* at P291. Plaintiff explained the basis for that refusal by stating to CNYPC personnel "these are heterogeneous medications, work as isotopes, you know, like small nuclear bombs[,]", adding "I am a different organism, therefore under no circumstances I would take them." *Id.*

On or about October 1, 2007, Donald Sawyer, Ph. D., the Executive Director of the Center, petitioned the New York State Supreme Court, Oneida County, for an order committing plaintiff to the CNYPC for a period not to exceed six months. *Id.* at P271–272. Following a hearing regarding the petition held on October 11, 2007, Supreme Court Justice Anthony F. Shaheen issued a ruling, over plaintiff's objection, in which he determined that McQuilkin was mentally ill and a proper subject for custody and continued treatment in the CNYPC within the meaning of New York Mental Hygiene Law ("MHL") § 9.27, and therefore approved the requested retention period. [4] Waldron Aff. (Dkt. No. 66) Exh. B. at P263.

| 4 | Pursuant to the MHL, the director of a hospital may receive and retain therein as a patient any person alleged to be mentally ill and in need of |
|---|---|

involuntary care and treatment upon the certificates of two examining physicians, accompanied by an application for the admission of such a person. N.Y. MENTAL HYG. § 9.27(a). The examination may be conducted jointly but each examining physician must execute a separate certificate. *Id.*

Based on plaintiff's refusal to consent to the administration of medication while at the Center, and following an evaluation of his condition by CNYPC staff, on or about November 1, 2007, Sawyer once again petitioned the state courts, this time for an order authorizing OMH employees to forcibly administer psychiatric medication to McQuilkin. Waldron Aff. (Dkt. No. 66) ¶ 17 and Exh. B at P276–96. That involuntary treatment petition was granted on November 21, 2007, following a hearing and despite McQuilkin's objection, based upon a finding that plaintiff lacked the capacity to make a reasoned decision regarding his own treatment and that the administration of medication to the plaintiff was in his best interest. *Id.* at ¶¶ 19–20 and Exh. B at P318–19. The order granting the petition authorized the administration of psychiatric drugs "during the concurrent retention of Rudolph McQuilkin, and any extension thereof at [CNYPC] as well as for a period not to exceed twelve (12) months after the patient is discharged from the [CNYPC] to a psychiatric satellite unit operated by [OMH] at a New York State Correctional facility ..." *Id.* at Exh. B and P319.

Plaintiff was discharged from the CNYPC and transferred into the Clinton Correctional Facility ("Clinton") on January 4, 2008, commencing the twelve-month period of court-authorized forced medication. Waldron Aff. (Dkt. No. 66) ¶ 21. During that time, plaintiff was injected with fifty milligrams of Haldol, an antipsychotic medication, once a month. *Id.* at ¶¶ 21–22 and Exh. B. at P320–23.

From the expiration of the court-ordered psychiatric treatment period on January 4, 2009 until April of 2009, plaintiff refused to be medicated, which caused him to become symptomatic. Waldron Aff. (Dkt. No. 66) ¶ 23 and Exh. B. at P327–30. On April 8, 2009, Dr. Sohail Gillani, a psychiatrist, requested that McQuilkin be taken to the Clinton Mental Health Satellite Unit ("Satellite Unit") for evaluation as to whether an involuntary psychiatric hospitalization in the CNYPC, based upon the recommendation of two physicians, should be sought and with the intent of seeking another court order permitting involuntary psychiatric medication. Waldron Aff. (Dkt. No. 66) ¶ 24 and Exh. B at P331–32. This request was based on plaintiff's ongoing refusal to take psychiatric medication and his repeated history of subsequent psychiatric

decompensation, as well as his refusal to attend therapy sessions during which his mental status could be clinically monitored. *Id.*

 **\*3** As a result of Dr. Gillani's request, plaintiff was escorted from his cell to the Mental Health Satellite unit at Clinton, where he was assigned to a residential crisis treatment program cell. *Id.* at ¶ 26. Once there, McQuilkin showed poor insight and judgment, continued to display symptoms of paranoia, and persisted in his denial of any mental health issues. *Id.* at ¶ 27. Plaintiff remained in the satellite unit for less than twenty-four hours, however, based upon his agreement to take his prescribed psychiatric medication (Haldol 50 mg). *Id.* at ¶ 28.

During the period that Haldol was administered, plaintiff complained of side effects including a rash. [5] Waldron Aff. (Dkt. No. 66) ¶ 32. The use of Haldol to address plaintiff's condition was ultimately discontinued, and Risperal was added to his prescription drug regimen on or about July 17, 2009. *Id.* at ¶ 33 and Exh. B at P336. Since then, plaintiff has not registered any further medical complaints, and reports that he "like[s] the Risperdal better." *Id.* at ¶ 34.

[5]    According to defendants' submissions, this is not a side effect ordinarily associated with Haldol. Waldron Aff. (Dkt. No. 66) ¶ 32.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on September 22, 2008, and has since twice amended his complaint. Dkt. Nos. 1, 8, and 35. As defendants, plaintiff's second amended complaint names the CNYPC; J. Taylor, the Superintendent of the Gouverneur Correctional Facility; CNYPC psychiatrists J. Berggren, V. Komareth, K. Sangani, S. Hanna, and Dr. Hernandez; D. Sawyer, the Director of the CNYPC; and G. Bodrog, whose position is not disclosed in plaintiff's complaint but who appears to be a physician involved in the October, 2007 petition to have him involuntarily committed. Dkt. No. 35; *see* Waldron Aff. (Dkt. No. 66) Exh. B at P287–88. Plaintiff's second amended complaint contains three designated causes of action requesting various forms of relief, including 1) an order prohibiting defendants from forcing McQuilkin to take psychiatric medications against his free will; 2) total expungement of any reference of being a mental health patient from plaintiff's institutional record; and 3) damages for wanton disregard of his Eighth Amendment rights as well as directing that defendants not retaliate against him for filing this proceeding. Dkt. No. 35.

In response all of the defendants, with the exception of Dr. Sangani, have answered generally denying the allegations of plaintiff's complaint and asserting eighteen separate affirmative defenses. Dkt. No. 38. For his part, Dr. Sangani has moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure seeking the dismissal of plaintiff's claims against him for failure to state a claim upon which relief may be granted. Dkt. No. 56.

On January 28, 2010, following the completion of discovery, the defendants other than Dr. Sangani moved for summary judgment dismissing plaintiff's complaint upon a variety of grounds. Dkt. No. 66. In their motion, those defendants argue that 1) all claims against the CNYPC and against the other defendants in their official capacities should be dismissed as barred by the Eleventh Amendment; 2) plaintiff's first cause of action, seeking injunctive relief, should be dismissed as moot in light of his release from DOCS custody; 3) plaintiff's claims are procedurally barred based upon his failure to exhaust administrative remedies with respect the majority of his claims; 4) plaintiff's claims surrounding his interfacility transfer lack merit since inmates do not have a constitutional right to be incarcerated at a correctional facility of their choice; 5) plaintiff's due process claim concerning the alleged seizure and destruction of his personal property is not constitutionally cognizable; 6) plaintiff is not entitled to expungement of his psychiatric records; 7) plaintiff's allegations of wrongdoing are unduly conclusory and therefore subject to dismissal; 8) plaintiff's challenges to his OMH confinement are barred by *Heck v. Humphrey* and the *Rooker–Feldman* doctrine [6]; 9) defendants are entitled to qualified immunity; and 10) plaintiff's claims surrounding disagreement with his medical care are not actionable under the Eighth Amendment.

[6]    *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994); *District of Columbia v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923).

 **\*4** Despite expiration of the time for responding, plaintiff has failed to offer any submissions in opposition to either of the pending motions, which are now ripe for determination and have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Standards of Review*

#### 1. *Motion to Dismiss*

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929, –––– , (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001)

(quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted).

#### 2. *Summary Judgment Motions*

**\*5** Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though pro se plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether pro se plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable

trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Assn. v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); see also Anderson, 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Plaintiff's Failure to Oppose Defendants' Summary Judgment Motion*

**\*6** Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' motions, and specifically whether that failure automatically entitles defendants to the relief sought.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed an admission that there is consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against dismissal or summary judgment motions. *See Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the consequences of Local Rule 7.1(b) (3). *Robinson v. Delgado,* No. 96–CV–169, 1998 WL 278264, at \*2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.)[7]; *Cotto v. Senkowski,* No. 95–CV–1733, 1997 WL 665551, at \*1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106–07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.). Accordingly, absent a showing of good cause defendants' unopposed motions should be granted, if determined to be facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231–32 (N.D.N.Y.2000) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545–46 (N.D.N.Y.2000) (Kahn, J.).

[7] Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

It should also be noted that the plaintiff's failure to properly oppose the pending summary judgment motion is not without further consequences. By failing to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged, thus permitting the court to deem facts set forth in the defendants' statement of material facts not in dispute to have been admitted based upon his failure to properly respond to that statement. *See Elgamil v. Syracuse Univ.,* No. 99–CV–611, 2000 WL 1264122, at \*1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dept. of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

Based upon plaintiff's failure to oppose defendants' summary judgment motion, I recommend that the court review the motion for facial sufficiency, accepting defendants' assertions of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, and that the motion be granted if determined to be facially meritorious.[8]

[8] I note that defendants' notice of motion contains the required notice to plaintiff of the consequences of his failure to respond to the summary judgment motion. Dkt. No. 66; *see* N.D.N.Y.L.R. 56.2.

### C. *Eleventh Amendment Immunity*

At the outset, defendants' summary judgment motion seeks dismissal of plaintiff's claims against the CNYPC as well as the individual defendants, to the extent that they are sued in their official capacities, asserting their entitlement to Eleventh Amendment immunity.

**\*7** As defendants correctly argue, "it is beyond dispute that the State of New York and its agencies have never consented to be sued in federal court." *Dube v. State Univ. of N.Y.,* 900 F.2d 587, 594–95 (2d Cir.1990), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991).[9] "The law is clear that the state, and state agencies ..., are immune from prisoner § 1983 suits because of their Eleventh Amendment sovereign immunity." *Jackson v. Johnson,* 985 F.Supp. 422, 426 (S.D.N.Y.1997).

9    "On the other hand, a state official acting in his [or her] official capacity may be sued in a federal forum to enjoin conduct that violates the federal Constitution, notwithstanding the Eleventh Amendment bar. *Id.* at 595 (citing *Papasan v. Allain,* 478 U.S. 265, 276–77, 105 S.Ct. 2932, 2939–40 (1986)). Insofar as plaintiff seeks injunctive relief, his claims against the CNYPC and the individual defendants in their official capacities are not barred by the Eleventh Amendment. As will be seen, however, plaintiff's request for injunctive relief is nonetheless moot in light of his release from prison. *See* pp. 21–23, *post.*

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends to both state agencies and state officials sued in their official capacities, when the essence of the claim involved is one against a state as the real party in interest. 10 *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984), (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89–91 102 S.Ct. 2325, 2328–2329 (1982)). To the extent that a state official is sued for damages in his or her official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state. 11 *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer,* 502 U.S. at 25, 112 S.Ct. at 361.

10    In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County,* 547 U.S. 189, 193, 126 S.Ct. 1689, 1693, 164 L.Ed.2d 367 (2006).

11    By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials

under *section 1983. See Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

Because plaintiff's *section 1983* claims against the CNYPC are in reality claims against the State of New York, they typify those against which the Eleventh Amendment protects, and are therefore subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798–99 (N.D.N.Y.1984) (McCurn, J.). Additionally, to the extent that plaintiff asserts claims for damages against the defendants in their official capacities, those claims are properly regarded as claims against the state, and are likewise barred by the Eleventh Amendment. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 3107, 87 L.Ed.2d 114 (1985); *Ying Jing Gan v. City of N.Y.,* 996 F.2d 522, 529 (2d Cir.1993). Accordingly, I recommend the entry of summary judgment dismissing plaintiff's claims for damages against the CNYPC and the individual defendants in their official capacities.

### D. *Mootness*

In their motion, defendants next seek summary judgment with respect to plaintiff's first cause of action, in which he seeks "[a]n order prohibiting defendants from forcing plaintiff to take psychiatric medications against his free will." Second Amended Complaint (Dkt. No. 35) p. 9. In support of their request, defendant argues that because the plaintiff is no longer in state custody, that claim is moot.

"The mootness doctrine is derived from Article III of the Constitution, which provides that federal courts may decide only live cases or controversies. 'This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate.' " *Van Wie v. Pataki,* 267 F.3d 109, 113 (2d Cir.2001) (citations omitted). A federal court has no authority to decide an issue when the relief sought can no longer be given, or is no longer needed. *Martin–Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983). The courts have recognized a narrow exception to this rule for repetitive conduct, although only in exceptional circumstances. *City of Los Angeles v. Lyons,* 461 U.S. 95, 109, 103 S.Ct. 1660, 1669, 75 L.Ed.2d 675 (1983). The capable of repetition doctrine applies when the conduct at issue is of insufficient duration to permit it to be fully litigated and is reasonably likely to reoccur. *Spencer v. Kemna,* 523 U.S. 1, 17, 118 S.Ct. 978, 988, 140 L.Ed.2d 43 (1998) (citing and quoting *Lyons* ). This limited exception does not appear to be potentially applicable in this instance.

**\*8**  The record now before the court reflects that plaintiff is no longer in state custody. *See* Dkt. No. 57; Waldron Aff. (Dkt. No. 66) Exh. A. To the extent McQuilkin seeks injunctive relief preventing the defendants from forcing him to be medicated against his will, they are no longer involved with him, and the claim is now moot. I therefore recommend dismissal of plaintiff's first cause of action on this basis.

### E. *Exhaustion*

In their motion defendants seek dismissal of certain of plaintiff's claims on the basis of his failure to exhaust available administrative remedies before commencing suit.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002) (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement, though not jurisdictional, gives rise to a defense which may affirmatively be raised by a defendant in response to an inmate suit. *Jones v. Block,* 549 U.S. 199, 212, 127 S.Ct. 910, 919, 166 L.Ed.2d 798 (2007). In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ).[12]

12  While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted).

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112–13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the IGRC within twenty-one days of the incident. 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the CORC which makes the final administrative decision. *Id.* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at \*3 (S.D.N.Y. Dec.11, 2000)).

**\*9**  In support of their exhaustion argument, defendants submit a declaration given by Karen Bellamy, the Director of the IGP, reflecting that from a review of records maintained by the CORC it appears that only one grievance filed by the plaintiff, grievance number CL 57139–08, relating to missing personal property, was processed through to completion under the IGP. *See* Bellamy Aff. (Dkt. No. 66) ¶ 10. This, they assert, requires dismissal of all of plaintiff's remaining claim as unexhausted.

While McQuilkin does not appear to have filed grievances related to the other matters at issue in this case, including principally his treatment while at the CNYPC, and to have

processed those grievances through to completion under the IGP, he did take certain measures to complain of the treatment received while there. At the suggestion of personnel employed at the Mental Hygiene Legal Services, with whom plaintiff communicated in writing concerning his plight on multiple occasions including in February of 2008, plaintiff McQuilkin sent letters on March 28, 2008, and again on June 27, 2008, to Dr. Jonathan Kaplan, the Clinical Director of the Mental Hygiene Psychiatric Center at Marcy, New York, to whom he had been referred.[13] *See* Second Amendment Complaint (Dkt. No. 35) pp. 12–23, 26. In those letters, plaintiff requested that Dr. Kaplan review his treatment plan in light of adverse effects from which he claimed to suffer as a result of the medication being administered. *Id.* at pp. 12–13, 26. In addition, McQuilkin forwarded a letter dated February 21, 2008, to "the psychiatrist" at Clinton, again complaining of being compelled to take the drugs and of their side effects, and also that he was not being properly monitored "due to insincere motives on the original action for the court order." *See* Attachments to Second Amended Complaint (Dkt. No. 35) p. 31.

[13]    The attachments to plaintiff's Second Amended Complaint (Dkt. No. 35) are not separately marked as exhibits, nor are the pages numbered. The page numbers referred to herein as are reflected in the court's docket.

While confined at Clinton, plaintiff also filed an inmate grievance, dated April 1, 2008 and assigned grievance number CL–56924–08, complaining that he was being ordered to take psychiatric medication against his will, that he was experiencing adverse side effects from the medication, and requesting that the medication be discontinued. Attachments to Second Amended Complaint (Dkt. No. 15) p. 10. In response to plaintiff's grievance, the IGRC advised McQuilkin that pursuant to DOCS Directive No. 4040,[14] the OMH, together with its employees, policies and procedures, are not within the jurisdiction of the DOCS inmate grievance program, and he was therefore directed to address the issue of psychiatric medication with Joanne Waldron, Satellite Unit Chief. *Id.* at p. 11. Thus, in accordance with the DOCS Directive No. 4040, the matter was deemed closed, and there is no record of plaintiff having appealed this determination. *Id.*

[14]    DOCS Directive No. 4040 provides, in relevant part, that "[t]he IGRC may dismiss and close a grievance after a hearing if it determines, by

majority vote (3 of 4), that ... the grievant is seeking action with respect to any policy, regulation, rule or action of any agency not under the supervision of the Commissioner of Correctional Services (see section 701.3[f] of this Part)." 7 N .Y.C.R.R. § 701.5(b)(4)(i)(d).

On June 27, 2008, plaintiff wrote letters to Drs. Gillani and Berggren complaining of the administration of psychiatric drugs, claiming that he was being discriminated against and harassed by certain corrections officers and nurses who administered his oral medication, and requesting a meeting to discuss the possibility of receiving all of his medication once a month by injection. *See* Second Amended Complaint (Dkt. No. 15) at pp. 24–25. Plaintiff wrote a second letter to Dr. Gillani on July 16, 2008, voicing the same complaint and again requesting that he be given all his court-ordered drugs at the same time each month. *Id.* at pp. 27–28.

**\*10**  Although the plaintiff was at all relevant times an inmate in the primary care and custody of the DOCS, the conduct giving rise to his claims occurred at the CNYPC, a facility operated by the OMH. Based upon that circumstance, it is arguable that plaintiff's claims are not subject to the PLRA because they do not involve "prison life." While the court's research has not identified a case in this circuit squarely addressing the issue, it appears that even though confined to the CNYPC at the time in question, plaintiff would still qualify as a prisoner subject to the requirements of the PLRA. *See, e.g., Page v. Torrey,* 201 F.3d 1136, 1140 (9th Cir.2000) ("[W]e hold that only individuals who, at the time they seek to file their civil actions, are detained as a result of being accused of, convicted of, or sentenced for criminal offense are 'prisoners' within the definition of 42 U.S.C. § 1997e...."); *Kalinowski v. Bond,* 358 F.3d 978, 979 (7th Cir.) ("As used in this section, the term 'prisoner' means any person incarcerated or detained at any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, [or] probation ....") (quoting 28 U.S.C. § 1915(h)), *cert. denied,* 542 U.S. 907, 124 S.Ct. 2843, 159 L.Ed.2d 273 (2004). It would therefore appear that plaintiff's complaint includes a combination of claims relating to lost property, which were properly exhausted, and claims for which he failed to exhaust his administrative remedies, including those relating to his confinement to CNYPC and the forced administration of psychiatric drugs, as well as that relating to retaliation.[15]

15     Because defendants have not raised failure to exhaust administrative remedies with regard to plaintiff's claims that he was denied access to the courts and the right to practice his religion, I have not addressed exhaustion of these claims.

In a series of decisions rendered since enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d 37 at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). The test for determining whether a claim has not been properly exhausted should nonetheless be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. *Hemphill,* 380 F.3d at 689; *see also Giano v. Goord,* 380 F.3d at 676–77; *Hargrove,* 2007 WL 389003, at *10. The circumstances potentially qualifying as "special" under this prong of the test can include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano* ).

Undeniably, plaintiff appears not to have pursued to completion a grievance regarding his treatment at the CNYPC. It should be noted, however, that "DOCS Directive 4040 states, *inter alia,* that '[t]he individual decisions or dispositions of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered non-grievable.' " *Giano,* 380 F.3d at 678. Indeed, as was previously noted, the IGRC response to plaintiff's grievance number CL 56924–08 requesting discontinuation of his medication specifically stated, "OMH, it's [sic] employees and policies and procedures are not with in [sic] the jurisdiction of the DOCS Inmate grievance program." *See* Attachments to Second Amended Compl. (Dkt. No. 35) p. 11. Given this response, it seems somewhat disingenuous for defendants to now contend that plaintiff failed to fully exhaust his administrative remedies as to the claims relating to his psychiatric treatment. It is true that, strictly construed, plaintiff's grievance number CL 56924–08 does not specifically complain of his CNYPC confinement; nonetheless, after having received the foregoing response from the IGRC, and being specifically advised that his grievance complaining of being forced to take the drugs was

being "closed and dismissed", it certainly would have been reasonable for plaintiff to conclude that he could not grieve either claim, and likewise that an appeal of the denial of the medication grievance would be rejected.

**\*11** It is also worth noting that the IGRC directed the plaintiff to the OMH, and that both before and after he was notified that his grievance was closed and dismissed, he sent numerous letters to the Clinical Director of CNYPC, both the Director and Deputy Director of Mental Hygiene Legal Services, and Drs. Gillani and Berggren complaining of his psychiatric treatment. In each instance, Mental Hygiene Legal Services referred plaintiff to the physicians and ultimately advised that they could provide no further assistance; McQuilkin's letters to the doctors received no responses at all.

In view of the foregoing, it appears that, at a minimum, issues of fact exist as to whether sufficient special circumstances are present to excuse plaintiff's failure to exhaust claims relating to his psychiatric treatment. For the going reasons, I conclude that the defendants' motion for summary judgment dismissing the plaintiff's unexhausted claims regarding his confinement in the CNYPC and involuntarily administration of psychiatric drugs against the plaintiff's wishes will be denied.

### F. Confinement At Clinton

Although not identified as a discrete cause of action, plaintiff's complaint alleges that he was "transported to the Clinton Correctional Facility against his free will and adamant refusal." Second Amended Compl. (Dkt. No. 35) ¶ 3. To the extent that plaintiff attempts to premise his section 1983 claim in part upon this prison transfer, defendants seek dismissal of that claim as failing to allege a constitutional violation.

It is well-established that convicted prisoners have no right to choose the prison they are housed in. *Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). Prison authorities are entrusted with unfettered discretion to transfer prisoners from one institution to another. *Pugliese v. Nelson,* 617 F.2d 916, 922–23 (2d Cir.1980).

In view of the foregoing, summary judgment in favor of the defendants on plaintiff's apparent claim of violation of his constitutional rights based upon his alleged involuntarily transfer to Clinton is appropriate.

### G. Due Process Claim Based on Destruction of Personal Property

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 197 of 236
McQuilkin v. Central New York Psychiatric Center, Not Reported in F.Supp.2d (2010)
2010 WL 3765847

Although not alleged as a distinct cause of action, in his second amended complaint plaintiff appears to claim that all of his legal work and documentation—five draft bags altogether—were seized and allegedly destroyed by employees at the Gouverneur Correctional Facility ("Gouverneur"). Second Amended Compl. (Dkt. No. 35) ¶ 2. Defendants contend that this claim also should be dismissed as failing to state a constitutionally cognizable cause of action.

Addressing inmate claims relating to stolen or lost property, the Supreme Court has held that even intentional destruction of prisoner's property may not be the basis for constitutional claims if sufficient post deprivation remedies are available to address the claim. *Hudson v. Palmer,* 468 U.S. 517, 531, 104 S.Ct. 3194, 3202, 82 L.Ed.2d 393 (1984) (citing *Parratt v. Taylor,* 451 U.S. 527, 541, 101 S.Ct. 1908, 1916, 68 L.Ed.2d 420 (1981)). As long as a meaningful post deprivation remedy is provided, the due process requirement is met and the Fourteenth Amendment is satisfied. *Howard v. Leonardo,* 845 F.Supp. 943, 947 (N.D.N.Y.1994) (citing *Parratt,* 451 U.S. at 540, 101 S.Ct. at 1916). With regard to claims of lost or stolen property, the Second Circuit has recognized that New York provides, "an adequate post deprivation remedy in the form of, *inter alia,* a Court of Claims action. *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001) (citing *Love v. Coughlin,* 714 F.2d 207, 208–09 (2d Cir.1983)).

**\*12** In this instance plaintiff had available to him, and indeed apparently pursued, an internal DOCS process for making a claim for his lost property. Additionally, under the New York Court of Claims Act, the State provides inmates like the plaintiff with a post deprivation remedy by way of an action asserted in the New York Court of Claims for appropriation of personal property. *See* N.Y. CT. OF CLAIMS ACT §§ 8, 9(2). Thus, as a matter of law, McQuilkin was afforded adequate procedural protections and any procedural due process claim premised upon the alleged destruction of his property at Gouverneur is subject to dismissal. [16]

[16]     The availability of a post-deprivation remedy does not foreclose plaintiff's claim that he was effectively denied meaningful access to the courts as a result of the loss of his legal documents. *See Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 2179, 135 L.Ed.2d 606 (1996). As will be seen, however, that claim also lacks merit. *See* pp. 41–43, *post.*

H. *Expungement of Psychiatric Records*

Plaintiff's second cause of action seeks "total expungement from [sic] any reference of mental health patient from Plaintiff's institutional record." Second Amended Compl. (Dkt. No. 35) Second Cause of Action. In their motion, defendants request dismissal of this cause of action as not presenting a constitutional claim, and additionally because the relief sought is not available under New York law.

To state a valid claim under section 1983, a plaintiff must allege that he or she was deprived of a right guaranteed under the Constitution of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citing *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993)). Plaintiff has identified no cognizable constitutional right at stake with regard to his mental health records. While plaintiff complains of his involuntary commitment at the Center, it appears from the record now before the court that the commitment occurred, at least in part, based upon state court proceedings conducted pursuant to New York Correction Law § 402. [17] *See generally* Waldron Aff. (Dkt. No. 66). As such, plaintiff cannot plausibly allege the denial of procedural due process associated with that commitment.

[17]     Under that provision, upon receiving a report from a physician that an inmate is, in his or her opinion, mentally ill the superintendent of a correctional facility must apply to the court for designation of two examining physicians who, conducting a personal examination, may certify that the inmate is mentally ill and in need of care and treatment, if deemed appropriate. N.Y. Correction Law § 402. In the event that certification is made by the two examining physicians, the superintendent must then apply to an appropriate state court judge for an order of commitment, with notice to the affected inmate as well as any known relative. *Id.* § 402(3). The inmate thereafter may request a hearing, and the court additionally may request one of its own initiative. *Id.* § 402(5). In the event the court determines that the person is mentally ill and in need of care and treatment, the court may order him or her committed for a period not to exceed six months in order that the inmate may be transferred into an OMH facility. *Id.*

Nor has McQuilkin stated a claim under New York law, even assuming such a claim would be actionable under section 1983. Generally, expungement of psychiatric records is not an available form of relief in New York. *Wade v. Dep't of Mental*

2010 WL 3765847

*Hygiene of New York,* 49 N.Y.2d 947, 428 N.Y.S.2d 945, 406 N.E.2d 800 (1980). MHL section 33.14 does allow for the sealing of psychiatric records when

> the petitioner has demonstrated by competent medical evidence that he is not currently suffering from a mental illness, has not for a period of three years received inpatient services for the treatment of a mental illness, and the interests of the petitioner and society would best be served by sealing the petitioner's records.

N.Y. MENTAL HYG. LAW § 33.14(a)(1)(b). Plaintiff cannot avail himself of the sealing provision in this instance, however. At the outset, plaintiff cannot establish that he has not "received inpatient services for a period of three years." *Id.* Plaintiff was discharged from services on October 27, 2009 and has therefore received inpatient services within the last three years. Waldron. Aff. (Dkt. No. 66) Exh A. Additionally, plaintiff has not established, by competent medical evidence, that he is not currently suffering from a mental illness, nor has he demonstrated that both his interests and those of society would be best served by sealing his records of mental health treatment.

**\*13** For these reasons, the defendants' motion should be granted with respect to plaintiff's second cause of action.

### I. *Religious Discrimination and Access to Court*
Plaintiff's complaint makes passing reference to abridgement of his right to "access the court of law" and his "religious rights." Second Amended Complaint (Dkt. No. 35) ¶¶ 2, 8. As defendants assert in support of their motion, plaintiff's complaint is devoid of any factual allegations to support these claims, and there is nothing in the record that would suggest that these rights are implicated.

### 1. *Religious Discrimination*
While inmates confined within prison facilities are by no means entitled to the full panoply of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that amendment does afford them at least some measure of constitutional protection, including their right to participate in congregate religious services. *See Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974) ("In the First Amendment context ... a prison inmate retains those First Amendment rights that are not inconsistent with his [or her] status as a prisoner or with the legitimate penological objectives of the corrections system."); *see also Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) ("It is well established that prisoners have a constitutional right to participate in congregate religious services.") (citing cases). The task of defining the contours of that right in a prison setting requires careful balance of the rights of prison inmates against the legitimate interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987); *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003); *Salahuddin,* 993 F.2d at 308. When determining whether an action taken by prison officials impinges upon that individual's First Amendment free exercise right, the inquiry is "one of reasonableness, taking into account whether the particular [act] affecting [the] right ... is 'reasonably related to legitimate penological interests.' " *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990) (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987)); *Ford,* 352 F.3d at 588; *see also Farid v. Smith,* 850 F.2d 917, 925 (2d Cir.1988) (citing, *inter alia, O'Lone,* 482 U.S. at 348, 107 S.Ct. at 2404).

In this instance, neither plaintiff's complaint nor the record before the court discloses any facts demonstrating religious discrimination or establishing that plaintiff's religious beliefs were somehow burdened by his confinement to CNYPC or the administration of psychiatric drugs against his will. Plaintiff's complaint does not identify his religion, nor does it explain how the forced administration of psychiatric medications infringes upon his sincerely held religious beliefs. Since plaintiff's religious deprivation claim is stated in wholly conclusory terms without the articulation of facts demonstrating the existence of a plausible claim, and in light of his failure to come forward with the evidence to support that claim in the face of defendants' summary judgment motion, I recommend that any cause of action deemed to assert a First Amendment freedom of religion violation be dismissed.

### 2. *Access to Courts*
**\*14** Turning to plaintiff's reference to his deprivation of access to the courts, I note that undeniably "[p]risoners have a

constitutional right of access to the courts, which is infringed when prison officials interfere with a prisoner's preparation of legal documents." *Thomas v. Egan,* 1 Fed. App'x 52, 54 (2d Cir.2001) (citing *Lewis,* 518 U.S. at 350, 116 S.Ct. at 2179) (cited in accordance with Fed. R.App. Proc. 32.1). "To state a claim of denial of access to the courts, an inmate must allege an actual injury." *Id.* (citing *Lewis,* 518 U.S. at 349, 116 S.Ct. at 2179). Conclusory allegations are insufficient. *Id.* (citing *Lewis,* 518 U.S. at 349, 116 S.Ct. at 2179).

In this instance, plaintiff's complaint alleges that among his property confiscated and destroyed by unnamed prison workers at Gouverneur were legal documents. Second Amended Complaint (Dkt. No. 35) ¶ 2. Neither his complaint nor anything within the record now before court suggests, however, that plaintiff suffered any harm as a result of the alleged destruction of his legal documents. Plaintiff's complaint therefore fails to allege the existence of prejudice, an essential element of such a claim. *See Davidson v. Murray,* 371 F.Supp.2d 361, 366 (W.D.N.Y.2005) (citing cases) (requiring proof on access to courts claim that "a nonfrivolous legal claim had been frustrated or was being impeded due to the action or inaction" of defendants). Based upon this lack of supporting facts, I recommend that plaintiff's court access claim be dismissed.

### J. Retaliation

The claims set forth in plaintiff's complaint appear to be centered upon his involuntary commitment into the CNYPC and the forced administering of anti-psychotic medication, allegedly in retaliation for his filing a "notice of summons" against the DOCS. In their motion, defendants assert that plaintiff has failed to state a cognizable claim of retaliation. When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds sub nom., Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a prima facie claim under § 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*15** Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to summary judgment dismissing plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

Plaintiff alleges that he was administered antipsychotic medication "in a continuing retaliation against him for filing a claim in the International Trade Court several years ago which was against the State of New York and the Quango New York State Brokerage Mortmain Collection Department of Correctional Services." Second Amended Compl. (Dkt. No. 35) ¶ 2. Plaintiff also alleges that in retaliation for his service of a "notice of summons upon [Defendant Taylor] on July 2, 2007 and July 3, 2007 ...". defendants seized and destroyed five bags containing his property on July 18, 2007, and "wrongfully referred" him to the psychiatric department at Clinton. *Id.*

Plaintiff's complaint clearly satisfies the first element of the retaliation claim. Both the filing of a claim with the International Trade Court and service of a notice of

summons appear to qualify as constituting protected activity. *See Joseph's House and Shelter, Inc. v. City of Troy,* 641 F.Supp.2d 154, 159 n. 5 (N.D.N.Y.2009) (Scullin, S.D.J.) (citing *Dougherty v. Town of N. Hempstead,* 282 F.3d 83, 91 (2d Cir.2002) (finding lawsuit constitutionally protected activity under the First Amendment)). In addition I have assumed, solely for purposes of the instant motion, that the forced administering of drugs and the destruction of plaintiff's property could qualify as sufficiently adverse to trigger the protections of the First Amendment. *See Jones v. Harris,* 665 F.Supp.2d 384, 399 (S.D.N.Y.2009). The evidence of a connection between the two, however, is lacking in this case.

The portion of plaintiff's retaliation claim stemming from his filing of the claim in the International Trade Court is easily dispensed with. By plaintiff's own admission that claim was filed "several years ago" and does not appear to have involved any of the named defendants in this action. The bare allegation that the filing of that claim is somehow linked to the defendants' actions in forcing him to take medications, without further support, is woefully insufficient to establish the required connection between that protected activity and the adverse consequences claimed in his retaliation cause of action. *Flaherty,* 344 F.3d at 13.

Plaintiff's retaliation claim against defendant Taylor based upon service of a summons, followed by in short order by the seizure of his property, presents a closer question given the close proximity in time between the two events. In the face of a summary judgment motion, however, calling for plaintiff to lay bare his claims and the proof which supports them, however, this alone is insufficient to establish a basis upon which a reasonable factfinder could conclude that unlawful retaliation has occurred. *Vega v. Lareau,* No. 9:04–CV–0750, 2010 WL 2682307, at \*10 (N.D.N.Y.2010) (Baxter, M .J.). I note, in that regard, that the record fails to support plaintiff's claim that defendant Taylor, against whom this portion of the retaliation claim is asserted, was involved in any way in the decision to admit the plaintiff into the CNYPC. Instead, the record reflects the decision was made by OMH care providers following an evaluation of plaintiff's mental status, and was authorized by a state court order.

**\*16** Because the record fails to support plaintiff's retaliation cause of action, I recommend that it be dismissed.

### K. *OMH Confinement and Involuntary Treatment*
Also embedded in plaintiff's complaint is a claim for violation of his Eighth and Fourteenth Amendment rights arising from his commitment to the CNYPC as well as the drugs he was forcibly administered while there. In support of their motion, defendants argue that these claims should be dismissed as impermissibly conclusory, and further that because they are precluded under *Heck v. Humphrey* and the *Rooker–Feldman* doctrine.

### 1. *Eighth Amendment*
The claims alleged in plaintiff's complaint relating to his involuntary commitment to the CNYPC and the forced administration of drugs are predicated upon alleged violation of the Eighth and Fourteenth Amendments and, in essence, are directed to the medical treatment that he received for his schizophrenia.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)). A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement—the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach,* 103 F.Supp.2d at 546 (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer); Waldo,* 1998 WL 713809, at \*2 (same).

To satisfy the objective prong of an Eighth Amendment conditions of confinement claim, a plaintiff must demonstrate a deprivation of " 'the minimal civilized measure of life's necessities,' such as adequate food, clothing shelter, sanitation, medical care, and personal safety." *May v. DeJesus,* No.3:06CV1888, 2010 WL 1286800, at *4 (D.Conn. Mar.30, 2010) (quoting *Alvarez v. County of Cumberland,* Civil No. 07–346(RBK), 2009 WL 750200, at *2 (D.N.J. Mar.18, 2009) (citation omitted)). Conditions that are merely restrictive or harsh, however, do not implicate the Eighth Amendment; "they are merely part of the penalty that criminal offenders pay for their offense against society." *May,* 2010 WL 1286800, at *4 (quoting *Alvarez,* 1009 WL 750200, at *2).

**\*17** Plaintiff does not claim that he was deprived of any of basic need or that his personal safety was put at risk during his confinement in the CNYPC or at Clinton. Instead, his complaint is directed to the facts that he was confined to a mental health facility and forced to undergo mental health treatment. Broadly construed, at best, plaintiff's Eighth Amendment claim can be interpreted as a challenge to his medical treatment.

Claims that prison officials have intentionally disregarded an inmate's medical needs are encompassed within the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291. Here, however, even liberally construing plaintiff's allegations there is no claim, and indeed no evidence in the record to suggest that plaintiff's medical needs were disregarded. In fact, at the heart of plaintiff's claim is his contention that he did not need mental health treatment at all. It is well established, however, that "[c]harges that amount only to allegations of malpractice, and mere disagreements with respect to quality of medical care do not state an Eighth Amendment claim." *Arroyo v. City of New York,* 2003 WL 22211500, at *2 (S.D.N.Y. Sept.25, 2003) (citing *Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 292). As a result, defendants are correct in their assertion that plaintiff's Eighth Amendment challenge to his CNYPC confinement and mental health treatment must fail as a matter of law.

### 2. Heck v. Humphrey

Defendants also assert that any claim by plaintiff that he should not have been placed in the CNYPC or in an OMH Satellite Unit is barred by the rule enunciated in *Heck v. Humphrey.* In *Heck,* the United States Supreme Court addressed the types of claims for which state prisoners may seek redress in section 1983 actions. *Heck,* 512 U.S. at 480–

82, 114 S.Ct. at 2369–70. The Supreme Court specifically held that a state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if a judgment in his or her favor "would necessarily imply the invalidity of his conviction or sentence." *Heck,* 512 U.S. at 487, 114 S.Ct. at 2372. For a plaintiff to recover damages for actions

> whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

*Id.* at 486–87, 2372. "But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." *Id.* The Second Circuit has observed, however, that a section 1983 suit by a prisoner, "challenging the validity of a disciplinary or administrative sanction that does not affect the overall length of the prisoner's confinement is not barred by *[Heck]." Jenkins v. Haubert,* 179 F.3d 19, 27 (2d Cir.1999).

**\*18** In this case, plaintiff is not disputing either his conviction or his confinement to prison; rather, McQuilkin is challenging his confinement to a mental health facility, which occurred in accordance with a state court order. Plaintiff additionally challenges the forced administration of psychotropic drugs, which also was court-authorized. It does not appear that these state court determinations had any effect on the length of the plaintiff's prison term. Waldron Aff. (Dkt. No. 66) Exh. B P263, P318–319. Additionally, these state court proceedings clearly were not criminal in nature, but rather were civil state mental health proceedings. As a result, it cannot be said that the instant action would affect the invalidity of a criminal judgment against the plaintiff. [18]

[18]   The fact that plaintiff has been released from custody does not alter this conclusion because "[t]his favorable termination requirement applies

McQuilkin v. Central New York Psychiatric Center, Not Reported in F.Supp.2d (2010)

2010 WL 3765847

to plaintiffs who are incarcerated at the time that they file their section 1983 actions, regardless of whether they are later released." *Hamm v. Hatcher,* No. 05–CV–503, 2009 WL 1322357, at *8 n. 6 (S.D.N.Y. May 5, 2009).

For these reasons, it therefore does not appear that plaintiff's claims are precluded by the doctrine enunciated in *Heck v. Humphrey.*

### 3. *Rooker–Feldman*

Defendants further assert that plaintiff's OMH retention and involuntary treatment claims are subject to dismissal under the *Rooker–Feldman* doctrine because the plaintiff was accorded due process in the state court mental health proceedings, and the claim presents a pure question of state law that is not properly raised in a section 1983 action.

"Where a federal suit follows a state suit, the former may be prohibited by the so-called *Rooker–Feldman* doctrine in certain circumstances." *Hoblock v. Albany County Board of Elections,* 422 F.3d 77, 83 (2d Cir.2005). A federal district court "has no authority to review final judgments of state court judicial proceedings." *District of Columbia v. Feldman,* 460 U.S. 462, 482, 103 S.Ct. 1303, 1315, 75 L.Ed.2d 206 (1983). "To do so would be an exercise of appellate jurisdiction which only the Supreme Court possesses over state court judgments." *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 416, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923).

The Supreme Court of the United States reviewed and redefined the limits of the *Rooker–Feldman* doctrine in *Exxon Mobile Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). The Court limited application of the doctrine to "cases brought by state court losers complaining of injuries caused by state court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobile Corp.,* 544 U.S. at 284, 125 S.Ct. at 1521–22. In *Hoblock,* the Second Circuit established four elements that must be met before the *Rooker–Feldman* doctrine applies:

> First, the federal court plaintiff must have lost in state court. Second the plaintiff must 'complain[ ] of injuries caused by [a] state court judgment [.]' Third, the plaintiff must 'invite district court review and rejection of [that] judgment[ ].' Fourth, the state court judgment must

have been 'rendered before the district court proceedings commenced.'

*Hoblock,* 422 F.3d at 85.

**\*19** Here, the first and fourth elements of this test are clearly satisfied. First, the plaintiff lost in the New York Supreme Court proceedings which resulted in the retention and involuntary treatment described in plaintiff's complaint. *See* Waldron Aff. (Dkt. No. 66) Exh. B at P263, P318–319. Additionally, the state court decisions at issue, dated October 11, 2007 and November 21, 2007, respectively, *see id.,* were rendered prior to the commencement of this action on September 15, 2008. *See* Dkt. No. 1.

The second and third elements of the prevailing *Rooker–Feldman* test also appear to have been established in this instance. Plaintiff's complaint is directly addressed to the injuries suffered as a result of those court determinations. Moreover, plaintiff's complaint, as amended, appears to challenge the correctness of those rulings, seeking both an order prohibiting his forced medication, despite the fact that it was accomplished pursuant to a state court order, as well as expungement of records of his treatment at the Center, also accomplished by court order. This, then, appears to present a classic case of a claim precluded under the *Rooker–Feldman* doctrine. I therefore recommend dismissal of plaintiff's confinement and administration of psychiatric drug claims on this basis.

### L. *Due Process Claims*

In their motion defendants further attack plaintiff's procedural due process claim asserted under the Fourteenth Amendment.

To successfully state a claim under 42 U.S.C. § 1983 for denial of procedural due process, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). It is undeniable that [i]nvoluntary confinement, including civil commitment, constitutes a significant deprivation of liberty, requiring due process." *Abdul–Matiyn v. Pataki,* 9:06–CV–1503, 2008 WL 974409, at *10 (N.D.N.Y. April. 8, 2008) (Hurd, J. and Homer, M.J.) (quoting *Fisk v. Letterman,* 401 F.Supp.2d 362, 374 (S.D.N.Y.2005) (citations omitted). "When a person's liberty interests are implicated, due process requires at a

2010 WL 3765847

minimum notice and an opportunity to be heard." *Mental Hygiene Legal Service v. Spitzer,* 2007 WL 4115936, at *5 (S.D.N.Y. Nov.16, 2006) (citing *Hamdi v. Rumsfeld,* 542 U.S. 507, 533, 124 S.Ct. 2633, 2648, 159 L.Ed.2d 578 (2004) (plurality opinion)). The Supreme Court has approved the use of involuntary confinement where there has been a determination that the person in question currently suffers from a "mental abnormality" and is likely to pose a future danger to the public. *Abdul,* 2008 WL 974409, at *10 (citing *Kansas v. Hendricks,* 521 U.S. 346, 371, 117 S.Ct. 2072, 2086, 138 L.Ed.2d 501 (1997)).

The primary focus of plaintiff's due process claim and defendants' motion seeking its dismissal, then, is upon the sufficiency of the procedural safeguards associated with that deprivation. [19] In this instance, plaintiff was committed to the CNYPC by way of the procedures set out in the New York Corrections Law § 402.

[19]    The record does not address, and I am therefore unable to determine, whether as a result of his involuntary commitment to the CNYPC and forced medication, plaintiff suffered deprivation of a cognizable liberty interest beyond that already associated with this criminal conviction and sentence. I have nonetheless assumed, for purposes of the pending motion, that the plaintiff can demonstrate the deprivation of a cognizable liberty interest associated with those acts.

 *20  It is clear from the record before the court that plaintiff was retained at the CNYPC under the authority of that statute, and his retention and involuntary treatment with the antipsychotic medication were court-ordered. Section 402 provides procedures and safeguards similar to the provisions of MHL section 33.03, the general provision governing involuntary commitment, and one which "has withstood challenges that it was facially unconstitutional." *United States v. Waters,* 23 F.3d 29, 32 (2d Cir.1994) (citing *Project Release v. Prevost,* 722 F.2d 960, 971–981 (2d Cir.1983)).

Plaintiff's claims regarding involuntary medication are similarly destined to fail. The Second Circuit has held that "due process requires an opportunity for hearing and review of a decision to administer antipsychotic medication-but such a hearing need not be judicial in nature." *Project Release,* 722 F.2d at 981. Moreover, due process does not require a guarantee that a physician's assessments in their commitment

evaluation be correct. *Rodriguez City of New York,* 72 F.3d 1051, 1062 (2d Cir.1995).

Plaintiff was transferred from Mid–State to the CNYPC on September 17, 2007, after he refused medication and mental health treatment, and once admitted continued to refuse medication without any rational basis for doing so. As a result, the Executive Director of the CNYPC petitioned the court, based upon the certifications of two examining physicians, for an order committing McQuilkin for six months. McQuilkin objected to the retention petition, and a hearing was held in Oneida County Supreme Court to determine whether the plaintiff was mentally ill and a proper subject for involuntary commitment. Following the hearing, on October 11, 2007, the court ordered plaintiff's commitment to CNYPC for six months.

After the commitment order was issued, McQuilkin persisted in his refusal to consent to the administration of medication. As a result, following a similar procedure as he did for commitment, based upon the certification of two examining physicians, defendant Sawyer petitioned the court for an order authorizing the administration of the medication against McQuilkin's will. McQuilkin opposed the petition, and, after a hearing, the court determined that he lacked capacity to make a reasoned decision regarding his own treatment and granted the petition. *United States v. Waters,* 23 F.3d at 32.

Because the evidence in the record establishes that defendants followed the procedures outlined in New York Corrections Law § 402 in obtaining authorization for plaintiff's involuntary commitment, and plaintiff was afforded the constitutionally required process to which he was entitled in connection with both that determination and the court ordered forced mediation, his procedural process claim lacks merit. [20]

[20]    To the extent that plaintiff may be suggesting that defendants failed to follow the procedures outlined in the MHL, his claim would still fail. Section 1983 imposes liability for violations of rights protected by the Constitution and laws of the United States, and not for violations arising solely out of state or common law principles. *Fluent v. Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994). "A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases). For this reason,

even if defendants had failed to follow the letter of the New York MHL provisions with regard to his confinement and treatment, that failure would not provide the basis a cognizable section 1983 claim.

For the foregoing reasons, I recommend summary judgment granting dismissal of plaintiff's due process claim arising out of his mental health confinement and treatment with psychiatric medication.

### M. *Defendant Sangani's Motion to Dismiss*

**\*21** In his motion Dr. K. Sangani, who has yet to answer plaintiff's complaint, seeks its dismissal for failure to state a claim against him upon which relief may be granted. The focus of defendant Sangani's motion is upon plaintiff's failure to allege in his complaint facts showing Sangani's involvement in the constitutional deprivations alleged.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010) (quoting *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006)). It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cri.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

The only mention of Dr. Sangani in plaintiff's second amended complaint is in that portion wherein it is alleged, "[t]he next day plaintiff was transferred to Marcy Psychiatric Center and petition before the court upon the application of K. Perlman and the certificates of Doctors K. Sangani and V. Komareth on 10/11/07 ..." Amended Complaint. (Dkt. No. 35) ¶ 5. It is doubtful that the mere provision of a certificate in support of an involuntary commitment petition would suffice to establish a physician's personal involvement in a claim that the involuntary commitment was either retaliatory or accomplished through lack of procedural due process. As such, it seems doubtful that plaintiff's claim against Dr. Sangani is legally plausible, given his failure to

sufficiently allege that defendant's personal involvement in a constitutional deprivation. Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend *at least* once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991) (emphasis added); *see also* Fed. R. Civ. Proc. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief). I note, however, that I have already recommended dismissal of plaintiff's claims growing out of that commitment as legally insufficient. I therefore similarly recommend that an order be entered dismissing plaintiff's claims against Dr. Sangani on this basis, without leave to replead.

### N. *Defendants Komareth and Bodrog*

**\*22** Although defendants' motion does not explicitly request this relief, I have of my own initiative determined to raise the question of whether plaintiff's claims should proceed against the defendants Komareth and Bodrog, two defendants who were never served with the summons and complaint, and who, if this report and recommendation is adopted, would be the sole remaining defendants in the case.

Rule 4(m) of the Federal Rules of Civil Procedure requires that service of a summons and complaint be made within 120 days of issuance of the summons.[21] "[W]here good cause is shown, the court has no choice but to extend the time for service, and the inquiry is ended." *Panaras v. Liquid Carbonic Indus. Corp.,* 94 F.3d 338, 340 (7th Cir.1996). "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or direct that service be effected within a specified time." *Id.* (citing Fed.R.Civ.P. 4(m)); *Zapata v. City of New York,* 502 F.3d 192, 196 (2d Cir.2007) ("[D]istrict courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.,* 807 F.2d 309, 311 (2d Cir.1986). When examining whether to extend the specified 120 day period for service, a district court is afforded ample discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause. *See Zapata,* 502 F.3d at 197.

21      That rule provides that

2010 WL 3765847

[i]f a defendant is not served within 120 days after the complaint is filed, the court —on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed.R.Civ.P. 4(m). This court's local rules shorten the time for service from the 120 day period under Rule 4(m) to sixty days. *See* N.D.N.Y.L.R. 4.1(b).

A plaintiff's *pro se* status entitles him or her to a certain degree of leniency insofar as service of process is concerned; courts generally favor resolution of such a case on its merits, rather than on the basis of a procedural technicality. *Poulakis v. Amtrak,* 139 F.R.D. 107, 109 (N.D.Ill.1991). When a plaintiff proceeds *in forma pauperis,* such as is the case here, the court is obligated to issue the plaintiff's process to the United States Marshal, who must in turn effect service upon the defendants, "thereby relieving [the] plaintiff of the burden to serve process once reasonable steps have been taken to identify for the court the defendants named in the complaint." *Byrd v. Stone,* 94 F.3d 217, 219 (6th Cir.1996).

I am mindful of the Second Circuit's recent decision in *Murray v. Pataki,* in which the court cautioned that

[a] *pro se* prisoner proceeding *in forma pauperis* is only required to provide the information necessary to identify the defendant, *see, e.g. Sellers,* 902 F.2d at 602, and it is "unreasonable to expect incarcerated and unrepresented prisoner-litigants to provide the current business addresses of prison-guard defendants who no longer work at the prison," *Richardson v. Johnson,* 598 F.3d 734, 739–40 (11th Cir.2010).

*Murray v. Pataki,* No. 09–1657, 2010 WL 2025613, at *2 (2d Cir. May 24, 2010) (summary order) (cited in accordance with Fed. R.App. Proc. 32.1). In this instance, however, plaintiff has failed to demonstrate the requisite vigilance in insuring service upon these defendants and, to the extent necessary, eliciting the court's assistance. Plaintiff's original complaint in this action was filed on September 15, 2008. Summonses issued for defendants Komareth and Bodrog were initially returned unexecuted on January 16, 2009. See Dkt. Nos. 18, 19. The summonses were thereafter reissued and again forwarded to the Marshals for service on April 29, 2009,

Dkt. No. 30, and yet again on May 14, 2009, Dkt. No. 36, but were, once again, returned as unexecuted on July 23, 2007 (defendant Komareth), Dkt. No. 44, and August 3, 2009 (defendant Bodrog) Dkt. No. 46. Despite the passage of more than one year, and at least one court intervention at plaintiff's request seeking an order compelling discovery, *see* Dkt. Minute Entry Dated 8/5/09, plaintiff has failed to request assistance from the court in locating and serving these defendants. On that basis I recommend dismissal of plaintiff's claims against defendants Komareth and Bodrog, without prejudice. [22]

[22]    In his complaint plaintiff alleges that defendants Komareth and Bodrog are physicians who submitted certifications in support of the applications to confine McQuilkin to the CNYPC and to require that he submit to the administration of psychiatric medication. Since I have already determined that as to the defendants Hanna and Hernandez, who also submitted certifications in support of these applications, plaintiff has failed to establish that his constitutional rights have been violated, for the same reasons I could recommend dismissal of plaintiff's against these two defendants on the merits as well.

## IV. *SUMMARY AND RECOMMENDATION*

**\*23** Although defendants have asserted that certain of plaintiff's claims should be dismissed for failure to exhaust his administrative remedies, the record shows that special circumstances potentially exist that could justify excusing the plaintiff from the exhaustion requirement in this instance. I therefore recommend against dismissal of plaintiff's claims on this procedural basis.

Turning to the merits of plaintiff's claims, I note first that his claim for injunctive relief must be dismissed as moot, based upon his release from custody. I also recommend dismissal of all claims against the CNYPC, and plaintiff's damages claims against the defendants in their official capacities, on the basis of the immunity afforded under the Eleventh Amendment. I further find that the balance of plaintiff's claims are not supported by the record now before the court, and no reasonable factfinder could conclude that those claims are meritorious. Finally, I recommend dismissal of plaintiff's involuntary commitment and forced medication claims on the basis of the *Rooker–Feldman* doctrine, and find it unnecessary, in light of these determinations, to address

2010 WL 3765847

the additional, alternative basis for dismissal of qualified immunity.

Based upon the foregoing it is hereby respectfully,

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 66) be GRANTED, and that plaintiff's claims against the Central New York Psychiatric Center, Berggren, Hernandez, Sawyer, Hanna and Taylor be DISMISSED in all respects, with prejudice; and it is further

RECOMMENDED that defendant Sangani's motion to dismiss the complaint (Dkt. No. 56) be GRANTED and that all claims against that defendant be DISMISSED for failure to state a plausible civil rights claim; it is further

RECOMMENDED that plaintiff's claims against defendants Komareth and Bodrog be DISMISSED, *sua sponte,* without prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court amend the court's records to reflect the correct spelling of defendant Berggen's name; and it is further

ORDERED THAT the clerk serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 3765847

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3765715

2010 WL 3765715
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Rudolph McQUILKIN, Plaintiff,
v.
CENTRAL NEW YORK PSYCHIATRIC
CENTER, J. Taylor, J. Berggren, V. Komareth,
K. Sangani, Dr. Hernandez, D. Sawyer,
S. Hanna, and G. Bodrog, Defendants.

Civil Action No. 9:08–CV–00975 (TJM/DEP).
|
Sept. 20, 2010.

**Attorneys and Law Firms**

Rudolph McQuilkin, New York, NY, pro se.

Krista A. Rock, New York State Attorney General, Peter B. Joslin, Jr., O'Connor, O'Connor Law Firm, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. David E. Peebles, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). No objections to the Report–Recommendation and Order dated August 27, 2010 have been filed, and the time to do so has expired. Furthermore, after examining the record, this Court has determined that the Report–Recommendation and Order is not subject to attack for plain error or manifest injustice. Accordingly, the Court adopts the Report–Recommendation and Order for the reasons stated therein.

It is therefore,

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 66) is **GRANTED,** and Plaintiff's claims against the Central New York Psychiatric Center, Berggren, Hernandez, Sawyer, Hanna and Taylor are **DISMISSED** in all respects, with prejudice; and it is further

**ORDERED** that Defendant Sangani's motion to dismiss the complaint (Dkt. No. 56) is **GRANTED** and all claims against Sangani are **DISMISSED** with prejudice; and it is further

**ORDERED** that Plaintiff's claims against Defendants Komareth and Bodrog are **DISMISSED,** *sua sponte,* without prejudice.

The Office of the Clerk of the Court is instructed to close the file in this matter.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3765715

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 3739925
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Michael N. KELSEY, Plaintiff,

v.

Christopher SHERMAN, individually and
in his official capacity; and Kathy Hochul,
individually and in her official capacity, Defendants.

22 CV 1934 (VB)
|
Signed May 30, 2023
|
Filed May 31, 2023

**Attorneys and Law Firms**

Michael N. Kelsey, Salt Point, NY, Pro Se.

Steven Neil Schulman, Office of the Attorney General, New York, NY, for Defendants.

### OPINION AND ORDER

Briccetti, United States District Judge:

**\*1** Plaintiff Michael N. Kelsey, proceeding pro se,[1] brings this action against Christopher Sherman, Board Examiner of the New York State Board of Examiners of Sex Offenders (the "Board"), and New York State Governor Kathy Hochul under 42 U.S.C. § 1983 alleging New York State's Sex Offender Registration Act ("SORA") is unconstitutional under the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

[1]     Although plaintiff is proceeding pro se, he is a disbarred attorney. See In re Kelsey, 148 A.D. 3d 257, 258 (2d Dep't 2017).

Now pending is defendants' motion to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6). (Doc. #16).

For the reasons set forth below, the motion is GRANTED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

### BACKGROUND

For the purpose of ruling on the motion to dismiss, the Court accepts as true all well-pleaded factual allegations in the complaint, documents attached thereto, and certain factual allegations in plaintiff's opposition, and draws all reasonable inferences in plaintiff's favor, as summarized below.[2]

[2]     Because plaintiff is proceeding pro se, the Court considers new allegations in the opposition to the extent they are consistent with the complaint. See Kelley v. Universal Music Grp., 2016 WL 5720766, at *6 (S.D.N.Y. Sept. 29, 2016). Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations. Plaintiff will be provided copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009) (per curiam).

I. Factual Allegations

On June 30, 2015, plaintiff was charged in St. Lawrence County Court with one count of sexual abuse in the first degree in violation of N.Y. Penal Law § 130.65(2), one count of attempted sexual abuse in the first degree in violation of N.Y. Penal Law §§ 110.00, 130.65(2), one count of forcible touching in violation of N.Y. Penal Law § 130.52, and two counts of endangering the welfare of a child in violation of N.Y. Penal Law § 260.10(1). (Doc. #2-1 at ECF 14–16).[3] According to an indictment, which plaintiff attaches to his complaint, the conduct underlying the charges occurred in August 2014, when plaintiff subjected two minors, who were fifteen years old, "to sexual contact" while they were asleep and thus "physically helpless." (Id. at ECF 14).

[3]     "ECF __" refers to page numbers automatically assigned by the Court's Electronic Case Filing system.

Plaintiff was convicted after trial, and on October 21, 2016, he was sentenced to seven years' imprisonment and ten years of post-release supervision. As part of his sentencing, the County Court judge told plaintiff: "You are now classified or certified as a sex offender and required to comply with the state Sex Offender Registration Act." (Doc. #2-1 at ECF 18). Further, the Judge told plaintiff of several obligations

under SORA including the duty to register with the Division of Criminal Justice Services ("DCJS") for a period to "be determined at a risk assessment hearing which will occur prior to your release," notify DCJS of "any change of home address no later than ten days after you move," and inform DCJS if he were to attend, enroll at, reside at, or be employed by any institution of higher education. (Id.). Moreover, plaintiff was told that if he was "found to be a level one or two offender and not a sexual predator, you must verify your home address once a year for the duration of your registration through the return of a signed address verification form." (Id. at ECF 18–19). However, if plaintiff was "determined to be a level three offender or a sexual predator, you must verify your home address in person with your local law enforcement agency every 90 days." (Id.). In addition, plaintiff was informed that if he failed to register or verify under SORA, he would be "guilty of a crime, and failure to register may be the basis for revocation of your parole." (Id.).

**\*2** On February 9, 2022, defendant Sherman sent the County Court a Sex Offender Designation Form, indicating plaintiff's release from prison for May 8, 2022. (Doc. #2-1 at ECF 21). The Sex Offender Designation Form indicates the Board was recommending plaintiff be designated a "Sexually Violent Offender," which is defined as "a sex offender who has been convicted of a sexually violent offense defined in Correction Law section 168-a(3)." (Id.).

Plaintiff alleges a hearing regarding his SORA risk designation level was scheduled for March 30, 2022. At the hearing, plaintiff was designated a sexually violent offender and assigned a SORA risk level of 2. (Doc. #29 ("Opp.") at 21).

Plaintiff alleges he has suffered several injuries as a result of SORA's certification, registration, and notification provisions. He contends sex offenders subject to SORA suffer from "oppression and relegation ... as second-rate or lesser citizens." (Doc. #2 ("Compl.") at 31).[4] He also alleges SORA's certification, registration, and notification provisions impose punishment—and thus, injury—on sex offenders.

[4]    Plaintiff's complaint was docketed in two parts, see Doc. #2 and Doc. #2-1, at ECF 1–13. Further, plaintiff restarts the paragraph numbers in his complaint. Accordingly, to avoid confusion, all citations to "Compl." cite to the page numbers used by plaintiff, across Docs. ##2, 2-1, rather than paragraph or ECF page number citations. However,

citations to Doc. #2-1 and the relevant ECF page number refer to documents attached as exhibits to the complaint.

More specifically, plaintiff alleges a separate New York law, the Sexual Assault Reform Act ("SARA"), bans sex offenders from living within 1,000 feet of a school. Further, plaintiff alleges New York Department of Corrections and Community Supervision ("DOCCS") directives and policies "impede travel rights, job-training, and arbitrarily restrict parolee sex offender's freedoms merely for being subject to the State's Sex Offender Registry." (Compl. at 40). For example, DOCCS requires parolees deemed "high risk," which include "Registered and Discretionary Sex Offenders," to seek written approval from their parole officer before traveling within the state. (Id. at 42). As to job training, plaintiff allegedly was denied admission into a computer vocational class while imprisoned because of his "Instant Offense of Sexual Abuse 1st." (Id. at 41). Plaintiff further alleges he was denied from participating in a DMV Call Center job-training program while he was imprisoned, because he had a "sex offense on record." (Id.).

## II. Statutory Scheme

In 1995, New York enacted SORA to protect the public from "the danger of recidivism posed by sex offenders." 1995 N.Y. Sess. Laws ch. 192 § 1. SORA has a certification requirement, which requires that a court, "upon conviction" of an individual for specified offenses, "certify that the person is a sex offender and shall include the certification in the order of commitment, if any, and judgment of conviction." N.Y. Correct. Law § 168-d(1).

Before a sex offender is released from prison, the Board makes a risk recommendation to the sentencing court. N.Y. Correct. Law § 168-n(2). The sentencing court then notifies the sex offender that it will conduct a risk determination proceeding to

determine whether you will be classified as a level 3 offender (risk of repeat offense is high), a level 2 offender (risk of repeat offense is moderate), or a level 1 offender (risk of repeat offense is low), or whether you will be designated as a sexual predator, a sexually violent offender or a predicate sex offender, which will

determine how long you must register as a sex offender and how much information can be provided to the public concerning your registration.

**\*3** Id. § 168-n(3).

Before discharge, release, or parole, SORA requires all sex offenders to register with the DCJS. N.Y. Correct. Law § 168-f. Consequences of sex offender registration include: "the registrant's name, address, photograph and fingerprints remain on file with [DCJS]; the registrant must verify his address annually to [DCJS], and must appear periodically at a law enforcement agency to provide a current photograph; [and] local law enforcement agencies are notified when a registrant moves into their jurisdiction." People v. Knox, 12 N.Y.3d 60, 65 (2009) (citing N.Y. Correct. Law §§ 168-b, 168-f, 168-j,168-l). SORA also contains a notification provision, which "permit[s] free public telephonic access to the [sex offender] registry and authorize[s] law enforcement officers to disseminate information regarding ... sex offenders to entities with vulnerable populations." Doe v. Cuomo, 755 F.3d 105, 110 (2d Cir. 2014); see N.Y. Correct. Law § 168-l(6).

## DISCUSSION

### I. Legal Standard

#### A. Rule 12(b)(1)

"[F]ederal courts are courts of limited jurisdiction and lack the power to disregard such limits as have been imposed by the Constitution or Congress." Durant, Nichols, Houston, Hodgson & Cortese-Costa, P.C. v. Dupont, 565 F.3d 56, 62 (2d Cir. 2009). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Nike, Inc. v. Already, LLC, 663 F.3d 89, 94 (2d Cir. 2011), aff'd, 568 U.S. 85 (2013). "The party invoking the court's jurisdiction bears the burden of establishing jurisdiction exists." Conyers v. Rossides, 558 F.3d 137, 143 (2d Cir. 2009).

"When the Rule 12(b)(1) motion is facial, i.e., based solely on the allegations of the complaint ..., the plaintiff has no evidentiary burden," and "[t]he task of the district court is to determine whether the [complaint] alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." Carter v. HealthPort Techs., LLC, 822 F.3d 47, 56 (2d Cir. 2016).

In deciding a motion to dismiss under Rule 12(b)(1) at the pleading stage, the Court "must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." Conyers v. Rossides, 558 F.3d at 143. "However, argumentative inferences favorable to the party asserting jurisdiction should not be drawn." Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992) (citing Norton v. Larney, 266 U.S. 511, 515 (1925)). When a factual challenge to the Court's jurisdiction has been raised, "the court may resolve [any] disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits." Zappia Middle E. Constr. Co., Ltd. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000).

When a defendant moves to dismiss for lack of subject matter jurisdiction and on other grounds, the court should consider the Rule 12(b)(1) challenge first. Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990).

#### B. Rule 12(b)(6)

**\*4** In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under "the two-pronged approach" articulated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). First, a plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss. Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility." Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that

a defendant has acted unlawfully." Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

The Court must liberally construe submissions of pro se litigants and interpret them "to raise the strongest arguments that they suggest." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (collecting cases). "Even in a pro se case, however, ... threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010). Nor may the Court "invent factual allegations" a plaintiff has not pleaded. Id.

## II. New Allegations and Claims

As an initial matter, in his opposition, plaintiff attempts to add new allegations and assert new constitutional challenges premised on the First Amendment and procedural due process under the Fourteenth Amendment, which were not included in his complaint.

For pro se plaintiffs, "it is appropriate ... to consider factual allegations made in their opposition papers, so long as the allegations are consistent with the complaint." Kelley v. Universal Music Grp., 2016 WL 5720766, at *6. Although "a pro se plaintiff may not raise entirely new causes of action for the first time in his opposition papers, ... the Court may consider new claims appearing for the first time in briefing if the claims could have been asserted based on the facts alleged in the complaint." Davila v. Lang, 343 F. Supp. 3d 254, 267 (S.D.N.Y. 2018); see Mathie v. Goord, 267 F. App'x 13, 14 (2d Cir. 2008) (summary order) (affirming dismissal of pro se plaintiff's new constitutional challenge, first raised in an opposition, because the "complaint did not encompass that claim").

Thus, the Court may consider new factual allegations introduced in plaintiff's opposition that are consistent with the facts and claims in the complaint. For example, it is appropriate for the Court to consider plaintiff's allegations elaborating upon his inability to reside within 1,000 feet of schools, travel freely, and obtain job training. However, the complaint cannot be construed to allege SORA is unconstitutional under the First Amendment, or based on procedural due process under the Fourteenth Amendment. Plaintiff first raised these arguments in his opposition. (See Opp. at 15, 19–20, 22–23). Plaintiff is incorrect that he alleged facts giving rise to a First Amendment challenge in his complaint; he cannot cure this deficiency by attaching grievance forms to his opposition about parole

conditions preventing him from attending church, associating with family in the presence of children, or expressing himself by wearing a Halloween costume. (See Doc. #23 at ECF 138–41). The same is true for new allegations in plaintiff's opposition regarding procedural due process violations because he did not plausibly allege facts giving rise to a procedural due process claim in the complaint. Thus, the Court declines to consider these new claims and allegations in support. See Davila v. Lang, 343 F. Supp. 3d at 267.

**\*5** Accordingly, to the extent plaintiff seeks to bring a First Amendment or a Fourteenth Amendment procedural due process claim, such claims are dismissed without prejudice. [5]

[5]   The Court further addresses these new claims in Part VI infra, in which plaintiff is granted leave to file an amended complaint.

## III. Standing

Defendants argue plaintiff lacks standing to bring this facial challenge because (i) he "does not show" SORA "was unconstitutionally applied to him" (Doc. #18 ("Mem.") at 10), and (ii) several of plaintiff's purported injuries are restrictions "not part of SORA," and plaintiff "does not explain how determining that SORA is unconstitutional would affect the applicability of these restrictions to him." (Id. at 24 n. 11).

The Court disagrees and finds plaintiff has standing to challenge SORA because he has alleged the SORA provisions he seeks to challenge were unconstitutionally applied to him. However, plaintiff has failed to allege several of his alleged injuries are traceable to SORA, and therefore does not have standing to pursue constitutional claims regarding those injuries.

### A. Legal Standard

"The 'irreducible constitutional minimum' of standing in federal court requires: an (1) 'injury in fact'; (2) that is 'fairly traceable' to a defendant's challenged conduct; and (3) that is 'likely to be redressed' by a favorable decision." Mejia v. Time Warner Cable Inc., 2017 WL 3278926, at *7 (S.D.N.Y. Aug. 1, 2017) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)). "To support standing, an injury must be both concrete and particularized." Id. (quoting Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016)). Indeed, "a 'bare' statutory violation is insufficient to confer constitutional standing absent some 'concrete' harm." Id. (citing Spokeo, Inc. v. Robins, 136 S. Ct. at 1549); see also TransUnion

LLC v. Ramirez, 141 S. Ct. 2190, 2205 (2021) ("Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may then sue that private defendant over that violation in federal court.").

Even "[t]he seminal cases in which the Court held state legislation unconstitutional 'on its face' did not involve any departure that a litigant only has standing to vindicate his own constitutional rights." Members of City Council of City of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 796 (1984). Where entire statutes are declared facially invalid, there is no "exception from the general rule that constitutional adjudication requires a review of the application of a statute to the conduct of a party before the Court." Id. at 798.

Further, "[s]tanding is not dispensed in gross." Lewis v. Casey, 518 U.S. 343, 358 n.6 (1996). "Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008). The Second Circuit has interpreted this as a requirement that a party's injury-in-fact "must be particular to the claim raised and the relief sought." Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd., 726 F.3d 62, 80 (2d Cir. 2013).

### B. Analysis

#### 1. Certification, Registration, and Notification Requirement Injury

**\*6** First, the Court concludes plaintiff has standing to bring his substantive due process and equal protection challenges to SORA because he has plausibly alleged he has been injured by SORA's certification, registration, and notification provisions, as applied to Level 2 Offenders. Here, because plaintiff was convicted of a sex offense, he was certified by the sentencing court as a sex offender, is required to register as a sex offender under SORA or face criminal prosecution, and his information is available to the public pursuant to SORA's notification provision. "This is a very real injury" and is traceable to SORA, because "if the Court grants [plaintiff's] requested relief, [he] will no longer be required to register." See, e.g., Doe v. Wasden, 558 F. Supp. 3d 892, 904 (D. Idaho 2021) (analyzing Idaho's version of SORA), appeal dismissed per stipulation, 2022 WL 19333636 (9th Cir. Dec. 12, 2022). Likewise, if the Court were to declare SORA unconstitutional, plaintiff would no longer be certified as a

sex offender subject to SORA and his information would not be released pursuant to SORA's notification provision.

Accordingly, plaintiff's alleged injuries caused by SORA's certification, registration, and notification requirements are concrete, traceable to SORA, and confer standing to challenge SORA.

#### 2. Other Injuries

However, plaintiff alleges his injuries are "broader than mere registration requirements or the police notification/ communication of registrant's information to community members. This Complaint attacks the broader scheme that begins with the certification and designation of offenders as 'sex offenders' and the profusion of laws and restrictions that follow" which lead to "oppression and relegation of those designated as [sex offenders to] second-rate or lesser citizens." (Compl. at 31). Plaintiff does not explicitly challenge the constitutionality of these other "laws and restrictions that follow" upon a SORA certification designation (id.); instead, he alleges these injuries support his substantive due process challenge to SORA.

Specifically, plaintiff alleges sex offenders are prohibited from living within 1,000 feet of a school under another New York statute, SARA. Further, he contends "NYS DOCCS directives and policies ... impede travel rights, job-training, and arbitrarily restrict parolee sex offender's freedoms merely for being subject to the State's Sex Offender Registry. (Compl. at 40).

The Court addresses each claimed injury in turn.

#### a. Residency Restriction

The Court concludes plaintiff's injuries from the residency restrictions imposed by SARA are not fairly traceable to SORA's certification, registration, and notification provisions, and do not confer plaintiff with standing to challenge SORA on substantive due process grounds.

SARA "bar[s] offenders convicted of certain sex offenses from residing within 1,000 feet of a school" (the "SARA Residency Restriction"). Alvarez v. Annucci, 38 N.Y.3d 974, 976 (2022) (citing N.Y. Exec. Law § 259-c; N.Y. Penal Law § 220.24(b)). The SARA Residency Restriction applies to "a

person serving a sentence for an offense defined in article one hundred thirty ... of the penal law and the victim of such offense was under the age of eighteen at the time of such offense or such person has been designated a level three sex offender pursuant to subdivision six of section one hundred sixty-eight-l of the correction law." N.Y. Exec. Law § 259-c(14) (emphasis added).

Here, plaintiff was not designated a Level 3 sex offender under SORA. Accordingly, he is not subject to the SARA Residency Restriction because of his SORA risk assessment level. Instead, plaintiff is subject to the SARA Residency Restriction because he is serving a sentence on parole, resulting from convictions under article 130 of the New York Penal Law, specifically, his convictions for sexual abuse in the first degree and attempted sexual abuse in the first degree under Section 130.65(2) and forcible touching under Section 130.52. These convictions stemmed from plaintiff engaging in sexual conduct involving minors who were fifteen years old.

**\*7** Thus, even if the Court were to invalidate SORA's certification, registration, or notification provisions herein, plaintiff would still be subject to the SARA Residency Requirement and prohibited from residing within 1,000 feet of a school. Moreover, plaintiff has not launched a substantive due process challenge against SARA. Thus, he lacks standing to pursue claims challenging SORA based on injuries imposed by SARA, which are not traceable to or caused by the provisions of SORA plaintiff is challenging.

b. Job-Training Restriction

Likewise, the Court determines plaintiff lacks standing to challenge SORA based on injuries he allegedly suffered when he was denied job training opportunities, because such injuries are not traceable to SORA's certification, registration, or notification provisions or the defendants sued herein.

Plaintiff alleges "[i]n August 2021 [he] personally was denied admission into a Computer Operator vocational class [in prison] that provided certification in Microsoft Office programs." (Compl. at 41). Plaintiff allegedly filed a grievance regarding this decision and alleges "[t]he reason for [plaintiff's] rejection from such program was due to [his] 'Instant Offense of Sexual Abuse 1st' which the prison SORC referenced was in conformity with DOCCS policy as outlined in April 2021 department memorandum." (Id.).

The April 2021 DOCCS memorandum, which plaintiff attaches as an exhibit to the complaint, states "Mandatory Sex Offenders **are excluded** from participating in computer technology programs" and includes individuals "[s]ubject to registration with the New York State Sex Offender Registry" as mandatory sex offenders. (Doc. #2-1 at ECF 36).

Plaintiff further alleges DOCCS "exclude[d] incarcerated individuals with a 'sex offense on record' from participating in the NYS DMV Call Center job-training program." (Compl. at 41). Plaintiff filed a grievance challenging the policy excluding sex offenders from the DMV program; in response, "[it] was explained to [plaintiff] at a grievance hearing that such an exclusion was a clause in the contract between DOCCS and DMV." (Id. at 42; see Doc. #2-1 at ECF 37).

As to the Computer Operator program, plaintiff alleges DOCCS policy prohibited individuals who were "subject to" the sex offender registry from enrolling. Although certification under SORA subjects sex offenders to SORA's registration requirements, plaintiff's injury of being excluded from this program is too attenuated to support a substantive due process challenge to SORA against Board Examiner Sherman and Governor Hochul. Plaintiff does not sue the Commissioner of DOCCS or the Deputy Commissioner for Program Services who authored the relevant memorandum. Further, he only seeks to challenge SORA, not the constitutionality of the DOCCS policy itself. There must "be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Lujan v. Defs. of Wildlife, 504 U.S. at 560 (emphasis added). Here, DOCCS's independent decision to exclude SORA-certified inmates from computer training is not fairly traceable to defendants Sherman or Hochul.

Moreover, plaintiff was excluded from the DMV job training because of his sex offense convictions and a contract between DOCCS and DMV, not the SORA provisions he seeks to challenge. Such injuries cannot support a substantive due process challenge to SORA because plaintiff has not plausibly alleged these injuries are traceable to SORA's certification, notification, or registration provisions.

**\*8** Accordingly, plaintiff does not have standing to challenge SORA on substantive due process grounds based on his purported exclusion from job training.

### c. Intrastate Travel Restriction

Finally, plaintiff lacks standing to challenge SORA based on purported injuries from being prohibited from traveling within New York without prior approval of his parole officer, because this injury is not caused by SORA's certification, registration, or notification provisions.

Plaintiff alleges DOCCS Directive 9240 permits parolees convicted of crimes to travel within New York state without a written travel permit if they "are not deemed a high-risk parolee as defined in Section III-E" of the Directive. (Compl. at 42; see Doc. #2-1 at ECF 23–26). However, under Section III-E, "high-risk" parolees include "Registered and Discretionary Sex Offenders." (Compl. at 42). Such high-risk parolees, including registered and discretionary sex offenders, "must obtain approval from the Parole Officer prior to the proposed dates of travel" within New York state." (Id.). Thus, DOCCS's policy of restricting sex offenders on parole from traveling within the state without prior permission is not limited to sex offenders subject to SORA's certification, registration, and notification provisions; Directive 9240 equally applies to "discretionary sex offenders," which plaintiff alleges are those sex offenders "not subject to SORA." (Id. at 41). Accordingly, drawing all inferences in plaintiff's favor, he would still be deemed a high-risk parolee subject to intra-state travel restrictions because of the offenses of which he was convicted, even if he were not subject to SORA. Thus, if the Court were to invalidate SORA's certification, notification, and registration provisions, plaintiff's injury would not be redressed and he would still not be free to travel within the state without permission.

Accordingly, plaintiff lacks standing to pursue a substantive due process challenge to SORA based on his purported injuries caused by DOCCS's intrastate travel restrictions.

### IV. Equal Protection Claim

Defendants argue plaintiff fails to state an equal protection claim because sex offenders are not similarly situated with offenders who are convicted of non-sex crimes.

The Court agrees.

"The equal protection clause directs state actors to treat similarly situated people alike." Giano v. Senkowski, 54 F.3d 1050, 1057 (2d Cir. 1995). "Where, as here, Plaintiff does not claim to be a member of a protected class, he may bring an equal protection claim under one of two theories: selective enforcement or class of one." Rankel v. Town of Somers, 999 F. Supp. 2d 527, 544 (S.D.N.Y. 2014).

"A class-of-one claim exists 'where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.' " Analytical Diagnostic Labs, Inc. v. Kusel, 626 F.3d 135, 140 (2d Cir. 2010) (quoting Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)). To state a class-of-one claim, the plaintiff must identify at least one individual with whom he can be compared. King v. N.Y. State Div. of Parole, 260 F. App'x 375, 380 (2d Cir. 2008) (summary order) (affirming dismissal of claim because plaintiff "failed to identify a single individual with whom he can be compared for Equal Protection purposes").

**\*9** "Class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." Ruston v. Town Bd. for Town of Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010). "Because of the particular posture of a 'class of one' claim, the comparator's circumstances must be 'prima facie identical.' " Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011) (quoting Neilson v. D'Angelis, 409 F.3d 100, 105 (2d Cir. 2005), overruled on other grounds by Appel v. Spiridon, 531 F.3d 138 (2d Cir. 2018)). The comparison to similarly situated individuals should "provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate government policy that an improper purpose—whether personal or otherwise—is all but certain." Neilson v. D'Angelis, 409 F.3d at 105.

"It is well established that this pleading standard is demanding." Hampshire Recreation, LLC v. Vill. of Mamaroneck, 2016 WL 1181727, at *6 (S.D.N.Y. Mar. 25, 2016), aff'd, 664 F. App'x 98 (2d Cir. 2016) (summary order).

Here, plaintiff alleges he is "a class of one and that he and all certified and registered sex offenders in New York State are intentionally being subjected to invidious discrimination as 'despised' members of society," namely "the different treatment that a person convicted of a sex offense must go through in Article 6-C certification leading to registration and subject to notification provisions, AND by the supplemental and collateral impositions and prohibitions

Kelsey v. Sherman, Slip Copy (2023)

2023 WL 3739925

that the New York State government demands of we sex offenders, but <u>not of similarly situated criminals convicted of other crimes.</u>" (Compl. at 21) (emphasis added).

The Court concludes sex offenders, such as plaintiff, and people convicted of non-sex offenses are not similarly situated. "[F]elons who commit different crimes are not similarly situated." <u>Kasiem v. Paterson,</u> 2011 WL 723612, at *2 (S.D.N.Y. Feb. 18, 2011). And, in <u>Petitpas v. Martin,</u> the Second Circuit rejected an inmate's equal protection challenge to a prison risk assessment system, which allegedly prohibited inmates with higher "sex treatment need scores" from reducing their overall prison risk levels, as opposed to inmates without "sex treatment need scores" who were able to reduce their overall prison risk levels. 2021 WL 6101469, at **1-2 (2d Cir. Dec. 22, 2021) (summary order). In that case, the Second Circuit found the plaintiff had not established the requisite level of similarity for a class-of-one claim, because "none of these proffered comparators— whether described generally as 'other inmates' or individually as specific inmates who received risk level reductions— are sex offenders, which is a basic difference motivating their disparate treatment" from the plaintiff, who was a sex offender. <u>Id. at *2</u> (collecting cases holding sex offenders are not similarly situated to non-sex offenders).

Accordingly, plaintiff has failed plausibly to allege an equal protection claim.

**V.** <u>Substantive Due Process Claim</u>

**A.** <u>Legal Standard</u>

The Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Cont. amend. XIV § 1. "Substantive due process is an outer limit on the legitimacy of governmental action," <u>Natale v. Town of Ridgefield,</u> 170 F.3d 258, 263 (2d Cir. 1999), which "protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." <u>Kaluczky v. City of White Plains,</u> 57 F.3d 202, 211 (2d Cir. 1995).

**\*10** To determine whether a statute or regulation "infringes a substantive due process right," the Court first must determine "whether the right is fundamental." <u>Goe v. Zucker,</u> 43 F.4th 19, 30 (2d Cir. 2022), <u>cert. denied,</u> 143 S. Ct. 1020 (2023). "Rights are fundamental when they are implicit in the concept of ordered liberty, or deeply rooted in this Nation's history and

tradition." <u>Id.</u> When an infringed right is fundamental, courts "apply strict scrutiny, and the government regulation must be narrowly tailored to serve a compelling state interest." <u>Id.</u> However, "[w]hen a claimed right is not fundamental," the Court applies "rational basis review, and the government regulation need only be reasonably related to a legitimate state objective." <u>Id.</u> [6]

[6]    To the extent plaintiff alleges the stigma-plus test applies to his substantive due process claim, he is incorrect. The stigma-plus test applies to <u>procedural</u> due process claims. <u>See, e.g., Doe v. Mich. Dep't of State Police,</u> 490 F.3d 491, 502 (6th Cir. 2007) ("Our review of the caselaw has failed to identify any case that applies the stigma-plus test to a substantive due process claim.").

**B.** <u>Punitive Nature of SORA</u>

Defendants argue plaintiff's claim that SORA's certification, registration, and notification provisions are "punishment" should be analyzed under the Eighth Amendment and must be dismissed.

The Court disagrees that plaintiff's claims arise under the Eighth Amendment, but nevertheless concludes plaintiff fails to state a substantive due process claim under the Fourteenth Amendment.

Plaintiff alleges "the certifying act labeling a convict as a sex offender is a form of punishment" and that SORA "is in fact punitive thereby subjecting it to 14th Amendment scrutiny." (Compl. at 5–6). Further, plaintiff requests the Court "extend[ ] constitutional oversight to government actions" that are generally "labeled as civil or police-powered regulatory measures" by applying the Fourteenth Amendment to plaintiff's "grievances" regarding SORA's "punitive nature." (<u>Id.</u> at 6). Plaintiff notes other courts have not "expressly considered whether the certifying act labeling a convict as a sex offender is a form of punishment" (<u>id.</u> at 5) and sex offenders such as plaintiff are "subjected to decades or lifetimes of stigmatizing certification, registration, and notification provisions of SORA not due to any genuine threat of recidivism." (<u>Id.</u> at 13)

**1.** <u>Applicable Constitutional Amendment</u>

First, defendants assert plaintiff's substantive due process claims should be analyzed under the Eighth Amendment, because (i) plaintiff's allegations concern the purportedly punitive nature of SORA's certification, notification, and registration requirements, and (ii) plaintiff is on parole and thus a post-conviction litigant.

Generally, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." City of Sacramento v. Lewis, 523 U.S. 833, 842 (1998). However, the Second Circuit has continued to consider substantive due process challenges to punishments imposed on convicts, without merging such claims into Eighth Amendment challenges. See, e.g., United States v. Quinones, 313 F.3d 49, 70 n.18 (2d Cir. 2002) (finding a convict's Eighth Amendment challenge to the death penalty was foreclosed by Supreme Court precedent, but considering his Fifth Amendment substantive due process challenge). In the context of capital punishment, for example, the Second Circuit has recognized "substantive due process rights afford limited protection in the context of punishment beyond the protection provided by Eighth Amendment." See id.

*11 Accordingly, the Court determines it is appropriate to consider plaintiff's claims regarding SORA's purportedly punitive nature as pleaded—i.e., as a substantive due process claim under the Fourteenth Amendment—rather than under the Eight Amendment.

## 2. SORA's Purportedly Punitive Nature

Plaintiff alleges "SORA is a punitive statute" and, in contrast to prior ex post facto challenges to SORA, plaintiff requests the Court "consider whether the certification and sex offender classification is itself unconstitutional and punitive ... from the perspective of the 14th Amendment not the ex post facto clause." (Opp. at 7).

Although plaintiff acknowledges no court has held SORA is punitive, he nevertheless urges the Court to declare it punitive in violation of substantive due process by arguing those other courts only considered SORA's registration and notification provisions, not the certification provision. (Opp. at 5). Therefore, plaintiff argues SORA violates his substantive due process rights by infringing his right to be

free from punishment (i.e., the punishment of certification, registration, and notification), notwithstanding that recent research allegedly undermines the likelihood of sex offenders to recidivate, which was the legislature's goal in enacting SORA.

As the Second Circuit recognized in Doe v. Cuomo, "[t]he State is free ... to make 'reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences.' " 755 F.3d at 110 (quoting Smith v. Doe, 538 U.S. 84, 103 (2003)). [7] Nevertheless, courts will sometimes consider whether a law that "is intended to be civil or regulatory" has an "effect [that] is punitive" by considering factors such as "whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." Id. (quoting Smith v. Doe, 538 U.S. at 97).

7    Although plaintiff emphasizes he is not bringing an ex post facto challenge, precedent challenging SORA under the Ex Post Facto Clause—i.e., cases discussing whether SORA unconstitutionally increases the punishment for a crime after it is committed—is relevant in determining whether SORA is unconstitutionally punitive on a prospective basis.

The Second Circuit has determined SORA's notification and registration provisions are not punishment. See Doe v. Cuomo, 755 F.3d at 110–13; Doe v. Pataki, 120 F.3d 1263, 1273 (2d Cir. 1997). The Second Circuit's reasons for finding these provisions non-punitive under the Ex Post Facto clause support a finding that SORA's notification and registration provisions likewise are not punishment prospectively for substantive due process purposes. For example, the Circuit found "strong evidence of [SORA's notification provisions'] nonpunitive nature" in "(1) the calibration of notification requirements to the offender's perceived risk of re-offense; (2) the regulation of public access to and limitations on dissemination of registrant information; and (3) the protections against misuse of information." Id. at 110. The Circuit also noted a bill jacket and accompanying materials for a 2006 amendment to SORA's registration and notification provisions indicate the legislature acted "out of a concern for public safety." Id. Similarly, the Circuit found the registration provisions "serve[ ] the general goal of protecting

members of the public from the potential dangers posed by convicted sex offenders," and "the duration, form, and frequency of registration were calibrated to the offender's risk classification." Id. at 112.

**\*12** These considerations apply equally to plaintiff's claim that the notification and registration provisions are punitive, and weigh against it. Thus, because the Court concludes these provisions are not punitive, plaintiff has not plausibly alleged any fundamental right is infringed by SORA's notification and registration provisions.

Likewise, the Court concludes SORA's certification provision is not punishment. SORA's certification requirements provide, "[p]ursuant to Correction Law § 168–d(1)(a), the court shall certify that the person is a sex offender based upon his or her conviction of certain enumerated offenses set forth in Correction Law § 168–a(2) and (3), and shall include the certification in the order of commitment, if any, and the judgment of conviction." People v. Matos, 209 A.D.3d 19, 24 (2d Dep't 2022), leave to appeal denied, 39 N.Y.3d 905 (2022). Under New York law, "sex offender certification pursuant to Correction Law § 168–d(1) is distinct from a risk level determination." Id. "Although certification under SORA "is pronounced [by the court] at sentencing" and "is effected by operation of law upon conviction," the New York Court of Appeals has held that "SORA certification is not part of a [criminal] sentence," and "it is evident that the entire SORA statutory scheme is designed to have a remedial and non-penal effect." People v. Buyund, 37 N.Y.3d 532, 537–40 (2021) (quoting People v. Hernandez, 93 N.Y.2d 261, 267 (1999)). In fact, the "most significant adverse effects" of SORA certification "result from information most of which" would be publicly available aside from SORA and "flow essentially from the fact of the underlying conviction." Doe v. Cuomo, 755 F.3d at 111 (quoting Doe v. Pataki, 120 F.3d at 1278, 1280).

Therefore, plaintiff does not plausibly allege the punitive stigma he faces is a consequence of SORA certification itself, as opposed to his conviction for sex offenses involving minors. Because plaintiff has not plausibly alleged certification under SORA subjected him to punishment, he has not alleged SORA's certification provisions infringe a fundamental right.

### C. Rational Basis Review

Because freedom from sex offender certification, registration, and notification is "not a 'fundamental right,' as that term

is used in constitutional analysis, this Court must apply the 'rational basis' test, which does not ask whether the statute is wise, nor even whether it is substantially related to an important government objective, but only whether it is 'rationally related to a legitimate government interest.' " Yunus v. Robinson, 2018 WL 3455408, at \*21 (S.D.N.Y. June 29, 2018) ("freedom from sex offender registration is not a fundamental right") (quoting Winston v. City of Syracuse, 887 F.3d 553, 566 (2d Cir. 2018)), report and recommendation adopted 2019 WL 168544 (S.D.N.Y. Jan. 11, 2019); see Spiteri v. Russo, 2013 WL 4806960, at \*27 (E.D.N.Y. Sept. 7, 2013) ("Federal courts in this Circuit and across the country have ruled, similarly to the courts in New York, that a rational basis test is the correct level of scrutiny to be applied where there is a challenge to a sex offender registration requirement.") (collecting cases), aff'd sub nom., Spiteri v. Camacho, 622 F. App'x 9 (2d Cir. 2015) (summary order); People v. Knox, 12 N.Y.3d at 67.

The Court concludes SORA's certification, registration, and notification requirements are all reasonably related to a legitimate state objective.

**\*13** SORA was enacted to combat "the danger of recidivism posed by sex offenders, especially those sexually violent offenders who commit predatory acts characterized by repetitive and compulsive behavior" and to assist the state to "identify, investigate, apprehend and prosecute sex offenders." 1995 N.Y. Sess. Laws ch. 192 § 1. As the Court of Appeals has noted, SORA was enacted to protect vulnerable populations from sex offenders, prevent future sex offenses, and monitor sex offenders. See Spiteri v. Russo, 2013 WL 48060960, at \*28 (collecting cases).

Each of these state interests are rationally related to (i) requiring courts to certify, at the time of sentencing, that individuals convicted of sex offenses are subject to SORA so that a risk assessment will be conducted and so offenders can properly be monitored; (ii) reporting information about sex offenders on a public sex offender registry; and (iii) notifying the public, particularly vulnerable groups, about sex offenders. See, e.g., Doe v. Cuomo, 755 F.3d at 114 (affirming dismissal of substantive due process challenge to SORA's registration and notification provisions based on alleged infringement of plaintiff's right to privacy of personal information because SORA requirements "are rationally related to the aim of protecting public safety" and no fundamental right was violated).

Kelsey v. Sherman, Slip Copy (2023)

2023 WL 3739925

Accordingly, plaintiff's substantive due process claims must be dismissed.

## VI. Leave to Replead

A district court ordinarily should not dismiss a pro se complaint for failure to state a claim "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000) (quoting Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795 (2d Cir. 1999)). Here, reading the complaint liberally, no allegations suggest plaintiff has a valid substantive due process or equal protection claim that he "inadequately or inartfully pleaded" and therefore should be "given a chance to reframe." Id. To the contrary, the Court finds that repleading these claims would be futile, because the problems with plaintiff's causes of action are substantive, and supplementary and/or improved pleading will not cure their deficiencies. See id.

However, to the extent plaintiff attempted to raise Fourteenth Amendment procedural due process and First Amendment claims in his opposition to the motion to dismiss, the Court grants plaintiff leave to reframe these claims.

Accordingly, although he is not required to do so, if plaintiff wishes to pursue a First Amendment claim or a Fourteenth Amendment procedural due process claim, he may file an amended complaint. To the greatest extent possible, plaintiff's amended complaint must address the deficiencies identified in this Opinion and Order.

To be clear, the Court is permitting (but not requiring) plaintiff to file an amended complaint, to pursue only First Amendment and Fourteenth Amendment procedural due process claims. Plaintiff is not granted leave to file an amended complaint containing substantive due process or equal protection claims.

**The amended complaint will completely replace, not supplement, the existing complaint.** Therefore, plaintiff must include in the amended complaint all information necessary for these claims, including all relevant allegations from his original complaint and opposition.

## CONCLUSION

The motion to dismiss is GRANTED.

All of plaintiff's claims are dismissed.

Plaintiff is granted leave, should he wish to do so, to amend his complaint, in accordance with the instructions above. By June 30, 2023, plaintiff shall file his amended complaint. If plaintiff fails to file an amended complaint by June 30, 2023, the Court will enter judgment in defendants' favor and close this case.

**\*14** The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purposes of an appeal. Cf. Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

## All Citations

Slip Copy, 2023 WL 3739925

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Medina v. Cuomo, Not Reported in Fed. Supp. (2016)

2016 WL 756539

2016 WL 756539
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Richard D. MEDINA, Plaintiff,

v.

Andrew CUOMO, Governor, State of New
York; and Dean G. Skelos, Former Senate
Majority Leader and Deputy Majority Leader and
Current Member of the NYS Senate, Defendants.

7:15-CV-1283 (GTS/TWD)
|
Signed 02/25/2016

**Attorneys and Law Firms**

RICHARD D. MEDINA, Plaintiff, Pro Se, 24098 Route 12,
Watertown, New York 13601.

### DECISION and ORDER

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Richard D. Medina ("Plaintiff") against the
two above-captioned New York State officials ("Defendants")
pursuant to 42 U.S.C. § 1983, are the following: (1)
Plaintiff's motion for a preliminary injunction; (2) United
States Magistrate Judge Thérèse Wiley Dancks' Report-
Recommendation recommending that Plaintiff's Complaint
be *sua sponte* dismissed (in part with prejudice and in part
without prejudice) pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-
(iii); (3) Plaintiff's motion to include two summonses with
his Complaint; and (4) Plaintiff's Objections to the Report-
Recommendation. (Dkt. Nos. 3, 8, 9, 10.) For the reasons set
forth below, Plaintiff's motion to include two summonses with
his Complaint is granted; Plaintiff's Objects to the Report-
Recommendation are rejected; Magistrate Judge Dancks'
Report-Recommendation is accepted and adopted in its
entirety; the claims asserted in Plaintiff's Complaint are
dismissed with prejudice, dismissed without prejudice or
conditionally dismissed as explained below in this Decision
and Order; and Plaintiff's motion for a preliminary injunction
is denied.

### I. RELEVANT BACKGROUND

#### A. Magistrate Judge Dancks' Report-Recommendation

In her Report-Recommendation, Magistrate Judge Dancks
essentially rendered three recommendations: (1) that
Plaintiff's federal claims against Defendants Cuomo and
Skelos be dismissed with prejudice based on several
grounds (including absolute legislative immunity, Eleventh
Amendment immunity, and/or failure to state a claim); (2)
that the Court decline to exercise supplemental jurisdiction
over Plaintiff's remaining state law and state constitutional
claims, and dismiss those claims without prejudice to their
refiling in state court; and (3) that, prior to the closure of this
action, Plaintiff be permitted to amend his Complaint to assert
any federal claims that he may have against *other*, properly
named individuals with regard to the alleged Jefferson County
Sheriff's Department registration matter (i.e., the alleged
failure to allow Plaintiff to use the address "homeless" when
he performed his ninety-day registration and verification
under New York Sex Offender Registration Act of 1995 in
or about August 2015, and the alleged inclusion against his
wishes of an incorrect address on the registration signed by
him). (Dkt. No. 8, at Part IV.)

#### B. Plaintiff's Objections to the Report-Recommendation

Generally, in his 132-page Objections, Plaintiff argues that
the Court should reject the Report-Recommendation for
numerous reasons, most notably the following: (1) that,
because Plaintiff is proceeding *pro se*, his Complaint should
be construed with special solicitude; (2) that, because
SORA is a federally funded program, Defendants' "official
capacity sovereign immunity" has been waived; (3) that,
because Defendants may have created customs or policies
under which the alleged constitutional violations occurred,
Defendants may have been personally involved in those
alleged violations; (4) that SORA's requirements are a form
of indentured servitude that violates Plaintiff's rights under
the Thirteenth and Fourteenth Amendments; (5) that, because
Plaintiff's designation as "sexually violent, dangerous and
likely to reoffend" is a stigma that Plaintiff will have all his
life, it is a violation of Plaintiff's various First Amendment
rights; (6) that, in 2004, Plaintiff received ineffective
assistance of counsel with respect to his designation and
its consequences; (7) that SORA's requirements violate
Plaintiff's Fifth Amendment rights against self-incrimination;
and (8) that, before the Court dismiss Plaintiff's claims, it
should permit him to amend them. (*See, e.g.,* Dkt. No. 10, at
¶¶ 5, 8, 11.a., 11.c., 14, 15, 23, 25, 27, 28, 33, 36, 42-45, 49,

Medina v. Cuomo, Not Reported in Fed. Supp. (2016)

2016 WL 756539

65, 66, 78, 84, 88, 88.a., 91, 101, 101.a., 105, 106, 108, 110, 115, 117, 118, 124, 126, 127, 131.d., 133, 134, 142, 144, 148.)

## II. STANDARD OF REVIEW

**\*2** When a *specific* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c). [1] When performing such a *de novo* review, "[t]he judge may ... receive further evidence. ..." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. [2] Similarly, a district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance. *See Zhao v. State Univ. of N.Y.*, 04-CV-0210, 2011 WL 3610717, at \*1 (E.D.N.Y. Aug. 15, 2011) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley*, 752 F. Supp.2d 311, 312-13 (W.D.N.Y. 2009) ("In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks omitted).

[1]    *See also Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by

legal authority, was not sufficient to preserve the Title VII claim.").

[2]    *See Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137-38 (2d Cir. 1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40, n.3 (2d Cir. 1990) (finding that district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U. S. v. Raddatz*, 447 U.S. 667, 676, n.3 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b)(2),(3); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition; *see also Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at \*2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion*, 175 F.3d 1007 (2d Cir. 1999). Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review. [3] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.* [4]

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 221 of 236

Medina v. Cuomo, Not Reported in Fed. Supp. (2016)

2016 WL 756539

3    *See Mario*, 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed. R. Civ. P. 72(b) or Local Civil Rule 72.3(a) (3)."); *Camardo v. Gen. Motors Hourly-Rate Emp. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady*, 09-CV-0924, 2010 WL 3761902, at *1, n.1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue*, 07-CV-1077, 2010 WL 2985968, at *3 & n.3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole*, 04-CV-0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

4    *See also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

**\*3**  After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

## III. ANALYSIS

After carefully reviewing the relevant papers herein, including Magistrate Judge Dancks' thorough Report-Recommendation, the Court can find no error in those parts of the Report-Recommendation to which Plaintiff specifically objected, and no clear error in the remaining parts of the Report-Recommendation: Magistrate Judge Dancks employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Report-Recommendation is accepted and adopted in its entirety for the reasons stated therein. To those reasons, the Court adds three points.

First, the Court construes the Report-Recommendation's recommendation of a dismissal of certain claims without prejudice to refiling in this Court to mean a *conditional* dismissal of those claims with prejudice, i.e., a dismissal

of those claims with prejudice *unless* the defects identified in them are corrected in an Amended Complaint filed in this Court during the pendency of this action. The Court so construes the Report-Recommendation because the dismissal of the Complaint in its entirety before the filing of an Amended Complaint would deprive the Court of jurisdiction to consider the Amended Complaint; similarly, the dismissal of any portion of the Complaint without prejudice to refiling in another action in this Court would (under the circumstances) unnecessarily duplicate this action.

Second, even when construed liberally, Plaintiff's first and eighth arguments for rejecting the Report-Recommendation (summarized above in Part I.B. of this Decision and Order) do not contain a *specific* challenge to a finding or conclusion contained in the Report-Recommendation. In any event, the Court has, in fact, afforded Plaintiff special solicitude in its construction of his Complaint; and such special solicitude does not excuse a *pro se* litigant from having to comply with Rules 8 and 12 of the Federal Rules of Civil Procedure.[5] Moreover, the Court is permitting him to amend certain of his claims before dismissal.

5    *See Cusamano v. Sobek*, 604 F. Supp.2d 416, 426-27 & n.4 (N.D.N.Y. 2009) (Suddaby, J.) ("As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.") (collecting cases).

Third, Plaintiff's motion for a preliminary injunction is denied on each of two grounds: (1) he has failed to show irreparable harm; and (2) he has failed to show either (a) a likelihood of success on the merits, or (b) a sufficiently serious question as to the merits of the case to make it a fair ground for litigation coupled with a balance of hardships tipping decidedly in his favor.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's motion to include two summonses with his Complaint (Dkt. No. 9) is **GRANTED**; and it is further

**ORDERED** that Magistrate Judge Dancks' Report-Recommendation (Dkt. No. 8) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

2016 WL 756539

**ORDERED** that the **federal claims** asserted against Defendants Cuomo and Skelos in Plaintiff's Complaint (Dkt. No. 1) are **DISMISSED with prejudice**, and the **state law and state constitutional claims** asserted in the Complaint are **DISMISSED without prejudice** to their refiling in state court, **UNLESS**, within **THIRTY (30) DAYS** of the date of this Decision and Order, Plaintiff files an **AMENDED COMPLAINT** that assert any viable federal claims that he may have against *other*, properly named individuals with regard to the alleged Jefferson County Sheriff's Department registration matter (i.e., the alleged failure to allow Plaintiff to use the address "homeless" when he performed his ninety-day registration and verification under New York Sex Offender Registration Act of 1995 in or about August 2015, and the alleged inclusion against his wishes of an incorrect address on the registration signed by him); and it is further

**\*4 ORDERED** that Plaintiff's Amended Complaint shall be a complete pleading that supersedes his original Complaint in all respects (and does not incorporate by reference any portion of that Complaint), and shall not attempt to reassert his defective claims against Defendants Cuomo and Skelos; and it is further

**ORDERED** that, in the event Plaintiff does file an Amended Complaint, it is referred to Magistrate Judge Dancks for initial review under 28 U.S.C. § 1915(e)(2)(B); and it is further

**ORDERED** that Plaintiff's motion for a preliminary injunction (Dkt. No. 3) is **DENIED**.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 756539

---

    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    4

Medina v. Cuomo, Not Reported in Fed. Supp. (2015)

2015 WL 13744627

2015 WL 13744627
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Richard D. MEDINA, Plaintiff,

v.

Andrew CUOMO, Governor, State of New
York, Dean G. Skelos, Former Senate Majority
Leader Deputy Majority Leader and Current
Member of the NYS Senate, Defendants.

7:15-CV-01283 (GTS/TWD)
|
Signed 11/09/2015

**Attorneys and Law Firms**

RICHARD D. MEDINA, Plaintiff, Pro Se, 1729 Burns
Avenue Apt. C, Watertown, NY 13601.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

**\*1** The Clerk has sent Plaintiff Richard D. Medina's pro
se civil rights complaint, brought under 42 U.S.C. § 1983,
together with an application to proceed in *forma pauperis*
("IFP Application"), to the Court for review. (Dkt. Nos. 1 and
2.) Plaintiff's lawsuit, commenced against the Governor of
New York State, Andrew Cuomo ("Governor Cuomo") and
New York State Senator Dean G. Skelos ("Senator Skelos"),
challenges, among other things, the constitutionality of the
New York Sex Offender Registration Act of 1995, commonly
referred to as "Megan's Law" and codified at New York
Correction Law ("Corr. Law") §§ 168 to 168-w ("SORA").
(*See generally* Dkt. No. 1.)

In his rambling 256 page complaint, Plaintiff has asserted
thirty-four numbered causes of action, which include
federal constitutional and statutory claims, a New York
state constitutional claim, and a number state law tort
claims. Plaintiff seeks compensatory and punitive damages,
injunctive and declaratory relief, and an award of attorney's
fees. [1] (Dkt. No. 1 at ¶¶ 373-86.)

[1]     Plaintiff is seeking relief against not only the named
        Defendants but their "agents, persons working with
        them or on their behalf, their servants, who in their
        individual capacity and official capacity, and who
        knew or should have known, while acting under
        color of state law," of the deprivation of Plaintiff's
        rights and the irreparable harm suffered by him
        as a result of the "enactment, implementation,
        administration, and enforcement" of SORA. (Dkt.
        No. 1 at 1-2.) The Court's initial review of the
        complaint under 28 U.S.C. § 1915(e)(2)(B)(i)-(iii)
        is limited to the named Defendants.

**I. IFP APPLICATION**
A court may grant in *forma pauperis* status if a party "is
unable to pay" the standard fee for commencing an action.
28 U.S.C. § 1915(a)(1) (2006). After reviewing Plaintiff's IFP
Application (Dkt. No. 2), the Court finds that he meets the
standard and his IPF Application is granted. [2]

[2]     Plaintiff should note that although the application
        to proceed in *forma pauperis* has been granted,
        Plaintiff will still be required to pay fees that he
        may incur in this action, including copying and/or
        witness fees.

**II. LEGAL STANDARDS FOR INITIAL REVIEW**
Even when a plaintiff meets the financial criteria for in *forma
pauperis*, 28 U.S.C. § 1915(e) directs that when a plaintiff
proceeds in *forma pauperis*, "the court shall dismiss the case
at any time if the court determines that ... the action ... (i)
is frivolous or malicious; (ii) fails to state a claim on which
relief may be granted; or (iii) seeks monetary relief against
a defendant who is immune from such relief." 28 U.S.C. §
1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must
look to see whether the complaint lacks an arguable basis
either in law or in fact. *Neitzke v. Williams*, 490 U.S. 319,
325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). "An action is
frivolous when either: (1) the factual contentions are clearly
baseless such as when the claims are the product of delusion
or fantasy; or (2) the claim is based on an indisputably
meritless legal theory." *Livingston v. Adirondack Beverage
Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (citations and internal
quotation marks omitted). Although extreme caution should
be exercised in ordering *sua sponte* dismissal of a *pro se*
complaint before the adverse party has been served and the

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 224 of 236

Medina v. Cuomo, Not Reported in Fed. Supp. (2015)

2015 WL 13744627

parties must have had an opportunity to respond, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983), the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *See, e.g., Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (per curiam) (holding that a district court has the power to dismiss a complaint *sua sponte* if the complaint is frivolous).

**\*2**  To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me accusation." *Id.* In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Where a plaintiff proceeds *pro se*, the pleadings must be read liberally and construed to raise the strongest arguments they suggest. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citation omitted). A *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## III. PLAINTIFF'S COMPLAINT

### A. Factual Allegations [3]

[3]    The Court has considered both the complaint and the papers submitted by Plaintiff in support of his pending motion for a preliminary injunction (Dkt. No. 3) in its initial review.

On or about September 10, 2004, Plaintiff, who describes himself as homeless, was convicted of Sexual Abuse First Degree (N.Y. Penal Law § 130.65), a D felony; Sexual Abuse Second Degree (N.Y. Penal Law § 130.60), a class A misdemeanor; and Third Degree Sexual Abuse (N.Y. Penal Law § 130.55), a class B misdemeanor. (Dkt. No. 1 at ¶ 10.) Plaintiff was sentenced to two and a half years in state prison and three years post release supervision. *Id.* Plaintiff is not challenging his conviction, which appears to have been as the result of a guilty plea, in this lawsuit. *Id.* at ¶¶ 11-12.

Plaintiff alleges that he was not advised at the time of his plea allocution that he was being subjected to or sentenced under a "violent offense" statute and was not advised by his attorney or the sentencing court of the imposition or consequences of SORA prior to his sentencing. *Id.* at ¶¶ 12-13. Plaintiff remembers asking his attorney at the sentencing to question the Hon. Kim H. Martusewicz, Jefferson County Court Judge, about his status under SORA and recalls his attorney requesting a level 2 status. *Id.* at ¶¶ 14-15. Judge Martusewicz responded that Plaintiff's status under SORA would be determined at a later time. *Id.* at ¶ 16.

Prior to his release from prison sometime in 2005 or 2006, Plaintiff was transported to Jefferson County Court for a hearing which may have concerned his initial classification under SORA, although he cannot recall any specifics regarding the hearing, except that he did not stand before the court and state that he was "sexually violent, dangerous, or prone to recidivism" during the proceedings. *Id.* at ¶¶ 20-21. Plaintiff has no recollection of having been represented by counsel, and has alleged that while he requested an "appeal" to his legal arguments and defenses, none was provided by the court. *Id.* at ¶¶ 24-25.

**\*3**  In or about April 2006 when he was released from prison and placed on post-release supervision, an unknown Department of Corrections and Community Supervision employee gave Plaintiff a form to sign indicating that he was a sex offender and required to comply with SORA. *Id.* at ¶¶ 31-32. Plaintiff was subsequently arrested for the post-supervision release violation of living at other than an approved address and violating his sex offender counseling requirements by failing to write and provide a daily journal to the counselor. *Id.* at ¶ 33. Plaintiff was found guilty of the

Medina v. Cuomo, Not Reported in Fed. Supp. (2015)

2015 WL 13744627

sex offender treatment violation and returned to state prison for twenty-three months. *Id.* at ¶ 34.

Plaintiff was released to post-release supervision again in or about November 2008 and believes that sometime between December 2008 and July 2009, he was required to report to Jefferson County Court to be classified as a level 1, 2, or 3 sex offender. *Id.* at ¶ 37. Plaintiff was provided with counsel and following one or more hearings was classified as a level 3 sex offender by Judge Martusewicz. *Id.* at ¶ 40. According to Plaintiff, he again did not stand before the court and state he was "sexually violent, dangerous, or prone to recidivism." *Id.* at ¶ 41.

As a level 3 sex offender, Plaintiff is subject to a number of reporting requirements, including that he report to the local police at statutorily prescribed intervals and provide them with information that, among other things, includes his address. *Id.* at ¶ 44. According to Plaintiff, he had a residence in Jefferson County for two to four months in 2009 but then became homeless because he had no income of any kind for a period, was ineligible for state aid, was unable to reside in public housing, and was not allowed to stay with family members and associates who would not permit their addresses to appear on the SORA website for fear of discrimination, harm, and financial burdens. *Id.* at ¶ 47. Plaintiff claims to have been homeless since that time. *Id.* Plaintiff stays "temporarily wherever he can." *Id.* at ¶ 51.

Plaintiff reported to either the City of Watertown Police Department or Jefferson County Sheriff's Department in satisfaction of the level 3 reporting requirements for five years, and from approximately July 2009 until he reported in August of 2015, had been permitted to put "homeless" as his address. *Id.* at ¶ 48. According to Plaintiff's submission on his pending motion for a preliminary injunction, when he went to the Jefferson County Sheriff's Department to satisfy his ninety day registration and verification under SORA, Corr. Law § 168-f, on or about August 7, 2015, he was subjected to an hour long interview by the interrogating officer who indicated that he wanted to get to know the sex offenders he was required to question. (Dkt. No. 3 at ¶¶ 5-6.) The officer demanded that Plaintiff provide his address, and Plaintiff responded that he was homeless pursuant to New York State law and had been permitted to report as homeless by an officer no longer with the department since July of 2009. *Id.* at ¶ 9.

The interviewing officer made reference to family members of Plaintiff who lived in public housing as a possible address for Plaintiff, and Plaintiff informed him that he did not reside with his family members in a residence status, and advised him against including their address on the duty to register and verify form. *Id.* at ¶ 13. The officer, without Plaintiff's knowledge, nonetheless included what he believed to be the family members' address as Plaintiff's address on the registration and verification form he gave Plaintiff to sign. *Id.* at ¶¶ 19-22. Plaintiff would not have signed the form had he been aware of the address used by the officer because he knew that a false address could result in his being subjected to state and federal penalties. *Id.* at ¶ 24.

**\*4** There are no allegations in Plaintiff's complaint plausibly showing any involvement by Governor Cuomo or Senator Skelos, in their official or individual capacities, in the August 2015 ninety day registration and verification at the Jefferson County Sheriff's Department.

### B. Plaintiff's Claims

In his civil rights claim under 42 U.S.C. § 1983, Plaintiff alleges that Defendants have violated his rights under the First, Fourth, Fifth, Sixth, Eighth, Thirteenth, and Fourteenth Amendments to the United States Constitution. (*See generally* Dkt. No. 1.) In addition to his civil rights claims under 42 U.S.C. § 1983, Plaintiff has asserted civil rights claims under 42 U.S.C. §§ 1981, 1985, and 1986, along with a claim for attorney's fees under 42 U.S.C. § 1988. *Id.* at ¶¶ 315-325. Plaintiff also claims that Defendants have violated the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601-3619, by criminally interfering with his right to fair housing, and 18 U.S.C. §§ 1581, 1584, 1589, 1590, 1594, and 1595 by selling him into involuntary servitude, forced labor, and obstructing enforcement by returning him to a condition of peonage.[4] *Id.* at ¶¶ 326-27, 348-59, 362-63.

4    18 U.S.C. §§ 1581, 1584, 1589, 1590, 1594, and 1595 are criminal statutes, not statutes under which the Defendants could be found civilly liable to Plaintiff. Therefore, the Court finds those claims to be frivolous and recommends dismissal with prejudice on initial review under 28 U.S.C. § 1915(e)(2)(B)(i). The Court likewise finds Plaintiff's claim for criminal interference with the right to fair housing frivolous upon initial review inasmuch as it is the FHA, and not state law, that prohibits owners of federally assisted housing from admitting to such housing "any household that includes any individual who is subject to a lifetime

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 226 of 236
Medina v. Cuomo, Not Reported in Fed. Supp. (2015)
2015 WL 13744627

registration requirement under a State sex offender registration program." *See* 42 U.S.C. § 13663(a).

Plaintiff has also asserted a number of state law tort claims, most of which he has erroneously identified as being brought under 42 U.S.C. § 1983. Those claims include, false arrest, false or unlawful confinement and detention, misconduct of office, negligence and intentional negligence, intentional infliction of emotional distress, and larceny and fraud. *Id.* at ¶¶ at 328-342. In addition, Plaintiff claims that Defendants have violated his rights under NY Const. art. 1, § 8, which guarantees freedom of speech. *Id.* at ¶¶ 368-70.

### C. Relief Sought

Plaintiff seeks the following relief: (1) punitive damages of $60,000,000 jointly and severally against Defendants, or a minimum of $20,000 per day since Sept. 2004, or the date of the imposition of SORA on Plaintiff; (2) compensatory damages of $10,000,000 jointly and severally against Defendants; (3) costs of the suit commensurate with its importance to the nation; (4) a declaration that the acts and omissions described in the complaint have violated Plaintiff's rights under the United States Constitution; (5) a declaration that the acts and omissions described in complaint have violated Plaintiff's rights under the New York State Constitution; (6) such injunctive relief as is proper; (7) the court direct that all records related to Plaintiff's participation in and classification under SORA be expunged; (8) the court direct that all records and information not lawfully permitted to be released before SORA be expunged and Defendants be directed to enact a law requiring any such person to cease and desist; (9) Defendants be directed to contact all agencies, institutions, organizations and people that have used Plaintiff's images or photographs through SORA and require that they be deleted; (10) Defendants be directed to admit publicly that they have acted inconsistent with the Constitution; and (11) an award of legal fees. *Id.* at ¶¶ 373-386.

### IV. ANALYSIS

### A. SORA

#### 1. Classification Procedure

**\*5** SORA, Corr. Law §§ 168 *et seq.*, became effective on January 21, 1996. *Doe v. Pataki*, 120 F.3d 1263, 1266 (2d Cir. 1997). SORA requires sex offenders, defined to include individuals convicted of certain enumerated crimes,

to register with the New York State Division of Criminal Justice for a specified period of time. *Id.* The time period of required registration and level of community notification depends in part upon the risk level assigned to the offender. The risk levels are level 1 offenders with a low risk of re-offense; level 2 risk of repeat is moderate; and level 3 risk of repeat offense is high and there exists a threat to the public safety. Corr. Law § 168-1(6).

The sex offender must be notified that his case is under review no less than thirty days before the New York State Board of Examiners of Sex Offenders' ("Board") recommendation and is permitted to submit to the Board any information deemed relevant. Corr. Law § 168-n(3). The factors considered by the Board in determining risk level include such things as whether the offender has a mental abnormality or personality disorder, whether the offender's conduct was characterized by repetitive and compulsive behavior, associated with drugs or alcohol, the age of the offender and of the victim, the use of weapons, violence, the infliction of serious bodily injury, the number of prior offenses, response to treatment, and the victim impact statement. Corr. Law § 168-1(5).

While the Board makes a recommendation as to classification level, it is the sentencing court that determines the level of classification after a hearing held prior to the sex offender's release from incarceration. Corr. Law § 168-n(1). At least twenty days before the determination proceeding, the court is required to notify the sex offender and his counsel and the district attorney in writing of the date of the proceeding and also to provide them with a copy of the Board's recommendation and any statement of reasons for the recommendation. Corr. Law § 168-n(3). The sex offender is given notice of the right to a hearing prior to the court's determination, and the right to counsel, and to the appointment of counsel if he is financially unable to retain counsel. *Id.* The sex offender is allowed to appear and be heard in court, and the court is required to grant an adjournment for the offender or district attorney to obtain necessary materials. *Id.* The district attorney bears the burden of proving the facts supporting the determination by clear and convincing evidence. *Id.*

The court is required to render an order setting forth its determination and the findings of fact and conclusions of law on which the determination is based. *Id.* The sex offender is entitled to appeal from the determination. *Id.*

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 227 of 236
Medina v. Cuomo, Not Reported in Fed. Supp. (2015)
2015 WL 13744627

### 2. Level 3 Offender Requirements

A sex offender is given a level 3 classification when "risk of repeat offense is high and there exists a threat to the safety of the public." Corr. Law § 168-1(6)(c). An offender whose risk of re-offense is high is "deemed a sexually violent person." *Id.* As a level 3 sex offender, Plaintiff has a life-time registration requirement. Corr. Law § 168-h(2). A level 3 sex offender may be removed from the registry only if his conviction is overturned or he is pardoned. Corr. Law § 168-f(5).

Level 3 sex offenders are required to register and "shall personally appear at the law enforcement agency having jurisdiction within twenty days of the first anniversary of the sex offenders initial registration and every year thereafter during the period of registration for the purpose of providing a current photograph of such offender...." A level 3 sex offender "shall also personally verify his address every ninety days with the local law enforcement agency having jurisdiction where the offender resides." Corr. Law. § 168-h(3).

### B. Absolute Legislative Immunity – Senator Skelos

**\*6** Defendant Senator Skelos was SORA's sponsor in the New York State Senate. *See Doe v. Pataki*, 120 F.3d at 1277. There are no allegations in Plaintiff's complaint plausibly showing that Skelos had any official or personal involvement in matters related to Plaintiff's claims outside of the scope of his legislative actions in the enactment of SORA.

NY Const. art. III, § 11, echoing the Speech or Debate Clause of US Const. art. I, § 6, provides that "[f]or any speech or debate in either house of the legislature, the members shall not be questioned in any other place." The New York Court of Appeals has held that this clause confers immunity for any acts which are an integral part of the legislative process. *People v. Ohrenstein*, 77 N.Y.2d 38, 563 N.Y.S.2d 744, 752, 565 N.E.2d 493 (1990).

State legislators also have absolute federal common law immunity from civil liability for their legislative activities. *See Bogan v. Scott-Harris*, 523 U.S. 44, 46, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998) ("It is well established that federal, state, and regional legislators are entitled to absolute immunity from civil liability for their legislative activities."); *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 210 (2d Cir. 2003) ("Legislators are entitled to absolute immunity from civil liability for their legislative activities."). The immunity extends to claims for damages, declaratory, and injunctive relief. *See Tenney v. Brandhove*, 341 U.S. 367, 379, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).

Based upon the foregoing, the Court finds that Defendant Skelos has absolute legislative immunity from Plaintiff's claims and recommends that all of the federal claims asserted again him in this action be dismissed with prejudice under 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim. [5]

[5]      Inasmuch as Plaintiff has alleged no personal involvement by Senator Skelos in the violation of his constitutional rights, the Court's analysis herein of Governor Cuomo's individual liability applies equally to Senator Skelos.

### C. Official Capacity Claims for Money Damages Against Governor Cuomo

The Court has construed Plaintiff's civil rights claims against Defendant Cuomo under 42 U.S.C. § 1981, 1983, 1985, and 1986, and the claim under the FHA as having been brought against the Governor in both his official and individual capacities. With regard to Plaintiff's official capacity claims against Governor Cuomo, the Eleventh Amendment protects states against suits brought in federal court absent their consent or express waiver of sovereign immunity. [6] *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 92-100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state (*Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) ), and bars all money damages claims against state officials acting in their official capacities, including Governor Cuomo. [7] *Kentucky v. Graham*, 473 U.S. 159, 167-68, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003) ("The Eleventh Amendment bars the award of money damages against state officials in their official capacities.")

[6]      Courts have clearly rejected the premise that 42 U.S.C. §§ 1981, 1983, 1985, and 1986 act to abrogate state sovereign immunity. *See Quern v. Jordan*, 440 U.S. 332, 345, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (Congress did not abrogate state sovereign immunity in enacting 42 U.S.C. § 1983); *Fincher v. State of Florida Dep't of Labor, & Employment Sec.*, 798 F.2d 1371, 1371 (11th Cir.

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 228 of 236

Medina v. Cuomo, Not Reported in Fed. Supp. (2015)

2015 WL 13744627

1986) (same as to § 1985); *Coger v. Connecticut*, 309 F.Supp.2d 274, 281 (D. Conn. 2004) (same as to § 1981); *Seibert v. Oklahoma*, 867 F.2d 591, 594 (10th Cir. 1989) (same as to § 1986), *abrogated on other grounds by Federal Lands Legal Consort, ex rel. Robart Estate v. United States* 195 F.3d 1190 (10th Cir. 1999). Courts have also rejected the contention that the FHA abrogates sovereign immunity. *See Super v. D'Amelia & Assoc.*, No. 3:09cv831 (SRU), 2010 WL 3926887, at *6, 2010 U.S. Dist. LEXIS 103544, at *41 (D. Conn. Sept. 30, 2010) (no congressional abrogation of sovereign immunity in the FHA); *Gregory v. S.C. DOT*, 289 F.Supp.2d 721, 924-25 (D.S.C. 2003) (same).

7    The Eleventh Amendment would also bar official capacity claims against Senator Skelos were the Court not recommending dismissal of the complaint against him on absolute judicial immunity grounds.

**\*7** The Court finds that Plaintiff's official capacity claims for money damages under 42 U.S.C. §§ 1981, 1983, 1985, and 1986, and the FHA are barred by the Eleventh Amendment and recommends dismissal of those claims with prejudice for lack of subject matter jurisdiction. [8]

8    A finding that a defendants is entitled to sovereign immunity means the court lacks subject matter jurisdiction. *See McGinty v. New York*, 251 F.3d 84, 101 (2d Cir. 2001).

### D. Official Capacity Claims Against Governor Cuomo for Injunctive and Declaratory Relief

Plaintiff seeks a declaratory judgment that Governor Cuomo has violated his rights under the United States and New York State Constitutions. (Dkt. No. 1 at ¶¶ 378-79.) Plaintiff asks for such injunctive relief as is proper. *Id.* at ¶ 381. More specifically, Plaintiff seeks relief in the form of a mandatory injunction directing Governor Cuomo to expunge all of the records relating to Plaintiff's participation in SORA; directing that all records and information that could not have been lawfully released prior to SORA be expunged and that Defendants be directed to enact a law directing that those releasing the records cease and desist; directing Governor Cuomo to contact all agencies that have used Plaintiff's images through SORA and ordering that they be deleted; and directing the Governor to admit publically that

his actions have been inconsistent with the Constitution. *Id.* at ¶¶ 382-385.

Under *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), a person may sue a state for prospective injunctive and declaratory relief. *See Mary Jo C. v. New York State and Local Retirement System*, 707 F.3d 144, 166 (2d Cir. 2013) ("Under the well-known exception to the Eleventh Amendment's grant of sovereign immunity from suit first set forth in *Ex parte Young*, a plaintiff may sue a state official acting in his official capacity notwithstanding the Eleventh Amendment for prospective, injunctive relief from violations of federal law.") (citations and internal quotation marks and punctuation omitted). As with injunctive relief, declaratory relief dealing solely with past violations, where there is no present violation, is also barred under the Eleventh Amendment. *See Green v. Mansour*, 474 U.S. 64, 73, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985). Plaintiff's claims for injunctive and declaratory relief can be liberally construed as seeking both retrospective and prospective relief, and to the extent they seek prospective relief they would not be barred under the Eleventh Amendment.

### E. Section 1983 Claims Against Governor Cuomo in his Individual Capacity

Plaintiff's allegations that his rights under the First, Fourth, Sixth, Eighth, Thirteenth, and Fourteenth Amendments to the Constitution have been violated fall under his 42 U.S.C. § 1983 claim. It is well-settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *see also Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir. 1973) ("The rule in this circuit is that when monetary damages are sought under § 1983, the general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendants is required."). The Plaintiff's complaint is devoid of specific allegations of personal involvement by Governor Cuomo in the alleged violation of his constitutional rights, and the Court therefore recommends dismissal of the complaint against the Governor in his individual capacity.

### F. Plaintiff's Individual Claims Against Governor Cuomo Under 42 U.S.C. §§ 1981, 1985, and 1986

Medina v. Cuomo, Not Reported in Fed. Supp. (2015)

2015 WL 13744627

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 229 of 236

**\*8** Plaintiff has asserted claims against Cuomo under 42 U.S.C. §§ 1981, 1985, and 1986 in addition to his § 1983 claim.

Section 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...." 42 U.S.C. § 1981(a). To establish a claim under § 1981, a plaintiff must show that (1) he is a member of a protected class; (2) defendant intended to discriminate against plaintiff based upon his membership in the protected class; and (3) the discrimination concerned one or more of the activities enumerated in § 1981. *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000). Plaintiff has failed to allege facts in his complaint plausibly showing that his rights have been violated under § 1981.

Furthermore, in order to make out a claim for individual liability under § 1981, "a plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action.... [P]ersonal liability under section 1981 must be predicated on the actor's personal involvement." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000). Plaintiff's complaint is devoid of allegations showing personal involvement by Cuomo in the alleged § 1981 violation.

The elements of a claim under 42 U.S.C. § 1985(3) are "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, ... (3) an act in furtherance of a conspiracy; (4) whereby a person is ... deprived of any right of a citizen of the United States." *Brown*, 221 F.3d at 341 (citation and internal quotation marks omitted). The "conspiracy must also be motivated by some racial or perhaps otherwise class based animus behind the conspirators' action." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993) (per curiam) (citation and internal quotation marks omitted). The law is clear that conclusory, vague, or general allegations of conspiracy are not enough to sustain a claim under § 1985. *See Leon v. Murphy*, 988 F.2d 303, 311 (2d Cir. 1993).

Plaintiff's complaint is devoid of allegations plausibly showing the existence of a conspiracy under § 1985. Moreover, Plaintiff's failure to show personal involvement by Governor Cuomo in any conspiracy under § 1985 is fatal to his claim. *See Keitt v. Hawk*, No. 9:13-cv-850 (GLS/ATB), 2015 WL 1246058, at \*19, 2015 U.S. Dist. LEXIS 34240, at \*55 (N.D.N.Y. Jan. 8, 2015) (lack of personal involvement is fatal to a claim under 42 U.S.C. § 1985).

42 U.S.C. § 1986 provides that persons with "knowledge of any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured ... for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented...." Absent a violation of § 1985, there can be no violation of § 1986. *Brown*, 221 F.3d at 341.

**\*9** Based upon the foregoing, the Court recommends that Plaintiff's claims against Governor Cuomo under 42 U.S.C. §§ 1981, 1985, and 1986 be dismissed upon initial review for failure to state a claim. [9]

[9]    As noted above, Senator Skelos would also be entitled to dismissal of any federal claims asserted against him in his individual capacity based upon lack of personal involvement.

**G. First Amendment**

Although far from clear, the gist of Plaintiff's claim that SORA violates his rights under the First Amendment appears to be that SORA violates the prohibition on compelled speech and constitutes a violation of his right to privacy.

1. Compelled Speech

According to Plaintiff, SORA deprives him of his rights to freedom of speech, expression, association, and religion through the duty to register and verify because it compels him to appear and speak with law enforcement officials and provide them with certain information and pictures, and impermissibly "compel[s]" his "content, messages, ideas, and subject matter." [10] (Dkt. No. 1 at ¶¶ at 64-71.)

[10]    In Paragraph 84 of his complaint, Plaintiff alleges that SORA impermissibly allows Defendants:
    to compel him by coercion, threat of force, and actual force, to comply every day, every 10 days, every 90 days, and yearly, and for life, whether by personally reporting form or by

Medina v. Cuomo, Not Reported in Fed. Supp. (2015)

2015 WL 13744627

mailed verification form at "particular places and times" requiring the plaintiff to say the following and is forced to tell them through written, oral, and photographic testimonial admissions that "I live at said address, I live with my family or associations at said address, I work at said address and for said employer, I am homeless, I attend said school at said address, I use the internet at such time and such places with said names and said identifiers, I have changed my appearance, my beard, my hair, my eye color ... and that the plaintiff cannot say to them, I want to stop reporting to you as I don't even know you, as I have no contact with you and I don't want to have any contact with you, but I can't because you have the power to do so without my permission, and to be able to say enough is enough, but I cannot because you deny me my right to use my Freedom of Speech, Freedom of Expression, of the Press, of Association, and of religion ... and that defendants will put me in jail and take away my life, liberty, happiness and property if I want to say to defendants that I will no longer tell you where I live....

The relevant Supreme Court precedent on compelled speech is *Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) and *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). *Barnette* involved a First Amendment challenge to a state statute that required public school students to participate in daily ceremonies honoring the flag. The Supreme Court framed the issue before it as whether "a ceremony so touching matters of opinion and political attitude may be imposed upon the individual by official authority under powers committed to any political organization under our Constitution," and concluded it could not. In doing so, the Court noted with regard to the First Amendment prohibition on compelling such speech that "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by work or act their faith therein." *Barnette*, 319 U.S. at 642, 63 S.Ct. 1178.

**\*10** *Maynard* involved a New Hampshire law requiring all noncommercial vehicles to bear a license plate with the state motto "Live Free or Die." The plaintiff in *Maynard* challenged the requirement under the First Amendment on the grounds that it conflicted with his faith and coerced him

into "advertising a slogan which [he found] morally, ethically, religiously and politically abhorrent." *Maynard*, 430 U.S. at 713, 97 S.Ct. 1428. The Supreme Court acknowledged the protection of the right to remain silent under the First Amendment found in *Barnette*, and suggested that a state could violate that protection: (1) by forcing an individual through speech to affirm a religious, political, or ideological cause that the individual did not believe in; or (2) by forcing an individual as a part of his daily life to be an instrument for fostering public adherence to an ideological point of view in which he did not believe. *Id.* at 715, 97 S.Ct. 1428.

In *United States v. Arnold*, 740 F.3d 1032 (5th Cir. 2014), the Fifth Circuit rejected the plaintiff's claim that the registration requirements of the Sex Offender Registration and Notification Act "(SORNA)", 42 U.S.C. § 16913, requiring the sex offender to register and keep the registration current in each jurisdiction where he resided, worked, or went to school, violated his First Amendment right against compelled speech. The court explained that the plaintiff had not urged that SORNA required him to "(a) affirm a religious, political, or ideological belief he disagree[d] with or (b) to be a moving billboard for a governmental ideological message." *Id.* at 1035.

The circuit court in *Arnold* found support for its rejection of the First Amendment claim in the decision in *United States v. Sindel*, 53 F.3d 874 (8th Cir. 1995), in which the court rejected a claim that compelled disclosure of information on an IRS form was unlawful compelled speech. The court in *Sindel* had found that "[t]here is no right to refrain from speaking when essential operations of government require it for the preservation of an orderly society as in the case of compulsion to give evidence in court." *Id.* at 878 (citation and internal quotation marks omitted). The court in *Arnold* concluded that "[t]he logic of *Sindel* extend[ed] to the present case," explaining that "when the government, to protect the public, requires sex offenders to register their residence, it conducts an essential operation of the government, just as when it requires individuals to disclose information for tax collection." (internal quotation marks and punctuation omitted). *Id.* at 1035.

The Court finds the reasoning applied in *Arnold* applicable to Plaintiff's First Amendment compelled speech claim and, as in *Arnold*, concludes that Plaintiff has failed to state a First Amendment claim for compelled speech.

2015 WL 13744627

### 2. Right to Privacy

To the extent Plaintiff's complaint can be construed to allege a violation of privacy claim under the First Amendment, the Court notes that the Second Circuit concluded in *Doe v. Cuomo*, 755 F.3d 105, 114 (2d Cir. 2014), that the plaintiff's claim that the SORA registration and notification requirements violated any constitutional right to privacy was unsupported "[g]iven the combination of the nature of the information released (consisting in large part of matters of public record) and the State's strong interest in releasing it." The court also recognized that there was no question that SORA's requirements "are rationally related to the aim of protecting the public." *Id. See also Cutshall v. Sundquist*, 193 F.3d 466, 481 (6th Cir. 1999) ("the Constitution does not provide [plaintiff] with a right to keep his registry information [he was required to provide under the Tennessee Sex Offender Registration and Monitoring Act] private.").

Based upon the foregoing, the Court finds that Plaintiff has failed to state a claim under the First Amendment and recommends dismissal on initial review.

### H. Fourth Amendment

**\*11** Plaintiff has asserted a Fourth Amendment claim in his complaint. (Dkt. No. 1 at ¶¶ 95, 297-99.) In *Doe v. Cuomo*, the Second Circuit rejected the plaintiff's argument that the registration requirements under SORA violated his Fourth Amendment right to be free from unreasonable searches and seizures. The Court wrote:

> ... Doe argues that the registration requirements violate his Fourth Amendment right to be free from unreasonable searches and seizures. Even if we assume for argument that SORA's requirements subject Doe to a search or seizure for Fourth Amendment purposes, we cannot agree that any such search or seizure is unreasonable. Here, any searches or seizures required by SORA serve special needs such as the protection of potential future victims and the solving of crimes in the future and purport neither to facilitate the investigation of any specific crime nor primarily to serve a general interest in crime control. Moreover, the degree of intrusion on convicted sex offenders is reasonable in relation to the interests advanced by SORA. (citation omitted). We therefore conclude that SORA, as amended and as applied to Doe, does not run afoul of the Fourth Amendment. (citations and internal quotation marks omitted).

*Doe v. Cuomo*, 755 F.3d at 115.

Although the plaintiff in *Doe v. Cuomo* was a level 1 sex offender, the Court finds the Second Circuit's rationale in rejecting the plaintiff's Fourth Amendment claim equally applicable to the Fourth Amendment claim of Plaintiff, a level 3 sex offender, and recommends dismissal of the claim on initial review.

### I. Fifth Amendment

Plaintiff appears to allege that his Fifth Amendment rights are violated because the registration and reporting requirements under SORA compel him to be a witness against himself and to incriminate himself. (Dkt. No. 1 at ¶ 95.) The Fifth Amendment prohibits the government from compelling an individual "in any criminal case to be witness against himself." US Const. amend. V. The provision extends to any proceeding in which the answers might incriminate an individual in a future criminal proceeding. *Allen v. Illinois*, 478 U.S. 364, 368, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986).

In *United States v. Simon-Marcos*, 363 F. App'x 726 (11th Cir. 2010), one of the few decisions involving a Fifth Amendment claim similar to that asserted by Plaintiff, the court concluded that none of the information the plaintiff was required to provide under Georgia's sex offender registration statute would "have confronted him with a substantial hazard of self-incrimination" for Fifth Amendment purposes. *Id. at 728*. The information included the plaintiff's name; social security number; age; race; sex; date of birth; height; weight; hair color; eye color; fingerprints; photograph; place of residence; place of employment; vehicle make, model, color and licence plate tag number; e-mail address, username and user passwords; the crime which required registration; and the date released from prison. *Id.*; O.C.G.A. § 42-1-12(a)

2015 WL 13744627

(16)(A)-(L). The information required under SORA, §§ 168-b and 168-f(4) is similar to that under the Georgia statute and includes the sex offender's name and aliases used; date of birth; sex; race; height; weight; eye color; driver's license number; home address or expected place of domicile; internet accounts with internet access providers and the internet identities used by the offender; a photograph, which must be regularly updated and fingerprints; description of the offense for which the offender was convicted and sentence imposed; status of enrollment at an institution of higher education; and employment.

**\*12**  The Court finds, as did the Eleventh Circuit in *Simon-Marcos*, that none of the information required under SORA is of the kind that would incriminate Plaintiff in a future criminal proceeding and recommends dismissal of Plaintiff's Fifth Amendment claim on initial review.

#### J. Sixth Amendment

Plaintiff has alleged that SORA violates his rights under the Sixth Amendment. (Dkt. No. 1 at ¶¶ 95, 303-05.) The Sixth Amendment provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

US Const. amend. VI.

According to Plaintiff, he was

> [d]enied the due process and designation of a criminal case of the 6th Amendment requiring the plaintiff to be "informed of the nature and cause of the accusation" whereas the defendants claim the crime is merely a penalty

rather than a crime as they are, a trial through an "impartial jury" and that there is no impartiality possible when the defendants have "fraudulently persuaded the jury" the NYS DOC SORA is lawful, denied "to be confronted with the witnesses against him", as the defendants require the plaintiff to be a "witness against himself and to incriminate himself", and to be the person who provides the factual part of a criminal complaint, and to have "the Assistance of Counsel for his defense", when the defendants utilize fear, ostracization, and other political pressure to restrain the plaintiff's defense attorney from challenging the law....

(Dkt. No. 1 at ¶ 95.)

SORA provides for written notice to a sex offender of both the Board determination proceeding and of the right to a hearing before the sentencing court determining the level of classification. Corr. Law § 168-n(3). Therefore, the Court finds Plaintiff's claim that he was not informed of the nature and cause of the accusation against him to be frivolous.

Sex offenders facing a risk classification have been found to have a right to the effective assistance of counsel under both state and federal standards. *See People v. Bowles*, 89 A.D.3d 171, 932 N.Y.S.2d 112, 118 (2d Dep't 2011). SORA acknowledges a sex offender's right to counsel and to the appointment of counsel in the event the offender is financially unable to retain counsel. Corr. Law § 168-n(3). Plaintiff concedes that he was afforded a hearing with representation by counsel when he was classified by the County Court as a level 3 sex offender under SORA. *Id.* at 40.

Therefore, the Court recommends that Plaintiff's Sixth Amendment challenge to SORA be dismissed upon initial review.

#### K. Eighth Amendment

Plaintiff claims that SORA violates his Eighth Amendment right to be free from cruel and unusual punishment. (Dkt. No. 1 at ¶¶ 95, 262, 306-08.) Plaintiff complains of the social isolation and discrimination resulting from being perceived as a threat or danger because of his sex offender classification, difficulty in obtaining employment, inability to receive public housing allowances, and fear of his family members' safety if he visits or resides with them. *Id.* at ¶ 262.

**\*13**  The Second Circuit has concluded that SORA is regulatory in nature and not punitive. *See Doe v. Pataki*, 120 F.3d at 1284. Therefore, SORA does not violate the Eighth

Medina v. Cuomo, Not Reported in Fed. Supp. (2015)

2015 WL 13744627

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 233 of 236

Amendment's prohibition on cruel and unusual punishment, and the Court recommends that Plaintiff's Eighth Amendment claim be dismissed. *See Maldonado v. Fischer*, No. 11-CV-1091 Sr., 2012 WL 4461647, at * 3, 2012 U.S. Dist. LEXIS 137634, at *9 (W.D.N.Y. Sept. 24, 2012) (recognizing Second Circuit's determination that SORA's registration and community notification provisions were not "punishments" within the meaning of the Ex Post Facto Clause and concluding that accordingly, his allegations of cruel and unusual punishment under SORA failed to state a claim); *see also Cain v. Michigan*, No. 14-12567, 2015 WL 249296, at * 7, 2015 U.S. Dist. LEXIS 5959, at *18 (E.D. Mich. Jan. 20, 2015) (because the Michigan sex offender registration act was found to be regulatory rather than punitive, plaintiff failed to state a claim for cruel and unusual punishment under the Eighth Amendment).

## L. Thirteenth Amendment

Plaintiff claims that SORA constitutes "state sanctioned slavery" in violation of the Thirteenth Amendment. (Dkt. No. 1 at ¶ 175.) Section 1 of the Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude, except as punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." US Const. amend. XIII, § 2 provides that "Congress shall have the power to enforce this article by appropriate legislation." The Court finds Plaintiff's Thirteenth Amendment claim to be frivolous and recommends dismissal.

## M. Fourteenth Amendment Procedural Due Process [11]

[11]    To the extent Plaintiff is challenging the level classification proceedings held before Judge Martusewicz, his procedural due process claim may be barred under the *Rooker-Feldman* doctrine. However, the Court does not have sufficient information before it to make that determination on initial review.

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). When protected liberty or property interests are implicated, "the right to some kind of hearing is paramount." *Id.* at 569-70, 92 S.Ct. 2701.

Although the issue of whether requiring an individual to register as a sex offender implicates a liberty interest does not appear to have been conclusively decided in this Circuit, there are district court decisions that have found that a stigma plus liberty interest is implicated when an individual is required to register under SORA, since the stigma attached may affect the registered person in other areas such as employment. *See Woe v. Spitzer*, 571 F.Supp.2d 382, 387 (E.D.N.Y. 2008) (holding that SORA implicates a liberty interest) (citing *Doe v. Pataki*, 3 F.Supp.2d 456 (S.D.N.Y. 1998) ). Therefore, solely for purposes of this initial review, the Court will assume that Plaintiff possesses a cognizable stigma plus liberty interest.

Plaintiff's procedural due process claim nonetheless lacks merit. Once a liberty interest has been established, a plaintiff must show deprivation of that right without sufficient process. *Woe*, 571 F.Supp.2d at 387. When a person's liberty interests are implicated, due process requires at a minimum notice and an opportunity to be heard. *Hamdi v. Rumsfeld*, 542 U.S. 507, 533, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (plurality opinion). The right to a hearing to determine risk level, prior notice of the hearing, the right to appeal any determination, the right to an attorney during the proceedings and the right to discovery of evidence were established as a result of a litigation agreement between New York State and a class of sex offenders. *See Doe v. Pataki*, 481 F.3d 69, 77-79 (2d Cir. 2007) (finding that all the procedural safeguards suggested by the district court were implemented in the settlement and subsequent amendment to SORA and finding the settlement to be binding and valid); *United States v. Kimble*, 905 F.Supp.2d 465, 475 (W.D.N.Y. 2012) (finding that the settlement put in procedural safeguards of notice and opportunity to be heard to bring SORA in compliance with due process demands); *Woe,* 571 F.Supp.2d at 389 (holding that SORA post-settlement did not violate procedural due process).

 **\*14**  It seems clear that the SORA procedures for notice and an opportunity to be heard, assignment of counsel, and the right to appeal, Corr. Law § 168-n(3), which were afforded Plaintiff satisfied the Fourteenth Amendment's procedural due process requirements, and that his due process claim lacks merit. [12] (See Dkt. No. 1 at ¶¶ 37-43.) Therefore, the Court recommends that Plaintiff's Fourteenth Amendment procedural due process claim be dismissed upon initial review.

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 234 of 236
Medina v. Cuomo, Not Reported in Fed. Supp. (2015)
2015 WL 13744627

12     Plaintiff has alleged in his complaint that he requested an appeal, but that his attorney failed to file an appeal claiming that the Plaintiff had no chance. (Dkt. No. 1 at ¶¶ 42-43.) The fact that Plaintiff alleges that his lawyer failed to file an appeal is insufficient to state a procedural due process claim since an appeal was available to him under SORA. *See Hefferan v. Corda*, 498 F. App'x 86, 88 (2d Cir. 2012) (finding that "a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies") (citation and internal quotation marks omitted); *Chase Grp. Alliance LLC v. City of N.Y. Dep't of Fin.*, 620 F.3d 146, 152-53 (2d Cir. 2010) ("The fact that a state proceeding is required by due process does not mean that Section 1983 provides a remedy for every error committed in the state proceeding. So long as state appellate remedies are available, a Section 1983 action is not an available vehicle for relief.")

### N. Fourteenth Amendment Substantive Due Process
Inasmuch as Plaintiff makes reference to substantive rights throughout his complaint, the Court has liberally construed it to allege a substantive due process claim regarding his sex offender classification. Substantive due process protects individuals against governmental action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense. *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994). "It is not enough that the government act be 'incorrect or ill-advised'; it must be conscience-shocking." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011) (citation omitted). "Only the most egregious official conduct can be said to be arbitrary in the constitutional sense and therefore unconstitutional." *Id.* at 275. To satisfy this standard a plaintiff must show that the government decision it challenges "was arbitrary or irrational or motivated by bad faith." *Rosa R. v. Connelly*, 889 F.2d 435, 439 (2d Cir. 1989).

In *Doe v. Pataki*, 120 F.3d at 1266, the Second Circuit noted that "[t]he legislature articulated two goals served by the SORA: (1) protecting members of the community, particularly their children by notifying them of the presence of individuals in their midst who may present a danger, and (2) enhancing law enforcement authorities' ability to investigate and prosecute future sex crimes." Thus the motivation for the enactment of SORA was not arbitrary, irrational, or motivated by bad faith, but rather to protect New York State's vulnerable population and aid law enforcement by facilitating the monitoring of the whereabouts of sex offenders. Therefore, Plaintiff's substantive due process argument is without merit, and the Court recommends dismissal upon initial review.

### O. Equal Protection
It is not entirely clear from his complaint whether Plaintiff is claiming that SORA violates his equal protection rights. However, because of his pro se status, the Court has liberally construed his complaint to assert an equal protection claim. The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law and guarantees that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In order to prove an equal protection violation, plaintiff must demonstrate that "[he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (citations omitted).

**\*15** Convicted sex offenders have not been found to be a "suspect class" for equal protection purposes, and SORA is therefore subject to scrutiny under the rational basis test. 13 *See Cutshall*, 193 F.3d at 482 (convicted sex offenders are not a suspect class). "Unless the legislation classification under attack involves a suspect class, the classification need only be rationally related to a legitimate government goal to survive constitutional challenge." *Id.* (citing *Chapman v. United States*, 500 U.S. 453, 465, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) ). "[L]egislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249. Given the legislative purpose of SORA protecting vulnerable children and aiding law enforcement the Court cannot say that SORA is irrational and recommends that Plaintiff's equal protection claim be dismissed upon initial review. *See Cutshall*, 193 F.3d at 482 (dismissing claim that sex offender registration act violated plaintiff's equal protection rights); *Does v. Munoz*, 507 F.3d 961, 966 (6th Cir. 2007) (same).

13     Presumably those similarly situated to those subject to the requirements of SORA are criminal offenders who are not subject to the registration requirements of SORA.

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 235 of 236

Medina v. Cuomo, Not Reported in Fed. Supp. (2015)

2015 WL 13744627

**P. Conclusion as to Plaintiff's Federal Claims**

For the reasons explained above, the Court recommends that all of federal claims against Governor Cuomo and Senator Skelos, in both their official and individual capacities, be dismissed. While the Court is keenly aware that a *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated," *Gomez, 171 F.3d at 795,* it finds that the problems with Plaintiff's federal claims under against the Defendants are substantive and cannot be cured by a better pleading. Therefore, the Court recommends that the dismissal of the complaint against Governor Cuomo and Senator Skelos be with prejudice.

The Court is cognizant of the fact that Plaintiff has included allegations in his complaint and in his request for a preliminary injunction that an officer of the Jefferson County Sheriff's Department who met with Plaintiff in August of 2005 was unwilling to list Plaintiff's address as "homeless" on the registration and verification form signed by Plaintiff. (Dkt. No. 3 at ¶¶ 13, 19-22.) Instead, the officer inserted an old public housing address for Plaintiff's family against Plaintiff's wishes, placing Plaintiff at risk of state and federal charges for providing an incorrect address. *Id.* at ¶ 19-22, 24. Neither Governor Cuomo nor Senator Skelos has been implicated in the August 2015 registration matter by the allegations in the complaint, and the Court has, therefore, not considered whether Plaintiff can state a federal claim with regard to the address issue. The Court therefore recommends that the District Court allow Plaintiff to amend his complaint to assert any federal claims he may have against properly named defendants with regard to the Jefferson County Sheriff's Department registration matter, and to direct that in the event Plaintiff does file an amended complaint against the proper parties that it be referred to this Court for initial review under 28 U.S.C. § 1915(e)(2)(B).

**Q. Plaintiff's State Law Claims**

Plaintiff has asserted numerous state law tort claims and a New York State Constitution claim against Governor Cuomo and Senator Skelos. In light of the recommendation that all of Plaintiff's federal claims against Governor Cuomo and Senator Skelos be dismissed with prejudice, the Court also recommends that the District Court decline to exercise supplemental jurisdiction over Plaintiff's state law and state constitutional claims against those Defendants, without prejudice subject to refiling in state court and to

reconsideration in the event the District Court does not accept this Court's recommendation for dismissal of Plaintiff's federal claims with prejudice. *See Kolari v. New York Presbyterian Hosp.,* 455 F.3d 118, 120 (2d Cir. 2006).

**\*16** **ACCORDINGLY,** it is hereby

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 2) is granted; and it is hereby

**RECOMMENDED** that Plaintiff's complaint (Dkt. No. 1) be dismissed in its entirety upon initial review pursuant to 18 U.S.C. § 1915(e)(2)(B); and it is further

**RECOMMENDED** that all of Plaintiff's federal claims against Defendants Cuomo and Skelos be dismissed with prejudice. Those federal claims include Plaintiff's claims under:

1. 42 U.S.C. § 1983 violation of Plaintiff's rights under the First, Fourth, Sixth, Eighth, Thirteenth, and Fourteenth Amendments to the United States Constitution;

2. 42 U.S.C. § 1981;

3. 42 U.S.C. § 1985;

4. 42 U.S.C. § 1986;

5. 42 U.S.C. § 1988;

6. 18 U.S.C. §§ 1581, 1584, 1589, 1590, 1594, 1595, 2201; and

7. Criminal Interference with Right to Fair Housing under the FHA, 42 U.S.C. § 3601, *et seq.*; and it is further

**RECOMMENDED** that the District Court decline to exercise supplemental jurisdiction over Plaintiff's state law and state constitutional claims against Defendants Cuomo and Skelos (Causes of Action 15-23, 34), without prejudice, subject to refiling in state court and to reconsideration in the event the District Court does not accept this Court's recommendation for dismissal of Plaintiff's federal claims with prejudice; and it is further

**RECOMMENDED** that Plaintiff be granted leave to amend his complaint to assert any federal claims he may have against the proper defendants with regard to the issue concerning the failure to allow him to use the address "homeless" when he did his ninety day registration and verification under SORA

Case 9:23-cv-01114-DNH-MJK    Document 31    Filed 04/22/24    Page 236 of 236

**Medina v. Cuomo, Not Reported in Fed. Supp. (2015)**

2015 WL 13744627

in or about August 2015, and the inclusion against his wishes of an incorrect address on the registration signed by him, and direct that in the event Plaintiff does file an amended complaint that it be referred to this Court for initial review under 28 U.S.C. § 1915(e)(2)(B); and it is hereby

**ORDERED** that the Clerk provide Plaintiff with copies of all unpublished decisions cited herein in accordance with *LeBron v. Sanders*, 557 F.3d 76, 79 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam) ); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

**All Citations**

Not Reported in Fed. Supp., 2015 WL 13744627

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.